## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No._____ |
| v. | ) | |
| | ) | |
| HANOVER FOODS CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

## NATURE OF THE CASE

1.     The Lower Susquehanna Riverkeeper Association ("Plaintiff" or "Citizens"), by and through their counsel, the Environmental Integrity Project ("EIP"), file this Complaint against Hanover Foods Corporation ("Hanover Foods" or "Defendant") for significant and ongoing violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq*. (CWA), and Pennsylvania's Clean Streams Law, the Act of June 22, 1937, P.L. 1987, *as amended*, 35 Pa. Cons. Stat. § 691.1 *et seq*. (CSL), at Defendant's food processing facility (the "Facility"), located at 1550 York Street, Hanover, Pennsylvania 17331-0334, in Penn Township, York County.

2.     Industrial wastewater generated from the Facility is partially treated at an on-site industrial wastewater treatment plant ("WWTP"). The WWTP

discharges partially treated wastewater to Penn Township's municipal wastewater treatment plant, which then discharges the wastewater to Oil Creek. The WWTP also discharges wastewater directly to Oil Creek from Outfall 001.

3.      Oil Creek—with a watershed of approximately 16.8 square miles—is a small tributary to Codorus Creek.[1] Pollution from Oil Creek flows downstream directly into the Codorus Creek, which flows into the Lower Susquehanna River.

4.      Defendant owns and operates the Facility, including the WWTP.

5.      On June 29, 2021, Plaintiff sent a Notice of Intent to Sue letter to Defendant and other recipients as required by section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and section 601(e) of the CSL, 35 P.S. § 691.601. Exhibit 1, Lower Susquehanna Riverkeeper Association, Notice of Intent to Sue Hanover Foods Corporation for Violations of the Clean Water Act and Pennsylvania's Clean Streams Law at the Hanover Foods facility in York County, Pennsylvania (Jun. 29, 2021) ("NOI").

6.      The CWA prohibits any person from discharging any pollutant into waters of the United States from a point source without compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a),

---

[1] York County Planning Commission, *York County Environmental Resources Inventory* (Feb. 2018), 52-53 available at https://www.ycpc.org/DocumentCenter/View/285/Environmental-Resources-Inventory-PDF.

1342. Pennsylvania's CSL similarly prohibits the discharge of industrial waste or pollution into waters of the Commonwealth by any person. 35 P. S. §§ 691.1, 691.301, 691.307, 691.401.

7.    The Pennsylvania Department of Environmental Protection ("DEP") is authorized to administer the CWA's NPDES permitting program for the Commonwealth of Pennsylvania. *See* 33 U.S.C. § 1342; *see, e.g.,* 67 Fed. Reg. 55,841, 55,842 (Aug. 30, 2002) (stating that the Environmental Protection Agency ("EPA") delegated to DEP authority to issue NPDES permits on June 30, 1978). DEP issues NPDES permits pursuant to its authority under the CWA and the CSL. *See, e.g.*, 25 Pa. Code § 963.1 (defining a "Part I Permit" as an NPDES permit "issued by the Department under section 5 of The Clean Streams Law (35 P. S. § 691.5) and section 402 of the Clean Water Act (33 U.S.C.A. § 1342).").

8.    On September 22, 2015, DEP issued Defendant a renewal of NPDES Permit No. PA0044741, which became effective on October 1, 2015. Exhibit 1, NOI, Attachment D, Authorization to Discharge Under the National Pollutant Discharge Elimination System, Discharge Requirements for Industrial Wastewater Facilities, NPDES Permit No. PA0044741 (Sept. 22, 2015) (issued to Hanover Foods Corp, effective Oct. 1, 2015) (the "2015 NPDES Permit"). Although the 2015 NPDES Permit expired on September 30, 2020, it was administratively continued by DEP and remains in effect.

3

9.      The 2015 NPDES Permit authorizes Defendant to discharge specific pollutants from the Facility from several permitted outfalls, with specific limits on several parameters. The 2015 NPDES Permit also imposes monitoring and reporting requirements pertaining to the discharge and requires proper operation and maintenance of the WWTP. The 2015 NPDES Permit prohibits the discharge of any substances that result in observed deposits in the receiving water or that produce an observed change in the color or turbidity of the receiving water.

10.     Defendant has discharged, and continues to discharge, through Outfall 001, industrial wastewater containing pollutants at levels that exceed effluent limitations into Oil Creek, a tributary to Codorus Creek, which flows into the Susquehanna River.

11.     Defendant has discharged and, upon information and belief, continues to discharge, substances that result in observed deposits in Oil Creek and substances that produce an observed change in the color and turbidity of Oil Creek.

12.     The 2015 NPDES Permit and all conditions contained therein are each "a permit or condition of a permit issued under [33 U.S.C. § 1342]," and as such are each an "effluent standard or limitation" as defined by section 505(f)(7) of the CWA. 33 U.S.C. § 1365(f)(7).

13.     Defendant's discharges of pollutants through Outfall 001 to Oil Creek in excess of the 2015 NPDES Permit effluent limits and failures to comply with

4

other permit limits and conditions violate the 2015 NPDES Permit and also

constitute violations of the CWA and the CSL.

14.    The Penn Township Wastewater Treatment Plant ("Penn Township

WWTP") administers a pretreatment program, approved by the regional

administrator of the EPA in accordance with 40 C.F.R. § 403.11. According to its

pretreatment program, Penn Township WWTP sets pretreatment standards and

issues pretreatment permits to industrial facilities that discharge to it.

15.    Defendant holds a pretreatment permit issued by the Penn Township

WWTP, effective January 1, 2021, authorizing effluent discharge from the Facility

to the Penn Township WWTP according to its terms. Exhibit 1, NOI, Attachment

L, Penn Township Wastewater Treatment Plant Industrial Wastewater Discharge

Permit, Permit No. 2021-4 (the "2021 Pretreatment Permit").

16.    Previously, Defendant held a permit issued by Penn Township

WWTP, effective January 1, 2016 to December 31, 2020, which authorized

effluent discharge from the Facility to the Penn Township WWTP according to its

terms. Exhibit 1, NOI, Attachment M, Penn Township Wastewater Treatment Plant

Industrial Wastewater Discharge Permit, Permit No. 2016-4 (the "2016

Pretreatment Permit").

17.    Defendant has discharged and, upon information and belief, continues

to discharge, effluent to the Penn Township WWTP at a flow rate, and/or with

pollutant loads, that exceed permitted levels, in violation of the 2016 and 2021 Pretreatment Permits.

18.     The limits and conditions contained in the 2016 Pretreatment Permit and the 2021 Pretreatment Permit are each a "prohibition, effluent standard or pretreatment standard" under section 307 of the CWA, and as such are each an "effluent standard or limitation" as defined by section 505(f)(4) of the CWA. 33 U.S.C. § 1365(f)(4).

19.     Defendant's discharges of effluent to Penn Township WWTP violated the requirements of the 2016 Pretreatment Permit and continue to violate the requirements of the 2021 Pretreatment Permit; these violations also constitute violations of the CWA.

20.     Section 505(a)(1) of the CWA authorizes Citizens to bring suit for violations of the CWA and Defendant's 2015 NPDES Permit, 2016 Pretreatment Permit, and 2021 Pretreatment Permit. 33 U.S.C. § 1365(a)(1).

21.     Section 601(c) of the CSL authorizes Citizens to commence a civil suit against Defendant to compel compliance with the CSL and the 2015 NPDES Permit. 35 P.S. § 691.601(c).

