Complaint Exhibit 1

# Exhibit 1, Part 1 of 3

Notice of Intent to Sue

Attachments A-C to Notice of Intent to Sue

Complaint Exhibit 1

June 29, 2021

*Via Certified Mail, Return Receipt Requested*

Hanover Foods Corporation
P.O. Box 334, 1486 York Street
Hanover, PA 17331-0334

Hanover Foods Corporation
1550 York Street
Hanover, PA 17331-0334

John A Warehime
President
Hanover Foods Corporation
P.O. Box 334, 1486 York Street
Hanover, PA 17331-0334

David Still
Plant Manager
Hanover Foods Corporation
P.O. Box 334, 1486 York Street
Hanover, PA 17331-0334

Kumar Navile
Environmental Compliance Manager
Hanover Foods Corporation
P.O. Box 334, 1486 York Street
Hanover, PA 17331-0334

> **RE:  Notice of Intent to Sue Hanover Foods Corporation for Violations of the Clean Water Act and Pennsylvania's Clean Streams Law at the Hanover Foods facility in York County, Pennsylvania**

Dear Sirs:

The Environmental Integrity Project ("EIP") writes on behalf of the Lower Susquehanna Riverkeeper Association ("LSRA" or "Citizens") and its members to provide notice of LSRA's intent to file suit against Hanover Foods Corporation ("Hanover Foods") for significant and ongoing violations of the federal Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq.*, and Pennsylvania's Clean Streams Law (CSL), as amended, 35 P.S. § 691.1 *et seq.*, at Hanover Foods' food processing facility located in Penn Township, York County, at 1550 York Street, Hanover,

Complaint Exhibit 1

Pennsylvania 17331-0334 (the "Facility"). Hanover Foods owns and operates the Facility. Industrial wastewater generated from the Facility is treated at an on-site industrial wastewater treatment plant (the "Plant"). The Plant discharges treated wastewater to Penn Township's municipal wastewater treatment plant and to Oil Creek.

As explained more fully below, the Plant is routinely discharging pollutants in violation of the terms and conditions of its National Pollutant Discharge Elimination System (NPDES) permit, its pretreatment permit issued by the Penn Township Wastewater Treatment Plant (WWTP), the CWA, and the CSL. In addition, Hanover Foods is failing to comply with monitoring and reporting requirements in violation of the NPDES permit, the CWA, and the CSL. By failing to comply with its NPDES permit, its pretreatment permit, the CWA, and the CSL, Hanover Foods has injured and will continue to injure or threaten to injure, the health, environmental, aesthetic, and economic interests of LSRA and its members. These injuries or risks are traceable to violations at the Facility and redressing these ongoing violations will redress Citizens' injuries or risks.

CWA sections 505(a)(1) and (b)(1)(A) permit Citizens to commence a civil suit in the United States District Court for the Middle District of Pennsylvania against Hanover Foods for CWA effluent limitation violations after 60 days upon providing this notice of intent to sue. Citizens are entitled to commence an action "against any person . . . alleged to be in violation" of an "effluent standard or limitation" under the CWA. 33 U.S.C. § 1365(a)(1). Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342(a). For purposes of CWA section 505, the term "effluent standard or limitation under this chapter" includes, among other things, "a permit or condition of a permit" issued under section 402 that is in effect under this chapter and a "prohibition, effluent standard or pretreatment standard" under section 307. 33 U.S.C. § 1365(f)(4), (7). A court can impose a civil penalty of up to $56,460 per day for each CWA or permit violation. 33 U.S.C. § 1319(d).[1]

CSL section 601(c) permits Citizens to commence a civil suit against Hanover Foods to compel compliance with the CSL or a NPDES permit. Citizens are entitled to commence an action "against any other person alleged to be in violation of any provision of this act or . . . permit issued pursuant to this act." 35 P.S. § 691.601(c). Any person who violates the CSL, or a permit or regulation pursuant thereto, including by discharging, placing or allowing the flow of industrial waste or other pollution to waters of the Commonwealth without authorization, can be subject to a fine and/or a civil penalty of up to $10,000 per violation per day. 35 P.S. §§ 691.602(a), 605(a). Citizens may bring a CSL claim in federal court as a supplemental claim to the federal CWA claim, through pendent jurisdiction.

In accordance with section 505(b)(1)(A) of the CWA[2] and sections 601(c) and (e) of the CSL, this letter serves to notify Hanover Foods that Citizens intend to file suit for CWA and CSL violations, unless corrected, in U.S. District Court for the Middle District of Pennsylvania at any time beginning 60 days after the postmarked date of this letter. 40 C.F.R. § 135.2(c). Additionally, Citizens notify Hanover Foods of their intention to sue for ongoing violations of the same type that

---

[1] *See also* Civil Monetary Penalty Inflation Adjustment, 40 C.F.R. § 19.4 (effective December 23, 2020).
[2] 33 U.S.C. § 1365(b)(1)(A).

Complaint Exhibit 1

occur after the violations outlined in this notice letter (the "Notice"). *See Public Interest Research Group of N.J., Inc. v. Hercules, Inc.* 50 F.3d 1239 (3d Cir. 1995).

## I.   BACKGROUND

Hanover Foods is a food processing company located in Penn Township, York County, Pennsylvania. Hanover Foods produces canned, glass packed and frozen vegetable goods (beans, potatoes, beets, and tomatoes).[3] Hanover Foods operates the Facility at 1550 York Street, P.O. Box 334, Hanover, Pennsylvania 17331-0334. During food processing operations, the Facility generates non-contact cooling water and process wastewater. However, the fact sheet for the current permit (the "2015 Permit Fact Sheet") states that the non-contact cooling water "actually touches the cans to cool them down. If any of the cans open, there is a high probability of spillage into the water."[4] The Facility's industrial wastewater treatment plant (the "Plant") receives both the industrial process wastewater from the canning operations and the non-contact cooling water.[5]

The Plant provides pre-treatment for the industrial process wastewater from the Facility operations before sending a majority of this wastewater (monthly average of 450,000 gallons per day) to Penn Township WWTP for further treatment and discharge to Oil Creek.[6] The discharge to the Penn Township WWTP is authorized by a permit issued by Penn Township WWTP and, according to the 2015 Permit Fact Sheet, pursuant to a pretreatment agreement between Hanover Foods and Penn Township.[7] Upon information and belief, the pretreatment agreement is implemented by pretreatment permits that Penn Township issues to Hanover Foods every five years. These pretreatment permits authorize the discharge to the WWTP and provide the specific terms and conditions for the discharge. The remainder of the industrial process wastewater is combined with the non-contact cooling water, is further treated, and is discharged to Oil Creek at Outfall 001.[8] The Facility also discharges industrial stormwater through Outfalls 002, 003, and 004.

For pretreatment, the industrial wastewater from the food processing operations flows to a pretreatment building, where solids are screened and removed before the flow enters the grit removal chamber.[9] The industrial wastewater is then pumped to an anaerobic biofiltration system, comprising two anaerobic bio-reactors, where sludge is removed.[10] From either of the two bio-reactors (bio-reactor #1 and #2), the industrial wastewater flows to a flow splitter that diverts flow

---

[3] NPDES Permit Fact Sheet Individual Industrial Waste (IW) and IW Stormwater ("2015 Permit Fact Sheet"), at 1, attached hereto as **Attachment A**.

[4] Attachment A: 2015 Permit Fact Sheet. Even though the cooling water does come in contact with industrial processes, the inspection reports and several permitting documents, including the 2015 Permit Fact Sheet, refer to this cooling water as non-contact cooling water. In the Water Flow Schematics in both the 2012 and 2020 NPDES Permit Renewal Applications, Hanover Foods refers to the cooling water as "Contact Cooling Water." NPDES Permit Renewal No. PA00444741, Hanover Foods Corporation, Wastewater Treatment Plant (May 2020) (the "2020 Permit Renewal Application"), at Appendix 4; Hanover Foods Corporation, Hanover Cannery, NPDES Permit No. PA0044741 Renewal Application (the "2012 Permit Renewal Application"), at Attachment 2 (Aug. 20, 2012).

[5] NPDES Compliance Inspection Report, Hanover Foods IWTP (July 9, 2020) ("July 9, 2020 Inspection Report"), at 2, attached hereto as **Attachment B**.

[6] Attachment B: July 9, 2020 Inspection Report, at 3.

[7] Attachment A: 2015 Permit Fact Sheet, at 1.

[8] Attachment B: July 9, 2020 Inspection Report, at 2.

[9] Attachment A: 2015 Permit Fact Sheet, at 1; Attachment B: July 9, 2020 Inspection Report, at 2.

[10] Attachment A: 2015 Permit Fact Sheet, at 1; Attachment B: July 9, 2020 Inspection Report, at 2. These bio-reactors are referred to as anaerobic digesters in the Wastewater Treatment Plant Process Flow Schematic attached to the 2020

between two clarifiers.[11] Bio-reactor #1 feeds into clarifiers #1 and #2 and bio-reactor #2 feeds into clarifiers #3 and #4.[12] Effluent from the clarifiers then flows to aeration Lagoon #1, where it is sampled before the majority is sent to Penn Township WWTP for final treatment.[13]

The industrial wastewater that is not discharged to the Penn Township WWTP exits Lagoon #1 and enters aeration Lagoon #2, which also receives the non-contact cooling water from the Facility. The combined industrial wastewater and non-contact cooling water discharges from Lagoon #2 into two polishing ponds before undergoing UV disinfection and then being sampled for discharge through Outfall 001 into Oil Creek.[14]

Outfalls 002, 003, and 004 each discharge stormwater. Outfall 002 receives flow from a spring and stormwater runoff from roadways and the Facility and Outfall 003 receives flow from a waste storage area, both discharging to an unnamed tributary of Oil Creek. Outfall 004 is a spillway for a stormwater detention basin that discharges into a wetland area leading to an unnamed tributary of Oil Creek. Outfalls 002 and 003 must be monitored annually, but no monitoring is required for Outfall 004 because the detention basin receives runoff from areas of the Facility where little or no material handling occurs.[15]

### A.     NPDES Permit

On September 22, 2015, the Pennsylvania Department of Environmental Protection (DEP) renewed Hanover Foods' NPDES Permit No. PA0044741 (the "2015 Permit"), effective October 1, 2015 to September 30, 2020, based on Hanover Foods' 2012 application for renewal (the "2012 Permit Renewal Application"). The 2015 Permit provides that, in the event that it is not reissued before the expiration date, the terms and conditions of the 2015 Permit are automatically continued and remain fully effective and enforceable against the discharger provided that the permittee submitted a timely and complete application for renewal and that the delayed reissuance was through no fault of the permittee.[16] According to the 2015 Permit, an application for renewal was due 180 days prior to the expiration date—April 3, 2020. Although Hanover Foods submitted its renewal application late, on or around May 19, 2020 (the "2020 Permit Renewal Application"),[17] DEP accepted the application, deemed it complete on June 25, 2020, and is currently conducting a technical review of the application for renewal.[18] Therefore, the 2015 Permit remains effective and enforceable against Hanover Foods until DEP makes a final determination on the permit reissuance.

---

[11] Attachment A: 2015 Permit Fact Sheet, at 1; Attachment B: July 9, 2020 Inspection Report, at 2.
[12] Attachment A: 2015 Permit Fact Sheet, at 1; Attachment B: July 9, 2020 Inspection Report, at 2.
[13] Attachment B: July 9, 2020 Inspection Report, at 3.
[14] Attachment A: 2015 Permit Fact Sheet, at 1; Attachment B: July 9, 2020 Inspection Report, at 3. For a visual representation of the wastewater treatment plant process, see the 2020 Permit Renewal Application, Appendix 3, Wastewater Treatment Plant Process Flow Schematic, attached hereto as **Attachment C**.
[15] Attachment A: 2015 Permit Fact Sheet, at 4.
[16] NPDES Permit No. PA0044741, Authorization to Discharge under the National Pollutant Discharge Elimination System Discharge Requirements for Industrial Wastewater Facilities (Sept. 22, 2015) ("2015 Permit"), at 1, attached hereto as **Attachment D**.
[17] Cover page to 2020 Permit Renewal Application, dated May 19, 2020.
[18] PADEP, eFACTS, Authorization Search Details, Hanover Foods, Authorization ID: 1316819, https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleAuth.aspx?AuthID=1316819.

Complaint Exhibit 1

Terms and conditions of the 2015 Permit relevant to the violations alleged in this Notice include:

## 1.    Effluent Limitations, Monitoring, Recordkeeping and Reporting Requirements

The 2015 Permit[19] requires Hanover Foods to:

- For Outfall 001, report and adhere to monthly average, daily maximum, and instantaneous maximum limitations for concentrations and/or loads of:

  o   Carbonaceous Biochemical Oxygen Demand (CBOD5) (Permit Section I.A, I.B, I.C)

    ▪   May 1 – Oct 31: monthly average concentration 10 mg/L, monthly average load 70 lbs/day, daily maximum concentration 15 mg/L, daily maximum load 105 lbs/day, instantaneous maximum concentration 20 mg/L

    ▪   Nov 1 – Apr 30: monthly average concentration 18 mg/L, monthly average load 126 lbs/day, daily maximum concentration 27 mg/L, daily maximum load 189 lbs/day, instantaneous maximum concentration 36 mg/L

  o   Total Suspended Solids (TSS) (I.A, I.B, I.C)

    ▪   Monthly average concentration 30 mg/L, monthly average load 210 lbs/day, daily maximum concentration 60 mg/L, daily maximum load 420 lbs/day, instantaneous maximum concentration 75 mg/L

  o   Fecal Coliform (I.A, I.B, I.C)

    ▪   May 1 – Sep 30: geometric mean concentration 200 CFU/100 ml, instantaneous maximum 1,000 CFU/100 ml

    ▪   Oct 1 – Apr 30: geometric mean concentration 2,000 CFU/100 ml, instantaneous maximum 10,000 CFU/100 ml

  o   Ammonia-Nitrogen (I.A, I.B, I.C)

    ▪   May 1 – Oct 31: monthly average concentration 1.0 mg/L, monthly average load 7.0 lbs/day, daily maximum concentration 2.0 mg/L, daily maximum load 14 lbs/day, instantaneous maximum concentration 2.5 mg/L

    ▪   Nov 1 – Apr 30: monthly average concentration 3.0 mg/L, monthly average load 21 lbs/day, daily maximum concentration 6.0 mg/L, daily maximum load 42 lbs/day, instantaneous maximum concentration 7.5 mg/L

---

[19] References to specific provisions of the 2015 Permit are in parentheticals after each requirement that is set forth below.

Complaint Exhibit 1

- For Outfall 001, report and adhere to a minimum concentration of dissolved oxygen of 5.0 mg/L (I.A, I.B, I.C)

- For the first three years of the permit term, report daily maximum temperature (°F) from Outfall 001 (I.A, I.B). Beginning October 1, 2018, report and adhere to the following daily maximum limitations for temperature for Outfall 001 (I.C):

| Date | Limit (°F) |
|------|-----------|
| Jan 1-30 | 51 |
| Feb 1-29 | 52 |
| Mar 1-31 | 74 |
| Apr 1-15 | 83 |
| Apr 16-30 | 89 |
| May 1-15 | 85 |
| May 16-31 | 106 |
| Jun 1-15 | 106 |
| Jun 16-30 | 110 |
| Jul 1-31 | 101 |
| Aug 1-31 | 99 |
| Sep 1-15 | 94 |
| Sep 16-30 | 88 |
| Oct 1-15 | 82 |
| Oct 16-31 | 76 |
| Nov 1-15 | 69 |
| Nov 16-30 | 59 |
| Dec 1-31 | 50 |

- Annually report daily maximum concentrations for stormwater discharge from Outfalls 002 and 003 for the following parameters (I.D, I.E):

  o pH (S.U.)
  o CBOD5
  o Chemical Oxygen Demand (COD)
  o TSS
  o Oil and Grease
  o Total Phosphorus
  o Dissolved Iron
  o Total Iron

- For the first two years of the permit term, report monthly and annual Net Total Nitrogen and Net Total Phosphorus loads in lbs/month and lbs/year for Outfall 001 (I.F). Beginning October 1, 2017, continue monthly reporting and report and adhere to an Annual Maximum Load limit of 26,385 lbs/year for Net Total Nitrogen and 979 lbs/year for Net Total Phosphorus (together, the "Cap Loads") for Outfall 001 (I.G)

- Use test procedures for the analysis of pollutants or pollutant parameters that are sufficiently sensitive (III.A.4.c)

- Submit Discharge Monitoring Reports (DMRs) to DEP according to the following schedule, in pertinent part (III.B.2):

  o Monthly DMRs must be received within 28 days following the end of each calendar month.

  o Annual DMRs must be received by January 28, unless Part C of this permit requires otherwise.

- Orally report all instances of noncompliance that may endanger health or the environment as per paragraph III.C.4 within 24 hours of becoming aware of the circumstances and provide a written report within 5 days of becoming aware of the noncompliance; report all instances of noncompliance not based on endangerment of health or the environment or reported according to specific requirements of compliance schedules on the Non-Compliance Reporting Form at the time DMRs are submitted. The reports shall contain a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance. (III.C.5, III.C.4)

In addition to the above requirements, Part A of the 2015 Permit prohibits certain discharges, including:

- "Floating solids, scum, sheen or substances that result in observed deposits in the receiving water."

- "Foam or substances that produce an observed change in the color, taste, odor or turbidity of the receiving water, unless those conditions are otherwise controlled through effluent limitations or other requirements in this permit."

## 2.    Management Requirements

The 2015 Permit expressly states that if a compliance schedule has been established in this permit, the permittee must achieve compliance with the terms and conditions of the 2015 Permit within the time frames specified.[20] Additionally, Hanover Foods is required to submit reports of compliance or noncompliance for any interim or final requirements contained in the 2015 Permit, to be submitted no later than 14 days following the applicable schedule date or compliance deadline.[21] This applies to the Chesapeake Bay Schedule and the Schedule of Compliance for Temperature, which are described in Sections A.3.a) and A.4 below.

Part B, Section I.D of the 2015 Permit requires proper operation and maintenance of the Plant. Specifically, the 2015 Permit provides:

---

[20] Attachment D: Permit, at Part B.I.A.1.
[21] *Id.* at Part B.I.A.2.

Complaint Exhibit 1

"The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit. Proper operation and maintenance includes, but is not limited to, adequate laboratory controls including appropriate quality assurance procedures. This provision also includes the operation of backup or auxiliary facilities or similar systems that are installed by the permittee, only when necessary to achieve compliance with the terms and conditions of this permit."[22]

### 3. Chesapeake Bay Requirements

#### a) Chesapeake Bay Schedule

Part C of the 2015 Permit contains specific requirements related to protection of the Chesapeake Bay. Section I provides a schedule designed to bring Hanover Foods into compliance with its Cap Loads (i.e., Annual Net Total Nitrogen and Annual Net Total Phosphorus loads) by September 30, 2018. The following were the schedule requirements within the term of the 2015 Permit:

| | |
|---|---|
| Award Contract for Construction or Begin Implementation | 10/1/2015 |
| Construction or Implementation Progress Report(s) | Quarterly |
| Issue Certification of Substantial Completion (Plant Fully Operational) | 10/1/2017 |
| Compliance with effluent limitations | 9/30/2018[23] |

The effluent limitations referred to in this compliance schedule are the Cap Loads. As noted in section A.1 above, the 2015 Permit effluent limitations include these Annual Net Total Nitrogen and Net Total Phosphorus limits as applicable beginning October 1, 2017, with monthly reporting requirements and the first total annual Cap Loads to comply with the limits to be reported by September 30, 2018. Prior to October 1, 2017, Hanover Foods was only required to report annual and monthly loads for nitrogen and phosphorus.

The 2015 Permit required Hanover Foods to submit a written notice of compliance or noncompliance with the specific schedule requirement to DEP within 14 days of each due date.[24] Each notice of noncompliance was required to include descriptions of the noncompliance, any actions taken or proposed to comply with the requirement, and any factors explaining or mitigating the noncompliance. The notice was also required to provide an estimate of the date the schedule requirement would be achieved, an assessment of the probability that the next scheduled requirement would be met on time, and a revised compliance schedule for DEP approval.[25] As discussed in more detail in the sections of this Notice regarding Hanover Foods' violations,

---

[22] *Id.* at Part B.I.D.
[23] *Id.* at Part C.I.A.
[24] *Id.* at Part C.I.B.
[25] *Id.* at Part C.I.C

Complaint Exhibit 1

because the company does not appear to have submitted the required compliance or noncompliance reports, it is unclear whether Hanover Foods timely complied with the schedule of required activities. Based on the eDMRs, Hanover Foods partially complied with the Cap Loads by September 30, 2018, as required, but committed a reporting error discussed in a later section of this Notice.

### b)    Chesapeake Bay Nutrient Requirements

Part C, Section II of the 2015 Permit sets forth additional requirements related to the Cap Loads provided in Part A. These annual load limits of 26,385 lbs/year for Net Total Nitrogen and 979 lbs/year for Net Total Phosphorus became effective on October 1, 2017, with a compliance date of September 30, 2018, per the Chesapeake Bay Schedule set forth above. Credits[26] and approved offsets[27] may be used to comply with the Cap Loads under certain circumstances. Part C, Section II.E.3 requires the permittee to report any credits applied and sold and offsets applied to calculate the Annual Net Mass Loads and meet the Cap Loads.[28] The Annual Net Mass Loads are calculated based on the sum of monthly total mass loads for one Compliance Year, which begins October 1st and ends September 30th, once adjusted for credits sold and applied and offsets applied. The Annual DMR reporting Annual Net Mass Loads for both Total Nitrogen and Total Phosphorus, as adjusted, must be reported each year by November 28th.[29] The 2015 Permit requires Hanover Foods to report on the Nitrogen Budget and Phosphorus Budget supplemental forms the credits sold and applied, and offsets applied to calculate Annual Net Mass Loads. These forms must be attached to the Annual DMR.

### 4.    Schedule of Compliance for Temperature

The 2015 Permit establishes a compliance schedule for temperature, requiring Hanover Foods to meet interim deadlines designed to bring the Hanover Foods into compliance with temperature limitations by three years after the permit effective date:

| | |
|---|---|
| Feasibility study completion | 6 months after permit effective date |
| Final plan completion | 12 months after permit effective date |
| Start plan implementation | 12 months after permit effective date |
| Plan implementation progress report(s) | Quarterly |
| End of plan implementation | 36 months after permit effective date |

---

[26] The Permit defines a Credit as: "The tradable unit of compliance that corresponds with a unit of reduction of a pollutant as recognized by DEP which, when certified, verified and registered, may be used to comply with NPDES permit effluent limitations." Part C.II.B.

[27] The Permit defines Offset as: "The pollutant load reduction measured in pounds (lbs) that is created by an action, activity or technology which when approved by DEP may be used to comply with NPDES permit effluent limitations, conditions and stipulations under 25 Pa. Code Chapter 92a (relating to NPDES permitting, monitoring and compliance.) The offset may only be used by the NPDES permittee that DEP determines is associated with the load reduction achieved by the action, activity or technology." Part C.II.B.

[28] *Id.* at Part C.II.E.3.

[29] *Id.* at Part C.II.E.4.

Compliance with effluent limitations       36 months after permit effective date[30]

In accordance with this schedule, the effluent limitations for temperature began on October 1, 2018, as set forth in Part A of the 2015 Permit and noted in section A.1 of this Notice.

The permittee was required to submit a written notice of compliance or noncompliance with each specific schedule requirement within 14 days of the scheduled due date.[31] The written notice was required to contain each of the items required in the notice of compliance or noncompliance with the Chesapeake Bay Schedule: descriptions of the noncompliance, any actions taken or proposed to comply with the requirement, and any factors explaining or mitigating the noncompliance, as well as an estimate of the date the schedule requirement would be achieved, an assessment of the probability that the next scheduled requirement would be met on time, and a revised compliance schedule for DEP approval.

As discussed in more detail in the sections regarding Hanover Foods' violations, because the company does not appear to have submitted the required compliance or noncompliance reports related to the temperature compliance schedule, it is unclear whether Hanover Foods timely complied with the schedule of required activities. Based on the eDMRs, Hanover Foods met the temperature effluent limitations for the first two months after they became effective but thereafter consistently exceeded the limits, as discussed further in this Notice.

### B.    Flow Increase

The flow of combined industrial wastewater and non-contact cooling water effluent discharged from the Plant, through Outfall 001, has increased over the course of the past several years. The reported design flow in the 2012 Permit Renewal Application was 0.643 mgd and the average flow was 0.531 mgd.[32] A plant upgrade that occurred between the submission of the 2012 Permit Renewal Application and the issuance of the 2015 Permit increased the capacity of the plant to treat up to 0.19 mgd process wastewater and a maximum of 0.65 mgd of non-contact cooling water, for a total design flow of 0.84 mgd; thus the effluent limitations established in the 2015 Permit were based on a flow of 0.84 mgd.[33]

The 2020 Permit Renewal Application indicates that from 2015 to 2019, the average flow during operation was 0.563 mgd, with annual averages ranging from 0.373 (2015) to 0.691 (2016).[34] In 2020, based on Hanover Foods' eDMRs, the average monthly flow ranged from 0.652 mgd (February) to as high as 1.322 mgd (September). Based on the average monthly flows reported for each month in 2020, the overall average flow for the year was approximately 0.89 mgd, significantly higher than the previous several years and above the Plant's design flow of 0.84 mgd.

---

[30] *Id.* at Part C.IV.A.

[31] *Id.* at Part C.IV.B.

[32] 2012 Permit Renewal Application, at 2, Module 15, at 1.