22.     Citizens have satisfied the sixty-day notice provision in section 505(b)(1)(A) of the CWA and section 601(e) of the CSL and no bar to citizen enforcement exists pursuant to section 505(b)(1)(B) of the CWA or section 601(e)

of the CSL because neither EPA nor DEP has commenced a civil or criminal

enforcement action in federal or state court, and the violations alleged in the NOI

and this Complaint will continue until this Court orders Defendant to abate the

violations and take all steps necessary to come into full compliance with the CWA

and CSL.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to

33 U.S.C. § 1365(a) (regarding citizens' suits under the CWA) and 28 U.S.C.

§ 1331 (federal question jurisdiction), and supplemental jurisdiction regarding the

CSL claims pursuant to 28 U.S.C. § 1367(a).

24.     Pursuant to CWA section 505(c), 33 U.S.C. § 1365(c), venue is proper

because the Facility is located in this judicial district.

25.     Pursuant to section 505(b)(1)(A) of the CWA, 33 U.S.C.

§ 1365(b)(1)(A), Citizens gave notice more than sixty days prior to the

commencement of this action to all required parties, including: 1) Defendant; 2)

DEP; and 3) EPA. *See* Exhibit 1, NOI.

26.     Neither EPA nor the Commonwealth of Pennsylvania has commenced

or is diligently prosecuting a civil or criminal action against Defendant in a court

of the United States or the Commonwealth of Pennsylvania to require compliance

with the laws, rules, regulations, permits, standards, limitations, or orders at issue in this case.

27.     As explained below, Defendant has discharged and continues to discharge pollutants in violation of the numeric limitations contained in the 2015 NPDES Permit and is failing to adhere to other permit conditions and limitations, in violation of the CWA and the CSL. The Defendant also has discharged and continues to discharge wastewater to Penn Township WWTP in excess of its flow and pollution limits pursuant to the 2016 Pretreatment Permit and 2021 Pretreatment Permit, in violation of the permits and the CWA. Defendant is not operating and maintaining the Facility, including the WWTP, sufficiently to ensure compliance. Therefore, the violations alleged herein will continue until this Court enjoins Defendant from discharging in violation of the applicable permits, the CWA, and the CSL, and orders Defendant to address and remedy the underlying causes of the violations.

## PARTIES

28.     Plaintiff Lower Susquehanna Riverkeeper Association ("LSRA") is a 501(c)(3) nonprofit watershed association licensed by the Waterkeeper® Alliance on September 15, 2005. LSRA is dedicated to improving and protecting the ecological integrity of the Susquehanna Watershed and the Chesapeake Bay by identifying sources of pollution and enforcing environmental laws. LSRA also

actively educates the public on current water quality issues, works with decision-makers to emphasize the economic and social benefits of protecting our watershed, and, when necessary, enforces laws protecting communities and natural resources of the Susquehanna Watershed.

29.     LSRA members include avid kayakers, anglers, bird watchers, business owners, and other users of the Lower Susquehanna River and its tributaries, including the Codorus Creek, into which Oil Creek flows, and the Lower Susquehanna River Watershed. These members have been injured and will continue to be injured by Defendant's pollution that violates environmental laws, as described herein, as these violations threaten members' use and enjoyment of Codorus Creek and the Lower Susquehanna River.

30.     Defendant is a Pennsylvania corporation, registered to conduct business in the Commonwealth of Pennsylvania. Defendant is a "person" as that term is defined in CWA section 502(5) and CSL section 1. 33 U.S.C. § 1362(5); 35 P.S. § 691.1.

31.     Defendant maintains a business address of 1486 York Street, P.O. Box 334, Hanover, Pennsylvania, 17331-9570.

## STANDING

32.      Members of LSRA live, work, and/or recreate within the Lower Susquehanna River Watershed and have been adversely affected by Defendant's long-standing failure to comply with its permits, the CWA, and the CSL.

33.      Defendant's discharges of pollution into Oil Creek, which flows directly into Codorus Creek, have negatively impacted LSRA members' use and enjoyment of the Lower Susquehanna River Watershed, including Codorus Creek. LSRA members have observed sediment and turbidity in Codorus Creek near the confluence with Oil Creek and are concerned about the effects of Defendant's non-compliance and pollution on Oil Creek, Codorus Creek, and the Lower Susquehanna River and wildlife, and on their enjoyment of recreational activities, such as fishing, kayaking, and canoeing on the Codorus Creek and the Lower Susquehanna River, and hiking and biking on trails along the Codorus Creek and the Lower Susquehanna River.

34.      LSRA members would enjoy recreating near Oil Creek and on the Codorus Creek and the Lower Susquehanna River more if Defendant were required to comply with the terms of its permits and remediate the harm caused by the violations described in this Complaint.

35.     Plaintiff brings this action on behalf of itself and its members. The interests that Plaintiff seeks to protect are germane to the organization's mission and interests.

36.     These injuries to Plaintiff and its members would be redressed by a declaratory judgment that Defendant is in violation of its permits, the CWA and CSL; an injunction preventing Defendant from further violating its permits, the CWA, and CSL; and an order requiring Defendant to assess and remediate the harm caused by its violations and imposing civil penalties and the costs of litigation, including attorney's fees and future oversight costs.

37.     Neither the claims asserted nor the relief requested requires the participation of individual members of LSRA in this action.

38.     Plaintiff has standing to bring this complaint. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181–84 (2000).

## LEGAL REQUIREMENTS

### *The Clean Water Act*

39.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of pollutants," except in compliance with the CWA, including conditions of a NPDES permit issued under section 402, 33 U.S.C. § 1342.

40.     Section 402 of the CWA, 33 U.S.C. § 1342, created the NPDES program, under which EPA may issue NPDES permits for point source discharges

to waters of the United States. Section 402(b) of the Act, 33 U.S.C. § 1342(b), authorizes the EPA Administrator to delegate to the states the authority to issue NPDES permits. The Commonwealth of Pennsylvania, through DEP, was delegated the authority to issue NPDES permits on June 30, 1978, and has been implementing the federal permitting program since that date. *See* 67 Fed. Reg. 55,841-01, 55,842.

41.    The term "discharge of pollutants" is defined in section 502(12) of the CWA, 33 U.S.C. § 1362(12), to mean "any addition of any pollutant to navigable waters from any point source . . . ."

42.    Defendant discharges pollutants as that term is defined in section 502(12) of the CWA, 33 U.S.C. § 1362(12).

43.    The term "pollutant" is defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6), to include "solid waste," "biological materials, radioactive materials, heat," and "industrial . . . waste discharged into water."

44.    The wastewater discharged from Defendant's Facility, including the WWTP, contains "pollutants" as defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6).

45.    "Navigable waters" means "the waters of the United States . . . ." *Id.* § 1362(7).

46.     The term "waters of the United States" includes "(i) The territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide; . . ." and "(ii) Tributaries." 40 C.F.R. § 120.2(1)(i), (ii).

47.     The term "tributary" means "a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to a water identified in paragraph (1)(i) of this definition in a typical year either directly or through one or more waters identified in paragraph (1)(ii) [tributaries], (iii) [lakes and ponds, and impoundments of jurisdictional waters], or (iv) [adjacent wetlands] of this definition. A tributary must be perennial or intermittent in a typical year." 40 C.F.R. § 120.2(3)(xii).

48.     Oil Creek and the unnamed tributaries to Oil Creek into which Outfalls 002 and 003 discharge are "navigable waters" and therefore "waters of the United Sates" as those terms are defined in section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 120.2(1)(i) and (ii).

49.     "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel . . . from which pollutants are or may be discharged. . . ." *Id.* § 1362(14).