[33] Attachment A: 2015 Permit Fact Sheet, at 6. The available documents do not indicate whether a modification was submitted to the 2012 Permit Renewal Application, but the 2015 Permit Fact Sheet states that Hanover Foods submitted a Water Quality Management Permit to upgrade the plant to a design flow of 0.84 mgd but does not indicate when this upgrade occurred. Because it was not included in the 2012 Permit Renewal Application but this design capacity of 0.84 mgd was the basis for the effluent limitations in the 2015 Permit, the upgrade presumably occurred between 2012 and 2015.

[34] 2020 Permit Renewal Application, at 3, 7.

Complaint Exhibit 1

Additionally, in several months, such as June 2020 (1.068 mgd), September 2020 (1.322 mgd), and October 2020 (1.056 mgd), the flow spiked to over 25% above the design flow and up to 57.4% above the design flow in September 2020.

### C.   January 3, 2017 Consent Order and Agreement

On January 3, 2017, DEP and Hanover Foods entered into a Consent Order and Agreement (COA) to resolve Hanover Foods' violation of Section 308 of the CSL for failure to obtain an approved Water Quality Management Part II Permit ("WQM Permit") prior to construction of new industrial wastewater treatment facilities (the "2017 COA").[35] The WQM Permit was ultimately issued on July 26, 2016, but not until after DEP inspected the Plant on July 20, 2016 and determined that Hanover Foods had begun construction of an upgrade on October 27, 2015 without permit authorization.[36] The upgrade eventually covered by the WQM Permit was to improve the Plant by, among other projects, constructing a new 500,000 gallon Equalization Tank, constructing a second treatment train (including bio-reactor #2 and clarifiers #3 and #4) that mirrored the then-existing treatment process (bio-reactor #1 and clarifiers #1 and #2), and construction of a UV system.[37] Construction of a pretreatment and surge tank system, the bioreactor, and the clarifier structures was completed by July 21, 2017, but the final status of the upgrade is not clear from the available documents.[38]

Hanover Foods was previously subject to two prior COAs, one entered into on August 20, 2013 (the "2013 COA") and an amendment entered into on October 16, 2014 (the "2014 COA Amendment"). The 2017 COA states that Hanover Foods had paid all required stipulated penalties to fully resolve past violations to date pursuant to the 2013 COA and 2014 COA Amendment.[39] Additionally, Hanover Foods had paid $1,600 to fully resolve fecal coliform effluent violations from May 1 through September 30, 2016.[40] Though the Plant at the time of the 2017 COA did not contain a treatment system for fecal coliform, the WQM Permit provided for construction and operation of an ultraviolet system to treat for fecal coliform.[41] Inspection reports from the last two years, starting April 18, 2019, refer to the ultraviolet system at the Plant; therefore, this construction must have been completed at some point prior to April 18, 2019.

The 2017 COA was a modification that superseded and replaced the 2013 COA and the 2014 COA Amendment, adjusting the corrective action schedule included in the 2014 COA Amendment to align with the Chesapeake Bay Schedule in the 2015 Permit.[42] This corrective action schedule provided for quarterly construction or implementation progress reports for the planned upgrade of the Plant, issuance of a certification of substantial completion for construction of upgrades, and attaining compliance with permit effluent limitations.[43] The 2017 COA also assessed a civil penalty of $6,200 for CSL violations, based on Hanover Foods' failure to obtain a WQM Permit

---

[35] Consent Order and Agreement, *In the matter of Hanover Foods Corporation* (Jan. 3, 2017), ¶¶ N, R, S pgs. 3–4.
[36] *Id.* ¶¶ N, O pgs. 3–4.
[37] Water Quality Management Permit, Hanover Foods Corp, (July 26, 2016), at 1.
[38] Water Quality Management Post Construction Certification, Partial Construction Completion Date 07/21/2017.
[39] 2017 COA, ¶ M, pg. 3.
[40] *Id.*
[41] *Id.* ¶ L, pg. 3.
[42] *Id.* ¶ 1.b., pg. 5.
[43] *Id.* ¶¶ 3.a–c, pg. 5.

Complaint Exhibit 1

prior to commencing construction.[44] It also provided for stipulated civil penalties to be assessed for any violation of permit effluent limits.[45] Pursuant to the 2017 COA, Hanover Foods has paid stipulated penalties to DEP for effluent violations through November 2018, but a Right-to-Know-Law request to DEP revealed no evidence of payments of stipulated penalties for violations after November 2018.

By its terms, the stipulated penalties paragraph of the 2017 COA terminated when Hanover Foods demonstrated six consecutive months of compliance with the permitted effluent limits after completing the corrective actions and civil penalty requirements to DEP's satisfaction.[46] Based on the eDMRs, the stipulated penalties provisions of the 2017 COA likely terminated around July 2019, following a six-month period without effluent limit violations, assuming that the corrective action and civil penalty requirements were also met. Available documents do not make clear whether the 2017 COA is still in effect.

### D.   DEP Inspections and Notices of Violations

DEP has conducted several Compliance Inspections since the 2017 COA, some of which identified violations of the 2015 Permit, the CSL, and/or the CWA.

On April 18, 2019, DEP conducted a NPDES Compliance Inspection and determined that Hanover Foods was failing to properly operate and maintain all facilities installed or used to achieve compliance, pursuant to Part B.I.D of the 2015 Permit.[47] The aeration in the polishing ponds was off during inspection. The inspection report explained that the polishing ponds were experiencing heavy algae growth, which fouls the aerator motors. Though it is not entirely clear from the report, the algae growth was likely the reason the aerators were turned off.[48] The fence around the polishing ponds was also experiencing heavy erosion at the time of the inspection.

The UV disinfection system that receives the effluent from the polishing ponds prior to discharge through Outfall 001 was also off during the time of inspection, and during the inspection Hanover turned the unit to "AUTO."[49] Hanover Foods indicated that the UV system had been turned off to allow Hanover Foods to "remove the algae accumulation on the UV bulbs from the polishing tanks" approximately two weeks prior. It is not clear from the report why the UV system was not turned back if algae had been successfully removed from the UV bulbs two weeks prior to the inspection. Additionally, the inspection report noted that clarifiers #3 and #4 were short-circuiting,

---

[44] *Id.* ¶ 4, pg. 6.

[45] *Id.* ¶ 5.a.ii., pg. 6.

[46] *Id.* ¶ 19, pg. 10.

[47] NPDES Compliance Inspection Report, Hanover Foods IWTP (Apr. 18, 2019) ("Apr. 18, 2019 Inspection Report"), at 1, attached hereto as **Attachment E** (incorrectly citing Part B.I.E of the Permit, when describing Part B.I.D). The inspection report also described that bio-reactor #1 was operating at 90 degrees F or less although it was designed to operate at 95 °F. This concern was raised again in the July 9, 2020 Inspection Report when the inspection showed the bio-reactor was operating at 93.3 °F. Hanover Foods responded to this finding in an October 9, 2020 letter, in which it states that according to Hanover Foods's design engineer, temperatures as low as 85 °F can be utilized at lower-than-design loading rates, as was the case on July 8, 2020. Hanover Foods Letter to DEP re NPDES Permit No. PA0044741 (Oct. 9, 2020), at 2, attached hereto as **Attachment F**. Additionally, Hanover Foods indicated that it was in the process of converting the fuel source in the boiler, which will maintain higher temperature in the anaerobic digester.

[48] Attachment E: Apr. 18, 2019 Inspection Report, at 2.

[49] *Id.* at 3.

releasing gas, and that solids were carrying over in multiple areas along the weirs, with algae also accumulating in the effluent weir notches.[50]

DEP issued a Notice of Violation (NOV) on July 9, 2019 for failure to properly operate and maintain all facilities installed to achieve compliance, based on the UV disinfection system being offline for Outfall 001, as noted in the April 18, 2019 inspection.[51] The July 9, 2019 NOV also noted based on a review of DMR submissions that Hanover Foods had failed to submit Annual Stormwater DMRs and the associated Annual Inspection Form for the years 2016, 2017 and 2018 for Outfalls 002 and 003, as required by Part A.III.B of the 2015 Permit.[52]

On July 9, 2020, DEP conducted an NPDES Compliance Inspection and again noted a failure to properly operate and maintain all facilities installed or used to achieve compliance, this time based on problems with clarifiers #3 and #4.[53] During the inspection, bio-reactor #1 and clarifiers #1 and #2 were offline for maintenance and chemical feed repairs. Bio-reactor #2 and clarifiers #3 and #4 were online during the inspection, but clarifiers #3 and #4 were experiencing short-circuiting, gas release, rising sludge, and solids discharge. Algae was also accumulating in the effluent weir notches.[54] There were two UV units observed at the inspection, one of which was online at the time.[55] Although the effluent from Outfall 001 appeared to have a greenish/yellow tint with some observable solids, Oil Creek appeared clear both upstream and downstream of the outfall.[56] DEP issued Hanover Foods an NOV on August 26, 2020, noting the violation of Part B.I.D of the 2015 Permit for failure to properly operate and maintain all facilities and systems of treatment and control installed or used to achieve compliance with the 2015 Permit. This violation was based, in part, on the rising sludge in the clarifiers and solids carryover into the clarifier effluent weirs, which indicated that the clarifiers were short-circuiting.[57] The NOV noted that these issues were identified in both the July 9, 2020 inspection and the April 18, 2019 inspection.[58]

On December 29, 2020, DEP issued Hanover Foods another NOV, stating that electronic DMR submissions from July to November 2020 show a pattern of effluent limitations, as listed on page

---

[50] *Id.* at 2.

[51] Notice of Violation, Hanover Foods, NPDES Permit No. PA0044741 (July 9, 2019) ("July 9, 2019 NOV"), at 1, attached hereto as **Attachment G**.

[52] *Id.*

[53] Attachment B: July 9, 2020 Inspection Report, at 2.

[54] *Id.*

[55] *Id.* at 3.

[56] *Id.*

[57] Notice of Violation, Hanover Foods, NPDES Permit No. PA0044741 (Aug. 26, 2020) ("Aug. 26, 2020 NOV"), at 1, attached hereto as **Attachment H** (excluding July 9, 2020 Inspection Report that was attached to Aug 26, 2020 NOV, since this inspection report is already attached as Attachment B).

[58] *Id.* Hanover Foods responded to the Aug. 26, 2020 NOV with a Oct. 9, 2020 letter, stating "[Hanover Foods] did not observe short-circuiting" and "[Hanover Foods] did not observe excessive solids in the clarifier effluent," and providing justification for the rising sludge and solids carryover. Attachment F: Hanover Foods Letter to DEP re NPDES Permit No. PA0044741 (Oct. 9, 2020), at 2–3. However, these responses do not fully address the concerns identified in the Aug. 26, 2020 NOV. Hanover Foods also identified a few actions that Hanover Foods began between May 2020 and August 2020 that may improve the Facility. These improvements appeared to be unable to prevent reoccurrence of the operation and maintenance failures, as demonstrated by the February 4, 2021 Inspection Report, discussed further below.

Complaint Exhibit 1

3 of the NOV, attached hereto as **Attachment I**.[59] The violations include exceedances of average monthly and daily maximum loads and concentrations for ammonia-nitrogen, CBOD5, TSS; an exceedance of the instantaneous maximum for fecal coliform; exceedances of the daily maximum for temperature; and falling below the minimum concentration limit for dissolved oxygen.[60] The Dec. 29, 2020 NOV also indicated noncompliance with the Cap Loads of the 2015 Permit, as set forth in Part A.I.G. In the NOV, DEP requested that Hanover Foods submit a report prepared by a Pennsylvania Professional Engineer summarizing the cause of the violations and the condition and operability of the Plant. The report was required to include all corrective steps needed for Hanover Foods to comply with the 2015 Permit and a schedule providing for implementation of the steps and actions. The report was required to be submitted within 60 calendar days of the Dec. 29, 2020 NOV—February 27, 2021.[61] Citizens do not know whether this report was submitted timely based on the documents provided in response to the Right-to-Know-Law request, the timeframe of which predated the deadline for the report.

A January 28, 2021 Compliance Inspection Report based on an administrative review of Hanover Foods' Chesapeake Bay nutrient monitoring for the 2019-2020 Compliance Year confirmed that the Hanover Foods exceeded its annual total mass loads for total Nitrogen and Total Phosphorus, but that approved nutrient credits brought the company into compliance.[62] Hanover Foods did not properly complete the required nutrient tracking supplemental forms or include the updated Net Loadings on its eDMR submissions with the credits applied.[63]

Finally, DEP conducted a Compliance Inspection on February 4, 2021, which continued to indicate failure to properly operate and maintain facilities and also showed unauthorized discharges.[64] The Feb. 4, 2021 inspection report described the following operation and maintenance concerns, including:

- The non-contact cooling water flow metering pit was flooded and there was evidence of water level fluctuation and overflow.
- Bio-reactor #1 and clarifiers #1 and #2 were offline due to the need for bio-reactor #1 to be repaired.
- Operating parameters of bio-reactor #2 (hydraulic retention time and operating temperatures) were sub-optimal and possibly outside the design specifications, and small cracks were observed in the outer coating of the bio-reactor.
- Solids were bulking and there was carryover in clarifiers #3 and #4 to Lagoon #1.
- Several indicator lights relating to the UV disinfection treatment unit were on.
- Discharge from Lagoon #2, polishing ponds, and Outfall 002 appeared turbid with a brown tint and contained visible suspended solids.

---

[59] Notice of Violation, Hanover Foods, NPDES Permit No. PA0044741 (Dec. 29, 2020) ("Dec. 29, 2020 NOV"), at 1, attached hereto as **Attachment I**.
[60] *Id.* at 3.
[61] *Id.* at 1–2.
[62] NPDES Compliance Inspection Report, Hanover Foods IWTP (Jan. 28, 2021) ("Jan. 28, 2021 Inspection Report"), at 2, attached hereto as **Attachment J**.
[63] *Id.*
[64] NPDES Compliance Inspection Report, Hanover Foods IWTP (Feb. 4, 2021) (Feb. 4, 2021 Inspection Report"), at 1, attached hereto as **Attachment K**.

Complaint Exhibit 1

- Outfall 001 discharge "created a visible difference in water quality in Oil Creek to area approximately 20 meters downstream." DEP observed brown colored solids and accumulations of sphaerotilus-type bacterial colonies on the stream substrate at Outfall 001 and up to approximately 10-20 meters downstream of the outfall, while upstream of Outfall 001 the stream appeared clean and free of solids or sphaerotilus-type bacterial colonies.[65]

According to the Feb. 4, 2021 inspection report, in discussions with DEP, Hanover Foods indicated the challenges at the Facility were due to product sales changes during the COVID-19 pandemic. These changes required (and potentially may still be requiring) the Facility to operate for seven days per week to meet demand, compared with five days per week previously.[66] The inspection report notes that the increase in the quantity of process wastewater and non-contact cooling water has created operational challenges.[67] However, the pattern of effluent violations, which can alone demonstrate the Facility's failure to properly operate and maintain, began prior to the COVID-19 pandemic and have frequently occurred during periods of normal flow. Upon information and belief, Hanover Foods did not notify DEP of these challenges prior to the Feb. 4, 2021 inspection or request regulatory relief from its permit requirements due to COVID-19 at any time.

Given that solids carryover from clarifiers #3 and #4 continues as of the most recent inspection, Hanover Foods' prior efforts to resolve the Aug. 26, 2020 NOV do not appear to have succeeded.

### E.  Pretreatment Permits

Hanover Foods also holds a Penn Township WWTP Industrial Wastewater Discharge Permit ("Pretreatment Permit"), which authorizes discharge from the Plant to the Penn Township WWTP according to national pretreatment standards and local limits. The current Pretreatment Permit, No. 2021-4, became effective January 1, 2021 and expires December 31, 2025 (the "2021 Pretreatment Permit").[68] The prior Pretreatment Permit, No. 2016-4, was effective from January 1, 2016 to December 31, 2020 (the "2016 Pretreatment Permit").[69]

The 2016 Pretreatment Permit authorized Hanover Foods to discharge industrial wastewater from the Plant, pursuant to the permit terms, which included pollutant monitoring and reporting requirements, specific discharge limits, and limits on the average monthly flow and peak maximum flow to Penn Township WWTP. The 2016 Pretreatment Permit set forth, among others, specific discharge limits for daily maximum loads of BOD, TSS, and ammonia-nitrogen:[70]

| Parameter | Limits (lbs/day) |
|-----------|------------------|
| BOD | 1500 |

---

[65] *Id.* at 2.
[66] *Id.* Hanover Foods's 2020 Permit Renewal Application provides the average production days per month from 2015 to 2019 as oscillating between 27 and 28 days per month, which amounts to more than 5 days per week on average. If production in 2020 required production for 7 days per week, this would amount to 2-4 additional days of production each month. 2020 Permit Renewal Application at 7 (excerpt attached as **Attachment C**, pgs. 3–4).
[67] Attachment K: Feb. 4, 2021 Inspection Report, at 2.
[68] Penn Township Wastewater Treatment Plant Industrial Wastewater Discharge Permit, Permit No. 2021-4, Issued to Hanover Foods Corporation, at 1, attached hereto as **Attachment L**.
[69] Penn Township Wastewater Treatment Plant Industrial Wastewater Discharge Permit, Permit No. 2016-4, Issued to Hanover Foods Corporation, at 1, attached hereto as **Attachment M.**
[70] *Id.* at 17.

Complaint Exhibit 1

| TSS | 4000 |
| ammonia-nitrogen | 225 |

The discharge of wastewater from the Plant to Penn Township WWTP must not exceed an average monthly flow of 450,000 gallons per day (0.450 mgd) or a peak maximum daily flow of 700,000 gallons per day (0.700 mgd).[71] The 2021 Pretreatment Permit increased the limit for daily maximum load of BOD from 1,500 pounds per day to 2,300 pounds per day but retained all other limits, including the limits on the average monthly flow and peak maximum daily flow.[72]

### F.    Receiving Water Body

Hanover Foods is authorized to discharge to Oil Creek and an Unnamed Tributary (UNT) to Oil Creek.[73] Outfall 001 discharges directly to Oil Creek, Outfalls 002 and 003 discharge to an UNT to Oil Creek, and Outfall 004 discharges into a wetland area leading to an UNT of Oil Creek.[74] Oil Creek is a tributary to the Codorus Creek, which feeds the Lower Susquehanna River.[75] Oil Creek is impaired for nutrients and siltation.[76] Although the NPDES Permit Fact Sheet indicates that the Total Maximum Daily Load (TMDL) Status is "Pending" for the impairments listed, there is a 2003 TMDL for sediment for a segment of Oil Creek, based on impairment of a segment of Oil Creek for siltation, TSS, and turbidity.[77] There appears to be no TMDL yet developed for nutrients for Oil Creek. Oil Creek is classified as a Warm Water Fishery under DEP's regulations. 25 Pa Code § 93.9o.

Codorus Creek is a popular fishing stream and many segments have a designated use for high quality-cold water fishes. Though some segments of the Codorus Creek are impaired for thermal modification, siltation, flow regime modification or other sources, most of the stream segments immediately upstream and downstream of the confluence with Oil Creek are not impaired. Upstream of the confluence, the designated use of the Codorus Creek is consistently high quality-cold water fishes, whereas immediately downstream of the confluence with Oil Creek, the designated use is generally warm water fishes.

[71] *Id.*
[72] Attachment L: 2021 Pretreatment Permit, at 17.
[73] Attachment D: Permit, at 1.
[74] Attachment A: Permit Fact Sheet, at 1, 4.
[75] U.S. Geological Survey, Department of the Interior, National Water-Quality Assessment Program – the Lower Susquehanna River Basin, *Description of the Lower Susquehanna River Basin Study Unit* (Dec. 1, 1994), https://water.usgs.gov/nawqa/ne/lsus/lsus_factsheet.html#:~:text=Other%20major%20tributaries%20and%20their,Creek%20(278%20square%20miles); York County Conservation District, Codorus Creek Watershed Association, *Codorus Creek Nonpoint Source Pollution Control Watershed Implementation Plan, York County, Pennsylvania* (Dec. 6, 2007), 1-3, *available at* https://files.dep.state.pa.us/water/BWEW/Watershed%20Management/lib/watershedmgmt/nonpoint_source/implementation/codorus_creek.pdf.
[76] *Id.* at 3; U.S. E.P.A., How's My Waterway?, *Oil Creek-57474485,* https://mywaterway.epa.gov/waterbody-report/21PA/PA-SCR-57474485/2020.
[77] PADEP, Total Maximum Daily Loads and Alternative Restoration Strategies, https://www.ahs.dep.pa.gov/TMDL/, select "Oil Creek" in "Select by Watershed"; PADEP, Office of Water Management, Total Maximum Daily Load, Oil Creek Watershed (Mar. 1, 2003), *available at* https://www.dep.state.pa.us/dep/deputate/watermgt/wqp/wqstandards/tmdl/OilCreek_TMDL.pdf.

Complaint Exhibit 1

Hanover Foods is considered a significant industrial wastewater discharger to the Chesapeake Bay and is subject to the Chesapeake Bay TMDL. According to the Pennsylvania Watershed Implementation Plan (WIP), Phases 1 and 2, and the supplement to WIP 2, Hanover Foods' allocated Cap Loads are 26,385 lbs/year Total Nitrogen and 979 lbs/year Total Phosphorus, based on a total flow of 0.84 mgd. As outlined above, the 2015 Permit provides a compliance schedule for activities Hanover Foods must achieve, and the Chesapeake Bay Cap Loads became applicable beginning on October 1, 2017.[78]

On May 17, 2021, the Lower Susquehanna Riverkeeper took samples from Oil Creek, both upstream and downstream of Outfall 001, and photographed the discharge from Outfall 001. The sampling results show increases from the upstream to downstream locations in ammonia-nitrogen, CBOD, nitrate, and TSS.[79] These increases are consistent with the kinds of effluent limitation violations occurring at the site over the course of the past several years and pose potential risks to the ecosystem of Oil Creek.



Photo taken by Ted Evgeniadis on May 17, 2021 showing Outfall 001 discharging into Oil Creek from Hanover Foods.

[78] Attachment A: NPDES Permit Fact Sheet Individual IW and IW Stormwater, at 11.
[79] Certificate of Analysis, ALS Environmental (May 28, 2021), 5–6, attached hereto as **Attachment N** ("May 17, 2021 Oil Creek Sampling"). The lab report suggests that the sample was not properly preserved, which could have a potential effect on the ammonia results but should not affect the other parameters.

Complaint Exhibit 1

## II.     CLEAN WATER ACT AND CLEAN STREAMS LAW VIOLATIONS

Section 301(a) of the CWA, 33 U.S.C. § 1311(a), makes unlawful the discharge of any pollutant into waters of the United States by any person except in compliance with certain other enumerated sections of the CWA. Section 402 of the CWA, 33 U.S.C. § 1342, created the NPDES program, under which EPA may issue NPDES permits for point source discharges to waters of the United States. Section 402(b) of the Act, 33 U.S.C. § 1342(b), authorizes the EPA Administrator to delegate to the states the authority to issue NPDES permits. The Commonwealth of Pennsylvania, through DEP, was delegated the authority to issue NPDES permits on June 30, 1978 and has been implementing the federal permitting program since that date. *See* 67 Fed. Reg. 55,841-01, 55,842.[80]

Section 301 of the CSL prohibits a person from placing, or permitting to be placed, or discharging or permitting to flow, any "industrial waste" into waters of the Commonwealth, unless such discharge is in compliance with both the terms and conditions of a permit issued by the Commonwealth pursuant to section 402 and with the rules, regulations, and orders of the Commonwealth.[81]

Industrial stormwater and industrial process wastewater combined with non-contact cooling water are "pollutants" as that term is defined in section 502(6) of the CWA and "pollution" or "industrial waste" as those terms are defined in section 1 of the CSL.[82] The term "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source."[83] Hanover Foods' designated outfalls 001, 002, 003, and 004 are point sources as that term is defined in section 502(14) of the CWA because they are discernible, confined and discrete conveyances from

---

[80] The Commonwealth issues permits, including the Permit, pursuant to this authority under the CWA and the CSL. *See, e.g.*, 25 PA. CODE § 963.1 (2018) (defining a Part I Permit as an NPDES permit "issued by the Department under section 5 of the Clean Streams Law (35 P.S. § 691.5) and section 402 of the Clean Water Act (33 U.S.C. § 1342)").
and section 402 of the Clean Water Act (33 U.S.C. § 1342); 33 U.S.C. § 1342(i)).
[81] "No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act." 35 P.S. § 691.301.
[82] "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and **industrial**, municipal, and agricultural **waste** discharged into water." 33 U.S.C. § 1362(6) (emphasis added.); "Industrial waste" means "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations. 'Industrial waste' shall include all such substances whether or not generally characterized as waste." 35 P.S. § 691.1. "Pollution" means "contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The department shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined." *Id.*
[83] 33 U.S.C. § 1362(12)

which pollutants are discharged.[84] The Susquehanna River is a "navigable water" pursuant to section 502(7) of the CWA because it is a "water of the United States" as that term is defined by 40 C.F.R. § 120.2(1)(i).[85] Because Oil Creek is a tributary of the Codorus Creek, which is a tributary of the Susquehanna River, both creeks are also "waters of the United States" and therefore "navigable waters" under the CWA.[86] Oil Creek and Codorus Creek are also Waters of the Commonwealth under section 1 of the CSL.[87]

Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), states that "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this [Act]." Section 601(c) of the CSL, 35 P.S. § 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act . . . against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

As a corporation, Hanover Foods is a "person," as that term is defined in section 502(5) of the CWA and section 1 of the CSL and is subject to the effluent standards and limitations of the 2015 Permit and the 2016 and 2021 Pretreatment Permits.[88] According to CWA section 505(a), 33 U.S.C. § 1365(a), district courts have jurisdiction "to enforce such an effluent standard or limitation" and to apply any appropriate civil penalties under section 309(d) of the CWA, 33 U.S.C. § 1319(d). A court can impose a civil penalty of up to $56,460 per day for each CWA or permit violation. 33 U.S.C. § 1319(d).[89] Any person found violating the CSL, or a permit or regulation pursuant thereto, is subject to injunctive relief to abate the noncompliance and to a civil penalty of up to $10,000 per violation per day.[90]

For purposes of section 505, the term "effluent standard or limitation under this chapter" includes, among other things, "a permit or condition of a permit" issued under section 402 that is in effect under the CWA. 33 U.S.C. § 1365(f)(7). Therefore, a violation of the 2015 Permit constitutes a violation of an effluent standard or limitation. The term "effluent standard or limitation" also includes "prohibition, effluent standard or pretreatment standards" under section 307 of the CWA. 33 U.S.C. § 1365(f)(4). The discharge limits set forth in the 2016 Pretreatment Permit and 2021 Pretreatment Permit are pretreatment standards as set forth in section 505(f)(4). Therefore, the

---

[84] "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[85] "The term 'navigable waters' means the waters of the United States, including the territorial seas. 33 U.S.C. § 1362(7). The term "waters of the United States" includes "(i) The territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide; . . ." 40 C.F.R. § 120.2(1)(i).