50.    Outfalls 001, 002, and 003 are "point sources" as defined in section 502(14) of the CWA, 33 U.S.C. § 1362(14).

51.    "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).  As stated in Paragraph 30, Defendant is a "person".

52.    Section 307(b) of the CWA, 33 U.S.C. § 1317(b), directs EPA to publish regulations establishing pretreatment standards governing the introduction of pollutants into Publicly Owned Treatment Works ("POTWs") that are determined not to be susceptible to treatment by such POTWs or that would interfere with the operation of such POTWs. *See* 40 C.F.R. § 403.

53.    Section 307(d) of the CWA, 33 U.S.C. § 1317(d), provides that it shall be unlawful for any owner or operator of any source to operate any source in violation of any effluent standard or prohibition or pretreatment standard promulgated under section 307.

54.    Defendant is the "owner and operator" of the Facility, including the WWTP, as per section 307(d) of the CWA, 33 U.S.C. § 1317(d).

55.    A POTW is a treatment works which is owned by a State or municipality. 40 C.F.R. § 403.3(q).

56.    Penn Township WWTP is a POTW as per 40 C.F.R. § 403.3(q).

14

57.     Pursuant to 40 C.F.R. § 403.8, Penn Township WWTP is required to establish a pretreatment program.

58.     In accordance with 40 C.F.R. § 403.8, Penn Township WWTP established and implements an approved pretreatment program. Penn Township promulgated Sewer Use Ordinance No. 683 "Sewer System Use," which set pretreatment standards and required permits and reports related to such standards.

59.     40 C.F.R. § 403.5(c) requires a POTW with a pretreatment program to develop and enforce specific limits on pollutants that may be introduced to the POTW.

60.     Pursuant to 40 C.F.R. § 403.5(d), prohibitions or limits developed by a POTW in accordance with 40 C.F.R. § 403.5(c) constitute pretreatment standards that are federally enforceable pursuant to section 307(d) of the CWA, 33 U.S.C. § 1317(d).

61.     Pursuant to section 4.3 of Ordinance No. 683, Penn Township WWTP issued Defendant a wastewater discharge permit, the 2016 Pretreatment Permit, and subsequently the 2021 Pretreatment Permit, to discharge wastewater from the Facility to the Penn Township WWTP.

62.     Section 505(a)(1)(A) of the CWA states that citizens are entitled to bring suit against "any person . . . alleged to be in violation" of an "effluent standard or limitation" established under the CWA as defined in section 505(f),

15

which includes "a permit or condition of a permit issued under section 1342 of [the CWA]" and a "prohibition, effluent standard or pretreatment standards" under section 307 of the CWA. 33 U.S.C. §§ 1365(a)(1)(A), 1365(f)(4), (7).

63.   The 2015 NPDES Permit and all conditions contained therein are each "a permit or condition of a permit issued under [33 U.S.C. § 1342]," and as such are each an "effluent standard or limitation" as defined by section 505(f)(7) of the CWA. 33 U.S.C. § 1365(f)(7).

64.   The limits and conditions contained in the 2016 Pretreatment Permit and the 2021 Pretreatment Permit are each a "prohibition, effluent standard or pretreatment standard" under section 307 of the CWA, and as such are each an "effluent standard or limitation" as defined by section 505(f)(4) of the CWA. 33 U.S.C. § 1365(f)(4).

65.   Any person who violates, *inter alia*, section 301 or 307 of the CWA, 33 U.S.C. §§ 1311, 1317, or who violates any condition or limitation of a NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty of up to $56,460 per day for each CWA or permit violation that occurred after November 2, 2015, where penalties are assessed on or after December 23, 2020. 33 U.S.C. § 1319(d) (providing that any person who violates these sections of the CWA or any condition or limitation of a NPDES permit shall be subject to a civil penalty of up to $25,000 per day for each

16

violation); statutory civil monetary penalties, as adjusted for inflation, and tables,

40 C.F.R. § 19.4 tbl 1 (Dec. 23, 2020) (updating $25,000 per day civil penalty for

inflation to $56,460, for 33 U.S.C. § 1319(d) violations that occurred after

November 2, 2015, where penalties are assessed on or after December 23, 2020).

### *The Pennsylvania Clean Streams Law*

66.     Sections 301 and 307 of the CSL similarly prohibit any person from

discharging "industrial wastes" into waters of the Commonwealth, unless in

compliance with a permit issued by DEP or the rules and regulations of DEP, and

section 401 of the CSL further prohibits any person from "permit[ting] to be

discharged from property owned or occupied by such person . . . into any of the

waters of the Commonwealth, any substance of any kind or character resulting in

pollution as herein defined." 35 P.S. §§ 691.301, 691.307, 691.401.

67.     The CSL defines "Waters of the Commonwealth" to include "any and

all rivers, streams, creeks . . . and all other bodies or channels of conveyance of

surface and underground water, or parts thereof, whether natural or artificial,

within or on the boundaries of this Commonwealth." 35 P.S. § 691.1.

68.     Oil Creek and the unnamed tributaries into which Outfalls 002 and

003 discharge are "Waters of the Commonwealth" as defined in section 1 of the

CSL, 35 P.S. § 691.1.

69.     Under the CSL, "[i]ndustrial waste" means "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations," including "all such substances whether or not generally characterized as waste." *Id*.

70.     Defendant's wastewater is "industrial waste" as defined in section 1 of the CSL, 35 P.S. § 691.1.

71.     Under the CSL, "person" includes "any natural person, partnership, association or corporation . . . ." *Id.*

72.     Defendant is a "person" as defined in section 1 of the CSL, 35 P.S. § 691.1.

73.     Plaintiff is a "person" as that term is defined in section 1 of the CSL. 35 P.S. § 691.1.

74.     Under the CSL:

"Pollution" shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The

department shall determine when a discharge constitutes pollution, as
herein defined, and shall establish standards whereby and wherefrom it
can be ascertained and determined whether any such discharge does or
does not constitute pollution as herein defined.

*Id.*

75.     Defendant's discharges to Waters of the Commonwealth constitute
"pollution" as defined in section 1 of the CSL, 35 P.S. § 691.1.

76.     Under CSL regulations, "owner" means the "person or other legal
entity holding legal title to a facility or activity subject to this chapter." 25 Pa.
Code § 91.1.

77.     Defendant is the "owner" of the Facility, including the WWTP,
pursuant to 25 Pa. Code § 91.1.

78.     Section 601(c) of the CSL authorizes "any person having an interest
which is or may be adversely affected" to commence a civil action to "compel
compliance with this act or any rule, regulation, order or permit issued pursuant to
this act . . . against any other person alleged to be in violation of any provision of
this act or any rule, regulation, order or permit issued pursuant to this act." 35 P.S.
§ 691.601(c).

79.     Plaintiff has an interest which is or may be adversely affected by
Defendant's permit violations.

80.     Any person who violates the CSL, or a permit or regulation issued pursuant thereto, can be subject to a civil penalty of up to $10,000 per violation per day. 35 P.S. § 691.605(a).

## FACTUAL ALLEGATIONS

### *Hanover Foods*

81.     The Hanover Foods Facility produces canned, glass packed and frozen vegetable goods. During food processing operations, the Facility generates cooling water[2] and process wastewater. The WWTP receives both the industrial process wastewater from the canning operations and the cooling water.

82.     The WWTP provides pretreatment for the industrial process wastewater from the Facility operations before sending approximately 0.450 millions of gallons per day (mgd), on average,[3] of the wastewater to Penn Township WWTP for further treatment and discharge to Oil Creek. The remainder of the industrial process wastewater is combined with the cooling water and, after some additional treatment, is discharged to Oil Creek through Outfall 001 at an

---

[2] Though this cooling water should not be considered "non-contact cooling water" because it comes into contact with cans in the cooling process and could be contaminated by any spillage from the cans, DEP documents refer to it as "non-contact cooling water." In this Complaint, Plaintiff refers to it simply as "cooling water."