[86] *See* 40 C.F.R. § 120.2(1)(ii) (including "Tributaries" in the definition of "waters of the United States").

[87] 35 P.S. § 691.1 (defining "Waters of the Commonwealth" to include "any and all rivers, streams, creeks . . . and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth.")

[88] "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5); Under the CSL, "[p]erson" includes "any natural person, partnership, association or corporation or any agency, instrumentality or entity of Federal or State Government." 35 P.S. § 691.1.

[89] *See also* Civil Monetary Penalty Inflation Adjustment, 40 C.F.R. § 19.4.

[90] *See* 35 P.S. §§ 691.602(a), 605(a).

Complaint Exhibit 1

violation of either Pretreatment Permit constitutes a violation of an effluent standard or limitation and a violation of section 307(d) (". . . it shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition or pretreatment standard.").

Hanover Foods has violated, and is continuing to violate, terms and conditions of the 2015 Permit and the 2016 and 2021 Pretreatment Permits, and the CWA and CSL. The violations are each described in detail in the counts that follow:

Count 1: Violations of Effluent Concentration Limitations of the 2015 Permit

Count 2: Violations of Effluent Load Limitations of the 2015 Permit

Count 3: Chronic Failures to Properly and Timely Report under the 2015 Permit

Count 4: Failure to Properly Operate and Maintain Facilities under the 2015 Permit

Count 5: Violations of Chesapeake Bay Schedule Reporting Requirements and Chesapeake Bay Nutrient Reporting Requirements of the 2015 Permit

Count 6: Violations of Temperature Compliance Schedule Reporting Requirements and Effluent Limitations of the 2015 Permit

Count 7: Unauthorized Discharge of Substances that Result in Observed Deposits in, or Produce an Observed Change in the Color or Turbidity of, the Receiving Water

Count 8: Violations of Effluent Load Limitations and Flow Limitations of the 2016 Pretreatment Permit and Flow Limitations of the 2021 Pretreatment Permit

By violating the terms of the 2015 Permit and the 2016 and 2021 Pretreatment Permits, Hanover Foods violated, and is violating, the federal CWA and the Pennsylvania CSL. These violations are all continuing. For the past five years and for similar violations that occur after the date of this Notice, each day of each violation of the 2015 Permit and the 2016 and 2021 Pretreatment Permits constitutes a violation for which a penalty of up to $56,460 can be assessed under the CWA. Violations of the 2015 Permit are also violations of the CSL, for which injunctive relief to abate the noncompliance can be sought and a civil penalty of up to $10,000 per violation per day can be imposed.

**<u>Count 1: Violations of Effluent Concentration Limitations of the 2015 Permit</u>**

All of the information set forth above is incorporated herein. Hanover Foods' eDMRs demonstrate that violations of effluent limits are consistent over the course of several years, not specifically triggered by increased production during the current pandemic. Additionally, because any production changes as a result of the pandemic have likely been ongoing for over a year, Hanover Foods must change its practices to adjust to the new normal as needed to meet its permit limitations.

Complaint Exhibit 1

1.      **Violations of Monthly Average Effluent Concentration Limits for TSS, CBOD5, and ammonia-nitrogen**

Hanover Foods consistently exceeded its monthly average effluent concentration limits for TSS (18 times), CBOD5 (11 times), and ammonia-nitrogen (3 times) in the past five years. These exceedances are shown in **Tables 1–3** below. Each day of the month in which the discharged effluent exceeded the monthly average concentration limit for each pollutant is a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Table 1. Violations of Monthly Average Effluent Concentration Limit for TSS (30.0 mg/L)**

| Date | Effluent TSS (mg/L) |
|------|---------------------|
| Jun-16 | 49.0 |
| Jul-16 | 33.0 |
| Jun-17 | 35.0 |
| Feb-18 | 32.0 |
| Nov-18 | 36.0 |
| Sep-19 | 33.0 |
| Oct-19 | 33.0 |
| Nov-19 | 65.0 |
| Jan-20 | 39.0 |
| Feb-20 | 33.0 |
| Apr-20 | 59.0 |
| May-20 | 48.0 |
| Jun-20 | 37.0 |
| Jul-20 | 37.0 |
| Nov-20 | 78.0 |
| Jan-21 | 67.0 |
| Feb-21 | 70.0 |
| Mar-21 | 51.0 |

**Table 2. Violations of Monthly Average Concentration Limit for CBOD5 (10.0 mg/L re May 1–Oct 31; 18.0 mg/L re Nov 1– Apr 30)**

| Date | Effluent CBOD (mg/L) | Limit (mg/L) |
|------|----------------------|--------------|
| Oct-19 | 15.7 | 10.0 |
| Nov-19 | 65.06 | 18.0 |
| Dec-19 | 26.8 | 18.0 |
| Jan-20 | 22.6 | 18.0 |
| Jul-20 | 20.3 | 10.0 |
| Aug-20 | 24.3 | 10.0 |
| Oct-20 | 35.8 | 10.0 |
| Nov-20 | 18.5 | 18.0 |
| Jan-21 | 101.5 | 18.0 |
| Feb-21 | 85.4 | 18.0 |

| | | |
|---|---|---|
| Mar-21 | 45.5 | 18.0 |

**Table 3. Violations of Monthly Average Concentration Limit for ammonia-nitrogen (1.0 mg/L re May 1-Oct 31; 3.0 mg/L re Nov 1-Apr 30)**

| Date | Effluent ammonia-nitrogen (mg/L) | Limit (mg/L) |
|---|---|---|
| Aug-17 | 1.044 | 1.0 |
| Oct-17 | 1.28 | 1.0 |
| Jul-20 | 3.6 | 1.0 |

       2.       **Violations of Daily Maximum Effluent Concentration Limits for TSS, CBOD5, and ammonia-nitrogen**

**Tables 4**, **5,** and **6** show that Hanover Foods also consistently exceeded the daily maximum effluent concentration limits for TSS (17 times), CBOD5 (16 times), and ammonia-nitrogen (6 times) over the last five years. Each day the discharged effluent exceeded the daily maximum concentration limit for each pollutant is a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Table 4. Violations of Daily Maximum Effluent Concentration Limit for TSS (60.0 mg/L)**

| Date | Effluent TSS (mg/L) |
|---|---|
| Jun-16 | 77.0 |
| Apr-18 | 316.0 |
| May-18 | 86.0 |
| Nov-19 | 163.0 |
| Dec-19 | 111.0 |
| Jan-20 | 85.0 |
| Feb-20 | 69.0 |
| Apr-20 | 104.0 |
| May-20 | 80.0 |
| Jun-20 | 70.0 |
| Oct-20 | 174.0 |
| Nov-20 | 80.0 |
| Dec-20 | 76.0 |
| Jan-21 | 97.0 |
| Feb-21 | 122.0 |
| Mar-21 | 85.0 |
| Apr-21 | 62.0 |

**Table 5. Violations of Daily Maximum Effluent Concentration Limit for CBOD (15.0 mg/L re May 1-Oct 31; 27.0 mg/L re Nov 1-Apr 30)**

| Date | Effluent CBOD (mg/L) | Limit (mg/L) |
|---|---|---|
| May-18 | 16.1 | 15.0 |

Complaint Exhibit 1

| | | |
|---|---|---|
| Oct-19 | 79.1 | 15.0 |
| Nov-19 | 124.0 | 27.0 |
| Dec-19 | 81.7 | 27.0 |
| Jan-20 | 43.0 | 27.0 |
| Mar-20 | 65.8 | 27.0 |
| Apr-20 | 34.0 | 27.0 |
| Jun-20 | 23.6 | 15.0 |
| Jul-20 | 48.2 | 15.0 |
| Aug-20 | 49.0 | 15.0 |
| Oct-20 | 135.0 | 15.0 |
| Nov-20 | 52.6 | 27.0 |
| Dec-20 | 36.0 | 27.0 |
| Jan-21 | 179.0 | 27.0 |
| Feb-21 | 250.0 | 27.0 |
| Mar-21 | 115.0 | 27.0 |

**Table 6. Violations of Daily Maximum Effluent Concentration Limit for Ammonia-N (2.0 mg/L re May 1-Oct 31; 6.0 mg/L re Nov 1-Apr 30)**

| Date | Effluent Ammonia-N (mg/L) | Limit (mg/L) |
|---|---|---|
| Jul-17 | 2.49 | 2.0 |
| Oct-17 | 3.38 | 2.0 |
| Jul-19 | 2.87 | 2.0 |
| Jul-20 | 10.2 | 2.0 |
| Aug-20 | 3.81 | 2.0 |
| Sep-20 | 4.06 | 2.0 |

### 3. Violations of Instantaneous Maximum Effluent Concentration Limits for Fecal Coliform

Hanover Foods exceeded the instantaneous maximum effluent concentration limits for fecal coliform five times in 2016. According to the 2017 COA, Hanover Foods paid the Department $1,600 to resolve these violations from May 1 to September 30, 2016.[91] A plant upgrade provided for construction and operation of the ultraviolet system to treat for fecal coliform.[92] Two recent exceedances, including one in 2021, indicate that Hanover Foods continues to experience problems maintaining compliance with this effluent limitation.

Each day of noncompliance is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

---

[91] 2017 COA, at ¶ M, pg. 3.
[92] *Id.* at ¶ L, pg. 3.

Complaint Exhibit 1

**Table 7. Violations of Instantaneous Maximum for Fecal Coliform**
**(1,000 CFU/100 ml re May 1-Sep 30; 10,000 CFU/100 ml re Oct 1-Apr 30)**

| Date | Effluent Fecal Coliform (CFU/100 ml) | Limit (CFU/100 ml) |
|------|--------------------------------------|--------------------|
| May-16 | 2,300 | 1,000 |
| Jun-16 | 52,000 | 1,000 |
| Jul-16 | 33,000 | 1,000 |
| Aug-16 | 4,300 | 1,000 |
| Sep-16 | 13,500 | 1,000 |
| Oct-20 | 26,300 | 10,000 |
| Feb-21 | 29,000 | 10,000 |

### 4.     Failure to Meet Dissolved Oxygen Minimum Concentration Limit

The 2015 Permit sets a minimum level for concentrations of dissolved oxygen in the Plant effluent at 5.0 mg/L. Hanover Foods failed to meet this minimum level in its effluent four times in the past five years, including as recently as November 2020. Each day of noncompliance is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Table 8. Violations of Minimum Concentration Limit for Dissolved Oxygen**

| Date | Effluent DO (mg/L) |
|------|--------------------|
| Sep-16 | 4.8 |
| Nov-19 | 4.3 |
| Dec-19 | 4.4 |
| Nov-20 | 4.0 |

### Count 2: Violations of Effluent Load Limitations of the 2015 Permit

All of the information set forth above is incorporated herein.

### 1.     Violations of Monthly Average Effluent Load Limits for TSS, CBOD5, and ammonia-nitrogen

In several of the same months in which Hanover Foods exceeded its monthly average effluent concentration limits for TSS, CBOD5, and ammonia-nitrogen, it also exceeded its load limits for these parameters. As shown in **Tables 9, 10,** and **11** below, Hanover Foods consistently exceeded its monthly average effluent load limits for TSS (17 times) and CBOD5 (12 times) in the past five years and exceeded its load limits for ammonia-nitrogen three times in the same period. Each day of the month in which the discharged effluent exceeded the monthly average load limits for each pollutant is a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

Complaint Exhibit 1

**Table 9. Violations of Monthly Average Load Limit for TSS (210 lbs/day)**

| Date | Effluent TSS (lbs/day) |
|------|------------------------|
| Jun-16 | 313 |
| Jul-16 | 230 |
| Feb-18 | 216 |
| Apr-18 | 299 |
| Sep-19 | 277 |
| Oct-19 | 255 |
| Nov-19 | 401 |
| Jan-20 | 267 |
| Apr-20 | 403 |
| May-20 | 334 |
| Jun-20 | 369 |
| Jul-20 | 310 |
| Oct-20 | 861 |
| Nov-20 | 348 |
| Jan-21 | 621 |
| Feb-21 | 300 |
| Mar-21 | 278 |

**Table 10. Violations of Monthly Average Load Limit for CBOD5**
**(70 lbs/day re May 1-Oct 31; 126 lbs/day re Nov 1-Apr 30)**

| Date | Effluent CBOD (lbs/day) | Limit (lbs/day) |
|------|-------------------------|------------------|
| Oct-19 | 107 | 70 |
| Nov-19 | 378 | 126 |
| Jan-20 | 149 | 126 |
| Mar-20 | 136 | 126 |
| Jul-20 | 170 | 70 |
| Aug-20 | 215 | 70 |
| Sep-20 | 74 | 70 |
| Oct-20 | 405 | 70 |
| Nov-20 | 138 | 126 |
| Jan-21 | 1006 | 126 |
| Feb-21 | 320 | 126 |
| Mar-21 | 231 | 126 |

**Table 11. Violations of Monthly Average Load Limit for ammonia-nitrogen**
**(7 lbs/day re May-Oct 31; 21 lbs/day re Nov 1-Apr 30)**

| Date | Effluent Ammonia-N (lbs/day) | Limit (lbs/day) |
|------|------------------------------|------------------|
| Oct-17 | 9.0 | 7.0 |
| Jul-20 | 25.0 | 7.0 |
| Aug-20 | 15.0 | 7.0 |

Complaint Exhibit 1

2.      **Violations of Daily Maximum Effluent Load Limits for TSS, CBOD5, and ammonia-nitrogen**

Hanover Foods exceeded the daily maximum effluent load limits for TSS (19 times), CBOD5 (16 times), and ammonia-nitrogen (6 times) over the last five years. Each day the discharged effluent exceeded the daily maximum load limit for each pollutant is a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Table 12. Violations of Daily Maximum Effluent Load Limit for TSS (420 lbs/day)**

| Date | Effluent TSS (lbs/day) |
|------|------------------------|
| Jun-16 | 519 |
| May-17 | 460.0 |
| Apr-18 | 1911 |
| Nov-19 | 1177 |
| Dec-19 | 485 |
| Jan-20 | 682 |
| Feb-20 | 445 |
| Mar-20 | 683 |
| Apr-20 | 713 |
| May-20 | 653 |
| Jun-20 | 792 |
| Jul-20 | 506 |
| Aug-20 | 448 |
| Oct-20 | 2106 |
| Nov-20 | 759 |
| Dec-20 | 551 |
| Jan-21 | 733 |
| Feb-21 | 549 |
| Mar-21 | 567 |

**Table 13. Violations of Daily Maximum Effluent Load Limits for CBOD5 (105 lbs/day re May 1-Oct 31; 189 lbs/day re Nov 1-Apr 30)**

| Date | Effluent CBOD (lbs/day) | Limit (lbs/day) |
|------|-------------------------|-----------------|
| Oct-19 | 451 | 105 |
| Nov-19 | 715 | 189 |
| Dec-19 | 362 | 189 |
| Jan-20 | 274 | 189 |
| Mar-20 | 762 | 189 |
| Apr-20 | 218 | 189 |
| Jun-20 | 252 | 105 |
| Jul-20 | 461 | 105 |
| Aug-20 | 522 | 105 |
| Sep-20 | 135 | 105 |

Complaint Exhibit 1

| | | |
|---|---|---|
| Oct-20 | 1634 | 105 |
| Nov-20 | 310 | 189 |
| Dec-20 | 261 | 189 |
| Jan-21 | 2244 | 189 |
| Feb-21 | 667 | 189 |
| Mar-21 | 635 | 189 |

**Table 14. Violations of Daily Maximum Effluent Load Limits for Ammonia-N (14 lbs/day re May 1-Oct 31; 42 lbs/day re Nov 1-Apr 30)**

| Date | Effluent Ammonia-N (lbs/day) | Limit (lbs/day) |
|---|---|---|
| Jul-17 | 17 | 14 |
| Oct-17 | 35 | 14 |
| Jul-19 | 22 | 14 |
| Jul-20 | 67.0 | 14 |
| Aug-20 | 35.0 | 14 |
| Sep-20 | 53 | 14 |

## Count 3: Chronic Failures to Properly and Timely Report Under the 2015 Permit

All of the information set forth above is incorporated herein. In the last five years, Hanover Foods has consistently failed to comply with various reporting requirements. Hanover Foods failed to submit DMRs to DEP for Outfalls 002 and 003 for 2017 and 2018, failed to submit timely DMRs for Outfalls 002 and 003 for the 2019 reporting year, and in numerous instances from 2016 to 2020 failed to submit monitoring results that would allow DEP and the public to determine whether the values exceeded permit limits. Hanover Foods also consistently fails to provide reports of every instance of noncompliance on the required Non-Compliance Reporting Form. These chronic reporting errors and omissions over the course of the past five years reflect inadequate operation and maintenance, especially when it comes to placing appropriate emphasis on timely, accurate and full reporting of monitoring results as well as mandatory self-disclosures of instances of noncompliance. Failure to operate the Facility in a way that ensures accurate and full reporting constitutes violations of the 2015 Permit, as more fully described below. This inattention to detail also prevents regulators and the public alike from having a full understanding of Hanover Foods' compliance status. These monitoring and reporting irregularities have not been remedied.

### 1.    Failure to Sample and Submit DMRs

The eDMRs for Outfalls 002 and 003 display an "E" in place of a value for all parameters required to be monitored and reported annually, as a daily maximum, for the 2017 and 2018 reporting years. These failures to report are violations of 2015 Permit Parts I.D (Outfall 002) and I.E (Outfall 003). According to Hanover Foods' July 23, 2019 response to the July 9, 2019 NOV noting this reporting violation, the company failed to provide stormwater DMRs for 2017 and 2018 because it did not sample.[93] Hanover Foods stated that it had since initiated a procedure to collect stormwater samples pursuant to the 2015 Permit and would report by January 28 of each year. But, Hanover

---

[93] Hanover Foods Letter to DEP re NPDES Permit No. PA0044741 (July 23, 2019), attached hereto as **Attachment O**.

Foods still failed to submit its stormwater monitoring results timely the next annual reporting deadline, January 28, 2020, as noted in the next section, suggesting that these reporting issues are chronic and continuing.

The failure to monitor and report the daily maximum for each of the required parameters for Outfall 002 and Outfall 003 constitutes a separate violation for each parameter (CBOD5, chemical oxygen demand, dissolved iron, total iron, oil and grease, pH, total phosphorus, and TSS), for each Outfall, and for each year (2017 and 2018). This amounts to 32 total days of violations for failure to sample for Outfalls 002 and 003. Each day is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

### 2.      Failure to Submit Discharge Monitoring Reports Timely

The 2015 Permit requires the annual DMRs for Outfalls 002 and 003 to be received by January 28 of the following year.[94] The 2019 DMRs for Outfalls 002 and 003 were submitted nine months late.  The deadline for the 2019 DMRs was January 28, 2020, but Hanover Foods submitted its results on October 26, 2020. To the best of our knowledge, the failure to submit the 2019 DMR on time constitutes a violation for each day between the deadline for submission and the date the DMR was actually submitted, a total of 272 days. Each day is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed. At a minimum, the late submission of DMRs in 2019 constitutes a single violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

### 3.      Failure to Report DMR Values That Allow Comparison to Effluent Limitation

In its eDMRs, Hanover Foods occasionally submits results that do not allow DEP or the public to determine whether the average monthly concentration or load exceeds the effluent limitation for that parameter. These errors constitute violations of the limits themselves and show insufficiently sensitive test methods for pollutant analysis, in violation of Part A.III.A.4.c. Because the reported load or concentration was generally an average, rather than a single sampling result, these instances likely reflect either calculation errors or a reporting error. DEP included these reporting failures from August 2020 to November 2020 in the Dec. 29, 2020 NOV in which it listed all Monthly eDMR violations between July and November 2020.[95] Each day of the month in which a reporting error occurred for a monthly average limit must be treated as an effluent limitation violation, or at least a reporting violation, and is a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed. The reporting error for the total annual net load is also a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

---

[94] Attachment D: Permit, Part A.III.B.2.
[95] Attachment I: Dec. 19, 2020 NOV, at 3.

Complaint Exhibit 1

**Table 15. DMR Values Insufficient to Evaluate Compliance with Effluent Limitation**

| Date | Parameter | Limit | Limit Type | DMR Value |
|---|---|---|---|---|
| Jul-16 | Fecal coliform | 200 CFU/100ml | Geometric mean | < 421 |
| Oct-17 – Sep 18 | Phosphorus | 979 lbs/yr | Annual Net Load (applying credits/offsets) | < 1717 |
| Dec-19 | TSS | 30 mg/L | Avg monthly concentration | < 45 |
| Mar-20 | TSS | 30 mg/L | Avg monthly concentration | < 38 |
| Mar-20 | TSS | 210 lbs/day | Avg monthly load | < 273 |
| Jun-20 | CBOD5 | 70 lbs/day | Avg monthly load | < 94 |
| Aug-20 | Ammonia-Nitrogen | 1.0 mg/L | Avg monthly concentration | < 1.821 |
| Sep-20 | Ammonia-Nitrogen | 1.0 mg/L | Avg monthly concentration | < 1.92 |
| Sep-20 | Ammonia-Nitrogen | 7.0 lbs/day | Avg monthly load | < 23.0 |
| Dec-20 | TSS | 30 mg/L | Avg monthly concentration | < 32 |
| Dec-20 | TSS | 210 lbs/day | Avg monthly load | < 218 |

### 4.     Failure to Report All Instances of Noncompliance

The 2015 Permit requires Hanover Foods to report at the time DMRs are submitted all instances of noncompliance not otherwise reported under the permit section addressing endangerment or according to compliance schedule requirements.[96] The reports must be submitted on DEP's Non-Compliance Reporting Form and contain descriptions of the noncompliance, its cause, the duration, and steps taken or planned to prevent reoccurrence of the noncompliance. Upon information and belief, based on the files provided in response to a Right-to-Know-Law request, Hanover Foods has failed to submit Non-Compliance Reporting Forms in the past five years documenting every permit violation, with the exception of one submitted for exceedances of the daily maximum limit for TSS and maximum limit for pH for May 2017. A Non-Compliance Reporting Form should have been submitted for each violation of effluent limitations described in this Notice. Since the permit violations are continuing, the failures to report noncompliance are also continuing. Each failure to submit the Non-Compliance Reporting Form constitutes an ongoing violation, beginning at the time each report was due and continuing each day until these forms are submitted. Each day constitutes a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

---

[96] Attachment D: Permit, Part III.C.5 ("The permittee shall report all instances of noncompliance not reported under paragraph C.4 of this section or specific requirements of compliance schedules, at the time DMRs are submitted, on the Non-Compliance Reporting Form.")

Complaint Exhibit 1

**Count 4: Failure to Properly Operate and Maintain Facilities Under the 2015 Permit**

All of the information set forth above is incorporated herein. The 2015 Permit requires Hanover Foods to properly operate and maintain all facilities and systems of treatment and control installed or used to achieve compliance with the 2015 Permit.[97] The Apr. 18, 2019, July 9, 2020, and Feb. 4, 2021 Inspection Reports reveal a pattern of failures to properly operate and maintain the Plant and all the control and treatment systems. According to these inspection reports, problems with operating parameters of bio-reactor #2 and solids carryover in clarifiers #3 and #4 appear to be continuous problems that have not been addressed. The Feb. 4, 2021 Inspection Report highlighted several additional new potential problems that must be corrected. Each day of noncompliance is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

Chronic effluent exceedances and monitoring failures provide further proof of systemic operation and maintenance failures. Hanover Foods is subject to civil penalties each day of violation dating from the start of improper operation and maintenance. Upon information and belief, operation and maintenance violations are continuing and date back more than five years, but at least date from April 18, 2019. Hanover Foods is subject to a penalty of up to $56,460 for each day of violation of the 2015 Permit and the CWA for failure to properly operate and maintain all facilities of treatment and control. Each day is also a violation of the CSL for which a penalty of up to $10,000 can be imposed.

**Count 5: Violations of Chesapeake Bay Schedule Reporting Requirements and Chesapeake Bay Nutrient Reporting Requirements in the 2015 Permit**

All of the information set forth above is incorporated herein. Each day of noncompliance is a separate violation of the 2015 Permit and the CWA and is subject to a penalty of up to $56,460.