[3] Based on the average daily discharge reported on Defendant's 2020 application for renewal of its Industrial Wastewater Discharge Permit from Penn Township WWTP.

average flow of 0.563 mgd.[4] The Facility also discharges industrial stormwater through Outfalls 002, 003, and 004.

83.    For pretreatment of the industrial wastewater, solids are screened and removed before the flow enters the grit removal chamber.  The industrial wastewater is then pumped to one of two anaerobic bio-reactors, where sludge is removed.  From each of the two bio-reactors ("bio-reactor #1 and #2"), the industrial wastewater flows to a flow splitter that diverts flow between two clarifiers.  Bio-reactor #1 feeds into clarifiers #1 and #2 and bio-reactor #2 feeds into clarifiers #3 and #4.  Effluent from the clarifiers then flows to aeration lagoon #1, where it is sampled before the majority is sent to Penn Township WWTP for final treatment.

84.    The industrial wastewater that is not discharged to the Penn Township WWTP exits aeration lagoon #1 and enters aeration lagoon #2, which also receives the cooling water from the Facility. The combined industrial wastewater and cooling water discharges from lagoon #2 into two polishing ponds before undergoing ultraviolet (UV) disinfection.  The wastewater is then sampled prior to discharge through Outfall 001 into Oil Creek.

---

[4] Based on the average flow during production/operation reported on Defendant's 2020 application for renewal of the 2015 NPDES Permit.

85.     Outfalls 002, 003, and 004 each discharge stormwater. Outfall 002 receives flow from a spring and stormwater runoff from roadways and the Facility, and Outfall 003 receives stormwater flow from a waste storage area, both discharging to an unnamed tributary of Oil Creek. Outfall 004 is a spillway for a stormwater detention basin that discharges into a wetland area leading to an unnamed tributary of Oil Creek. Outfalls 002 and 003 must be monitored annually, but no monitoring is required for Outfall 004 because the detention basin receives runoff from areas of the Facility where little or no material handling occurs.

86.     Defendant has applied for an amendment to a Water Quality Management, Part II Permit, to construct heat transfer facilities to add to the WWTP treatment system. According to DEP's eFACTS online portal, DEP's target date for completing the technical review of the Water Quality Management Permit application is December 10, 2021.[5] Upon information and belief, this project is not likely to fully address the violations alleged in this Complaint. Discovery is necessary to fully investigate the violations at the Facility and determine appropriate remedies.

---

[5] Pennsylvania Department of Environmental Protection, eFACTS on the Web, *Authorization Search Details*, https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleAuth.aspx?AuthID =1360628.

### *The 2015 NPDES Permit*

87.     The 2015 NPDES Permit authorizes Defendant to discharge wastewater and stormwater, subject to effluent limitations and conditions.

88.     Defendant's discharge from Outfall 001 is subject to, *inter alia*, the following effluent limitations:

    a.  Carbonaceous Biochemical Oxygen Demand (CBOD5)[6]

        i.   May 1 – Oct. 31: monthly average concentration 10 mg/L, monthly average load 70 lbs/day, daily maximum concentration 15 mg/L, daily maximum load 105 lbs/day, instantaneous maximum concentration 20 mg/L

        ii.  Nov. 1 – Apr. 30: monthly average concentration 18 mg/L, monthly average load 126 lbs/day, daily maximum concentration 27 mg/L, daily maximum load 189 lbs/day, instantaneous maximum concentration 36 mg/L

---

[6] "Carbonaceous Biochemical Oxygen Demand (CBOD) represents the Biochemical Oxygen Demand (BOD) from organic (carbon-containing) compounds, as well as the oxidation of inorganic compounds such as ferrous iron and sulfide." *What is CBOD?*, Hach, https://support.hach.com/app/answers/answer_view/a_id/1000102/~/what-is-cbod%3F- (last visited Sept. 22, 2021). CBOD5 represents the quantity of oxygen utilized for the biochemical degradation of organic matter under standard laboratory procedures in five (5) days in the presence of a nitrification inhibitor.

   b. Total Suspended Solids (TSS)

      i. Monthly average concentration 30 mg/L, monthly average load 210 lbs/day, daily maximum concentration 60 mg/L, daily maximum load 420 lbs/day, instantaneous maximum concentration 75 mg/L

   c. Fecal Coliform

      i. May 1 – Sep. 30: geometric mean concentration 200 CFU/100 ml, instantaneous maximum concentration 1,000 CFU/100 ml

      ii. Oct. 1 – Apr. 30: geometric mean concentration 2,000 CFU/100 ml, instantaneous maximum concentration 10,000 CFU/100 ml

   d. Ammonia-Nitrogen

      i. May 1 – Oct. 31: monthly average concentration 1.0 mg/L, monthly average load 7.0 lbs/day, daily maximum concentration 2.0 mg/L, daily maximum load 14 lbs/day, instantaneous maximum concentration 2.5 mg/L

      ii. Nov. 1 – Apr. 30: monthly average concentration 3.0 mg/L, monthly average load 21 lbs/day, daily maximum concentration 6.0 mg/L, daily maximum load 42 lbs/day, instantaneous maximum concentration 7.5 mg/L

e. Dissolved Oxygen (DO)

　　i.　Minimum concentration of 5.0 mg/L

f. Temperature

　　i.　Beginning October 1, 2018, daily maximum limitations of:

| Date | Limit (°F) |
|---|---|
| Jan. 1-30 | 51 |
| Feb. 1-29 | 52 |
| Mar. 1-31 | 74 |
| Apr. 1-15 | 83 |
| Apr. 16-30 | 89 |
| May 1-15 | 85 |
| May 16-31 | 106 |
| Jun. 1-15 | 106 |
| Jun. 16-30 | 110 |
| Jul. 1-31 | 101 |
| Aug. 1-31 | 99 |
| Sep. 1-15 | 94 |
| Sep. 16-30 | 88 |
| Oct. 1-15 | 82 |
| Oct. 16-31 | 76 |
| Nov. 1-15 | 69 |
| Nov. 16-30 | 59 |
| Dec. 1-31 | 50 |

g. Annual Net Total Nitrogen

　　i.　Beginning October 1, 2017, annual maximum load limit of 26,385 lbs/yr

h. Annual Net Total Phosphorus

　　i.　Beginning October 1, 2017, annual maximum load limit of 979 lbs/yr

25

89.     The 2015 NPDES Permit prohibits certain discharges, including "[f]loating solids, scum, sheen or substances that result in observed deposits in the receiving water" and "[f]oam or substances that produce an observed change in the color, taste, odor or turbidity of the receiving water . . . ."

90.     The 2015 NPDES Permit requires proper operation and maintenance of the facilities and systems of treatment and control.

### *The 2016 and 2021 Pretreatment Permits*

91.     The 2016 Pretreatment Permit was effective from January 1, 2016 to December 31, 2020. The 2021 Pretreatment Permit became effective January 1, 2021 and expires December 31, 2025.