1. **Failure to Submit to DEP Notices of Compliance or Noncompliance with Chesapeake Bay Schedule**

The 2015 Permit requires Hanover Foods to submit a written notice of compliance or noncompliance with each specific schedule requirement of the Chesapeake Bay Schedule by no later than 14 days after the scheduled due date for the activity. Upon information and belief, based on the records received in response to a Right-to-Know-Law Request, Hanover Foods has failed to provide DEP the required written notice of compliance or noncompliance with at least two schedule requirements: to issue certification of substantial completion of a planned upgrade by October 1, 2017 and to comply with effluent limitations by September 30, 2018. Because Hanover Foods has still failed to submit the required notices of compliance or noncompliance with the Chesapeake Bay Schedule, it is subject to a penalty of up to $56,460 for each day since the October 1, 2017 and September 30, 2018 deadlines. Each day is also a violation of the CSL for which a penalty of up to $10,000 can be imposed.

---

[97] *Id.*, Part B.I.D.

Complaint Exhibit 1

2.      **Violations of Chesapeake Bay Nutrient Reporting Requirements**

To meet the Chesapeake Bay Nutrient Reporting Requirements, Hanover Foods must report the Annual Net Mass Loads for Nitrogen and Phosphorus, as calculated based on the sum of the monthly total mass loads for the Compliance Year and adjusted to account for credits and offsets. Hanover Foods must also attach to the Annual DMR supplemental forms reporting the credits sold and applied, and offsets applied, to calculate Annual Net Mass Loads. As noted in the Jan. 28, 2021 Inspection Report, Hanover Foods did not complete the required nutrient tracking supplemental forms or include the Annual Net Mass Loads, as adjusted for credits and offsets, with its eDMR submissions for the 2019-2020 Compliance Year. Upon information and belief, Hanover Foods has not completed the required nutrient tracking supplemental forms or submitted the adjusted Net Mass Loads with its eDMR submission. Each day since the deadline of November 28, 2020 is a violation of the CWA and the 2015 Permit, subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Count 6: Violations of Temperature Compliance Schedule Reporting Requirements and Temperature Effluent Limitations in the 2015 Permit**

All of the information set forth above is incorporated herein. The compliance schedule for temperature described in section A.4 reflects a three-year period for Hanover Foods to prepare to comply with the temperature effluent limitations of the 2015 Permit by no later than 36 months after the permit effective date. Hanover Foods failed to comply with the reporting requirements applicable to this temperature schedule and with the temperature effluent limitations themselves. Each day of noncompliance is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460 and the CSL, for which a penalty of up to $10,000 can be imposed.

1.      **Failure to Submit to DEP Notice of Compliance or Noncompliance with Temperature Compliance Schedule**

The 2015 Permit requires Hanover Foods to submit a written notice of compliance or noncompliance with each of the temperature compliance schedule requirements (completion of feasibility study, completion of final plan, starting plan implementation, etc.) by no later than 14 days after the scheduled due date. Upon information and belief, based on the records received in response to a Right-to-Know-Law Request, Hanover Foods has failed to provide DEP the required written notice of compliance or noncompliance with at least five of the six schedule requirements: final plan completion, start plan implementation, plan implementation progress report(s), end of plan implementation, and compliance with effluent limitations. Each day that each of these deliverables is outstanding since the date it was required constitutes a separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

2.      **Violations of Daily Maximum Temperature Effluent Limitations**

Since the effective date of the temperature limits on October 1, 2018, Hanover Foods has violated the limitations once in 2018, three times in 2019, six times in 2020 and five times in 2021 based on the currently available data. These exceedances constitute continuing violations of the 2015 Permit. Each day of violation of the daily maximum temperature effluent limitations constitutes a

Complaint Exhibit 1

separate violation of the 2015 Permit and the CWA, for which a penalty of up to $56,460 can be assessed, and the CSL, for which a penalty of up to $10,000 can be imposed.

**Table 16. Violations of Daily Maximum Temperature Effluent Limitations**

| Date | Temperature (ºF) | Limit (ºF) |
|---|---|---|
| Dec-18 | 60.0 | 50.0 |
| Nov-19 (1-15) | 83.0 | 69.0 |
| Nov-19 (16-31) | 81.0 | 59.0 |
| Dec-19 | 90.0 | 50.0 |
| Jan-20 | 83.0 | 51.0 |
| Feb-20 | 60.0 | 52.0 |
| Oct-20 (16-31) | 85.0 | 76.0 |
| Nov-20 (1-15) | 84.0 | 69.0 |
| Nov-20 (16-31) | 86.0 | 59.0 |
| Dec-20 | 87.0 | 50.0 |
| Jan-21 | 82.0 | 51.0 |
| Feb-21 | 97.0 | 52.0 |
| Mar-21 | 95.0 | 74.0 |
| Apr-21 (1-15) | 99.0 | 83.0 |
| Apr-21 (16-30) | 96.0 | 89.0 |

## Count 7: Unauthorized Discharge of Substances that Result in Observed Deposits in, or Produce an Observed Change in the Color or Turbidity of, the Receiving Water

All of the information set forth above is incorporated herein. Section A.I of the 2015 Permit prohibits the discharge of substances that result in observed deposits in the receiving water and substances that produce an observed change in color or turbidity of the receiving water. At the Feb. 4, 2021 inspection, DEP observed discharge from Outfall 002 that contained visible suspended solids and the discharge from Outfall 001 created a visible difference in water quality in Oil Creek 20 meters downstream of the outfall. This included both a color change and change in turbidity compared with the water upstream. These observations and the photos on the following page from the Feb. 4, 2021 Inspection Report indicate violations of the prohibitions set forth in section A.I of the 2015 Permit.

Complaint Exhibit 1



From Feb. 4, 2021 Inspection Report. Shows sphaerotilus-type bacterial colonies and accumulation of brown-colored solids on stream substrate in Oil Creek, approximately 3m downstream from Outfall 001.



From Feb. 4, 2021 Inspection Report. Showing turbid stream flow and solids accumulation on stream substrate.

Given the ongoing operation and maintenance issues DEP has identified at each on-site inspection since April 18, 2019, and the many operation and maintenance issues specifically identified at the Feb. 4, 2021 inspection, the prohibited discharges are likely ongoing. The contribution to deposits,

Complaint Exhibit 1

turbidity, and change in color of the receiving waterbody are likely affected by the repeated maintenance concerns, including problems with solids bulking and carryover in the operating clarifiers to the lagoons.

On June 22, 2021, the Lower Susquehanna Riverkeeper waded in Oil Creek and photographed what appears to be sediment in the downstream waters. The Riverkeeper's sampling from May 17, 2021 also indicated an increase in ammonia-nitrogen, CBOD, nitrate, and TSS from upstream to downstream of Outfall 001.[98] The increased presence of several pollutants and the increase in sediment present in the downstream waters is consistent with the types of effluent limitation violations described in this Notice, which have been ongoing for years.



Photo taken by Ted Evgeniadis on June 22, 2021, showing Oil Creek downstream from Outfall 001.

Hanover Foods has violated and, upon information and belief, is continuing to violate the 2015 Permit, the CWA, and the CSL based on the ongoing discharge of prohibited substances that affect the turbidity and color of the receiving water. Each day that Hanover Foods discharges substances in violation of the 2015 Permit, beginning at least on Feb. 4, 2021 and continuing to the present, is a separate violation of the 2015 Permit and the CWA subject to a penalty of up to $56,460, and the CSL, for which a penalty of up to $10,000 can be imposed.

---

[98] Attachment N: May 17, 2021 Oil Creek Sampling, at 5–6.

Complaint Exhibit 1

### Count 8: Violations of Effluent Load Limitations and Flow Limitations of the 2016 Pretreatment Permit and Flow Limitations of the 2021 Pretreatment Permit

All of the information set forth above is incorporated herein. In the past three years, Hanover Foods has repeatedly discharged wastewater to Penn Township WWTP in violation of the 2016 Pretreatment Permit. Specifically, Hanover Foods has discharged BOD and ammonia-nitrogen at levels that exceed the permitted daily maximum load limits, and Hanover Foods has discharged wastewater exceeding the permitted average monthly flow of 450,000 gallons per day and peak maximum daily flow of 700,000 gallons per day. Additionally, the Plant's discharge of wastewater to Penn Township in February and March of 2021, pursuant to the recently renewed 2021 Pretreatment Permit, exceeded the same permitted average monthly flow (450,000 gpd), violating the new permit as well.

Each day of each daily maximum effluent load limitation exceedance constitutes a separate violation of the 2016 Pretreatment Permit and subjects Hanover Foods to a penalty of up to $56,460. Each day of the month in which the discharged wastewater exceeded the monthly average flow limit is a separate violation of the applicable 2016 or 2021 Pretreatment Permit and the CWA, for which a penalty of up to $56,460 can be assessed. Each day of an exceedance of the peak maximum daily flow is a separate violation of the 2016 Pretreatment Permit and the CWA, for which a penalty of up to $56,460 can be assessed.[99]

**Table 17. Violations of the Daily Maximum Effluent Load Limit for BOD to Penn Township WWTP (1,500 lbs/day)**

| Date | Effluent BOD (lbs/day) |
|------|------------------------|
| Nov. 12, 2018 | 1,998 |
| Feb. 7, 2019 | 1,529 |
| Nov. 7, 2019 | 1,741 |
| Nov. 12, 2019 | 2,479 |
| Nov. 19, 2019 | 3,222 |
| Nov. 26, 2019 | 3,337 |
| Dec. 5, 2019 | 2,326 |
| Dec. 17, 2019 | 2,494 |
| Jan. 10 ,2020 | 1,903 |
| Jan. 28, 2020 | 1,800 |
| Dec. 8, 2020 | 1,740 |
| Dec. 15, 2020 | 2,769 |

[99] The violations of the 2016 and 2021 Pretreatment Permits only constitute violations of the CWA, not CSL, because in Pennsylvania the pretreatment program is implemented by the publicly owned treatment works and administered by EPA.

Complaint Exhibit 1

**Table 18. Violations of the Daily Maximum Effluent Load Limit for ammonia-nitrogen to Penn Township WWTP (225 lbs/day)**

| Date | Effluent ammonia-nitrogen (lbs/day) |
|------|-------------------------------------|
| Mar. 8, 2018 | 288 |
| Jun. 7, 2018 | 256 |
| Jun. 12, 2018 | 243 |
| Sep. 6, 2018 | 249 |
| May 29, 2019 | 239 |
| July 23, 2019 | 253 |
| Sep. 16, 2019 | 256 |

**Table 19. Violations of the Permitted Average Monthly Flow of Industrial Wastewater to Penn Township WWTP (0.450 mgd)**

| Date | Average Flow (mgd) |
|------|--------------------|
| Aug-16 | 0.493 |
| Sep-16 | 0.477 |
| Oct-16 | 0.532 |
| Aug-18 | 0.598 |
| Sep-18 | 0.661 |
| Oct-18 | 0.618 |
| Nov-18 | 0.594 |
| Apr-19 | 0.463 |
| Aug-19 | 0.456 |
| Oct-19 | 0.469 |
| Nov-19 | 0.551 |
| Dec-19 | 0.470 |
| Feb-21 | 0.532 |
| Mar-21 | 0.547 |

**Table 20. Violations of the Permitted Peak Maximum Daily Flow of Industrial Wastewater to Penn Township WWTP (0.700 mgd)**

| Date | Maximum Flow (mgd) |
|------|--------------------|
| Dec-16 | 0.783 |
| Aug-18 | 0.707 |
| Sep-18 | 0.760 |
| Oct-18 | 0.732 |
| Nov-18 | 0.768 |

## III.    PERSONS RESPONSIBLE FOR VIOLATIONS

Hanover Foods is a Pennsylvania private corporation that maintains a business address of 1486 York Street, P.O. Box 334, Hanover, Pennsylvania 17331-0334. As a private corporation, Hanover

Complaint Exhibit 1

Foods is a "person" pursuant to section 302 of the CWA and section 1 of the CSL.[100] Because Hanover Foods is a "person," is the owner and operator of the Facility and the Plant, and is the holder of the 2015 Permit, 2016 Pretreatment Permit, and 2021 Pretreatment Permit, it is responsible for the permit violations and, consequently, the CWA and CSL.

CWA section 505(b)(1)(A) requires notice of the violation to be given "to any alleged violator of the standard, limitation, or order . . . ."[101] In this case, Hanover Foods is the violator of the effluent standard or limitation. EPA has issued regulations that provide further guidance as to how to serve notice upon an alleged violator of an effluent standard or limitation that is a corporation.[102] Service of notice shall be accomplished by certified mail addressed to "the owner or managing agent of the building, plant, installation, vessel, facility, or activity alleged to be in violation."[103] CSL section 601(e) also requires notice of the CSL violation to be given "to any alleged violator."[104]

## IV.    PERSONS GIVING NOTICE

The Lower Susquehanna Riverkeeper Association is the person giving Hanover Foods notice regarding the violations of effluent standards or limitations and provides its organizational information pursuant to 40 C.F.R. § 135.3. The Lower Susquehanna Riverkeeper Association is located at 2098 Long Level Road, Wrightsville, PA 17368, and its phone number is 609-571-5278. It is a 501(c)(3) nonprofit watershed association licensed by the Waterkeeper® Alliance on September 15, 2005. The Lower Susquehanna Riverkeeper Association is dedicated to improving and protecting the ecological integrity of the Susquehanna Watershed and Chesapeake Bay by identifying sources of pollution and enforcing environmental laws. The Lower Susquehanna Riverkeeper Association also actively educates the public on current issues, works with decision-makers to emphasize the economic and social benefits of protecting our watershed, and, when necessary, enforces laws protecting communities and natural resources of the Susquehanna Watershed.

Many of the Lower Susquehanna Riverkeeper Association's members are avid kayakers, fishermen, bird-watchers, business owners, and other users of the Lower Susquehanna River and its tributaries, including Codorus Creek, into which Oil Creek flows, and the Lower Susquehanna River watershed. These members have been injured and continue to be injured by Hanover Foods' pollution that violates environmental laws, as described herein, as these violations threaten members' use and enjoyment of the Lower Susquehanna River and the tributaries that flow into the Lower Susquehanna River.

## V.    CONCLUSION

Hanover Foods Corporation has violated and is currently violating the CWA and the CSL at the Hanover Foods Facility located at 1550 York Street, Hanover, Pennsylvania 17331-0334. Due to

---

[100] "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5); "Person" includes "any natural person, partnership, association or corporation or any agency, instrumentality or entity of Federal or State Government." 35 P.S. § 691.1.
[101] 33 U.S.C. 1365(b)(1)(A).
[102] 40 C.F.R. § 135.2(a)(1).
[103] *Id.*
[104] 35 P.S. § 691.601(e).

Complaint Exhibit 1

the high number and repetitive nature of the violations, Citizens believe that Hanover Foods will continue discharging in violation of the 2015 Permit and the 2016 and 2021 Pretreatment Permits. Hanover Foods also consistently has failed to properly operate and maintain its facilities and failed to properly report monitoring results. Accordingly, EIP intends to file suit on behalf of the Lower Susquehanna Riverkeeper Association in the United States District Court for the Middle District of Pennsylvania pursuant to Section 505(a)(1) and (b)(1)(A) of the CWA. This lawsuit will seek injunctive relief to enjoin and abate the aforementioned violations and ensure future compliance with the CWA and the CSL, civil penalties up to a maximum statutory penalty amount of $56,460[105] per day for each violation of the CWA, imposition of up to a $10,000 penalty per day for each violation of the CSL, fees and costs of litigation, including future oversight costs regarding implementation of injunctive relief and the use of experts,[106] and such other relief as the court deems appropriate.

If you have any questions regarding the allegations in this Notice or believe any of the foregoing information may be in error, please contact Natalia M. Cabrera, Staff Attorney at Environmental Integrity Project, as per below, or Lisa Hallowell, Senior Attorney, at (202) 294-3282 or lhallowell@environmentalintegrity.org. In the absence of any questions, we also would welcome an opportunity to discuss a resolution of this matter prior to the initiation of litigation if you are prepared to remedy the violations discussed above.

Sincerely

*Natalia Cabrera*

Natalia M. Cabrera
Staff Attorney
Environmental Integrity Project
1000 Vermont Ave NW, Ste 1100
Washington, DC 20005
(202) 469-3151
ncabrera@environmentalintegrity.org

*Counsel for Citizen Group:*
Lower Susquehanna Riverkeeper Association
2098 Long Level Road
Wrightsville, PA 17368
(609) 571-5278

cc:

Ted Evgeniadis                          *Via Electronic Mail*
Lower Susquehanna Riverkeeper Association

---

[105] 33 U.S.C § 1319(d) provides for a civil penalty of up to $25,000 per day for each violation. EPA's most recent annual update to the statutory civil penalties, as adjusted for inflation, are effective December 23, 2020. 40 C.F.R. § 19.4. The updated civil penalty for CWA Section 1319(d) is $56,460 per day for violations that occurred after November 2, 2015, where penalties are assessed on or after December 23, 2020. *Id.*

[106] 33 U.S.C. § 1365(d) provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party . . . ."

Complaint Exhibit 1

lowsusriver@hotmail.com

Michael S. Regan                    *Via Certified Mail, Return Receipt Requested*
Administrator
U.S. Environmental Protection Agency
Office of the Administrator, Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Diana Esher                         *Via Certified Mail, Return Receipt Requested*
Acting Regional Administrator
U.S. Environmental Protection Agency, Region 3
1650 Arch Street (3PM52)
Philadelphia, PA 19103-2029

Patrick McDonnell                   *Via Certified Mail, Return Receipt Requested*
Secretary
Pennsylvania Department of Environmental Protection
Rachel Carson State Office Building
400 Market Street
Harrisburg, PA 17101

Rodney Nesmith                      *Via Certified Mail, Return Receipt Requested*
Regional Director
Pennsylvania Department of Environmental Protection
South-Central Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110

Aneca Atkinson                      *Via Certified Mail, Return Receipt Requested*
Deputy Secretary for Water Programs
Pennsylvania Department of Environmental Protection
Office of Water Programs
Rachel Carson State Office Building
400 Market Street
Harrisburg, PA 17101

Complaint Exhibit 1

NOTICE OF INTENT TO SUE HANOVER FOODS CORPORATION ON BEHALF OF
LOWER SUSQUEHANNA RIVERKEEPER

INDEX OF ATTACHMENTS

| ATTACHMENT | Title/Description |
|---|---|
| A | 2015 NPDES Permit Fact Sheet |
| B | July 9, 2020 Inspection Report |
| C | Excerpts from 2020 NPDES Permit Renewal Application |
| D | 2015 NPDES Permit No. PA0044741 |
| E | Apr. 18, 2019 Inspection Report |
| F | Oct. 9, 2020 Hanover Foods Letter to DEP re NPDES Permit |
| G | July 9, 2019 NOV |
| H | Aug. 26, 2020 NOV |
| I | Dec. 29, 2020 NOV |
| J | Jan. 28, 2021 Inspection Report |
| K | Feb. 4, 2021 Inspection Report |
| L | 2021 Pretreatment Permit, No. 2021-4 |
| M | 2016 Pretreatment Permit, No. 2016-4 |
| N | May 17, 2021 Oil Creek Sampling |
| O | July 23, 2019 Hanover Foods Letter to DEP re NPDES Permit |

Complaint Exhibit 1

# ATTACHMENT A



**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

SOUTHCENTRAL REGIONAL OFFICE
CLEAN WATER PROGRAM

Complaint Exhibit 1

| | | | |
|---|---|---|---|
| Application Type | **Renewal** | **NPDES PERMIT FACT SHEET** | Application No. **PA0044741** |
| Facility Type | **Industrial Waste** | **INDIVIDUAL INDUSTRIAL WASTE (IW)** | APS ID **274875** |
| Major / Minor | **Minor** | **AND IW STORMWATER** | Authorization ID **946303** |

## Applicant and Facility Information

| | | | |
|---|---|---|---|
| Applicant Name | **Hanover Foods Corp** | Facility Name | **Hanover Foods** |
| Applicant Address | 1486 York Street PO Box 334 | Facility Address | 1550 York Street PO Box 334 |
| | Hanover, PA 17331-0334 | | Hanover, PA 17331-0334 |
| Applicant Contact | Donald Herr | Facility Contact | Byron Musser |
| Applicant Phone | (717) 632-6000 | Facility Phone | (717) 632-6000 |
| Client ID | 62075 | Site ID | 271646 |
| SIC Code | 2033 | Municipality | Penn Township |
| SIC Description | Manufacturing - Canned Fruits And Vegetables | County | York |
| Date Application Received | October 1, 2012 | EPA Waived? | No |
| Date Application Accepted | October 12, 2012 | If No, Reason | Significant CB Discharge |
| Purpose of Application | Renewal and Amendment of an NPDES permit for discharge of industrial waste and NCCW | | |

## Summary of Review

This protection report is for the renewal of NPDES Permit No. PA 0044741 for Hanover Foods Corporation in Penn Township, York County. The Hanover Foods Corporation is a food processing company that produces canned, glass packed and frozen vegetable goods (beans, potatoes, beats and tomatoes). During the food processing operations, Hanover Foods generates non-contact cooling water (NCCW) and process wastewater. However, the NCCW actually touches the cans to cool them down. If any of the cans open, there is a high probability of spillage into the water.

Industrial wastewater (IW) from the food processing operations flows to a pretreatment building where solids are screened and removed for cattle feed. The IW is then pumped to an anaerobic biofiltration system. The biofiltration system consists of an anaerobic digester with plastic media for growing bio-films. Sludge from the anaerobic digester is removed and land applied off site. Wastewater exiting the biofiltration system enters a methane stripper and a flow splitter before flowing to either of the two parallel clarifiers. Effluent from the clarifiers then flows to two 7 million gallon facultative lagoons. Each lagoon is HDPE lined with tapered sides. The lagoons are approximately 18' deep with a one percent slope decrease towards the lagoon effluent discharge. Each lagoon contains nine aerators that operate the majority of the day. Currently, 0.45 MGD from Lagoon No. 1 is discharged to the Penn Township wastewater treatment plant (per a pretreatment agreement between Hanover Foods and Penn Township). The remaining IW exiting Lagoon No. 1 enters Lagoon No. 2 where it mixes with NCCW that is discharged from Hanover Foods operations. Lagoon No. 2 then discharges into two polishing ponds before exiting through Outfall 001 into Oil Creek.

Historically, the NCCW flowed to a cooling water sump that drained into a pump station. The pumps then conveyed the NCCW to Lagoon No. 2. Typically Lagoon No. 1 is cleaned out twice per year; each cleaning process takes approximately one month. Lagoon No. 2 is cleaned out every five to ten years. During lagoon maintenance, NCCW was directed to the polishing ponds before discharging some of the effluent through Outfall 003 into a UNT of Oil Creek and Outfall 001. However, in 2002 the Department identified temperature permit violations and lack of aquatic life in the tributary. Subsequently Hanover Foods mitigated the high temperature discharge by rerouting all NCCW to the polishing ponds.

| Approve | Return | Deny | Signatures | Date |
|---|---|---|---|---|
| X | | | J. Pascal Kwedza / Environmental Engineering Specialist | May 22, 2015 |
| X | | | Jay E. Patel, P.E. / Environmental Engineer Manager | 6/16/15 |

**NPDES Permit Fact Sheet**                                                    **NPDES Permit No. PA0044741**
**Hanover Foods**

## Summary of Review                          Complaint Exhibit 1

Hanover Food's NPDES permit PA 0044741, issued March 15, 2000, expired on April 1, 2005. The Department requires a permittee to submit an NPDES renewal application 180 days prior to the permit expiration date; the Hanover Foods Corporation NPDES permit renewal application was received on October 26, 2004 (156 days before the expiration date). Since 2005, Hanover Foods has been operating under administrative extension of their existing permit without a renewed NPDES permit. They are obligated to a February 24, 2003 Consent Order and Agreement (COA) with the Department which addressed violations and illegal discharges and assessed civil penalties for those actions. The COA also required that Hanover Foods submit an NPDES permit amendment application within six months of the COA agreement date. During the 2003 COA negotiations, Department biologist determined that the Point of First Use (POFU) for aquatic life is the confluence of Outfall 001 and formerly Outfall 003. Because of the temperature of the NCCW, the Department determined that temperature limitations would need to be imposed or all NCCW would need to be discharged directly to the main stem of Oil Creek. Hanover Foods was notified on September 11, 2002 of these options and subsequently on November 8, 2002 submitted a Corrective Action Plan. On April 3, 2003 Hanover Food submitted an NPDES permit amendment application. The permit amendment was issued on January 6, 2004 and this amendment stated the following: NCCW is prohibited from direct discharge to surface waters; NCCW is routed to the IW treatment plant; and the pump station overflow line is permanently sealed. The original Outfall 001 and 003 were eliminated and Outfall 005 was re-designated Outfall 001. Also during the NPDES amendment, three storm water outfalls (002, 003, and 004) were added to the permit.