92.     The 2016 Pretreatment Permit authorized Defendant to discharge industrial wastewater from the WWTP to Penn Township WWTP, pursuant to the permit terms, which included pollutant monitoring and reporting requirements, specific discharge limits, and limits on the average monthly flow and peak maximum flow to Penn Township WWTP. The 2016 Pretreatment Permit set forth, among others, specific discharge limits for daily maximum loads of BOD, TSS, and ammonia-nitrogen:

| Parameter | Limits (lbs/day) |
|---|---|
| BOD | 1500 |
| TSS | 4000 |
| Ammonia-Nitrogen | 225 |

93.     According to the 2016 Pretreatment Permit, the discharge of wastewater from the WWTP to Penn Township WWTP must not exceed an average monthly flow of 450,000 gallons per day (0.450 mgd) or a peak maximum daily flow of 700,000 gallons per day (0.700 mgd).

94.     The 2021 Pretreatment Permit increased the limit for daily maximum load of BOD from 1,500 pounds per day to 2,300 pounds per day but retained all other limits, including the limits on the average monthly flow and peak maximum daily flow.

95.     Upon information and belief, Penn Township has not taken enforcement action against Defendant regarding pretreatment permit violations in the last five years.

### *Receiving Water Body*

96.     Outfall 001 discharges directly to Oil Creek, Outfalls 002 and 003 discharge to an unnamed tributary to Oil Creek, and Outfall 004 discharges into wetlands leading to an unnamed tributary of Oil Creek.

97.     Oil Creek is a tributary to the Codorus Creek, which feeds the Lower Susquehanna River. Segments of Oil Creek are impaired for nutrients, pathogens, and siltation. The segments downstream of Defendant's discharge are impaired for siltation and nutrients. There is a 2003 Total Maximum Daily Load for sediment based on siltation impairments for a segment of Oil Creek that begins east of

Hanover, Pennsylvania, and ends shortly before the creek crosses into Heidelberg Township. Protected uses of Oil Creek include aquatic life and recreation. Oil Creek is classified as a Warm Water Fishery under DEP's regulations. 25 Pa Code § 93.9o.

98.    Codorus Creek is a popular fishing stream, and many segments have a designated use for high quality-cold water fishes. Upstream of the confluence with Oil Creek, the designated use of the Codorus Creek is consistently high quality-cold water fishes, whereas immediately downstream of the confluence with Oil Creek, the designated use is generally warm water fishes.

## CAUSES OF ACTION

## Count 1: Violations of Effluent Concentration Limitations of the 2015 NPDES Permit

99.    Each paragraph alleged above is incorporated by reference herein as if restated in full.

100.    The 2015 NPDES Permit imposes effluent concentration limits for several pollutants discharged from Outfall 001.

101.    Defendant has been in violation of its CBOD5, TSS, ammonia-nitrogen, fecal coliform, and dissolved oxygen effluent concentration limitations for Outfall 001 eighty-four times in the last five years. Specifically, with respect to these pollutants, Defendant has violated its monthly average effluent concentration limitations thirty-seven times in the last five years and daily maximum or

28

instantaneous maximum effluent concentration limitations forty-three times in the last five years, as well as its minimum effluent concentration for dissolved oxygen four times.

102.   The following are Defendant's violations of the monthly average effluent concentration limit for TSS (limit 30.0 mg/L) at Outfall 001:

| Date | Effluent TSS (mg/L) |
|------|---------------------|
| Jun. 2017 | 35.0 |
| Feb. 2018 | 32.0 |
| Nov. 2018 | 36.0 |
| Sep. 2019 | 33.0 |
| Oct. 2019 | 33.0 |
| Nov. 2019 | 65.0 |
| Dec. 2019 | 45.0 |
| Jan. 2020 | 39.0 |
| Feb. 2020 | 33.0 |
| Mar. 2020 | 38.0 |
| Apr. 2020 | 59.0 |
| May 2020 | 48.0 |
| Jun. 2020 | 37.0 |
| Jul. 2020 | 37.0 |
| Nov. 2020 | 78.0 |
| Dec. 2020 | 32.0 |
| Jan. 2021 | 67.0 |
| Feb. 2021 | 70.0 |
| Mar. 2021 | 51.0 |

103.   The following are Defendant's violations of the monthly average effluent concentration limit for CBOD5 at Outfall 001:

| Date | Effluent CBOD5 (mg/L) | Limit (mg/L) |
|------|----------------------|--------------|
| Oct. 2019 | 15.7 | 10.0 |
| Nov. 2019 | 65.06 | 18.0 |

| | | |
|---|---|---|
| Dec. 2019 | 26.8 | 18.0 |
| Jan. 2020 | 22.6 | 18.0 |
| Jul. 2020 | 20.3 | 10.0 |
| Aug. 2020 | 24.3 | 10.0 |
| Oct. 2020 | 35.8 | 10.0 |
| Nov. 2020 | 18.5 | 18.0 |
| Jan. 2021 | 101.5 | 18.0 |
| Feb. 2021 | 85.4 | 18.0 |
| Mar. 2021 | 45.5 | 18.0 |

104.   The following are Defendant's violations of the monthly average

effluent concentration limit for ammonia-nitrogen at Outfall 001:

| Date | Effluent Ammonia-Nitrogen (mg/L) | Limit (mg/L) |
|---|---|---|
| Aug. 2017 | 1.044 | 1.0 |
| Oct. 2017 | 1.28 | 1.0 |
| Jul. 2020 | 3.6 | 1.0 |
| Aug. 2020 | 1.821 | 1.0 |
| Sep. 2020 | 1.92 | 1.0 |
| May 2021 | 1.895 | 1.0 |
| Jun. 2021 | 1.047 | 1.0 |

105.   The following are Defendant's violations of the daily maximum

effluent concentration limit for TSS (limit 60.0 mg/L) at Outfall 001:

| Date | Effluent TSS (mg/L) |
|---|---|
| Apr. 2018 | 316.0 |
| May 2018 | 86.0 |
| Nov. 2019 | 163.0 |
| Dec. 2019 | 111.0 |
| Jan. 2020 | 85.0 |
| Feb. 2020 | 69.0 |
| Apr. 2020 | 104.0 |
| May 2020 | 80.0 |
| Jun. 2020 | 70.0 |
| Oct. 2020 | 174.0 |

| | |
|---|---|
| Nov. 2020 | 80.0 |
| Dec. 2020 | 76.0 |
| Jan. 2021 | 97.0 |
| Feb. 2021 | 122.0 |
| Mar. 2021 | 85.0 |
| Apr. 2021 | 62.0 |

106.   The following are Defendant's violations of the daily maximum

effluent concentration limit for CBOD5 at Outfall 001:

| Date | Effluent CBOD5 (mg/L) | Limit (mg/L) |
|---|---|---|
| May 2018 | 16.1 | 15.0 |
| Oct. 2019 | 79.1 | 15.0 |
| Nov. 2019 | 124.0 | 27.0 |
| Dec. 2019 | 81.7 | 27.0 |
| Jan. 2020 | 43.0 | 27.0 |
| Mar. 2020 | 65.8 | 27.0 |
| Apr. 2020 | 34.0 | 27.0 |
| Jun. 2020 | 23.6 | 15.0 |
| Jul. 2020 | 48.2 | 15.0 |
| Aug. 2020 | 49.0 | 15.0 |
| Oct. 2020 | 135.0 | 15.0 |
| Nov. 2020 | 52.6 | 27.0 |
| Dec. 2020 | 36.0 | 27.0 |
| Jan. 2021 | 179.0 | 27.0 |
| Feb. 2021 | 250.0 | 27.0 |
| Mar. 2021 | 115.0 | 27.0 |