### EXISTING LIMITS:

| Discharge Parameter | DISCHARGE LIMITATIONS | | | | | | MONITORING REQUIREMENTS | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) | | Concentrations (mg/l) | | | | | |
| | Average Monthly | Maximum Daily | Inst. Minimum | Average Monthly | Maximum Daily | Inst. Maximum | Monitoring Frequency | Sample Type |
| Flow (mgd) | Monitor & Report | Monitor & Report | XXX | XXX | XXX | XXX | Continuous | Measured |
| pH (S.U.) | XXX | XXX | 6.0 | XXX | XXX | 9.0 | 1/day | Grab |
| D.O. | XXX | XXX | 5.0 | XXX | XXX | XXX | 1/day | Grab |
| Total Residual Chlorine | XXX | XXX | XXX | 0.1 | XXX | 0.3 | 1/day | Grab |
| Total Suspended Solids | XXX | XXX | XXX | 30 | XXX | 60 | 2/week | Grab |
| CBOD$_5$ (5/1 to 10/31) | XXX | XXX | XXX | 10 | XXX | 15 | 2/week | 8-hour comp |
| CBOD$_5$ (11/1 to 4/30) | XXX | XXX | XXX | 20 | XXX | 30 | 2/week | 8-hour comp |
| NH$_3$-N (5/1 to 10/31) | XXX | XXX | XXX | 1.3 | XXX | 2.6 | 2/week | 8-hour comp |
| NH$_3$-N (11/1 to 4/30) | XXX | XXX | XXX | 3.9 | XXX | 7.8 | 2/week | 8-hour comp |
| Fecal Coliform | XXX | XXX | XXX | XXX | M&R | XXX | 1/month | 8-hour comp |
| Temperature | XXX | XXX | XXX | XXX | M&R | XXX | 1/day | i-s |

**NPDES Permit Fact Sheet**
**Hanover Foods**

**NPDES Permit No. PA0044741**

Complaint Exhibit 1

| Discharge, Receiving Waters and Water Supply Information | | |
|---|---|---|

| | | | |
|---|---|---|---|
| Outfall No. | 001 | Design Flow (MGD) | 0.84 |
| Latitude | 39° 48' 52.91" | Longitude | 76° 56' 53.54" |
| Quad Name | Hanover | Quad Code | 2030 |
| Wastewater Description: | Process wastewater and non-contact cooling water | | |

| | | | |
|---|---|---|---|
| Receiving Waters | Oil Creek | Stream Code | 08312 |
| NHD Com ID | 57474431 | RMI | 5.43 |
| Drainage Area | 6.44 | Yield (cfs/mi$^2$) | 0.138 |
| $Q_{7-10}$ Flow (cfs) | 0.88 | $Q_{7-10}$ Basis | Penn Township Gage |
| Elevation (ft) | 537 | Slope (ft/ft) | |
| Watershed No. | 7-H | Chapter 93 Class. | WWF |
| Existing Use | | Existing Use Qualifier | |
| Exceptions to Use | | Exceptions to Criteria | |
| Assessment Status | Impaired | | |
| Cause(s) of Impairment | Nutrients, Siltation | | |
| Source(s) of Impairment | Agriculture | | |
| TMDL Status | Pending | Name | |

| | | | |
|---|---|---|---|
| Background/Ambient Data | | Data Source | |
| pH (SU) | | | |
| Temperature (°F) | | | |
| Hardness (mg/L) | | | |
| Other: | | | |

| | | | |
|---|---|---|---|
| Nearest Downstream Public Water Supply Intake | | Wrightsville Water Supply Co. | |
| PWS Waters | Susquehanna River | Flow at Intake (cfs) | |
| PWS RMI | | Distance from Outfall (mi) | 40.1 |

Changes Since Last Permit Issuance: none

## PUBLIC WATER SUPPLY:

The most immediate public water supply intake is the Wrightsville Water Supply Co. intake on the Susquehanna River, located approximately 40.09 miles downstream of the Hanover Foods facility. Due to distance and dilution, effluent from Hanover Foods Outfall 001 is not expected to impact the Wrightsville Water Supply intake.

| Discharge, Receiving Waters and Water Supply Information | | |
|---|---|---|
| **Outfall No.** 002 | **Design Flow (MGD)** | 0.000000 |
| **Latitude** 39° 48' 45.48" | **Longitude** | 76° 56' 51.02" |
| **Wastewater Description:** Stormwater | | |
| **Outfall No.** 003 | **Design Flow (MGD)** | 0.000000 |
| **Latitude** 39° 48' 33.52" | **Longitude** | 76° 57' 0.51" |
| **Wastewater Description:** Stormwater | | |
| **Outfall No.** 004 | **Design Flow (MGD)** | 0.000000 |
| **Latitude** 39° 48' 30.53" | **Longitude** | 76° 57' 8.05" |
| **Wastewater Description:** Stormwater | | |

Changes Since Last Permit Issuance: none

## STORMWATER:

The stormwater outfalls 002, 003 and 004 were originally placed in the NPDES permit by an amendment. Conditions for the stormwater outfalls have not changed and will therefore remain in the permit. Outfall 002 according to Hanover Foods 2003 site plan, is located at the confluence of the UNT of Oil Creek and Oil Creek. This outfall receives flow from a spring and stormwater runoff from roadways and the facility site and 003 receives drainage from the waste storage area surrounding the freezing unit, west of Wilson Avenue. This outfall leads to a swale adjacent to the rail road tracks passing through the site. Outfalls 002 and 003 are required to be monitored annually for $BOD_5$, COD, TSS, pH, Oil and Grease, Total Kjeldahl Nitrogen, Total Phosphorus and Total Iron. Outfall 004 is a spill way for a stormwater detention basin that discharges into a wetland area leading to an UNT of Oil Creek. This detention basin receives runoff from areas of the facility that experience little or no material handling. No monitoring is required for this outfall

Complaint Exhibit 1

## Compliance History

DMR Data for Outfall 001 (from January 1, 2013 to January 31, 2015)

| Month | Flow Avg-Max | pH Min-Max | D.O mg/l | TRC mg/l | Fecal Coli | TSS Avg Mo - Max daily mg/l | CBOD5 Avg Mo - Max daily mg/l | NH3-N Avg Mo mg/l | Temp 0F Max |
|---|---|---|---|---|---|---|---|---|---|
| Jan-15 | 0.68 - 1.47 | 7.8 - 8.1 | 8.7 | 0.03 | 7000 | 28 - 40 | 7.5 - 9.4 | 1 | 62 |
| Dec-14 | 0.983 - 1.68 | 7.6 - 8.1 | 6.9 | 0.03 | 6760 | 23 - 40 | 7.1 - 12.9 | 0.92 | 74 |
| Nov-14 | 0.99 - 1.79 | 7.6 - 8.1 | 6.1 | 0.04 | 23000* | 35* - 45 | 10.6 - 17.1 | 0.84 | 74 |
| Oct-14 | 0.91 - 1.59 | 7.7 - 8.6 | 3.2* | 0.04 | 330 | 11 - 28 | 2.1 - 4.8 | 0.93 | 118 |
| Sep-14 | 1.07 - 2.14 | 7.7 - 8.2 | 2.4* | 0.03 | 410 | 31* - 66* | 10.1* - 32.3* | 2.25* | 105 |
| Aug-14 | 0.96 - 1.42 | 7.6 - 8.4 | 4.2 | 0.04 | 829 | 25 - 38 | 7.8 - 13.2 | 0.81 | 89 |
| Jul-14 | 0.76 - 1.25 | 7.9 - 8.4 | 4.7* | 0.04 | 14 | 26 - 42 | 7.6 - 11.4 | 1.93* | 90 |
| Jun-14 | 0.83 - 1.43 | 7.3 - 8.7 | 5.1 | 0.06 | 58 | 29 - 50 | 8.6 - 14.1 | 1.73 | 88 |
| May-14 | 0.61 - 1.25 | 7.6 - 9.0 | 6.3 | 0.07 | 38 | 25 - 39 | 7.9 - 12.4 | 1.3 | 82 |
| Apr-14 | 0.48 - 0.68 | 8.0 - 8.7 | 8.3 | 0.02 | 520 | 28 - 50 | 5.7 - 8.6 | 0.16 | 75 |
| Mar-14 | 0.53 - 0.98 | 7.9 - 8.6 | 6.2 | 0.03 | 240 | 35* - 72* | 8.4 - 13.3 | 0.38 | 70 |
| Feb-14 | 0.70 - 1.09 | 7.8 - 8.3 | 7.1 | 0.02 | 909 | 11 - 28 | 7.8 - 11.5 | 0.67 | 62 |
| Jan-14 | 0.69 - 1.10 | 7.8 - 8.1 | 6.6 | 0.02 | 38000* | 22 - 32 | 8.8 - 17.2 | 0.72 | 63 |
| Dec-13 | 0.70 - 1.33 | 7.9 - 8.2 | 9.1 | 0.04 | 1560 | 13 - 17 | 3.8 - 5.4 | 0.7 | 61 |
| Nov-13 | 0.88 - 1.94 | 7.8 - 8.3 | 3.2* | 0.03 | 73000* | 25 - 61* | 34.6* | 1.1 | 113 |
| Oct-13 | 0.79 - 1.45 | 7.7 - 8.2 | 6 | 0.05 | 104 | 22 - 28 | 4.8 - 6.5 | 0.85 | 87 |
| Sep-13 | 0.79 - 1.24 | 7.8 - 8.8 | 6.1 | 0.03 | 480 | 20 - 28 | 5.2 - 6.9 | 0.56 | 89 |
| Aug-13 | 0.70 - 1.24 | 7.8 - 8.9 | 6.1 | 0.03 | 6700* | 20 - 32 | 4.2 - 6.8 | 0.54 | 89 |
| Jul-13 | 0.77 - 1.62 | 7.2 - 9.4* | 6.2 | 0.02 | 99 | 35* - 55 | 3.8 - 6.6 | 0.2 | 93 |
| Jun-13 | 0.65 - 1.11 | 7.8 - 8.6 | 5.6 | 0.02 | 16 | 19 - 40 | 6.6 - 18.1* | 2.3* | 87 |
| May-13 | 0.53 - 0.84 | 8.2 - 8.7 | 7.3 | 0.02 | 1830* | 24 - 36 | 4.3 - 6.4 | 0.19 | 82 |
| Apr-13 | 0.58 - 1.20 | 7.9 - 8.9 | 6.9 | 0.03 | 12400* | 41* - 56 | 7.2 - 11.8 | 0.19 | 74 |
| Mar-13 | 0.67 - 1.15 | 7.8 - 8.3 | 8.4 | 0.02 | 1 | 35* - 49 | 7.6 - 11.7 | 0.93 | 64 |
| Feb-13 | 0.57 - 0.68 | 7.7 - 8.1 | 8 | 0.02 | 12 | 16 - 21 | 3.4 - 4.4 | 0.33 | 64 |
| Jan-13 | 7.6 - 8.2 | 7.6 - 8.2 | 6.6 | 0.02 | 1 | 17 - 29 | 4.7 - 7.4 | 0.57 | 65 |

Violations are indicated with * (asterisks)

Complaint Exhibit 1

| Compliance History |
| --- |

**Effluent Violations for Outfall 001**

Based on the 2003 COA, Hanover Foods Corporation continues to pay the Department penalties for effluent violations because the IWTP has been unable to meet effluent limits for six consecutive months.  On August 20, 2013, the department executed a new consent order and agreement (COA) with Hanover Foods to address continuous violations at the plant. The new COA replaces the 2003 COA and calls for a major upgrade to the treatment plant and also assessed a civil penalty for violations from June 2011 to the date COA was signed(August 20, 2013) and established stipulation for effluent violations that will occur in the future. The DMR data summary for 20013 and 2014 is added, monitoring data for fecal Coliform shows discharges are higher than the required maximum allowed in the summer and winter months. Permit limit will be established for Fecal Coliform. Numerous effluent violations continue to occur after COA was signed. Refer to DMR summary. Current inspection at the facility listed some effluent violations and an unauthorized discharge. The compliance section directed  the permittee to resolve these violations and address the unauthorized discharge from occurring in the future. Hanover foods submitted a WQM permit to upgrade the plant to treat up to 0.19MGD process wastewater and also to discharge a maximum of 0.65MGD of NCCW. Both treated process effluent and the NCCW will combine for a total discharge of 0.84MGD to outfall 001. Effluent limitation will be based on the combined flow of 0.84 MGD.

NPDES Permit Fact Sheet                                                      NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

| Development of Effluent Limitations |
|---|

| Outfall No. | 001 | Design Flow (MGD) | 0.84 |
|---|---|---|---|
| Latitude | 39° 48' 52.91" | Longitude | 76° 56' 53.54" |
| Wastewater Description: | Industrial wastewater and NCCW | | |

## TECHNOLOGY BASED LIMITATIONS:

The following technology-based limitations apply, subject to water quality analysis and BPJ where applicable:
The Hanover Foods Corporation, as a vegetable processor of beets, dry beans, snap beans and potatoes, which discharges food processing wastewater, is required to meet the federal Effluent Limitation Guidelines (ELGs) per 40 CFR § 407 Subpart G. According to the production data, dry beans and potatoes are consistently processed year round, whereas beets and snap beans are processed during different periods. There is a period of one to three months where production overlaps for all of the vegetables processed at the facility.

The $BOD_5$ ELGs for this type of vegetable processing are as follows:

| | $BOD_5$ (lb/1000 lb raw material) | | |
|---|---|---|---|
| | Maximum for any 1 day | Average of daily values for 30 consecutive days | Annual average |
| Beets | 1.01 | 0.71 | 0.57 |
| Dry Beans | 2.50 | 1.76 | 1.21 |
| Snap Beans | 1.51 | 0.87 | 0.58 |
| Potatoes | 0.90 | 0.66 | 0.55 |

40 CFR § 407 Subpart G also contains ELGs for TSS. The TSS ELGs for this type of vegetable processing are as follows:

| | TSS (lb/1000 lb raw material) | | |
|---|---|---|---|
| | Maximum for any 1 day | Average of daily values for 30 consecutive days | Annual average |
| Beets | 1.88 | 1.47 | 1.12 |
| Dry Beans | 4.48 | 3.13 | 1.97 |
| Snap Beans | 2.67 | 1.80 | 1.04 |
| Potatoes | 1.69 | 1.37 | 1.09 |

Based on the ELG values, the most stringent limit that will apply to Hanover Foods is the ELGs for potatoes. The average daily production over 5years according to the production values provided by Hanover Foods Corporation is 362,936.16lbs/day. The following are the resultant ELG mass-based effluent limitations

Table 1

| | $BOD_5$ Mass-Based Effluent Limitations(lbs/day) | | |
|---|---|---|---|
| | Maximum for any 1 day | Average of daily values for 30 consecutive days | Annual average |
| Potatoes | 326.64* | 239.54 | 199.6 |

*Max limit for any day = 362,936.16lbs/day x 0.9lbs/1000lbs = 326.64lbs/day

7

**NPDES Permit Fact Sheet**                                                                 **NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

Based on the ELG values, as well as the production values provided by Hanover Foods Corporation, the following are the resultant ELG mass-based effluent limitations:

Table 2

TSS Mass-Based Effluent Limitations(lbs/day)

|  | Maximum for any 1 day | Average of daily values for 30 consecutive days | Annual average |
|---|---|---|---|
| Potatoes | 613.36* | 497.22 | 377.45** |

*Max limit for any day = 362,936.16lbs/day x 1.69lbs/1000lbs = 326.64lbs/day
** Annual average snap beans ELG most stringent is used for calculation.

## WATER QUALITY-BASED LIMITATIONS:

### STREAMFLOWS

Penn Township with a discharge located about 1,480 feet upstream, of Hanover food discharge has a flow meter within Oil Creek and has reportedly been monitoring stream flows for several years. The Township requested that these data be used as the basis for determining water quality limits, and the writer responded that it may or may not be possible to use the data, depending on how long measurements have been taken. Data for November 2001 through November 2004 were submitted with the permit application. During 2002, a "drought year," the average monthly flow in August was 0.53 MGD (0.82 cfs). The lowest seven day consecutive average flow, from August 13-19, was 0.346 MGD (0.535 cfs). During this same period of time, the average flow measured in the Susquehanna River at Gage No. 01576000 (Marietta) was 3,571 cfs. The $Q_{7-10}$ flow statistic, at this gage, according to USGS, is 3,800 cfs for post-regulation years (1972-1996).

For the current permit renewal, the permittee, upon request, submitted daily flow data for Oil Creek for their entire monitoring period to date (October 26, 2001 through June 9, 2014). Review of the data revealed that the aforementioned low flow period during August 2002 still remains as the lowest 7-day period for the entire 12+ year dataset. The second lowest average 7-day flow was 0.393 MGD, which occurred during August 2006.

The closest USGS gage (no. 01574500 on Codorus Creek at Spring Grove, PA) is over 8 miles downstream of the Penn Township discharge. It is also downstream of the Lake Marburg dam, which has a large influence on the streamflow. Therefore, USGS gage data will not be utilized, as StreamStats and the permittee's gage data may be deemed more reliable.

The drainage area upstream of Hanover Foods discharge is 6.4mi taken from the previous protection report. The $Q_{7-10}$ estimate for Hanover foods is 0.88cfs (0.138 cfs/mi$^2$ x 6.44 mi). This information is used to obtain a chronic or 30 day ($Q_{30-10}$), and an acute or 1 day ($Q_{1-10}$) exposure stream flow for the discharge point as follows (Guidance No. 391-2000-023):

$$Q_{7-10} = 0.88 \text{ cfs}$$

$$Q_{30-10} = 1.36 * 0.88 \text{ cfs} = 1.20 \text{ cfs}$$

$$Q_{1-10} = 0.64 * 0.88 \text{ cfs} = 0.56 \text{ cfs}$$

### WQM 7.0 Data:

Due to the close proximity of Hanover foods Corp's discharge to the Penn Township discharge, both discharges have historically been modelled together. The following three nodes were used for the WQM 7.0 model.

| Parameter | Value | Source |
|---|---|---|
| DO Goal | 5.0 mg/L | (Requirement for WWF) |
| Discharge pH (Node 1) | 7.5 | (DMR Data) |
| Discharge pH (Node 2) | 7.9 | (Most recent protection report) |
| Discharge Temperature (Node 1) | 25°C | (Default) |
| Discharge Temperature (Node 2) | 30°C | (Most recent protection report) |

**NPDES Permit Fact Sheet**                                  **NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

| | | | |
|---|---|---|---|
| Stream pH | 7.82 | (See below)[1] |
| Stream Temperature | 25°C | (Default for WWF) |
| Stream $NH_3$-N | 0.0 mg/L | (Default) |

(1) Stream pH was determined by Hanover Foods in 1993 while conducting WET tests (per the 2008 protection report for Penn Township).

*Node input data:*

| Node 1: | Penn Township Outfall 001 on Oil Creek (08213) | |
|---|---|---|
| | Elevation: | 537 ft (USGS National Map Viewer) |
| | Drainage Area: | 3.87 mi$^2$ (USGS PA StreamStats) |
| | River Mile Index: | 5.69 (PA DEP eMapPA) |
| | Low Flow Yield: | 0.138 cfs/mi$^2$ |
| | Discharge Flow: | 4.2 MGD (NPDES Application) |

| Node 2: | Hanover Foods Outfall 001 | |
|---|---|---|
| | Elevation: | 532 ft (USGS National Map Viewer) |
| | Drainage Area: | 6.44 mi$^2$ (USGS PA StreamStats) |
| | River Mile Index: | 5.41 (PA DEP eMapPA) |
| | Low Flow Yield: | 0.138 cfs/mi$^2$ |
| | Discharge Flow: | 0.840 MGD (NPDES Permit) |

| Node 3: | Just before confluence with UNT 08223 | |
|---|---|---|
| | Elevation: | 517 ft (USGS National Map Viewer) |
| | Drainage Area: | 6.72 mi$^2$ (USGS PA StreamStats) |
| | River Mile Index: | 4.56 (PA DEP eMapPA) |
| | Low Flow Yield: | 0.138 cfs/mi$^2$ |
| | Discharge Flow: | 0.000 MGD |

**$NH_3N$ :**

$NH_3$-N calculations are based on the Department's Implementation Guidance of Section 93.7 Ammonia Criteria, dated 11/4/97 (ID No. 391-2000-013).

The attached WQM7.0 printout presented in attachment B indicates that, for a discharge of 0.84 MGD, a limit of 1.0 mg/L $NH_3$-N as a monthly average and 2.0 mg/L $NH_3$-N as a daily maximum is necessary to protect the aquatic life from toxicity effects (model values rounded based on the Doc. No. 362-0400-001 10/97). The WQM limits of 1.0 mg/L as an average monthly and 2.0 mg/L as a daily maximum are recommended with a bi-weekly 24-hour composite type. An instantaneous maximum of 2.5 mg/L is also recommended based on the industrial multiplier of 2.5 (see 362-0400-001).

**$CBOD_5$ :**

The WQM 7.0 model, employed by the Department, calculates $CBOD_5$ and not $BOD_5$. To compare the ELGs to the WQBELs results from WQM 7.0, $BOD_5$ must be converted to $CBOD_5$. Engineering literature, suggests that $CBOD_5$ is approximately 15-20% less than $BOD_5$. For conversion of the ELG $BOD_5$ into $CBOD_5$, a factor 15% is used. The table below represents the conversion results:

Table 3

### $BOD_5$ to $CBOD_5$ Mass-Based Effluent Limitations (lbs/day)

| | Maximum for any 1 day | Average of daily values for 30 consecutive days | Annual average |
|---|---|---|---|
| Potatoes | 277.6* | 203.61 | 169.66 |

*326.64 x 0.85 = 277.6 lbs/day

Complaint Exhibit 1

The attached computer printout of the WQM 7.0 stream model indicates that 18.0 mg/l as an average monthly limit for $CBOD_5$ is adequate to protect the water quality of the stream. However, the previous NPDES permit, established an average monthly $CBOD_5$ limit of 10.0 mg/l and a maximum daily and instantaneous maximum limit of 15.0 mg/ and 20.0 mg/l, respectively, during the period from May 1st to October 31st. For the period from November 1st to April 30th, the previous permit established limits of 20 mg/L as an average monthly, 30 as a maximum daily and 40 mg/L as an instantaneous maximum. The previous summer permit limit concentrations produce a more stringent mass limits than the ELG mass-based effluent limitations (10.0 mg/L X 0.84 MGD X 8.34 lbs/gal = 70.06 lbs/day monthly average, 105.09lbs/day Maximum and 140lbs/day). Therefore, the existing summer limits, are recommended for inclusion in the renewed NPDES permit for summer months. For the winter months, the recommended WQM model results of 18mg/l monthly average, 27mg/l daily maximum and  36mg/l IMAX concentration is more stringent that the existing winter limitation and it produces a more stringent mass limits than (Table 3) ELG mass-based effluent limitations (18.0 mg/L X 0.84 MGD X 8.34 lbs/gal = 126 lbs/day monthly average, 189lbs/day Maximum and 252lbs/day IMAX). Therefore, the recommended WQM 7.0 limits will be included in the renewed NPDES permit for winter months.  A bi-weekly 24 hour composite sample type is recommended per the Department's NPDES Permit Development document (no. 362-0400-001).

**TOTAL SUSPENDED SOLIDS**:

The previous permit established a TSS limit of 30 mg/l as an average monthly with 60 mg/l and 75 mg/l as a maximum daily and instantaneous maximum, respectively.  The previous permit limit concentrations produce a more stringent mass limits than (Table 2) ELG mass-based effluent limitations (30.0 mg/L X 0.84 MGD X 8.34 lbs/gal = 210.17 lbs/day monthly average;420.34lbs/day daily maximum and 525lbs/day IMAX).Therefore, the existing concentration limits with their corresponding mass limits is recommended for the renewed permit.  A bi-weekly 24 hour composite sample type is recommended per the Department's NPDES Permit Development document (no. 362-0400-001).

**TOTAL PHOSPHORUS :**

Oil Creek, located in both the Penn and Heidelberg Townships, is listed as impaired due to nutrients and siltation.  The Pennsylvania Code, Chapter 96 Water Quality Standards Implementation states the following (96.5. Nutrient discharges (c)): "When it is determined that the discharge of phosphorus, alone or in combination with the discharge of other pollutants, contributes or threatens to impair existing or designated uses in a free flowing surface water, phosphorus discharges from point source discharges shall be limited to an average monthly concentration of 2 mg/L.  More stringent controls on point source discharges may be imposed, or may be otherwise adjusted as a result of a TMDL which has been developed." Therefore a monthly limit of 2mg/l written in the permit pending TMDL development. A bi-weekly 24-hour composite sample type is also recommended. Monitor and report is required until phosphorus reduction controls are installed during the plant upgrade.

**CHESAPEAKE BAY STRATEGY:**

In 2003, EPA established state-wide cap loads for Total Nitrogen and Total Phosphorus for Pennsylvania that are needed to ensure compliance with new water quality standards enacted to restore the water quality of the Chesapeake Bay. DEP released Pennsylvania's Chesapeake Bay Tributary Strategy (CBTS) in January of 2005 to guide Pennsylvania's efforts to meet those cap loads, and made revisions to the Strategy in 2006-2007 following a stakeholder process. Industrial discharges have been prioritized by Central Office based on their delivered TN loadings to the Bay. Significant industrial wastewater dischargers are facilities that discharge more than 75 lbs/day of TN or 25 lbs/day of TP on an average annual basis and the rest are classified as non-significant dischargers. Allocation of cap loads for significant industrial dischargers is divided into five categories. 1. Facilities that reduced TN and TP prior to 2002 – Cap Loads established using the 2002 load or the current (2007-2008) load, whichever is greater, plus 10%. 2. Facilities that submitted a Nutrient Reduction Evaluation (NRE) as requested by DEP and reduced their TN and TP loads between 2002 and 2009 – Cap Loads established using the current (2007-2008) load, plus 10%. 3. Facilities that submitted an NRE and planning to reduce TN and TP loads through facility upgrades or operational improvements – Cap Loads established as requested by the facility in the NRE, with a compliance schedule. 4. Facilities that are already at "low levels" of nutrient discharge loads – Cap Loads established at current (2007-2008) loads. 5. Facilities that did not submit an NRE or submitted an NRE but did not propose to reduce nutrient loads – Cap Loads established at current (2007-2008) loads, reduced by 33%.

Prior to implementing DEPs industrial discharger cap load,  EPA published the Chesapeake Bay Total Maximum Daily Load (TMDL) in December of 2010. The TMDL was prompted by insufficient progress and continued poor water quality in

Complaint Exhibit 1

the Chesapeake Bay and its tidal tributaries.  In order to address the TMDL, Pennsylvania developed a Chesapeake Watershed Implementation Plan (WIP) – Phase 1 in January 2011 and Phase 2 WIP and a supplement to phase 2 WIP.