107.   The following are Defendant's violations of the daily maximum

effluent concentration limit for ammonia-nitrogen at Outfall 001:

| Date | Effluent Ammonia-Nitrogen (mg/L) | Limit (mg/L) |
|---|---|---|
| Jul. 2017 | 2.49 | 2.0 |
| Oct. 2017 | 3.38 | 2.0 |
| Jul. 2019 | 2.87 | 2.0 |
| Jul. 2020 | 10.2 | 2.0 |
| Aug.2020 | 3.81 | 2.0 |

| Sep. 2020 | 4.06 | 2.0 |
| May 2021 | 2.81 | 2.0 |

108.   The following are Defendant's violations of the instantaneous

maximum effluent concentration limit for fecal coliform at Outfall 001:

| Date | Effluent Fecal Coliform (CFU/100 ml) | Limit (CFU/100 ml) |
| --- | --- | --- |
| Aug. 2016 | 4,300 | 1,000 |
| Sep. 2016 | 13,500 | 1,000 |
| Oct. 2020 | 26,300 | 10,000 |
| Feb. 2021 | 29,000 | 10,000 |

109.   The following are Defendant's violations of the minimum

concentration limit for dissolved oxygen (5.0 mg/L minimum) at Outfall 001:

| Date | Effluent DO (mg/L) |
| --- | --- |
| Sep. 2016 | 4.8 |
| Nov. 2019 | 4.3 |
| Dec. 2019 | 4.4 |
| Nov. 2020 | 4.0 |

110.   Defendant violated the 2015 NPDES Permit, section 301(a) of the

CWA, and sections 301 and 307 of the CSL, by discharging pollutants from

Outfall 001 in excess of the effluent concentration limitations set forth in the 2015

NPDES Permit. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301, 691.307.

111.   Given that these violations are chronic, varied, and consistent, upon

information and belief, the violations are ongoing and will continue.

112.   Each day a daily maximum or instantaneous maximum limit is

exceeded for a particular pollutant is a separate violation of the 2015 NPDES

Permit, the CWA, and the CSL, for which a penalty can be assessed against Defendant. In addition, each day of each month where a monthly discharge limit is exceeded for a particular pollutant is a separate violation of the 2015 NPDES Permit, the CWA, and the CSL, for which a penalty can be assessed against Defendant.

113.   Defendant is subject to a civil penalty under the CWA of up to $56,460 per day for each violation that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbl. 1; 33 U.S.C. §§ 1319(d), 1365(a). Defendant is subject to a civil penalty under the CSL of up to $10,000 per day for each violation. 35 P.S. § 691.605(a).

114.   Pursuant to section 505(d) of the CWA, and section 601(g) of the CSL, Plaintiff is entitled to and seeks recovery of all costs of litigation, including attorney's fees and future oversight costs, regarding all violations alleged herein.

**Count 2: Violations of Effluent Load Limitations of the 2015 NPDES Permit**

115.    Each paragraph alleged above is incorporated by reference herein as if restated in full.

116.   The 2015 NPDES Permit imposes effluent load limits for several pollutants discharged from Outfall 001 at the Facility.

117.   Defendant has been in violation of its CBOD5, TSS, and ammonia-nitrogen effluent load limitations for Outfall 001 seventy-six times in the last five

years. Specifically, for these pollutants, Defendant has violated its monthly average effluent load limitations thirty-five times in the last five years and daily maximum effluent load limitations forty-one times in the last five years.

118.   The following are Defendant's violations of the monthly average effluent load limit for TSS (limit 210 lbs/day) at Outfall 001:

| Date | Effluent TSS (lbs/day) |
|---|---|
| Feb. 2018 | 216 |
| Apr. 2018 | 299 |
| Sep. 2019 | 277 |
| Oct. 2019 | 255 |
| Nov. 2019 | 401 |
| Jan. 2020 | 267 |
| Mar. 2020 | 273 |
| Apr. 2020 | 403 |
| May 2020 | 334 |
| Jun. 2020 | 369 |
| Jul. 2020 | 310 |
| Oct. 2020 | 861 |
| Nov. 2020 | 348 |
| Dec.2020 | 218 |
| Jan. 2021 | 621 |
| Feb. 2021 | 300 |
| Mar. 2021 | 278 |

119.   The following are Defendant's violations of the monthly average effluent load limit for CBOD5 at Outfall 001:

| Date | Effluent CBOD5 (lbs/day) | Limit (lbs/day) |
|---|---|---|
| Oct. 2019 | 107 | 70 |
| Nov. 2019 | 378 | 126 |
| Jan. 2020 | 149 | 126 |
| Mar. 2020 | 136 | 126 |

| | | |
|---|---|---|
| Jun. 2020 | 94 | 70 |
| Jul. 2020 | 170 | 70 |
| Aug. 2020 | 215 | 70 |
| Sep. 2020 | 74 | 70 |
| Oct. 2020 | 405 | 70 |
| Nov. 2020 | 138 | 126 |
| Jan. 2021 | 1006 | 126 |
| Feb. 2021 | 320 | 126 |
| Mar. 2021 | 231 | 126 |

120.   The following are Defendant's violations of the monthly average

effluent load limit for ammonia-nitrogen at Outfall 001:

| Date | Effluent Ammonia-Nitrogen (lbs/day) | Limit (lbs/day) |
|---|---|---|
| Oct. 2017 | 9 | 7 |
| Jul. 2020 | 25 | 7 |
| Aug. 2020 | 15 | 7 |
| Sep. 2020 | 23 | 7 |
| May 2021 | 11 | 7 |

121.   The following are Defendant's violations of the daily maximum

effluent load limit for TSS (limit 420 lbs/day) at Outfall 001:

| Date | Effluent TSS (lbs/day) |
|---|---|
| May 2017 | 460 |
| Apr. 2018 | 1911 |
| Nov. 2019 | 1177 |
| Dec. 2019 | 485 |
| Jan. 2020 | 682 |
| Feb. 2020 | 445 |
| Mar. 2020 | 683 |
| Apr. 2020 | 713 |
| May 2020 | 653 |
| Jun. 2020 | 792 |
| Jul. 2020 | 506 |
| Aug. 2020 | 448 |
| Oct. 2020 | 2106 |

| | |
|---|---|
| Nov. 2020 | 759 |
| Dec. 2020 | 551 |
| Jan. 2021 | 733 |
| Feb. 2021 | 549 |
| Mar. 2021 | 567 |

122.   The following are Defendant's violations of the daily maximum

effluent load limit for CBOD5 at Outfall 001:

| Date | Effluent CBOD5 (lbs/day) | Limit (lbs/day) |
|---|---|---|
| Oct. 2019 | 451 | 105 |
| Nov. 2019 | 715 | 189 |
| Dec. 2019 | 362 | 189 |
| Jan. 2020 | 274 | 189 |
| Mar. 2020 | 762 | 189 |
| Apr. 2020 | 218 | 189 |
| Jun. 2020 | 252 | 105 |
| Jul. 2020 | 461 | 105 |
| Aug. 2020 | 522 | 105 |
| Sep. 2020 | 135 | 105 |
| Oct. 2020 | 1634 | 105 |
| Nov. 2020 | 310 | 189 |
| Dec. 2020 | 261 | 189 |
| Jan. 2021 | 2244 | 189 |
| Feb. 2021 | 667 | 189 |
| Mar. 2021 | 635 | 189 |

123.   The following are Defendant's violations of the daily maximum

effluent load limit for ammonia-nitrogen at Outfall 001:

| Date | Effluent Ammonia-N (lbs/day) | Limit (lbs/day) |
|---|---|---|
| Jul. 2017 | 17 | 14 |
| Oct. 2017 | 35 | 14 |
| Jul. 2019 | 22 | 14 |
| Jul. 2020 | 67 | 14 |
| Aug. 2020 | 35 | 14 |
| Sep. 2020 | 53 | 14 |

| May 2021 | 20 | 14 |
|---|---|---|

124.   Defendant violated the 2015 NPDES Permit, section 301(a) of the CWA, and sections 301 and 307 of the CSL by discharging pollutants from Outfall 001 in excess of the effluent load limitations set forth in the 2015 NPDES Permit. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301, 691.307.