Outlined in the Phase 1 and Phase 2 WIP, and the supplement to WIP 2, permitting for significant Industrial discharges will follow the original categorical approach established during the stakeholder process in 2006-2007. This facility falls in category 5, did not submit NRE but proposed upgrade to their treatment plant to meet cap load. The facility's allocated cap loads are 26,385lb/yr TN and 979lb/yr TP for a total flow of 0.84MGD.

A TMDL does not exist for Oil Creek as of May 2015.  Since Oil Creek is impaired for nutrients, the purchase of credits outside of the Oil Creek Watershed to meet the Bay Cap Load requirement is prohibited; however, Hanover Foods may purchase credits from within the watershed from facilities such as Penn Township.

Based on the information provided, in the event that Hanover Foods is unable to meet their annual cap loads, their intention is to purchase additional credits from Penn Township, which  is approximately 1400' upstream of the Hanover Foods Corp's facility and within the Oil Creek watershed. A compliance schedule is provided in the permit for the facility to comply with the Chesapeake Bay cap loads upon completion of plant upgrade..

## TOTAL RESIDUAL CHLORINE:

The attached computer printout presented in attachment C utilizes the equations and calculations as presented in the Department's May 1, 2003 Implementation Guidance for Total Residual Chlorine (TRC) (ID No. 391-2000-015) for developing chlorine limitations.  The Guidance references Chapter 92a, Section 92a.48 (b) which establishes a standard BAT limit of 0.5 mg/l unless a facility-specific BAT has been developed.  The attached printout indicates that a water quality limit of 0.1 mg/l monthly average and 0.3mg/l IMAX would be needed to prevent toxicity concerns. This is consistent with the existing permit and the facility is meeting this limit. Therefore, it is recommended that a TRC limit of 0.1 mg/l monthly average and 0.3 mg/l maximum be applied again for this permit cycle.

## FECAL COLIFORM:

Fecal coliforms have historically been elevated within the Hanover Foods discharge. The previous permit did not contain a fecal effluent limit only monitor report.  The DMR data contained several notably high fecal coliform results over the last five years. Refer to summary of DMR data table above, results above department Imax requirement are indicated with asterisks. Effluent limits will established in the permit during this permit renewal.

Per 25 Pa Code § 92a.47, the Hanover Foods IWTP must meet a geometric mean of 200 CFUs/100 mL with an instantaneous maximum of 1,000 CFUs/100 mL from May 1st to September 30 and a geometric mean of 2,000 CFUs/100 mL with an instantaneous maximum of 10,000 CFUs/100 mL from October 1st to April 30th for the final effluent.

## DISSOLVED OXYGEN:

A minimum D.O. of 5.0 mg/L is required.  This is consistent with the previous permit and current Department criteria.

## pH:

The existing effluent discharge pH  of above 6 and below 9 standard units according to Chapter 95.2(2) will remain. These units are more stringent than the ELG's 6 to 9.5 S.U. for canned food processors.

## COLOR

Color was a concern in the past, using the following mass balance equation with a  streamflow of 0.88cfs ( 0.57MGD), Color Criterion = 75PCU and a discharge of 0.84MGD,

75 PCU (0.8400 + 0.57) MGD  = X (0.8400 MGD) + 0 x 0.57MGD
X  = 125.9 PCU's

NPDES Permit Fact Sheet                                                          NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

A color limit of 126 Platinum Cobalt Units (PCU) resulted however, application report 3 samples with a maximum color measured as 25 PCU. Color limitation is not required, monitor and report will be required to collect more data for further analysis.

## OIL & GREASE

This discharge is from a potential industrial Oil-bearing wastewater. PA code § 95.2 requires this type of discharge should not contain more than 15 milligrams of oil per liter as a daily average value nor more than 30 milligrams of oil per liter at any time, and should not cause discoloration in the receiving stream. The permit will be written with the limitations on oil and grease.

## TOXICS

A reasonable potential (RP) was done for pollutant Groups 1 and 2 submitted with the application and re-sample of some toxics pollutants reported as undetected but above criterion. All pollutants that were detected in the application sampling and re-sampling were entered into the Toxics Screening Analysis spreadsheet to determine if any pollutants were candidates for PENTOXSD modeling. All pollutants that were determined to be candidates for PENTOXSD modeling were entered into the PENTOXSD model. The most stringent WQBELs recommended by the PENTOXSD model (attachment D were then entered into the same Toxics Screening Analysis spreadsheet in order to determine which parameters of concern need further action.

The RP Screening Analysis spreadsheet presented in attachment E indicates that in exception of Total Cadmium, PENTOXSD Modelling is not required for the following parameters detected in the application sampling data: Total Aluminum, Total Barium, Total Boron, dissolved Iron, Total Iron, Total Manganese and Total Copper. Total Cadmium was entered into PENTOXSD Model to establish WQBELs for further analysis. Results from the PENTOXSD model is presented in attachment D. A monthly average limitation of $0.77\mu g/l$ is recommended for Total Cadmium. The recommended monthly average limit of 0.0008mg/l and maximum daily limit of 0.0016mg/l will be applied to the permit with a bi-weekly 24-hr composite sampling. Permittee will monitor Total Cadmium in the interim until plant upgrade is completed.

The recommended limitations follow the logic presented in DEPs SOP, to establish limits in the permit where the maximum reported concentration exceeds 50% of the WQBEL, or for non-conservative pollutants to establish monitoring requirements where the maximum reported concentration is between 25% - 50% of the WQBEL, or to establish monitoring requirements for conservative pollutants where the maximum reported concentration is between 10% - 50% of the WQBEL.

## TDS, CHLORIDE, SULFATE, BROMIDE, & 1,4-DIOXANE

The maximum daily TDS discharge submitted with the application is 452mg/l which is equivalent to 3,166.53 lbs/day based on the design flow of 0.84MGD. The discharge level for TDS is well below 1000mg/l and 20,000 lbs/day cut-off to require monitoring in the permit. Average of 3 samples of bromide submitted with application is 0.64mg/l is below 1mg/l therefore no monitoring is required. There is no data on 1,4-dioxane. Guidance on TDS follows the logic below:

- Where the concentration of TDS in the discharge exceeds 1,000 mg/L, or the net TDS load from a discharge exceeds 20,000 lbs/day, and the discharge flow exceeds 0.1 MGD, Part A of the permit should include monitor and report for TDS, sulfate, chloride, and bromide. Discharges of 0.1 MGD or less should monitor and report for TDS, sulfate, chloride, and bromide if the concentration of TDS in the discharge exceeds 5,000 mg/L.

- Where the concentration of bromide in a discharge exceeds 1 mg/L and the discharge flow exceeds 0.1 MGD, Part A of the permit should include monitor and report for bromide. Discharges of 0.1 MGD or less should monitor and report for bromide if the concentration of bromide in the discharge exceeds 10 mg/L.

- Where the concentration of 1,4-dioxane (CAS 123-91-1) in a discharge exceeds 10 µg/L and the discharge flow exceeds 0.1 MGD, Part A of the permit should include monitor and report for 1,4-dioxane. Discharges of 0.1 MGD or less should monitor and report for 1,4-dioxane if the concentration of 1,4-dioxane in the discharge exceeds 100 µg/L.

Complaint Exhibit 1

## CHEMICAL ADDITIVES

The permittee submitted chemical additive notification forms for thirteen chemical additives currently being used at the facility. In exception of Sodium hypochlorite and Chlorine liquefied gas, the proposed daily maximum usage rate for the chemicals appear to be below the maximum usage rate allowable in the creek. The permittee is re-calculating the usage rate for some of the chemical additives to include dilution factors. If the results show all chemical additive usage rates proposed are below the maximum allowable, they can be used otherwise alternatives will be re-evaluated. There is a chlorine limitation in the permit to control chlorine discharge to the creek. The permit will be written with the new chemical additive usage and notification requirement.

## TEMPERATURE:

Currently, Hanover Foods records temperature when NCCW is discharged directly to Lagoon #2. Temperature data reported on DMR show temperature is consistently at or above the department's criteria. Temperature calculations for the discharge was done using the Thermal discharge Spreadsheet case 2 with a proposed discharge of 0.84MGD. Since there is no ambient temperature data, the Department default values were used. The results are presented in attachment F. Data provided with DMR indicate the facility will be in violation of the temperature limitations in winter months without some level of cooling of the effluent prior to discharge . The facility requested 3 years schedule to comply with the temperature limitation. Monitoring will continue in the interim.

## ANTIDEGRADATION (93.4):

The effluent limits for this discharge have been developed to ensure that existing instream water uses and the level of water quality necessary to protect the existing uses are maintained and protected.  No High Quality Waters are impacted by this discharge.  No Exceptional Value Waters are impacted by this discharge.

## CLASS A WILD TROUT FISHERIES:

No Class A Wild Trout Fisheries are impacted by this discharge.

## 303d LISTED STREAMS:

The discharge is located on the 2008 303d listed stream segment as impaired for nutrients and siltation. TMDL is schedule for 2015. Following PA Code, Chapter 96.5c an average monthly concentration of 2 mg/L for Total Phosphorus is required pending TMDL development.  A re-opener condition will be in the permit informing the permittee that a more stringent control on point source discharges may be imposed, as a result of final TMDL development. No further reduction in Total Phosphorus is warranted at this time.

Complaint Exhibit 1

| Proposed Effluent Limitations and Monitoring Requirements |
| --- |

The limitations and monitoring requirements specified below are proposed for the draft permit, and reflect the most stringent limitations amongst technology, water quality and BPJ.  Instantaneous Maximum (IMAX) limits are determined using multipliers of 2 (conventional pollutants) or 2.5 (toxic pollutants).   Sample frequencies and types are derived from the "NPDES Permit Writer's Manual" (362-0400-001) and/or BPJ.

**Outfall 001, Effective Period: Permit Effective Date through Permit Expiration Date**

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mass Units (lbs/day) | | Concentrations (mg/L) | | | | Minimum Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| Flow (MGD) | Report | Report | XXX | XXX | XXX | XXX | Continuous | Measured |
| pH (S.U.) | XXX | XXX | 6.0 | XXX | XXX | 9.0 | 1/day | Grab |
| Dissolved Oxygen | XXX | XXX | 5.0 | XXX | XXX | XXX | 1/day | Grab |
| Total Residual Chlorine | XXX | XXX | XXX | 0.1 | XXX | 0.3 | 1/day | Grab |
| Color (Pt-Co Units) | XXX | XXX | XXX | XXX | Report | XXX | 2/month | Grab |
| Temperature (°F) Jan 1-31 | XXX | XXX | XXX | XXX | 51 | XXX | 1/day | I-S |
| Temperature (°F) Feb 1-29 | XXX | XXX | XXX | XXX | 52 | XXX | 1/day | I-S |
| Temperature (°F) Mar 1-31 | XXX | XXX | XXX | XXX | 74 | XXX | 1/day | I-S |
| Temperature (°F) Apr 1-15 | XXX | XXX | XXX | XXX | 83 | XXX | 1/day | I-S |
| Temperature (°F) Apr 16-30 | XXX | XXX | XXX | XXX | 89 | XXX | 1/day | I-S |
| Temperature (°F) May 1-15 | XXX | XXX | XXX | XXX | 85 | XXX | 1/day | I-S |
| Temperature (°F) May 16-31 | XXX | XXX | XXX | XXX | 106 | XXX | 1/day | I-S |
| Temperature (°F) Jun 1-15 | XXX | XXX | XXX | XXX | 106 | XXX | 1/day | I-S |

Complaint Exhibit 1

Outfall 001, Continued (from **Permit Effective Date** through **Permit Expiration Date**)

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) | | Concentrations (mg/L) | | | | Minimum Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| Temperature (ºF) Jun 16-30 | XXX | XXX | XXX | XXX | 110 | XXX | 1/day | I-S |
| Temperature (ºF) Jul 1-31 | XXX | XXX | XXX | XXX | 101 | XXX | 1/day | I-S |
| Temperature (ºF) Aug 1-31 | XXX | XXX | XXX | XXX | 99 | XXX | 1/day | I-S |
| Temperature (ºF) Sep 1-15 | XXX | XXX | XXX | XXX | 94 | XXX | 1/day | I-S |
| Temperature (ºF) Sep 16-30 | XXX | XXX | XXX | XXX | 88 | XXX | 1/day | I-S |
| Temperature (ºF) Oct 1-15 | XXX | XXX | XXX | XXX | 82 | XXX | 1/day | I-S |
| Temperature (ºF) Oct 16-31 | XXX | XXX | XXX | XXX | 76 | XXX | 1/day | I-S |
| Temperature (ºF) Nov 1-15 | XXX | XXX | XXX | XXX | 69 | XXX | 1/day | I-S |
| Temperature (ºF) Nov 16-30 | XXX | XXX | XXX | XXX | 59 | XXX | 1/day | I-S |
| Temperature (ºF) Dec 1-31 | XXX | XXX | XXX | XXX | 50 | XXX | 1/day | I-S |
| CBOD5 May 1 - Oct 31 | 70 | 105 | XXX | 10 | 15 | 20 | 2/week | 24-Hr Composite |
| CBOD5 Nov 1 - Apr 30 | 126 | 189 | XXX | 18 | 27 | 36 | 2/week | 24-Hr Composite |
| Total Suspended Solids | 210 | 420 | XXX | 30 | 60 | 75 | 2/week | 24-Hr Composite |
| Oil and Grease | Report | Report | XXX | 15 | 30 | 30 | 2/week | Grab |

Complaint Exhibit 1

Outfall , Continued (from **Permit Effective Date** through **Permit Expiration Date**)

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) | | Concentrations (mg/L) | | | | Minimum Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| Fecal Coliform (CFU/100 ml) May 1 - Sep 30 | XXX | XXX | XXX | 200 Geo Mean | XXX | 1,000 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) Oct 1 - Apr 30 | XXX | XXX | XXX | 2,000 Geo Mean | XXX | 10,000 | 2/week | Grab |
| Ammonia-Nitrogen May 1 - Oct 31 | 7.0 | 14 | XXX | 1.0 | 2.0 | 2.5 | 2/week | 24-Hr Composite |
| Ammonia-Nitrogen Nov 1 - Apr 30 | 21 | 42 | XXX | 3.0 | 6.0 | 7.5 | 2/week | 24-Hr Composite |
| Total Phosphorus | 14 | 28 | XXX | 2.0 | 4.0 | 5.0 | 2/week | 24-Hr Composite |
| Total Cadmium | 0.0056 | 0.011 | XXX | 0.0008 | 0.0016 | 0.002 | 2/week | 24-Hr Composite |

Compliance Sampling Location: 001

Other Comments:

Complaint Exhibit 1

| Proposed Effluent Limitations and Monitoring Requirements |
|---|

The limitations and monitoring requirements specified below are proposed for the draft permit, and reflect the most stringent limitations amongst technology, water quality and BPJ. Instantaneous Maximum (IMAX) limits are determined using multipliers of 2 (conventional pollutants) or 2.5 (toxic pollutants). Sample frequencies and types are derived from the "NPDES Permit Writer's Manual" (362-0400-001) and/or BPJ.

**Outfall 002 and 003, Effective Period: Permit Effective Date through Permit Expiration Date**

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) | | Concentrations (mg/L) | | | | Minimum Measurement Frequency | Required Sample Type |
| | Average Monthly | | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| pH (S.U.) | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| CBOD5 | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Chemical Oxygen Demand | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Suspended Solids | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Oil and Grease | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Phosphorus | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Dissolved Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

| Proposed Effluent Limitations and Monitoring Requirements | Complaint Exhibit 1 |

The limitations and monitoring requirements specified below are proposed for the draft permit, to comply with Pennsylvania's Chesapeake Bay Tributary Strategy.

**Outfall 001, Effective Period:** __Permit Effective Date__ through __Permit Expiration Date__

| Parameter | Effluent Limitations | | | | | Monitoring Requirements | |
| | Mass Units (lbs/day) | | Concentrations (mg/L) | | | Minimum Measurement Frequency | Required Sample Type |
| | Monthly | Annual | Minimum | Monthly Average | Maximum | | |
|---|---|---|---|---|---|---|---|
| Ammonia---N | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Kjeldahl---N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Nitrate-Nitrite as N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Total Nitrogen | Report | Report | XXX | Report | XXX | 1/month | Calculation |
| Total Phosphorus | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Net Total Nitrogen | Report | 26,385 | XXX | XXX | XXX | 1/month | Calculation |
| Net Total Phosphorus | Report | 979 | XXX | XXX | XXX | 1/month | Calculation |

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

| | Tools and References Used to Develop Permit |
|---|---|
| ☒ | WQM for Windows Model (see Attachment **B**) |
| ☒ | PENTOXSD for Windows Model (see Attachment **D**) |
| ☒ | TRC Model Spreadsheet (see Attachment **C**) |
| ☒ | Temperature Model Spreadsheet (see Attachment **F**) |
| ☒ | Toxics Screening Analysis Spreadsheet (see Attachment **E**) |
| ☒ | Water Quality Toxics Management Strategy, 361-0100-003, 4/06. |
| ☒ | Technical Guidance for the Development and Specification of Effluent Limitations, 362-0400-001, 10/97. |
| ☐ | Policy for Conducting Technical Reviews of Minor NPDES Renewal Applications, 362-2000-008, 11/96. |
| ☐ | Technology-Based Control Requirements for Water Treatment Plant Wastes, 362-2183-003, 10/97. |
| ☐ | Technical Guidance for Development of NPDES Permit Requirements Steam Electric Industry, 362-2183-004, 12/97. |
| ☐ | Water Quality Antidegradation Implementation Guidance, 391-0300-002, 11/03. |
| ☒ | Implementation Guidance Evaluation & Process Thermal Discharge (316(a)) Federal Water Pollution Act, 391-2000-002, 4/97. |
| ☒ | Determining Water Quality-Based Effluent Limits, 391-2000-003, 12/97. |
| ☒ | Implementation Guidance Design Conditions, 391-2000-006, 9/97. |
| ☒ | Technical Reference Guide (TRG) WQM 7.0 for Windows, Wasteload Allocation Program for Dissolved Oxygen and Ammonia Nitrogen, Version 1.0, 391-2000-007, 6/2004. |
| ☐ | Technical Reference Guide (TRG) PENTOXSD for Windows, PA Single Discharge Wasteload Allocation Program for Toxics, Version 2.0, 391-2000-011, 5/2004. |
| ☐ | Implementation Guidance for Section 93.7 Ammonia Criteria, 391-2000-013, 11/97. |
| ☐ | Implementation Guidance Total Residual Chlorine (TRC) Regulation, 391-2000-015, 11/1994. |
| ☐ | Implementation Guidance for Temperature Criteria, 391-2000-017, 4/09. |
| ☒ | Implementation Guidance for Section 95.9 Phosphorus Discharges to Free Flowing Streams, 391-2000-018, 10/97. |
| ☐ | Implementation Guidance for Application of Section 93.5(e) for Potable Water Supply Protection Total Dissolved Solids, Nitrite-Nitrate, Non-Priority Pollutant Phenolics and Fluorides, 391-2000-019, 10/97. |
| ☐ | Field Data Collection and Evaluation Protocol for Determining Stream and Point Source Discharge Design Hardness, 391-2000-021, 3/99. |
| ☐ | Implementation Guidance for the Determination and Use of Background/Ambient Water Quality in the Determination of Wasteload Allocations and NPDES Effluent Limitations for Toxic Substances, 391-2000-022, 3/1999. |
| ☒ | Design Stream Flows, 391-2000-023, 9/98. |
| ☐ | Evaluations of Phosphorus Discharges to Lakes, Ponds and Impoundments, 391-3200-013, 6/97. |
| ☐ | Pennsylvania's Chesapeake Bay Tributary Strategy Implementation Plan for NPDES Permitting, 4/07. |
| ☐ | SOP: Establishing Effluent limitations |
| ☐ | Other: |
| ☐ | |

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

A.  Topographical

Complaint Exhibit 1



**NPDES Permit Fact Sheet**
**Hanover Foods**

**NPDES Permit No. PA0044741**

Complaint Exhibit 1

B.   WQM Model Results

## WQM 7.0 Effluent Limits

| SWP Basin | Stream Code | | | Stream Name | | | |
|---|---|---|---|---|---|---|---|
| '07H | 8213 | | | OIL CREEK | | | |

| RMI | Name | Permit Number | Disc Flow (mgd) | Parameter | Effl. Limit 30-day Ave. (mg/L) | Effl. Limit Maximum (mg/L) | Effl. Limit Minimum (mg/L) |
|---|---|---|---|---|---|---|---|
| 5.610 | Penn Township | PA0037150 | 4.200 | CBOD5 | 22.24 | | |
| | | | | NH3-N | 1.1 | 2.2 | |
| | | | | Dissolved Oxygen | | | 5 |

| RMI | Name | Permit Number | Disc Flow (mgd) | Parameter | Effl. Limit 30-day Ave. (mg/L) | Effl. Limit Maximum (mg/L) | Effl. Limit Minimum (mg/L) |
|---|---|---|---|---|---|---|---|
| 5.430 | Hanover Foods | PA0044741 | 0.840 | CBOD5 | 18.64 | | |
| | | | | NH3-N | 1.02 | 2.04 | |
| | | | | Dissolved Oxygen | | | 5 |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## Input Data WQM 7.0

| | SWP Basin | Stream Code | Stream Name | RMI | Elevation (ft) | Drainage Area (sq mi) | Slope (ft/ft) | PWS Withdrawal (mgd) | Apply FC |
|---|---|---|---|---|---|---|---|---|---|
| | 07H | 8213 | OIL CREEK | 5.610 | 537.00 | 3.87 | 0.00000 | 0.00 | ☑ |

### Stream Data

| Design Cond. | LFY (cfsm) | Trib Flow (cfs) | Stream Flow (cfs) | Rch Trav Time (days) | Rch Velocity (fps) | WD Ratio | Rch Width (ft) | Rch Depth (ft) | Tributary Temp (°C) | Tributary pH | Stream Temp (°C) | Stream pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q7-10 | 0.138 | 0.00 | 0.00 | 0.000 | 0.000 | 0.0 | 0.00 | 0.00 | 25.00 | 7.82 | 0.00 | 0.00 |
| Q1-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |
| Q30-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |

### Discharge Data

| Name | Permit Number | Existing Disc Flow (mgd) | Permitted Disc Flow (mgd) | Design Disc Flow (mgd) | Reserve Factor | Disc Temp (°C) | Disc pH |
|---|---|---|---|---|---|---|---|
| Penn Township | PA0037150 | 4.2000 | 0.0000 | 0.0000 | 0.000 | 25.00 | 7.50 |

### Parameter Data

| Parameter Name | Disc Conc (mg/L) | Trib Conc (mg/L) | Stream Conc (mg/L) | Rate Coef (1/days) |
|---|---|---|---|---|
| CBOD5 | 25.00 | 2.00 | 0.00 | 1.50 |
| Dissolved Oxygen | 5.00 | 8.24 | 0.00 | 0.00 |
| NH3-N | 25.00 | 0.00 | 0.00 | 0.70 |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## Input Data WQM 7.0

| | SWP Basin | Stream Code | Stream Name | RMI | Elevation (ft) | Drainage Area (sq mi) | Slope (ft/ft) | PWS Withdrawal (mgd) | Apply FC |
|---|---|---|---|---|---|---|---|---|---|
| | 07H | 8213 | OIL CREEK | 5.430 | 532.00 | 6.44 | 0.00000 | 0.00 | ☑ |

### Stream Data

| Design Cond. | LFY (cfsm) | Trib Flow (cfs) | Stream Flow (cfs) | Rch Trav Time (days) | Rch Velocity (fps) | WD Ratio | Rch Width (ft) | Rch Depth (ft) | Tributary Temp (°C) | Tributary pH | Stream Temp (°C) | Stream pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q7-10 | 0.138 | 0.00 | 0.00 | 0.000 | 0.000 | 0.0 | 0.00 | 0.00 | 25.00 | 7.82 | 0.00 | 0.00 |
| Q1-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |
| Q30-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |

### Discharge Data

| Name | Permit Number | Existing Disc Flow (mgd) | Permitted Disc Flow (mgd) | Design Disc Flow (mgd) | Reserve Factor | Disc Temp (°C) | Disc pH |
|---|---|---|---|---|---|---|---|
| Hanover Foods | PA0044741 | 0.8400 | 0.0000 | 0.0000 | 0.000 | 30.00 | 7.90 |

### Parameter Data

| Parameter Name | Disc Conc (mg/L) | Trib Conc (mg/L) | Stream Conc (mg/L) | Fate Coef (1/days) |
|---|---|---|---|---|
| CBOD5 | 25.00 | 2.00 | 0.00 | 1.50 |
| Dissolved Oxygen | 5.00 | 8.24 | 0.00 | 0.00 |
| NH3-N | 25.00 | 0.00 | 0.00 | 0.70 |

Complaint Exhibit 1

## Input Data WQM 7.0

| | SWP Basin | Stream Code | Stream Name | RMI | Elevation (ft) | Drainage Area (sq mi) | Slope (ft/ft) | PWS Withdrawal (mgd) | Apply FC |
|---|---|---|---|---|---|---|---|---|---|
| | 07H | 8213 | OIL CREEK | 4.560 | 517.00 | 6.72 | 0.00000 | 0.00 | ☑ |