125.   Given that these violations are chronic, varied, and consistent, upon information and belief, the violations are ongoing and will continue.

126.   Each day a daily maximum is exceeded for a particular pollutant is a separate violation of the 2015 NPDES Permit, the CWA, and the CSL, for which a penalty can be assessed against Defendant. In addition, each day of each month where a monthly discharge limit is exceeded for a particular pollutant is a separate violation for which a penalty can be assessed against Defendant.

127.   Defendant is subject to a civil penalty under the CWA of up to $56,460 per day for each violation that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbl. 1; 33 U.S.C. §§ 1319(d), 1365(a). Defendant is subject to a civil penalty under the CSL of up to $10,000 per day for each violation. 35 P.S. § 691.605(a).

128.   Pursuant to section 505(d) of the CWA, and section 601(g) of the CSL, Plaintiff is entitled to and seeks recovery of all costs of litigation, including attorney's fees and future oversight costs, regarding all violations alleged herein.

**Count 3: Violations of Temperature Effluent Limitations in the 2015 NPDES Permit**

129.   Each paragraph alleged above is incorporated by reference herein as if restated in full.

130.   Since the effective date of the temperature limits in the 2015 NPDES Permit on October 1, 2018, Defendant has violated the limitations for Outfall 001 once in 2018, three times in 2019, six times in 2020 and five times in 2021 based on the currently available data:

| Date | Temperature (°F) | Limit (°F) |
| --- | --- | --- |
| Dec. 2018 | 60.0 | 50.0 |
| Nov. 2019 (1-15) | 83.0 | 69.0 |
| Nov. 2019 (16-31) | 81.0 | 59.0 |
| Dec. 2019 | 90.0 | 50.0 |
| Jan. 2020 | 83.0 | 51.0 |
| Feb. 2020 | 60.0 | 52.0 |
| Oct. 2020 (16-31) | 85.0 | 76.0 |
| Nov. 2020 (1-15) | 84.0 | 69.0 |
| Nov. 2020 (16-31) | 86.0 | 59.0 |
| Dec. 2020 | 87.0 | 50.0 |
| Jan. 2021 | 82.0 | 51.0 |
| Feb. 2021 | 97.0 | 52.0 |
| Mar. 2021 | 95.0 | 74.0 |
| Apr. 2021 (1-15) | 99.0 | 83.0 |
| Apr. 2021 (16-30) | 96.0 | 89.0 |

131.   Defendant violated the 2015 NPDES Permit, section 301(a) of the CWA, and sections 301 and 307 of the CSL, by discharging wastewater from Outfall 001 at temperatures in excess of the permit limitations. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301, 691.307.

132.   Given that these violations are chronic and consistent, upon information and belief, the violations are ongoing and will continue.

133.   Each day of violation of the daily maximum temperature effluent limitations constitutes a separate violation of the 2015 NPDES Permit, the CWA, and the CSL. Under the CWA, Defendant is subject to a penalty of up to $56,460 per day for each violation, and pursuant to the CSL, Defendant is subject to a penalty of up to $10,000 per day for each violation.

134.   Pursuant to section 505(d) of the CWA, and section 601(g) of the CSL, Plaintiff is entitled to and seeks recovery of all costs of litigation, including attorney's fees and future oversight costs, regarding all violations alleged herein.

**Count 4: Failure to Properly Operate and Maintain Facilities Under the 2015 NPDES Permit**

135.   Each paragraph alleged above is incorporated by reference herein as if restated in full.

136.   DEP inspection reports from April 18, 2019, July 9, 2020, and February 4, 2021, reveal a pattern of failures to properly operate and maintain the Facility, including the WWTP, and the control and treatment systems installed or used to achieve compliance with the 2015 NPDES Permit. *See* Exhibit 1, NOI, Attachment B, July 9, 2020 Inspection Report; *id.*, Attachment E, Apr. 18, 2019 Inspection Report; *id.*, Attachment K, Feb. 4, 2021 Inspection Report.

137.   According to the inspection reports, problems with operating parameters of bio-reactor #2 and solids carryover in clarifiers #3 and #4 appear to be continuous problems that have not been addressed. The Feb. 4, 2021 Inspection Report highlighted several additional new potential problems that must be corrected, including, *inter alia*, water level fluctuation and overflow of the cooling water flow metering pit, repairs needed on bio-reactor #1, and discharge from lagoon #2, polishing ponds, and Outfall 002 appearing turbid with a brown tint and containing visible suspended solids. *See* Exhibit 1, NOI, Attachment K, Feb. 4, 2021 Inspection Report. These concerns identified by DEP all reflect continuous problems with operation and maintenance of the Facility, including the WWTP. Chronic effluent exceedances, as described in Counts 1-3 above, provide further proof of systemic operation and maintenance failures.

138.   Upon information and belief, and given the chronic and continuing nature of the effluent violations, operation and maintenance violations are continuing and date back more than five years. The Detailed Facility Report for the Facility on the Enforcement and Compliance History Online (ECHO) database also indicates that inadequate operation and maintenance is continuing.

139.   Defendant is violating the 2015 NPDES Permit, section 301(a) of the CWA, and sections 301 and 307 of the CSL by failing to properly operate and maintain its treatment systems. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301, 691.307.

140.   Defendant is subject to civil penalties each day of violation dating from the start of improper operation and maintenance. Defendant is subject to a penalty of up to $56,460 for each day of violation of the 2015 NPDES Permit and the CWA for failure to properly operate and maintain all facilities of treatment and control. Each day is also a violation of the CSL for which a penalty of up to $10,000 can be imposed.

141.   Pursuant to section 505(d) of the CWA, and section 601(g) of the CSL, Plaintiff is entitled to and seeks recovery of all costs of litigation, including attorney's fees and future oversight costs, regarding all violations alleged herein.

**Count 5: Unauthorized Discharge of Substances that Result in Observed Deposits in, or Produce an Observed Change in the Color or Turbidity of, the Receiving Water**

142.   Each paragraph alleged above is incorporated by reference herein as if restated in full.

143.   The 2015 NPDES Permit prohibits the discharge of substances that result in observed deposits in the receiving water and substances that produce an observed change in color or turbidity of the receiving water.

144.   At DEP's February 4, 2021 inspection, it observed that discharge from Outfall 002 contained visible suspended solids and the discharge from Outfall 001 created a visible difference in water quality in Oil Creek twenty meters downstream of the outfall. This included both a color change and change in

turbidity compared with the water upstream. These observations and the photos from the Feb. 4, 2021 Inspection Report indicate violations of the prohibitions set forth in the 2015 NPDES Permit. Exhibit 1, NOI, Attachment K, Feb. 4, 2021 Inspection Report.

145.   In EPA's March 4, 2021 Inspection Report, based on its February 4, 2021 inspection, EPA also described Oil Creek as "cloudy and turbid at the point of discharge [from Outfall 001] and sphaerotilus bacterial growth was observed in the vicinity." EPA also noted that solids accumulation was observed in Oil Creek "in the vicinity of Outfall 001 . . . ."

146.   Discharges prohibited by the 2015 NPDES Permit constitute violations of the 2015 NPDES Permit, section 301(a) of the CWA, and sections 301 and 307 of the CSL. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301, 691.307

147.   Given the ongoing operation and maintenance issues DEP has identified at each on-site inspection since April 18, 2019, and the many operation and maintenance issues specifically identified at the Feb. 4, 2021 inspection that are likely to contribute to deposits, turbidity, and change in color of the receiving waterbody, the prohibited discharges, upon information and belief, remain unabated and continue.