### Stream Data

| Design Cond. | LFY (cfsm) | Trib Flow (cfs) | Stream Flow (cfs) | Rch Trav Time (days) | Rch Velocity (fps) | WD Ratio | Rch Width (ft) | Rch Depth (ft) | Tributary Temp (°C) | Tributary pH | Stream Temp (°C) | Stream pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q7-10 | 0.138 | 0.00 | 0.00 | 0.000 | 0.000 | 0.0 | 0.00 | 0.00 | 25.00 | 7.82 | 0.00 | 0.00 |
| Q1-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |
| Q30-10 | | 0.00 | 0.00 | 0.000 | 0.000 | | | | | | | |

### Discharge Data

| Name | Permit Number | Existing Disc Flow (mgd) | Permitted Disc Flow (mgd) | Design Disc Flow (mgd) | Reserve Factor | Disc Temp (°C) | Disc pH |
|---|---|---|---|---|---|---|---|
| | | 0.0000 | 0.0000 | 0.0000 | 0.000 | 0.00 | 7.00 |

### Parameter Data

| Parameter Name | Disc Conc (mg/L) | Trib Conc (mg/L) | Stream Conc (mg/L) | Fate Coef (1/days) |
|---|---|---|---|---|
| CBOD5 | 25.00 | 2.00 | 0.00 | 1.50 |
| Dissolved Oxygen | 5.00 | 8.24 | 0.00 | 0.00 |
| NH3-N | 25.00 | 0.00 | 0.00 | 0.70 |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## WQM 7.0 Hydrodynamic Outputs

| | SWP Basin | | Stream Code | | | | Stream Name | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07H | | 8213 | | | | OIL CREEK | | | | | |

| RMI | Stream Flow (cfs) | PWS Wlth (cfs) | Net Stream Flow (cfs) | Disc Analysis Flow (cfs) | Reach Slope (ft/ft) | Depth (ft) | Width (ft) | W/D Ratio | Velocity (fps) | Reach Trav Time (days) | Analysis Temp (°C) | Analysis pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Q7-10 Flow** | | | | | | | | | | | | |
| 5.610 | 0.53 | 0.00 | 0.53 | 6.4974 | 0.00526 | .665 | 22.63 | 34.01 | 0.47 | 0.024 | 25.00 | 7.52 |
| 5.430 | 0.89 | 0.00 | 0.89 | 7.7969 | 0.00327 | .687 | 27.99 | 40.73 | 0.45 | 0.118 | 25.75 | 7.57 |
| **Q1-10 Flow** | | | | | | | | | | | | |
| 5.610 | 0.34 | 0.00 | 0.34 | 6.4974 | 0.00526 | NA | NA | NA | 0.46 | 0.024 | 25.00 | 7.51 |
| 5.430 | 0.57 | 0.00 | 0.57 | 7.7969 | 0.00327 | NA | NA | NA | 0.44 | 0.120 | 25.78 | 7.56 |
| **Q30-10 Flow** | | | | | | | | | | | | |
| 5.610 | 0.73 | 0.00 | 0.73 | 6.4974 | 0.00526 | NA | NA | NA | 0.47 | 0.023 | 25.00 | 7.52 |
| 5.430 | 1.21 | 0.00 | 1.21 | 7.7969 | 0.00327 | NA | NA | NA | 0.46 | 0.115 | 25.72 | 7.57 |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## WQM 7.0 Modeling Specifications

| Parameters | | | |
|---|---|---|---|
| Parameters | Both | Use Inputted Q1-10 and Q30-10 Flows | ☑ |
| WLA Method | EMPR | Use Inputted W/D Ratio | ☐ |
| Q1-10/Q7-10 Ratio | 0.64 | Use Inputted Reach Travel Times | ☐ |
| Q30-10/Q7-10 Ratio | 1.36 | Temperature Adjust Kr | ☑ |
| D.O. Saturation | 90.00% | Use Balanced Technology | ☑ |
| D.O. Goal | 5 | | |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

# WQM 7.0 Wasteload Allocations

| SWP Basin | Stream Code | Stream Name |
|---|---|---|
| 07H | 8213 | OIL CREEK |

### NH3-N Acute Allocations

| RMI | Discharge Name | Baseline Criterion (mg/L) | Baseline WLA (mg/L) | Multiple Criterion (mg/L) | Multiple WLA (mg/L) | Critical Reach | Percent Reduction |
|---|---|---|---|---|---|---|---|
| 5.610 | Penn Township | 4.05 | 4.26 | 4.05 | 4.2 | 2 | 1 |
| 5.430 | Hanover Foods | 1.84 | 2.64 | 3.59 | 2.61 | 2 | 1 |

### NH3-N Chronic Allocations

| RMI | Discharge Name | Baseline Criterion (mg/L) | Baseline WLA (mg/L) | Multiple Criterion (mg/L) | Multiple WLA (mg/L) | Critical Reach | Percent Reduction |
|---|---|---|---|---|---|---|---|
| 5.610 | Penn Township | .99 | 1.1 | .99 | 1.1 | 2 | 0 |
| 5.430 | Hanover Foods | .53 | 1.03 | .92 | 1.02 | 2 | 1 |

### Dissolved Oxygen Allocations

| RMI | Discharge Name | CBOD5 Baseline (mg/L) | CBOD5 Multiple (mg/L) | NH3-N Baseline (mg/L) | NH3-N Multiple (mg/L) | Dissolved Oxygen Baseline (mg/L) | Dissolved Oxygen Multiple (mg/L) | Critical Reach | Percent Reduction |
|---|---|---|---|---|---|---|---|---|---|
| 5.61 | Penn Township | 22.24 | 22.24 | 1.1 | 1.1 | 5 | 5 | 0 | 0 |
| 5.43 | Hanover Foods | 18.64 | 18.64 | 1.02 | 1.02 | 5 | 5 | 0 | 0 |

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

# WQM 7.0 D.O.Simulation

| SWP Basin | Stream Code | | Stream Name | |
|---|---|---|---|---|
| 07H | 8213 | | OIL CREEK | |

| RMI | Total Discharge Flow (mgd) | Analysis Temperature (°C) | Analysis pH |
|---|---|---|---|
| 5.610 | 4.200 | 25.000 | 7.518 |
| **Reach Width (ft)** | **Reach Depth (ft)** | **Reach WDRatio** | **Reach Velocity (fps)** |
| 22.630 | 0.665 | 34.011 | 0.467 |
| **Reach CBOD5 (mg/L)** | **Reach Kc (1/days)** | **Reach NH3-N (mg/L)** | **Reach Kn (1/days)** |
| 20.70 | 1.324 | 1.01 | 1.029 |
| **Reach DO (mg/L)** | **Reach Kr (1/days)** | **Kr Equation** | **Reach DO Goal (mg/L)** |
| 5.246 | 26.283 | Tsivoglou | 5 |
| **Reach Travel Time (days)** | | | |
| 0.024 | | | |

| TravTime (days) | Subreach Results CBOD5 (mg/L) | NH3-N (mg/L) | D.O. (mg/L) |
|---|---|---|---|
| 0.002 | 20.62 | 1.01 | 5.31 |
| 0.005 | 20.54 | 1.01 | 5.36 |
| 0.007 | 20.46 | 1.01 | 5.41 |
| 0.009 | 20.38 | 1.00 | 5.47 |
| 0.012 | 20.30 | 1.00 | 5.51 |
| 0.014 | 20.22 | 1.00 | 5.56 |
| 0.016 | 20.14 | 1.00 | 5.60 |
| 0.019 | 20.06 | 0.99 | 5.64 |
| 0.021 | 19.98 | 0.99 | 5.68 |
| 0.024 | 19.90 | 0.99 | 5.72 |

| RMI | Total Discharge Flow (mgd) | Analysis Temperature (°C) | Analysis pH |
|---|---|---|---|
| 5.430 | 5.040 | 25.748 | 7.567 |
| **Reach Width (ft)** | **Reach Depth (ft)** | **Reach WDRatio** | **Reach Velocity (fps)** |
| 27.987 | 0.687 | 40.734 | 0.452 |
| **Reach CBOD5 (mg/L)** | **Reach Kc (1/days)** | **Reach NH3-N (mg/L)** | **Reach Kn (1/days)** |
| 18.98 | 1.286 | 0.95 | 1.089 |
| **Reach DO (mg/L)** | **Reach Kr (1/days)** | **Kr Equation** | **Reach DO Goal (mg/L)** |
| 5.715 | 16.061 | Tsivoglou | 5 |
| **Reach Travel Time (days)** | | | |
| 0.118 | | | |

| TravTime (days) | Subreach Results CBOD5 (mg/L) | NH3-N (mg/L) | D.O. (mg/L) |
|---|---|---|---|
| 0.012 | 18.61 | 0.94 | 5.60 |
| 0.024 | 18.25 | 0.93 | 5.51 |
| 0.035 | 17.89 | 0.92 | 5.45 |
| 0.047 | 17.54 | 0.90 | 5.41 |
| 0.059 | 17.20 | 0.89 | 5.39 |
| 0.071 | 16.87 | 0.88 | 5.38 |
| 0.082 | 16.54 | 0.87 | 5.38 |
| 0.094 | 16.21 | 0.86 | 5.39 |
| 0.106 | 15.90 | 0.85 | 5.41 |
| 0.118 | 15.59 | 0.84 | 5.43 |

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

C. TRC Calculations

| B | C | D | E | F | G |
|---|---|---|---|---|---|
| TRC EVALUATION | | | Enter Facility Name in E3 | | |
| Input appropriate values in B4:B8 and E4:E7 | | | | | |
| 0.88 | = Q stream (cfs) | | 0.5 | = CV Daily | |
| 0.84 | = Q discharge (MGD) | | 0.5 | = CV Hourly | |
| 30 | = no. samples | | 1 | = AFC Partial Mix Factor | |
| 0.3 | = Chlorine Demand of Stream | | 1 | = CFC Partial Mix Factor | |
| 0 | = Chlorine Demand of Discharge | | 15 | = AFC Criteria Compliance Time (min) | |
| 0.5 | = BAT/BPJ Value | | 720 | = CFC Criteria Compliance Time (min) | |
| | = % Factor of Safety (FOS) | | | =Decay Coefficient (K) | |
| Source | Reference | AFC Calculations | Reference | CFC Calculations | |
| TRC | 1.3.2.iii | WLA afc = 0.235 | 1.3.2.iii | WLA cfc = 0.222 | |
| PENTOXSD TRG | 5.1a | LTAMULT afc = 0.373 | 5.1c | LTAMULT cfc = 0.581 | |
| PENTOXSD TRG | 5.1b | LTA_afc= 0.088 | 5.1d | LTA_cfc = 0.129 | |
| Source | | Effluent Limit Calculations | | | |
| PENTOXSD TRG | 5.1f | AML MULT = 1.231 | | | |
| PENTOXSD TRG | 5.1g | AVG MON LIMIT (mg/l) = 0.108 | AFC | | |
| | | INST MAX LIMIT (mg/l) = 0.353 | | | |

WLA afc      $(.019/e(-k*AFC\_tc)) + [(AFC\_Yc*Qs*.019/Qd*e(-k*AFC\_tc))...$
             $... + Xd + (AFC\_Yc*Qs*Xs/Qd)]*(1-FOS/100)$
LTAMULT afc  $EXP((0.5*LN(cvh^2+1))-2.326*LN(cvh^2+1)^0.5)$
LTA_afc      $wla\_afc*LTAMULT\_afc$

WLA_cfc      $(.011/e(-k*CFC\_tc)) + [(CFC\_Yc*Qs*.011/Qd*e(-k*CFC\_tc))...$
             $... + Xd + (CFC\_Yc*Qs*Xs/Qd)]*(1-FOS/100)$
LTAMULT_cfc  $EXP((0.5*LN(cvd^2/no\_samples+1))-2.326*LN(cvd^2/no\_samples+1)^0.5)$
LTA_cfc      $wla\_cfc*LTAMULT\_cfc$

AML MULT       $EXP(2.326*LN(cvd^2/no\_samples+1)^0.5)-0.5*LN(cvd^2/no\_samples+1))$
AVG MON LIMIT  $MIN(BAT\_BPJ,MIN(LTA\_afc,LTA\_cfc)*AML\_MULT)$
INST MAX LIMIT $1.5*((av\_mon\_limit/AML\_MULT)/LTAMULT\_afc)$

29

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

D.  PENTOXSD Model Results

### PENTOXSD Analysis Results

### Recommended Effluent Limitations

| SWP Basin | Stream Code: | Stream Name: |
|---|---|---|
| 07H | 8213 | OIL CREEK |

| RMI | Name | Permit Number | Disc Flow (mgd) |
|---|---|---|---|
| 5.43 | Hanover Foods | PA0044741 | 0.8400 |

| Parameter | Effluent Limit (µg/L) | Governing Criterion | Max. Daily Limit (µg/L) | Most Stringent WQBEL (µg/L) | WQBEL Criterion |
|---|---|---|---|---|---|
| CADMIUM | 0.77 | CFC | 1.202 | 0.77 | CFC |

Tuesday, May 19, 2015                    Version 2.0d                    Page 1 of 1

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## PENTOXSD

### Modeling Input Data

| Stream Code | RMI | Elevation (ft) | Drainage Area (sq mi) | Slope | PWS With (mgd) | Apply FC |
|---|---|---|---|---|---|---|
| 8213 | 6.43 | 532.00 | 6.44 | 0.00000 | 0.00 | ☑ |

### Stream Data

| | LFY | Trib Flow | Stream Flow | WD Ratio | Rch Width | Rch Depth | Rch Velocity | Rch Trav Time | Tributary Hard | pH | Stream Hard | pH | Analysis Hard | pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (cfsm) | (cfs) | (cfs) | | (ft) | (ft) | (fps) | (days) | (mg/L) | | (mg/L) | | (mg/L) | |
| Q7-10 | 0.138 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7.82 | 212 | 0 | 0 | 0 |
| Qh | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 | 0 |

### Discharge Data

| Name | Permit Number | Existing Disc Flow (mgd) | Permitted Disc Flow (mgd) | Design Disc Flow (mgd) | Reserve Factor | AFC PMF | CFC PMF | THH PMF | CRL PMF | Disc Hard (mg/L) | Disc pH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hanover Foods | PA0044741 | 0.84 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 197 | 7.9 |

### Parameter Data

| Parameter Name | Disc Conc (µg/L) | Trib Conc (µg/L) | Disc Daily CV | Disc Hourly CV | Steam Conc (µg/L) | Stream CV | Fate Coef | FOS | Crit Mod | Max Disc Conc (µg/L) |
|---|---|---|---|---|---|---|---|---|---|---|
| CADMIUM | 1000000 | 0 | 0.5 | 0.5 | 0 | 0 | 0 | 0 | 1 | 0 |

| Stream Code | RMI | Elevation (ft) | Drainage Area (sq mi) | Slope | PWS With (mgd) | Apply FC |
|---|---|---|---|---|---|---|
| 8213 | 4.56 | 517.00 | 8.72 | 0.00000 | 0.00 | ☑ |

### Stream Data

| | LFY | Trib Flow | Stream Flow | WD Ratio | Rch Width | Rch Depth | Rch Velocity | Rch Trav Time | Tributary Hard | pH | Stream Hard | pH | Analysis Hard | pH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (cfsm) | (cfs) | (cfs) | | (ft) | (ft) | (fps) | (days) | (mg/L) | | (mg/L) | | (mg/L) | |
| Q7-10 | 0.138 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7.82 | 212 | 0 | 0 | 0 |
| Qh | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 | 0 |

### Discharge Data

| Name | Permit Number | Existing Disc Flow (mgd) | Permitted Disc Flow (mgd) | Design Disc Flow (mgd) | Reserve Factor | AFC PMF | CFC PMF | THH PMF | CRL PMF | Disc Hard (mg/L) | Disc pH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 7 |

### Parameter Data

| Parameter Name | Disc Conc (µg/L) | Trib Conc (µg/L) | Disc Daily CV | Disc Hourly CV | Steam Conc (µg/L) | Stream CV | Fate Coef | FOS | Crit Mod | Max Disc Conc (µg/L) |
|---|---|---|---|---|---|---|---|---|---|---|
| CADMIUM | 0 | 0 | 0.5 | 0.5 | 0 | 0 | 0 | 0 | 1 | 0 |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## PENTOXSD Analysis Results

### Hydrodynamics

| SWP Basin | Stream Code: | Stream Name: |
|---|---|---|
| 07H | 8213 | OIL CREEK |

| RMI | Stream Flow (cfs) | PWS With (cfs) | Net Stream Flow (cfs) | Disc Analysis Flow (cfs) | Reach Slope | Depth (ft) | Width (ft) | WD Ratio | Velocity (fps) | Reach Trav Time (days) | CMT (min) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Q7-10 Hydrodynamics** | | | | | | |
| 5.430 | 0.8887 | 0 | 0.8887 | 1.29947 | 0.0033 | 0.5707 | 18.372 | 32.195 | 0.2087 | 0.2547 | 3.097 |
| 4.560 | 0.9274 | 0 | 0.9274 | NA | 0 | 0 | 0 | 0 | 0 | 0 | NA |
| | | | | | **Qh Hydrodynamics** | | | | | | |
| 5.430 | 6.7021 | 0 | 6.7021 | 1.29947 | 0.0033 | 1.0096 | 18.372 | 18.198 | 0.4314 | 0.1232 | 5.599 |
| 4.560 | 6.9561 | 0 | 6.9561 | NA | 0 | 0 | 0 | 0 | 0 | 0 | NA |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

## PENTOXSD Analysis Results

### Wasteload Allocations

| RMI | Name | Permit Number |
|---|---|---|
| 6.43 | Hanover Foods | PA0044741 |

**AFC**

| Q7-10: | CCT (min) | 3.097 | PMF | 1 | Analysis pH | 7.865 | Analysis Hardness | 203.092 |
|---|---|---|---|---|---|---|---|---|

| Parameter | Stream Conc (µg/L) | Stream CV | Trib Conc. (µg/L) | Fate Coef | WQC (µg/L) | WQ Obj (µg/L) | WLA (µg/L) |
|---|---|---|---|---|---|---|---|
| CADMIUM | 0 | 0 | 0 | 0 | 4.008 | 4.384 | 7.382 |

Dissolved WQC. Chemical translator of 0.914 applied.

**CFC**

| Q7-10: | CCT (min) | 3.097 | PMF | 1 | Analysis pH | 7.865 | Analysis Hardness | 203.092 |
|---|---|---|---|---|---|---|---|---|

| Parameter | Stream Conc. (µg/L) | Stream CV | Trib Conc. (µg/L) | Fate Coef | WQC (µg/L) | WQ Obj (µg/L) | WLA (µg/L) |
|---|---|---|---|---|---|---|---|
| CADMIUM | 0 | 0 | 0 | 0 | 0.402 | 0.457 | 0.77 |

Dissolved WQC. Chemical translator of 0.879 applied.

**THH**

| Q7-10: | CCT (min) | 3.097 | PMF | NA | Analysis pH | NA | Analysis Hardness | NA |
|---|---|---|---|---|---|---|---|---|

| Parameter | Stream Conc (µg/L) | Stream CV | Trib Conc. (µg/L) | Fate Coef | WQC (µg/L) | WQ Obj (µg/L) | WLA (µg/L) |
|---|---|---|---|---|---|---|---|
| CADMIUM | 0 | 0 | 0 | 0 | NA | NA | NA |

**CRL**

| Qh: | CCT (min) | 5.599 | PMF | 1 | | | | |
|---|---|---|---|---|---|---|---|---|

| Parameter | Stream Conc (µg/L) | Stream CV | Trib Conc. (µg/L) | Fate Coef | WQC (µg/L) | WQ Obj (µg/L) | WLA (µg/L) |
|---|---|---|---|---|---|---|---|
| CADMIUM | 0 | 0 | 0 | 0 | NA | NA | NA |

**NPDES Permit Fact Sheet NPDES Permit No. PA0044741**
**Hanover Foods**

Complaint Exhibit 1

E.   Toxic Analysis Spreadsheet

## TOXICS SCREENING ANALYSIS
## WATER QUALITY POLLUTANTS OF CONCERN
## VERSION 2.2

Facility:   Hanover Foods Corp  
Analysis Hardness (mg/L):   202

NPDES Permit No.:   PA0034011  
Discharge Flow (MGD):   0.84

Outfall:   001  
Analysis pH (SU):   7.9

| | Parameter | | Maximum Concentration in Application or DMRs (µg/L) | Most Stringent Criterion (µg/L) | Candidate for PENTOXSD Modeling? | Most Stringent WQBEL (µg/L) | Screening Recommendation |
|---|---|---|---|---|---|---|---|
| **Group 1** | Total Dissolved Solids | | 452000 | 500000 | No | | |
| | Chloride | | | 250000 | | | |
| | Bromide | | 640 | N/A | No | | |
| | Sulfate | | 33900 | 250000 | No | | |
| | Fluoride | | 740 | 2000 | No | | |
| **Group 2** | Total Aluminum | | 230 | 750 | No | | |
| | Total Antimony | | 1 | 5.6 | No | | |
| | Total Arsenic | | 5 | 10 | No | | |
| | Total Barium | | 880 | 2400 | No | | |
| | Total Beryllium | | 1 | N/A | No | | |
| | Total Boron | | 240 | 1600 | No | | |
| | Total Cadmium | | 0.48 | 0.456 | Yes | 0.77 | Establish Limits |
| | Total Chromium | | | N/A | | | |
| | Hexavalent Chromium | | 10 | 10.4 | No | | |
| | Total Cobalt | | 10 | 19 | No | | |
| | Total Copper | | 12 | 17.0 | No | | |
| | Total Cyanide | | | N/A | | | |
| | Total Iron | | 150 | 1500 | No | | |
| | Dissolved Iron | | 64 | 300 | No | | |
| | Total Lead | | 3 | 7.8 | No | | |
| | Total Manganese | | 26 | 1000 | No | | |
| | Total Mercury | | 0.02 | 0.05 | No | | |
| | Total Molybdenum | | | N/A | | | |
| | Total Nickel | | 10 | 94.6 | No | | |
| | Total Phenols (Phenolics) | | | 5 | | | |
| | Total Selenium | < | 2 | 5.0 | No (Value < QL) | | |
| | Total Silver | | 2 | 12.7 | No | | |
| | Total Thallium | < | 0.5 | 0.24 | No (Value < QL) | | |
| | Total Zinc | | 38 | 217.4 | No | | |

34

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

### F.  Temperature Calculations

| | |
|---|---|
| **Facility:** | Hanover Foods |
| **Permit Number:** | PA0044741 |
| **Stream Name:** | Oil Creek |
| **Analyst/Engineer:** | J.P Kwedza |
| **Stream Q7-10 (cfs):** | 0.88 |

| | Facility Flows[1] | | | | Stream Flows | |
|---|---|---|---|---|---|---|
| | Stream (Intake) (MGD) | External (Intake) (MGD) | Consumptive (Loss) (MGD) | Discharge (MGD) | Adj. Q7-10 Stream Flow (cfs) | Downstream[2] Stream Flow (cfs) |
| Jan  1-31 | 0 | 0.84 | 0 | 0.84 | 2.8 | 4.1 |
| Feb  1-29 | 0 | 0.84 | 0 | 0.84 | 3.1 | 4.4 |
| Mar  1-31 | 0 | 0.84 | 0 | 0.84 | 6.2 | 7.5 |
| Apr  1-15 | 0 | 0.84 | 0 | 0.84 | 8.2 | 9.5 |
| Apr 16-30 | 0 | 0.84 | 0 | 0.84 | 8.2 | 9.5 |
| May  1-15 | 0 | 0.84 | 0 | 0.84 | 4.5 | 5.8 |
| May 16-30 | 0 | 0.84 | 0 | 0.84 | 4.5 | 5.8 |
| Jun  1-15 | 0 | 0.84 | 0 | 0.84 | 2.6 | 3.9 |
| Jun 16-30 | 0 | 0.84 | 0 | 0.84 | 2.6 | 3.9 |
| Jul  1-31 | 0 | 0.84 | 0 | 0.84 | 1.5 | 2.8 |
| Aug  1-15 | 0 | 0.84 | 0 | 0.84 | 1.2 | 2.5 |
| Aug 16-31 | 0 | 0.84 | 0 | 0.84 | 1.2 | 2.5 |
| Sep  1-15 | 0 | 0.84 | 0 | 0.84 | 1.0 | 2.3 |
| Sep 16-30 | 0 | 0.84 | 0 | 0.84 | 1.0 | 2.3 |
| Oct  1-15 | 0 | 0.84 | 0 | 0.84 | 1.1 | 2.4 |
| Oct 16-31 | 0 | 0.84 | 0 | 0.84 | 1.1 | 2.4 |
| Nov  1-15 | 0 | 0.84 | 0 | 0.84 | 1.4 | 2.7 |
| Nov 16-30 | 0 | 0.84 | 0 | 0.84 | 1.4 | 2.7 |
| Dec  1-31 | 0 | 0.84 | 0 | 0.84 | 2.1 | 3.4 |

[1] Facility flows are not required (and will not affect the permit limits) if all intake flow is from the receiving stream (Case 1),
   consumptive losses are small, and permit limits will be expressed as Million BTUs/day.
[2] Downstream Stream Flow includes the discharge flow.

*Please forward all comments to Tom Starosta at 717-787-4317, tstarosta@state.pa.us.*

Version 1.0 – 08/01/2004     Reference: Implementation Guidance for Temperature Criteria, DEP-ID: 391-2000-017
NOTE: The user can only edit fields that are blue.
NOTE:  MGD x 1.547 = cfs.