148.   Pursuant to section 505(d) of the CWA, and section 601(g) of the

CSL, Plaintiff is entitled to and seeks recovery of all costs of litigation, including

attorney's fees and future oversight costs, regarding all violations alleged herein.

**Count 6: Violations of Effluent Load Limitations and Flow Limitations of the 2016 Pretreatment Permit and Flow Limitations of the 2021 Pretreatment Permit**

149.   Each paragraph alleged above is incorporated by reference herein as if

restated in full.

150.   Defendant has discharged BOD and ammonia-nitrogen to the Penn

Township WWTP at levels that exceed the permitted daily maximum load limits of

the 2016 Pretreatment Permit.

151.   The following are Defendant's violations of the daily maximum

effluent load limit for BOD in the 2016 Pretreatment Permit to Penn Township

WWTP (limit 1,500 lbs/day):

| Date | Effluent BOD (lbs/day) |
|------|------------------------|
| Nov. 12, 2018 | 1,998 |
| Feb. 7, 2019 | 1,529 |
| Nov. 7, 2019 | 1,741 |
| Nov. 12, 2019 | 2,479 |
| Nov. 19, 2019 | 3,222 |
| Nov. 26, 2019 | 3,337 |
| Dec. 5, 2019 | 2,326 |
| Dec. 17, 2019 | 2,494 |
| Jan. 10, 2020 | 1,903 |
| Jan. 28, 2020 | 1,800 |
| Dec. 8, 2020 | 1,740 |
| Dec. 15, 2020 | 2,769 |

152.    The following are Defendant's violations of the daily maximum effluent load limit for ammonia-nitrogen (limit 225 lbs/day) to Penn Township WWTP:

| Date | Effluent ammonia-nitrogen (lbs/day) |
|------|--------------------------------------|
| Mar. 8, 2018 | 288 |
| Jun. 7, 2018 | 256 |
| Jun. 12, 2018 | 243 |
| Sep. 6, 2018 | 249 |
| May 29, 2019 | 239 |
| July 23, 2019 | 253 |
| Sep. 16, 2019 | 256 |

153.    Defendant has discharged, and is discharging, wastewater to the Penn Township WWTP exceeding the permitted average monthly flow of 450,000 gallons per day and peak maximum daily flow of 700,000 gallons per day.

154.    The following are Defendant's discharges to Penn Township WWTP in violation of the 700,000 gallons per day peak maximum daily flow limit:

| Date | Maximum Flow (mgd) |
|------|--------------------|
| Dec. 2016 | 0.783 |
| Aug. 2018 | 0.707 |
| Sep. 2018 | 0.760 |
| Oct. 2018 | 0.732 |
| Nov. 2018 | 0.768 |

155.    The following are Defendant's discharges to Penn Township WWTP in violation of the 450,000 gallons per day monthly average flow:

| Date | Average Flow (mgd) |
|------|--------------------|
| Aug. 2016 | 0.493 |
| Sep. 2016 | 0.477 |
| Oct. 2016 | 0.532 |
| Aug. 2018 | 0.598 |
| Sep. 2018 | 0.661 |
| Oct. 2018 | 0.618 |
| Nov. 2018 | 0.594 |
| Apr. 2019 | 0.463 |
| Aug. 2019 | 0.456 |
| Oct. 2019 | 0.469 |
| Nov. 2019 | 0.551 |
| Dec. 2019 | 0.470 |
| Feb. 2021 | 0.532 |
| Mar. 2021 | 0.547 |
| Apr. 2021 | 0.451 |
| May 2021 | 0.451 |
| Jun. 2021 | 0.502 |

156.   Defendant violated the 2016 Pretreatment Permit, the 2021 Pretreatment Permit, and sections 301(a) and 307(d) of the CWA, by discharging wastewater to Penn Township WWTP in excess of the permit limitations. 33 U.S.C. § 1311(a); 33 U.S.C. § 1317(d).

157.   Upon information and belief, given the chronic nature of noncompliance and ongoing inadequate operation and maintenance of the Facility, including the WWTP, the violations of the pretreatment effluent load and flow limits are continuing.

158.   Each day of each daily maximum effluent load limitation exceedance constitutes a separate violation of the 2016 Pretreatment Permit and CWA and

subjects Hanover Foods to a penalty of up to $56,460. Each day of the month in which the discharged wastewater exceeded the monthly average flow limit is a separate violation of the applicable 2016 or 2021 Pretreatment Permit and the CWA, for which a penalty of up to $56,460 can be assessed. Each day of an exceedance of the peak maximum daily flow is a separate violation of the 2016 Pretreatment Permit and the CWA, for which a penalty of up to $56,460 can be assessed.

159.   Pursuant to section 505(d) of the CWA, Plaintiff is entitled to and seeks recovery of all costs of litigation, including attorney's fees and future oversight costs, regarding all violations alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.   Declare that Defendant is in violation of its permits, the CWA, and the CSL;

B.   Enjoin Defendant from further violating its permits, the CWA, and the CSL;

C.   Order Defendant to assess and remediate the harm caused by its violations;

D.   Assess civil penalties against Defendant;

E.      Award Plaintiff the cost of litigation, including reasonable attorney's

        fees, costs, and expert fees and expenses, including future oversight

        costs;

F.      Retain jurisdiction to ensure compliance with the Court's decree; and

G.      Grant such other relief as the Court deems just and proper.

Date: September 24, 2021

                                Respectfully submitted,

                                /s/ Lisa Widawsky Hallowell
                                Lisa Widawsky Hallowell
                                Bar ID No. PA207983
                                Environmental Integrity Project
                                1000 Vermont Avenue, NW
                                Suite 1100
                                Washington, DC 20005
                                Telephone: (202) 294-3282
                                Fax: (202) 296-8822
                                Lhallowell@environmentalintegrity.org

                                Natalia M. Cabrera*
                                Environmental Integrity Project
                                1000 Vermont Avenue, NW
                                Suite 1100
                                Washington, DC 20005
                                Telephone: (202) 469-3151
                                Fax: (202) 296-8822
                                ncabrera@environmentalintegrity.org

                                Counsel for Plaintiff

* Petition for Special Admission under Local Rule 83.8.2.1 pending.

## EXHIBIT PARTS TABLE OF CONTENTS

**Exhibit 1** Notice of Intent to Sue Hanover Foods Corporation and Attachments

**Part 1 of 3**   Notice of Intent to Sue Hanover Foods Corporation

Attachment A: 2015 NPDES Permit Fact Sheet

Attachment B: July 9, 2020 Inspection Report

Attachment C: Excerpts from 2020 NPDES Permit Renewal Application

**Part 2 of 3**   Attachment D: 2015 NPDES Permit No. PA0044741

Attachment E: Apr. 18, 2019 Inspection Report

Attachment F: Oct. 9, 2020 Hanover Foods Letter to DEP re NPDES Permit

Attachment G: July 9, 2019 NOV

Attachment H: Aug. 26, 2020 NOV

Attachment I: Dec. 29, 2020 NOV

Attachment J: Jan. 28, 2021 Inspection Report

Attachment K: Feb. 4, 2021 Inspection Report

Attachment L: 2021 Pretreatment Permit, No. 2021-4

**Part 3 of 3**   Attachment M: 2016 Pretreatment Permit, No. 2016-4

Attachment O:[14] July 23, 2019 Hanover Foods Letter to DEP re NPDES Permit

[14] Attachment N Omitted.