NPDES Permit Fact Sheet NPDES Permit No. PA0044741
Hanover Foods

Complaint Exhibit 1

Facility: **Hanover Foods**
Permit Number: PA0044741
Stream: Oil Creek

| | **WWF** Ambient Stream Temperature (°F) (Default) | Ambient Stream Temperature (°F) (Site-specific data) | Target Maximum Stream Temp.[1] (°F) | **WWF** Daily WLA[2] (Million BTUs/day) | **WWF** Daily WLA[3] (°F) | at Discharge Flow (MGD) |
|---|---|---|---|---|---|---|
| Jan  1-31 | 35 | 0 | 40 | N/A -- Case 2 | 50.8 | 0.84 |
| Feb  1-29 | 35 | 0 | 40 | N/A -- Case 2 | 51.9 | 0.84 |
| Mar  1-31 | 40 | 0 | 46 | N/A -- Case 2 | 74.4 | 0.84 |
| Apr  1-15 | 47 | 0 | 52 | N/A -- Case 2 | 83.5 | 0.84 |
| Apr 16-30 | 53 | 0 | 58 | N/A -- Case 2 | 89.5 | 0.84 |
| May  1-15 | 58 | 0 | 64 | N/A -- Case 2 | 84.7 | 0.84 |
| May 16-30 | 62 | 0 | 72 | N/A -- Case 2 | 106.5 | 0.84 |
| Jun  1-15 | 67 | 0 | 80 | N/A -- Case 2 | 106.4 | 0.84 |
| Jun 16-30 | 71 | 0 | 84 | N/A -- Case 2 | 110.0 | 0.84 |
| Jul  1-31 | 75 | 0 | 87 | N/A -- Case 2 | 100.8 | 0.84 |
| Aug  1-15 | 74 | 0 | 87 | N/A -- Case 2 | 99.3 | 0.84 |
| Aug 16-31 | 74 | 0 | 87 | N/A -- Case 2 | 99.3 | 0.84 |
| Sep  1-15 | 71 | 0 | 84 | N/A -- Case 2 | 93.7 | 0.84 |
| Sep 16-30 | 65 | 0 | 78 | N/A -- Case 2 | 87.7 | 0.84 |
| Oct  1-15 | 60 | 0 | 72 | N/A -- Case 2 | 81.8 | 0.84 |
| Oct 16-31 | 54 | 0 | 66 | N/A -- Case 2 | 75.8 | 0.84 |
| Nov  1-15 | 48 | 0 | 58 | N/A -- Case 2 | 68.8 | 0.84 |
| Nov 16-30 | 42 | 0 | 50 | N/A -- Case 2 | 58.7 | 0.84 |
| Dec  1-31 | 37 | 0 | 42 | N/A -- Case 2 | 50.1 | 0.84 |

[1] This is the maximum of the WWF WQ criterion or the ambient temperature.  The ambient temperature may be
either the design (median) temperature for WWF, or the ambient stream temperature based on site-specific data entered by the user.
A minimum of 1°F above ambient stream temperature is allocated.

[2] The WLA expressed in Million BTUs/day is valid for Case 1 scenarios, and disabled for Case 2 scenarios.

[3] The WLA expressed in °F is valid only if the limit is tied to a daily discharge flow limit (may be used for Case 1 or Case 2).
WLAs greater than 110°F are displayed as 110°F.

Complaint Exhibit 1

# ATTACHMENT B

3800-FM-BPNPSM0168A   9/2012


**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**
# NPDES COMPLIANCE INSPECTION REPORT

Complaint Exhibit 1

| NPDES Permit No. | Mo/Day/Yr | Entry Time | Exit Time | Inspection Type | eFACTS Inspection ID |
|---|---|---|---|---|---|
| PA0044741 | 7/9/2020 | 09:00 | | CEI | |

| Facility Name: | Permittee Name: |
|---|---|
| Hanover Foods IWTP | Hanover Foods Corporation |

| Physical Location/Directions: | Permit Expiration Date: |
|---|---|
| 1550 York Street, Hanover, PA 17331 | 09/30/2020 |

| Municipality: | County: | Permit Renewal Application Due: |
|---|---|---|
| Penn Township | York | 03/31/2020 |

Facility Type:  ☐ Sewage  ■ Industrial Waste  ☐ Industrial Stormwater  ☐ Other:
☐ Major  ■ Minor

| Responsible Person: | Certified Operator Required: ☐ Yes ■ No |
|---|---|
| David Still | Certified Operator in Responsible Charge: |
| Title: Vice President - Operations | Eric Eckersley |

| Permittee Address: | PO Box 334 | Client ID: |
|---|---|---|
| | 1486 York Street | Class-Subclass(es): |
| | Hanover, PA 17331 | Circuit Rider: ☐ Yes ■ No |

| Business Phone: 717.632.6000 | Business Phone: 717.632.6000 xt 1214 |
|---|---|
| Fax: | Cell: |
| Email: dstill@hanoverfoods.com | Email: eeckersley@hanoverfoods.com |

24-Hour Emergency Contact Person / Phone:

| **VIOLATIONS:** (list below) | ■ Yes  ☐ No  ☐ Pending Sample Results |
|---|---|

Short circuiting, rising sludge, and solids discharge from IWTP clarifiers #3 & #4 are a violation of Part B.I.D of your NPDES Permit No. PA0044741. Failure to properly operate and maintain all facilities which are installed or used by the permittee to achieve compliance

| Person Interviewed: | Date: | Inspector: | Date: |
|---|---|---|---|
| Eric Eckersley | 07/09/2020 | Austen Randecker | 7/9/2020 |
| Signature: | Phone No.: 717.632.6000 | Inspector Signature: | Phone No.: 717.503.7121 |
| Title: Operator | | Title: Water Quality Specialist | |
| Email: eeckersley@hanoverfoods.com | | Email: arandecker@pa.gov | |

This document is official notification that a representative of the Department of Environmental Protection inspected the above facility. The findings of this inspection are shown above and on any attached pages. Any violations which were noted during the inspection are indicated. Violations may also be discovered upon examination of the results of laboratory analyses of the discharge and review of Department records.



3800-FM-BPNPSM0168B   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Comments |
| --- |
| A Compliance Evaluation Inspection was conducted today by the Department's Clean Water Program. In attendance for the inspection was Austen Randecker (Water Quality Specialist). I was met on-site Eric Eckersley (Plant Operator) and Kumar Navile (Environmental Affairs & Sustainability Manager) who accompanied me on the inspection. |
| Treatment plant receives industrial wastewater from canning operations as well as NCCW. Industrial wastewater is treated as a pre-treatment operation for Penn Township STP (450,000 gallons/day monthly average). NCCW is treated and discharged to Oil Creek at Outfall 001. Industrial Wastewater that is not sent to Penn Township is combined with the NCCW, treated and discharged at Outfall 001. |
| Influent flow from industrial canning operations passes through screening before entering the grit removal chamber. Once removed or grit and screenings, influent enters the wet well equipped with 3 influent pumps and one surge pump. During periods of high flows or heavy BOD loadings an EQ/Surge tank can be put online to store extra flow and can be fed back to the wet well by a flow metering device in the screening area. Influent samples are collected for weekly testing and for daily COD. The Surge tank was online during the inspection. The Surge tank is equipped with a mixer and is continuously mixed. |
| There were some food particles on the ground surface near the screening building. Mr. Eckersley stated that the screening area is cleaned daily. Screenings are collected in trucks and stored in the residual storage pad for land application. Other clippings and food waste products are kept on the storage pad. The storage pad is fully covered and sloped to a drain system that collects any runoff from the screenings/food waste. This runoff is gravity fed to a sump pump at the slurry tank that is directly pumped into the influent line before the screening devices. |
| After screening and grit removal industrial waste is pumped to 1 of 2 bio-reactors via 3 influent wet well pumps. Bio-reactor #2 was online during the inspection. Bio-reactor #1 and clarifiers 1 and 2 were offline due to maintenance and chemical feed repairs. Reactor #1 is currently operating at 93.3 degrees F and is designed to operate at ~95 degrees F. Mr. Eckersley states that heat exchanger may not be sufficient enough to maintain design temperature, there has been discussion of installing a heat exchanger on the IW/NCCW lines to help aide the temperature in the bio-reactor. The reactor has ability to flare gas, normal operations use the gas as fuel for the heat exchanger. A natural gas line is to be installed in the future, it will be used as a fuel source to maintain temperature in the bio-reactors. |
| Flow from bio-reactor #2 is fed to a splitter box that diverts flow between primary clarifier 3 and 4, both online during the inspection. Clarifiers 3 and 4 are experiencing short-circuiting, gas release, and solids carry over in multiple areas along the weirs. There is some minor algae accumulation in the effluent weir notches. RAS from the clarifiers is sent to a RAS pit. There is a valve in the RAS pit that is used to waste sludge. Wasted sludge is sent to the Slurry tank and ultimately is land applied. Effluent from clarifier 3 and 4 is gravity fed to aeration lagoon #1. |



3800-FM-BPNPSM0168B   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT** Complaint Exhibit 1

pennsylvania
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

# NPDES COMPLIANCE INSPECTION REPORT

| Comments |
|---|
| Lagoon #1 appeared to be a brown/green color and there were no significant odors, scum, or floatables. The liner appears to be in good repair. Lagoon #1 is equipped with 3 diffuser barges, 1 surface aerator, and 4 pontoon aerators. Effluent from lagoon #1 is sampled and is the majority is sent to Penn Township WWTP for final treatment. A new flow isolation gate valve was recently installed on lagoon #1 for flow being sent to Penn Township WWTP. Flow from lagoon #1 that is not sent to Penn Township WWTP is fed into lagoon #2. |
| Lagoon #1 was drained about 4-5 feet from the last inspection so the lagoon can be cleaned. Solids are being removed from the bottom of the lagoon and are being placed into 2 Geo-bags that are located just to the south of lagoon 1. Solids are pumped into the geo-bags to be dewatered. The runoff from the geo-bags is sloped and directed back into lagoon 1. The geo-bags are currently in the final drying stage and will be removed off-site once the drying process is completed. |
| NCCW is also treated on-site. NCCW flow, and some of lagoon #1 effluent enters aeration lagoon #2. Lagoon #2 appeared mostly clear and had a green/brown tint. No rips/tears were noted with the liner. Lagoon #2 is equipped with 3 diffuser barges, 1 surface aerator, and 4 pontoon aerators. 1 pontoon aerator was offline during the inspection. Flow from lagoon #1 is gravity fed to a splitter box where flow is diverted to 2 polishing ponds. The polishing ponds were being aerated during the inspection. The water in the polishing ponds appeared clear with a green tint. There were some scum and solids on the surface. |
| Effluent from the polishing ponds is combined and sent to UV disinfection before being discharged to Oil Creek at Outfall 001. There are two UV units, bank 2 was online during the inspection. The UV units are alternated. The UV system has a PLC and SCADA that can be viewed and operated from the control building. Effluent composite samples are collected from the effluent line post UV disinfection. Flow from the UV unit is gravity fed to Outfall 001. The outfall was clear of debris and no observable solids, foam, or scum was noted at the headwall. Effluent appeared to have a greenish/yellow tint with some observable solids. Oil Creek upstream and downstream of the outfall appeared clear. Effluent flow from Outfall 001 during the inspection was 322 gallons/minute. |
| Recommendations:<br>-Notify the Department when Bio-reactor 1 and Clarifiers 1 and 2 are operational and online<br>-Cleanup and housekeeping of screening area, residual waste storage pad, and slurry tank<br>-Sampling NCCW influent 1/week for process control<br>-Adjusting wasting rates/transfer from clarifiers to slurry tank<br>-Notify the Department of conducting any temperature changes within the Bio-reactor<br>-Updating the Emergency Response /PPC Plan and reviewing/revising on a yearly basis |



3800-FM-BPNPSM0168C   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| **Monitoring, Reporting and Recordkeeping**<br>**(NPDES Permit Part A)** |
|---|

<u>On-site laboratory:</u> ■ Registered   ☐ Accredited   ☐ N/A   ☐ Not Registered/Accredited

On-site analyses: ■ pH   ■ DO   ■ TRC   ☐ All NPDES parameters   ☐ None
■ Other(s): Temperature

DEP Lab Registration/Accreditation #: 67-01061       Lab Supervisor:

Comments:

---

<u>Contract Laboratory Name</u>: ALS Environmental       DEP Lab Accreditation #: 22-00293

Address & Phone: 301 Fulling Mill Road, Middletown

Parameters Analyzed: color, CBOD, TSS, O/G, fecal, NH3-N, Total Phos, Total Cadmium, Total nitrogen series

Comments:

---

<u>Sample Collection</u>: Influent sampling location: before bio-reactors

Effluent sampling location: Post UV system

| | | |
|---|---|---|
| Location(s) adequate for representative samples: | ■ Yes | ☐ No |
| Parameters analyzed, sample frequencies and sample types meet permit requirements: | ■ Yes | ☐ No |
| Samples properly preserved during collection, storage and shipping: | ■ Yes | ☐ No |
| Sampler or sample temperature is recorded using NIST traceable thermometer: | ■ Yes | ☐ No |

Comments:

---

<u>Composite samples</u>: Being collected: ■ Yes   ☐ No       Composites are: ☐ 8-hour   ■ 24-hour   ☐ Other

Samples are: ☐ Flow Proportional   ■ Time Proportional

Sampler controlled by: ■ Influent flow meter   ■ Effluent flow meter

Minimum aliquot volume greater than 100 ml: ■ Yes   ☐ No

Composite sampler temperature during inspection: 6C

Comments:

---

<u>Sample records</u>: Available for inspection: ■ Yes   ☐ No       Retained for at least three years: ■ Yes   ☐ No

Includes:   Collector name: ■ Yes   ☐ No   Collection date/time: ■ Yes   ☐ No   Collection location: ■ Yes   ☐ No
Analyst name: ■ Yes   ☐ No   Analysis date/time: ■ Yes   ☐ No   Analysis Results: ■ Yes   ☐ No
Analytical methods & quantitation limits: ■ Yes   ☐ No   Chain-of-Custody forms: ■ Yes   ☐ No

Comments:

---

<u>Bench sheets</u>: Data is consistent with data on the DMR: ■ Yes   ☐ No   ☐ N/A       Month(s)/year checked: September 2019

Comments:

---

<u>Field Testing</u>: Completed within required hold time: ■ Yes   ☐ No

Equipment is calibrated as required: pH: ■ Yes   ☐ No   DO: ■ Yes   ☐ No   TRC: ■ Yes   ☐ No   ☐ N/A
Other(s): ☐ Yes   ☐ No

Calibration records maintained: ■ Yes   ☐ No

Comments:

---

<u>DMR Submittal</u>: DMRs are submitted as required: ■ Yes   ☐ No       eDMR User: ■ Yes   ☐ No

DMR Supplemental Reports are submitted as required: ■ Yes   ☐ No

DMRs include all sample results collected and analyzed using approved methods: ■ Yes   ☐ No

Comments:

---



3800-FM-BPNPSM0168D   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| **Flow Measurement** |
| --- |
| **(NPDES Permit Part A)** |

<u>Primary flow meter and recorder</u>: Operable: ■ Yes ☐ No        Properly maintained: ■ Yes ☐ No

Measuring device type: ☐ Flume   ☐ Weir   ■ Full Pipe   ☐ Open Channel   ☐ Other:

Meter type:   ☐ Ultrasonic ■ Magnetic Meter   ☐ Bubbler        ☐ Other:

Meter location: Post UV system

Recorder type: ☐ Totalizer ☐ Daily Chart ☐ 7-Day Chart ■ SCADA/Electronic ☐ Other:

Capable of recording maximum flows: ☐ Yes ■ No      Calibration Range: unknown

Inspection frequency:    ■ Daily   ☐ Weekly   ☐ Other:

Calibration frequency: 2/year        Date of last calibration: 07-01-2020

Measuring device, meter and recorder included as part of flow meter calibration:   ■ Yes   ☐ No   ☐ N/A

Influent flow is measured before all return lines: ■ Yes ☐ No   Influent flow is measured after hauled-in wastes: ☐ Yes ☐ No

Effluent flow is measured after all withdraws: ■ Yes ☐ No

Comments:

<u>Flumes</u>: Flow is uniform across the channel: ☐ Yes ☐ No ■ N/A      Flume is free of debris and deposits: ☐ Yes ☐ No ■ N/A
Comments:

<u>Weirs</u>: Clean with a visible air space below the nappe: ☐ Yes    ☐ No   ■ N/A
Comments:

| **Treatment Plant** |
| --- |
| **(NPDES Permit Part B)** |

<u>Treatment plant bypass</u>: Since last inspection: ☐ Yes ■ No      Reported to DEP: ☐ Yes ☐ No

Location/cause:

<u>Major equipment repair/replacement</u>: Since last inspection: ☐ Yes ☐ No      Date of last inspection: CEI on 7/20/16

Repair List: grit belt

<u>Stand-by power</u>:   ■ Emergency generator   ☐ Dual power feed   ☐ None   ☐ Other:

System operable: ■ Yes ☐ No   Exercise frequency: weekly             Maintenance frequency: annual

Comments: Emergency generator is available for the wet well; there is no backup power at the treatment plant

<u>Alarms</u>: Type: ☐ None   ☐ SCADA   ☐ Auto Dialer   ☐ PLC   ■ Other: light alarm

System operable: ■ Yes ☐ No        Test frequency:

Alarm triggers: high/low levels

<u>Staffing schedule</u>: ☐ 24/7   Weekday hours: 0500 to 1500      Weekend/Holiday hours: Varies
Other:

<u>On site Logs</u>: Logs up-to-date: ■ Yes ☐ No ☐ N/A

Daily Log contains: ☐ Visual observations   ■ Process adjustments      ■ Problems and concerns

Repair log maintained: ■ Yes ☐ No   Routine maintenance log maintained: ■ Yes ☐ No

Comments: Repair and maintenance included in daily log

<u>Spare parts inventory</u>: maintained: ■ Yes ☐ No   ■ Standby units available
Comments:



3800-FM-BPNPSM0168E   9/2012

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Treatment Process Units (NPDES Permit Part B) | | | | |
|---|---|---|---|---|
| Water Quality Management Permit No. | | | All treatment units are as noted in permit: ☐ Yes  ☐ No | |
| **Treatment Units** | **Total** | **On-Line** | **Inoperable** | **Comments** |
| Screening | 1 | 1 | | |
| Grit Removal | 1 | 1 | | |
| Surge Tank (EQ) | 1 | 1 | | |
| Bio-reactor | 2 | 1 | 0 | Reactor #1 offline for maintenance |
| Primary Clarifier | 4 | 2 | 0 | #1 and #2 offline for maintenance |
| Aeration Lagoons | 2 | 2 | | |
| Polishing ponds | 2 | 2 | | |
| UV System | 2 | 1 | 0 | Two UV units that alternate |
| | | | | |
| | | | | |
| Residual Storage Pad | 1 | 1 | | Under roof cover |
| Slurry Tank | 1 | 1 | | Valve has been replaced; currently no leaks |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Chemical Additions: MgOH, sulfuric acid, PAC, Polymer, biological bug supplement | | | | |

Page 6 of 8                    Date: 7/9/2020                    Permit No.: PA0044741



3800-FM-BPNPSM0168F   9/2012

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Process Control (NPDES Permit Part B) | |
|---|---|
| **Frequency of Testing** | **Current Testing Results** |
| ■ Settleability | 1000 |
| ■ Dissolved Oxygen | Lagoon 2: West: 4.8, North: 5.0, East: 5.0. South: 5.4 |
| ■ Sludge Blanket | #3: 9ft; #4: 11 ft – 07/09 |
| ■ Mixed Liquor Suspended Solids     ☐ MLVSS | Digester #2: 4940 – 07/09 |
| ☐ Microscopic exam of MLSS | |
| ■ Color     ☐ Odor | Comments/observations/results: Lagoon 1 appeared to be a green/brownish color; Lagoon 2 appeared clear with a green tint |
| ■ Other: Digepster 2: pH: 6.98; Alkalinity: 350 | |

| Other Requirements (NPDES Permit Part C) | |
|---|---|
| Special Conditions: Next submission/action:                                      Due Date: | |

Special Conditions: Next submission/action:                                      Due Date:
☐ WETT:
☐ TRE/TIE:
☐ EPA Pretreatment Program     ☐ Annual report submitted:
■ Stormwater requirements: sampling at 002 and 003
☐ Permit Schedule:
☐ TMDL:
■ Other: C-Bay nutrient monitoring
Comments:

Emergency Response/PPC Plan: on-site:  ■ Yes   ☐ No   ☐ N/A     Last updated: 02/2016
Flood response plan available:   ☐ Yes   ☐ No   ■ N/A
Comments:

| Compliance History | |
|---|---|

History of noncompliance: with discharge effluent limits: ■ Yes   ☐ No
Recent Compliance Actions:   ■ Yes   ☐ No
Comments:

Legal Agreement: Consent Order and Agreement, Consent Decree or Order:   ■ Yes   ☐ No     Date executed: 01/03/2017
In compliance with legal agreement:   ☐ Yes   ■ No
Obligations due next: Quarterly reports
Comments:



3800-FM-BPNPSM0168G   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Effluent/Receiving Water Evaluation | | | | | |
|---|---|---|---|---|---|
| **Outfall Number(s):** 001 | **Stream Name:** Oil Creek | | | | |
| DEP Collector #: 2660-072 | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: 7/9/2020 @ 11:20 | Flow | | 322 | | GPM |
| Sample Location: post UV unit | pH | | 8.04 | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | 7.20 | | mg/L |
| | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | 31.5 | | °C |
| Upstream Observations: Clear | | | | | |
| Outfall Observations: Clear; no erosion and free of debris; effluent appeared slightly cloudy | | | | | |
| Downstream Observations: Clear | | | | | |
| **Outfall Number(s):** | **Stream Name:** | | | | |
| DEP Collector #: | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: | Flow | | | | MGD |
| Sample Location: | pH | | | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | | | mg/L |
| | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | | | °F |
| Upstream Observations: | | | | | |
| Outfall Observations: | | | | | |
| Downstream Observations: | | | | | |
| **Outfall Number(s):** | **Stream Name:** | | | | |
| DEP Collector #: | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: | Flow | | | | MGD |
| Sample Location: | pH | | | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | | | mg/L |
| | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | | | °F |
| Upstream Observations: | | | | | |
| Outfall Observations: | | | | | |
| Downstream Observations: | | | | | |

Complaint Exhibit 1

# ATTACHMENT C

Complaint Exhibit 1

# **Appendix 3** – WWTP Process Schematic

Complaint Exhibit 1

HANOVER FOODS
NPDES PERMIT No. PA0044741 RENEWAL

**WASTEWATER TREATMENT PLANT PROCESS FLOW SCHEMATIC**

Project No. 11208444
Report No.
Date MAR 2020

**APPENDIX 3**

Filename: G:\564\11208444\Digital_Design\ACAD 2018\Figures\11208444-APP03.dwg
Plot Date: 12 March 2020 - 10:34 AM

Source:

Complaint Exhibit 1

# NPDES Application for Individual Permit to Discharge Industrial Wastewater

3800-PM-BCW0008b   Rev. 6/2019
Permit Application

Applicant Name: Hanover Foods Corporation

Complaint Exhibit 1

## PRODUCTION DATA FOR EFFLUENT LIMITATION GUIDELINES (ELGs)

Complete this section for each production line with an applicable ELG. Use instructions and use additional sheets as necessary.

1.  Production line and process description:  **(1) Frozen white potatoes; (2) Canned tomatoes; (3) Beets (canned), broccoli (frozen), carrots (canned and frozen), corn (canned and frozen), dry beans (canned), lima beans (canned and frozen), mushrooms (canned and frozen), peas (canned and frozen), snap beans (canned and frozen), spinach (frozen), squash (frozen), sweet potatoes (canned) and white potatoes (canned).**

2.  Applicable ELG: 40 CFR: **407** Subpart: **D – Frozen Potato Products Subcategory**
    Applicable ELG: 40 CFR: **407** Subpart: **F – Canned and Preserved Fruits subcategory**
    Applicable ELG: 40 CFR: **407** Subpart: **G – Canned and Preserved Vegetables Subcategory**

3.  Is this production considered a new source? ☐ Yes ☒ No

4.  Outfall / IMP No. receiving wastewater:  **001**

5.  Units of production measurement for ELG:  **Lbs/Day**

6.  Design production capacity:  **690,000 Lbs/Day or 19,320,000 Lbs/Month**

7.  Complete the table below for the five last years of production.  Report production data using the same units of measurement as reported in question 5.

| Parameter | Production Years | | | | |
|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Total Annual Production Lbs/Year** | 121,525,572 | 111,266,272 | 102,038,776 | 104,892,742 | 124,498,839 |
| **Max Monthly Production Lbs/Month** | 14,163,998 | 12,052,725 | 12,062,270 | 11,646,970 | 12,788,184 |
| **Month of Max Production** | August | August | August | August | November |
| **Avg Annual Production Lbs/Month** | 10,127,131 | 9,272,189 | 8,503,231 | 8,741,062 | 10,374,903 |
| **Avg Annual Production Lbs/Day** | 372,264 | 340,571 | 306,788 | 320,921 | 369,677 |
| **Avg Production Hours/Day** | 24 | 24 | 24 | 24 | 24 |
| **Avg Production Days/Month** | 27 | 28 | 28 | 27 | 28 |
| **Avg Annual Water Usage (MGD)** | 0.992 | 1.014 | 0.909 | 0.965 | 1.104 |
| **Avg Annual Wastewater Flow (MGD)** | 0.373 | 0.691 | 0.572 | 0.514 | 0.611 |

8.  Average annual production over the past five years:  342,044  Units:  **Lbs/Day**

9.  Anticipated average annual production for the next five years:  TBD  Units:  **Lbs/Day**

10. Explain the basis for the anticipated average annual production for the next five years:

    To be determined

11. Attach any pertinent information from the applicable ELG in 40 CFR that would allow DEP to appropriately determine technology-based effluent limitations.