Complaint Exhibit 1

# Exhibit 1, Part 2 of 3
Attachments D-L to Notice of Intent to Sue

Complaint Exhibit 1

# ATTACHMENT D

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL PROTECTION

# AUTHORIZATION TO DISCHARGE UNDER THE
# NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
# DISCHARGE REQUIREMENTS FOR INDUSTRIAL WASTEWATER
# FACILITIES

## NPDES PERMIT NO: PA0044741

In compliance with the provisions of the Clean Water Act, 33 U.S.C. Section 1251 *et seq.* ("the Act") and Pennsylvania's Clean Streams Law, as amended, 35 P.S. Section 691.1 *et seq.*,

**Hanover Foods Corp**
**1486 York Street PO Box 334**
**Hanover, PA 17331-0334**

is authorized to discharge from a facility known as **Hanover Foods**, located in **Penn Township, York County**, to **Oil Creek and Unnamed Tributary to Oil Creek** in Watershed(s) **7- H** in accordance with effluent limitations, monitoring requirements and other conditions set forth in Parts A, B and C hereof.

**THIS PERMIT SHALL BECOME EFFECTIVE ON**     OCTOBER 1, 2015

**THIS PERMIT SHALL EXPIRE AT MIDNIGHT ON**     SEPTEMBER 30, 2020

The authority granted by this permit is subject to the following further qualifications:

1.  If there is a conflict between the application, its supporting documents and/or amendments and the terms and conditions of this permit, the terms and conditions shall apply.

2.  Failure to comply with the terms, conditions or effluent limitations of this permit is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application. (40 CFR 122.41(a))

3.  A complete application for renewal of this permit, or notice of intent to cease discharging by the expiration date, must be submitted to DEP at least 180 days prior to the above expiration date (unless permission has been granted by DEP for submission at a later date), using the appropriate NPDES permit application form. (40 CFR 122.41(b), 122.21(d)(2))

    In the event that a timely and complete application for renewal has been submitted and DEP is unable, through no fault of the permittee, to reissue the permit before the above expiration date, the terms and conditions of this permit, including submission of the Discharge Monitoring Reports (DMRs), will be automatically continued and will remain fully effective and enforceable against the discharger until DEP takes final action on the pending permit application. (25 Pa. Code §§ 92a.7(b), (c))

4.  This NPDES permit does not constitute authorization to construct or make modifications to wastewater treatment facilities necessary to meet the terms and conditions of this permit.

**DATE PERMIT ISSUED**     9/22/2015

**ISSUED BY**     /s/
**Maria D. Bebenek, P.E.**
**Clean Water Program Manager**
**Southcentral Regional Office**

3800-PM-BPNPSM0011   Rev. 10/2014
Permit                                                                                                                    Permit No. PA0044741

Complaint Exhibit 1

| PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS |
|---|

I. A.   For Outfall   001   ,   Latitude   39 ° 48 ° 52.91 °   ,   Longitude   76 ° 56 ° 53.54 °   ,   River Mile Index   5.43   ,   Stream Code   08312

    Receiving Waters:   Oil Creek

    Type of Effluent:   Treated industrial waste and cooling water

1.  The permittee is authorized to discharge during the period from October 1, 2015 through September 30, 2017.

2.  Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) [(1)] | | Concentrations (mg/L) | | | | Minimum [(2)] | Required |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Measurement Frequency | Sample Type |
| Flow (MGD) | Report | Report | XXX | XXX | XXX | XXX | Continuous | Measured |
| pH (S.U.) | XXX | XXX | 6.0 | XXX | XXX | 9.0 | 1/day | Grab |
| Dissolved Oxygen | XXX | XXX | 5.0 | XXX | XXX | XXX | 1/day | Grab |
| Total Residual Chlorine | XXX | XXX | XXX | 0.1 | XXX | 0.3 | 1/day | Grab |
| Color (Pt-Co Units) | XXX | XXX | XXX | XXX | Report | XXX | 2/month | Grab |
| Temperature (ºF) | XXX | XXX | XXX | XXX | Report | XXX | 1/day | I-S |
| CBOD5 May 1 - Oct 31 | 70 | 105 | XXX | 10 | 15 | 20 | 2/week | 24-Hr Composite |
| CBOD5 Nov 1 - Apr 30 | 126 | 189 | XXX | 18 | 27 | 36 | 2/week | 24-Hr Composite |
| Total Suspended Solids | 210 | 420 | XXX | 30 | 60 | 75 | 2/week | 24-Hr Composite |

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

**Outfall 001**, Continued (from <u>October 1, 2015</u> through <u>September 30, 2017</u>)

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| Oil and Grease | Report | Report | XXX | 15 | 30 | 30 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) May 1 - Sep 30 | XXX | XXX | XXX | 200 Geo Mean | XXX | 1,000 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) Oct 1 - Apr 30 | XXX | XXX | XXX | 2,000 Geo Mean | XXX | 10,000 | 2/week | Grab |
| Ammonia-Nitrogen May 1 - Oct 31 | 7.0 | 14 | XXX | 1.0 | 2.0 | 2.5 | 2/week | 24-Hr Composite |
| Ammonia-Nitrogen Nov 1 - Apr 30 | 21 | 42 | XXX | 3.0 | 6.0 | 7.5 | 2/week | 24-Hr Composite |
| Total Phosphorus | Report | Report | XXX | Report | Report | Report | 2/week | 24-Hr Composite |
| Total Cadmium | Report | Report | XXX | Report | Report | Report | 2/week | 24-Hr Composite |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): at Outfall 001

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. B.   For Outfall ___001___, Latitude _39 ° 48 ° 52.91 °_, Longitude _76 ° 56 ° 53.54 °_, River Mile Index __5.43__, Stream Code __08312__

  Receiving Waters: Oil Creek

  Type of Effluent: Treated industrial waste and cooling water

1. The permittee is authorized to discharge during the period from October 1, 2017 through September 30, 2018.

2. Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] | Required |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Measurement Frequency | Sample Type |
|---|---|---|---|---|---|---|---|---|
| Flow (MGD) | Report | Report | XXX | XXX | XXX | XXX | Continuous | Measured |
| pH (S.U.) | XXX | XXX | 6.0 | XXX | XXX | 9.0 | 1/day | Grab |
| Dissolved Oxygen | XXX | XXX | 5.0 | XXX | XXX | XXX | 1/day | Grab |
| Total Residual Chlorine | XXX | XXX | XXX | 0.1 | XXX | 0.3 | 1/day | Grab |
| Color (Pt-Co Units) | XXX | XXX | XXX | XXX | Report | XXX | 2/month | Grab |
| Temperature (ºF) | XXX | XXX | XXX | XXX | Report | XXX | 1/day | I-S |
| CBOD5 May 1 - Oct 31 | 70 | 105 | XXX | 10 | 15 | 20 | 2/week | 24-Hr Composite |
| CBOD5 Nov 1 - Apr 30 | 126 | 189 | XXX | 18 | 27 | 36 | 2/week | 24-Hr Composite |

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

**Outfall 001**, Continued (from <u>October 1, 2017</u> through <u>September 30, 2018</u>)

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| Total Suspended Solids | 210 | 420 | XXX | 30 | 60 | 75 | 2/week | 24-Hr Composite |
| Oil and Grease | Report | Report | XXX | 15 | 30 | 30 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) May 1 - Sep 30 | XXX | XXX | XXX | 200 Geo Mean | XXX | 1,000 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) Oct 1 - Apr 30 | XXX | XXX | XXX | 2,000 Geo Mean | XXX | 10,000 | 2/week | Grab |
| Ammonia-Nitrogen May 1 - Oct 31 | 7.0 | 14 | XXX | 1.0 | 2.0 | 2.5 | 2/week | 24-Hr Composite |
| Ammonia-Nitrogen Nov 1 - Apr 30 | 21 | 42 | XXX | 3.0 | 6.0 | 7.5 | 2/week | 24-Hr Composite |
| Total Phosphorus | 14 | 28 | XXX | 2.0 | 4.0 | 5.0 | 2/week | 24-Hr Composite |
| Total Cadmium | 0.0056 | 0.011 | XXX | 0.0008 | 0.0016 | 0.002 | 2/week | 24-Hr Composite |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): at Outfall 001

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. C.   For Outfall   001   ,   Latitude   39 ° 48 ° 52.91 °   ,   Longitude   76 ° 56 ° 53.54 °   ,   River Mile Index   5.43   ,   Stream Code   08312

   Receiving Waters:   Oil Creek

   Type of Effluent:   Treated Industrial waste and cooling water

1.  The permittee is authorized to discharge during the period from October 1, 2018 through September 30, 2020.

2.  Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Monitoring Requirements | |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Minimum [2] Measurement Frequency | Required Sample Type |
|---|---|---|---|---|---|---|---|---|
| Flow (MGD) | Report | Report | XXX | XXX | XXX | XXX | Continuous | Measured |
| pH (S.U.) | XXX | XXX | 6.0 | XXX | XXX | 9.0 | 1/day | Grab |
| Dissolved Oxygen | XXX | XXX | 5.0 | XXX | XXX | XXX | 1/day | Grab |
| Total Residual Chlorine | XXX | XXX | XXX | 0.1 | XXX | 0.3 | 1/day | Grab |
| Color (Pt-Co Units) | XXX | XXX | XXX | XXX | Report | XXX | 2/month | Grab |
| Temperature (ºF) Jan 1-31 | XXX | XXX | XXX | XXX | 51 | XXX | 1/day | I-S |
| Temperature (ºF) Feb 1-29 | XXX | XXX | XXX | XXX | 52 | XXX | 1/day | I-S |
| Temperature (ºF) Mar 1-31 | XXX | XXX | XXX | XXX | 74 | XXX | 1/day | I-S |
| Temperature (ºF) Apr 1-15 | XXX | XXX | XXX | XXX | 83 | XXX | 1/day | I-S |
| Temperature (ºF) Apr 16-30 | XXX | XXX | XXX | XXX | 89 | XXX | 1/day | I-S |

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

**Outfall 001**, Continued (from <u>October 1, 2018</u> through <u>September 30, 2020</u>)

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] | Required |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Measurement Frequency | Sample Type |
| Temperature (ºF) May 1-15 | XXX | XXX | XXX | XXX | 85 | XXX | 1/day | I-S |
| Temperature (ºF) May 16-31 | XXX | XXX | XXX | XXX | 106 | XXX | 1/day | I-S |
| Temperature (ºF) Jun 1-15 | XXX | XXX | XXX | XXX | 106 | XXX | 1/day | I-S |
| Temperature (ºF) Jun 16-30 | XXX | XXX | XXX | XXX | 110 | XXX | 1/day | I-S |
| Temperature (ºF) Jul 1-31 | XXX | XXX | XXX | XXX | 101 | XXX | 1/day | I-S |
| Temperature (ºF) Aug 1-31 | XXX | XXX | XXX | XXX | 99 | XXX | 1/day | I-S |
| Temperature (ºF) Aug 1-15 | XXX | XXX | XXX | XXX | 99 | XXX | 1/day | I-S |
| Temperature (ºF) Sep 1-15 | XXX | XXX | XXX | XXX | 94 | XXX | 1/day | I-S |
| Temperature (ºF) Sep 16-30 | XXX | XXX | XXX | XXX | 88 | XXX | 1/day | I-S |
| Temperature (ºF) Oct 1-15 | XXX | XXX | XXX | XXX | 82 | XXX | 1/day | I-S |
| Temperature (ºF) Oct 16-31 | XXX | XXX | XXX | XXX | 76 | XXX | 1/day | I-S |
| Temperature (ºF) Nov 1-15 | XXX | XXX | XXX | XXX | 69 | XXX | 1/day | I-S |
| Temperature (ºF) Nov 16-30 | XXX | XXX | XXX | XXX | 59 | XXX | 1/day | I-S |
| Temperature (ºF) Dec 1-31 | XXX | XXX | XXX | XXX | 50 | XXX | 1/day | I-S |

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

**Outfall , Continued (from <u>October 1, 2018</u> through <u>September 30, 2020</u>)**

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Mass Units (lbs/day) [(1)] | | Concentrations (mg/L) | | | | Minimum [(2)] Measurement Frequency | Required Sample Type |
| | Average Monthly | Daily Maximum | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | | |
| CBOD5 May 1 - Oct 31 | 70 | 105 | XXX | 10 | 15 | 20 | 2/week | 24-Hr Composite |
| CBOD5 Nov 1 - Apr 30 | 126 | 189 | XXX | 18 | 27 | 36 | 2/week | 24-Hr Composite |
| Total Suspended Solids | 210 | 420 | XXX | 30 | 60 | 75 | 2/week | 24-Hr Composite |
| Oil and Grease | Report | Report | XXX | 15 | 30 | 30 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) May 1 - Sep 30 | XXX | XXX | XXX | 200 Geo Mean | XXX | 1,000 | 2/week | Grab |
| Fecal Coliform (CFU/100 ml) Oct 1 - Apr 30 | XXX | XXX | XXX | 2,000 Geo Mean | XXX | 10,000 | 2/week | Grab |
| Ammonia-Nitrogen May 1 - Oct 31 | 7.0 | 14 | XXX | 1.0 | 2.0 | 2.5 | 2/week | 24-Hr Composite |
| Ammonia-Nitrogen Nov 1 - Apr 30 | 21 | 42 | XXX | 3.0 | 6.0 | 7.5 | 2/week | 24-Hr Composite |
| Total Phosphorus | 14 | 28 | XXX | 2.0 | 4.0 | 5.0 | 2/week | 24-Hr Composite |
| Total Cadmium | 0.0056 | 0.011 | XXX | 0.0008 | 0.0016 | 0.002 | 2/week | 24-Hr Composite |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): at Outfall 001

3800-PM-BPNPSM0011   Rev. 10/2014
Permit                                                                                      Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. D.   For Outfall ___002___, Latitude __39 ° 48 ° 45.48 °__, Longitude __76 ° 56 ° 51.02 °__, River Mile Index _____, Stream Code _____

Receiving Waters:   Unnamed Tributary to Oil Creek

Type of Effluent:   Stormwater

1. The permittee is authorized to discharge during the period from October 1, 2015 through September 30, 2020.

2. Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] | Required |
| | Average Monthly | | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Measurement Frequency | Sample Type |
| pH (S.U.) | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| CBOD5 | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Chemical Oxygen Demand | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Suspended Solids | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Oil and Grease | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Phosphorus | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Dissolved Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s):  at Outfall 002

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. E.   For Outfall   <u>003</u>   ,   Latitude   <u>39 ° 48 ° 33.52 °</u>   ,   Longitude   <u>76 ° 57 ° 0.51 °</u>   ,   River Mile Index <u>       </u>   ,   Stream Code   <u>      </u>

      Receiving Waters:     Unnamed Tributary to Oil Creek

      Type of Effluent:     Stormwater

1. The permittee is authorized to discharge during the period from <u>October 1, 2015</u> through <u>September 30, 2020</u>.

2. Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter | Effluent Limitations | | | | | | Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mass Units (lbs/day) [1] | | Concentrations (mg/L) | | | | Minimum [2] | Required |
| | Average Monthly | | Minimum | Average Monthly | Daily Maximum | Instant. Maximum | Measurement Frequency | Sample Type |
| pH (S.U.) | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| CBOD5 | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Chemical Oxygen Demand | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Suspended Solids | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Oil and Grease | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Phosphorus | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Dissolved Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |
| Total Iron | XXX | XXX | XXX | XXX | Report | XXX | 1/year | Grab |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): at Outfall 003

**3800-PM-BPNPSM0011   Rev. 10/2014**
**Permit**

**Permit No. PA0044741**

Complaint Exhibit 1

**PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS (Continued)**

Additional Requirements

The permittee may not discharge:

1. Floating solids, scum, sheen or substances that result in observed deposits in the receiving water. (25 Pa Code § 92a.41(c))

2. Oil and grease in amounts that cause a film or sheen upon or discoloration of the waters of this Commonwealth or adjoining shoreline, or that exceed 15 mg/l as a daily average or 30 mg/l at any time (or lesser amounts if specified in this permit).  (25 Pa. Code § 92a.47(a)(7), § 95.2(2))

3. Substances in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life.  (25 Pa Code § 93.6(a))

4. Foam or substances that produce an observed change in the color, taste, odor or turbidity of the receiving water, unless those conditions are otherwise controlled through effluent limitations or other requirements in this permit.  (25 Pa Code § 92a.41(c))

Footnotes

(1) When sampling to determine compliance with mass effluent limitations, the discharge flow at the time of sampling must be measured and recorded.

(2) This is the minimum number of sampling events required.  Permittees are encouraged, and it may be advantageous in demonstrating compliance, to perform more than the minimum number of sampling events.

Supplemental Information

The effluent limitations for Outfall 001 were determined using an effluent discharge rate of 0.84 MGD.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. F.   For Outfall    001    ,   Latitude    39 ° 48 ° 52.91 °  ,   Longitude    76 ° 56 ° 53.54 °  ,   River Mile Index    5.43    ,   Stream Code    08312

Receiving Waters:   Oil Creek

Type of Effluent:   Treated Industrial waste and cooling water

1. The permittee is authorized to discharge during the period from October 1, 2015 through September 30, 2017.

2. Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter [1] | Effluent Limitations | | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|
| | Mass Units (lbs) | | Concentrations (mg/L) | | | Minimum [2] Measurement Frequency | Required Sample Type |
| | Monthly | Annual | Minimum | Monthly Average | Maximum | | |
| Ammonia---N | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Kjeldahl---N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Nitrate-Nitrite as N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Total Nitrogen | Report | Report | XXX | Report | XXX | 1/month | Calculation |
| Total Phosphorus | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Net Total Nitrogen | Report | Report | XXX | XXX | XXX | 1/month | Calculation |
| Net Total Phosphorus | Report | Report | XXX | XXX | XXX | 1/month | Calculation |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s):  Outfall 001 .

Footnotes:
(1) See Part C for Chesapeake Bay Requirements.
(2) This is the minimum number of sampling events required.  Permittees are encouraged, and it may be advantageous in demonstrating compliance, to perform more than the minimum number of sampling events required.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

## PART A - EFFLUENT LIMITATIONS, MONITORING, RECORDKEEPING AND REPORTING REQUIREMENTS

I. G.  **For Outfall**  ___001___ ,  **Latitude**  _39 ° 48 ° 52.91 °_ ,  **Longitude**  _76 ° 56 ° 53.54 °_ ,  **River Mile Index**  _5.43_ ,  **Stream Code**  _08312_

**Receiving Waters:**  Oil Creek

**Type of Effluent:**  Treated Industrial waste and cooling water

1. The permittee is authorized to discharge during the period from October 1, 2017 through September 30, 2020.

2. Based on the anticipated wastewater characteristics and flows described in the permit application and its supporting documents and/or amendments, the following effluent limitations and monitoring requirements apply (see also Additional Requirements and Footnotes).

| Parameter [1] | Effluent Limitations | | | | | Monitoring Requirements [2] | |
| | Mass Units (lbs) | | Concentrations (mg/L) | | | Minimum Measurement Frequency | Required Sample Type |
| | Monthly | Annual | Minimum | Monthly Average | Maximum | | |
| Ammonia---N | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Kjeldahl---N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Nitrate-Nitrite as N | Report | XXX | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Total Nitrogen | Report | Report | XXX | Report | XXX | 1/month | Calculation |
| Total Phosphorus | Report | Report | XXX | Report | XXX | 2/week | 24-Hr Composite |
| Net Total Nitrogen | Report | 26,385 | XXX | XXX | XXX | 1/month | Calculation |
| Net Total Phosphorus | Report | 979 | XXX | XXX | XXX | 1/month | Calculation |

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s):  Outfall 001 .

Footnotes:
(1)  See Part C for Chesapeake Bay Requirements.
(2)  This is the minimum number of sampling events required.  Permittees are encouraged, and it may be advantageous in demonstrating compliance, to perform more than the minimum number of sampling events required.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No.  PA0044741

Complaint Exhibit 1

## II.   DEFINITIONS

*At Outfall (XXX)* means a sampling location in outfall line XXX below the last point at which wastes are added to outfall line (XXX), or where otherwise specified.

*Average* refers to the use of an arithmetic mean, unless otherwise specified in this permit. (40 CFR 122.41(l)(4)(iii))

*Best Management Practices* (BMPs) means schedules of activities, prohibitions of practices, maintenance procedures and other management practices to prevent or reduce the pollutant loading to surface waters of the Commonwealth.  The term also includes treatment requirements, operating procedures and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.  The term includes activities, facilities, measures, planning or procedures used to minimize accelerated erosion and sedimentation and manage stormwater to protect, maintain, reclaim, and restore the quality of waters and the existing and designated uses of waters within this Commonwealth before, during and after earth disturbance activities. (25 Pa. Code § 92a.2)

*Bypass* means the intentional diversion of waste streams from any portion of a treatment facility. (40 CFR 122.41(m)(1)(i))

*Calendar Week* is defined as the seven consecutive days from Sunday through Saturday, unless the permittee has been given permission by DEP to provide weekly data as Monday through Friday based on showing excellent performance of the facility and a history of compliance. In cases when the week falls in two separate months, the month with the most days in that week shall be the month for reporting.

*Clean Water Act* means the Federal Water Pollution Control Act, as amended. (33 U.S.C.A. §§ 1251 to 1387).

*Chemical Additive* means a chemical product (including products of disassociation and degradation, collectively "products") introduced into a waste stream that is used for cleaning, disinfecting, or maintenance and which may be detected in effluent discharged to waters of the Commonwealth.  The term generally excludes chemicals used for neutralization of waste streams, the production of goods, and treatment of wastewater.

*Composite Sample* (for all except GC/MS volatile organic analysis) means a combination of individual samples (at least eight for a 24-hour period or four for an 8-hour period) of at least 100 milliliters (mL) each obtained at spaced time intervals during the compositing period.  The composite must be flow-proportional; either the volume of each individual sample is proportional to discharge flow rates, or the sampling interval is proportional to the flow rates over the time period used to produce the composite. (EPA Form 2C)

*Composite Sample* (for GC/MS volatile organic analysis) consists of at least four aliquots or grab samples collected during the sampling event (not necessarily flow proportioned).  The samples must be combined in the laboratory immediately before analysis and then one analysis is performed. (EPA Form 2C)

*Daily Average Temperature* means the average of all temperature measurements made, or the mean value plot of the record of a continuous automated temperature recording instrument, either during a calendar day or during the operating day if flows are of a shorter duration.

*Daily Discharge* means the discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling.  For pollutants with limitations expressed in units of mass, the "daily discharge" is calculated as the total mass of the pollutant discharged over the day.  For pollutants with limitations expressed in other units of measurement, the "daily discharge" is calculated as the average measurement of the pollutant over the day. (25 Pa. Code § 92a.2, 40 CFR 122.2)

*Daily Maximum Discharge Limitation* means the highest allowable "daily discharge."

*Discharge Monitoring Report* (DMR) means the DEP or EPA supplied form(s) for the reporting of self-monitoring results by the permittee. (25 Pa. Code § 92a.2, 40 CFR 122.2)

Permit No.  PA0044741

Complaint Exhibit 1

*Estimated Flow* means any method of liquid volume measurement based on a technical evaluation of the sources contributing to the discharge including, but not limited to, pump capabilities, water meters and batch discharge volumes.

*Geometric Mean* means the average of a set of n sample results given by the nth root of their product.

*Grab Sample* means an individual sample of at least 100 mL collected at a randomly selected time over a period not to exceed 15 minutes. (EPA Form 2C)

*Hazardous Substance* means any substance designated under 40 CFR Part 116 pursuant to Section 311 of the Clean Water Act. (40 CFR 122.2)

*Hauled-In Wastes* means any waste that is introduced into a treatment facility through any method other than a direct connection to the wastewater collection system.  The term includes wastes transported to and disposed of within the treatment facility or other entry points within the collection system.

*Immersion Stabilization* (i-s) means a calibrated device is immersed in the wastewater until the reading is stabilized.

*Instantaneous Maximum Effluent Limitation* means the highest allowable discharge of a concentration or mass of a substance at any one time as measured by a grab sample. (25 Pa. Code § 92a.2)

*Measured Flow* means any method of liquid volume measurement, the accuracy of which has been previously demonstrated in engineering practice, or for which a relationship to absolute volume has been obtained.

*Monthly Average Discharge Limitation* means the highest allowable average of "daily discharges" over a calendar month, calculated as the sum of all "daily discharges" measured during a calendar month divided by the number of "daily discharges" measured during that month. (25 Pa. Code § 92a.2)

*Municipal Waste* means garbage, refuse, industrial lunchroom or office waste and other material, including solid, liquid, semisolid or contained gaseous material resulting from operation of residential, municipal, commercial or institutional establishments and from community activities; and sludge not meeting the definition of residual or hazardous waste under this section from a municipal, commercial or institutional water supply treatment plant, waste water treatment plant or air pollution control facility. (25 Pa. Code § 271.1)

*Non-contact Cooling Water* means water used to reduce temperature which does not come in direct contact with any raw material, intermediate product, waste product (other than heat), or finished product.

*Residual Waste* means garbage, refuse, other discarded material or other waste, including solid, liquid, semisolid or contained gaseous materials resulting from industrial, mining and agricultural operations and sludge from an industrial, mining or agricultural water supply treatment facility, wastewater treatment facility or air pollution control facility, if it is not hazardous. The term does not include coal refuse as defined in the Coal Refuse Disposal Control Act. The term does not include treatment sludges from coal mine drainage treatment plants, disposal of which is being carried on under and in compliance with a valid permit issued under the Clean Streams Law. (25 Pa Code § 287.1)

*Severe Property Damage* means substantial physical damage to property, damage to the treatment facilities that causes them to become inoperable, or substantial and permanent loss of natural resources that can reasonably be expected to occur in the absence of a bypass.  Severe property damage does not mean economic loss caused by delays in production. (40 CFR 122.41(m)(1)(ii))

*Stormwater* means the runoff from precipitation, snow melt runoff, and surface runoff and drainage. (25 Pa. Code § 92a.2)

*Stormwater Associated With Industrial Activity* means the discharge from any conveyance that is used for collecting and conveying stormwater and that is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant, and as defined at 40 CFR 122.26(b)(14) (i) - (ix) & (xi) and 25 Pa. Code § 92a.2.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

**Permit No.  PA0044741**

Complaint Exhibit 1

*Total Dissolved Solids* means the total dissolved (filterable) solids as determined by use of the method specified in 40 CFR Part 136.

*Toxic Pollutant* means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains may, on the basis of information available to DEP cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, including malfunctions in reproduction, or physical deformations in these organisms or their offspring. (25 Pa. Code § 92a.2)

3800-PM-BPNPSM0011   Rev. 10/2014
Permit                                                                                 **Permit No.  PA0044741**

Complaint Exhibit 1

**III.   SELF-MONITORING, REPORTING AND RECORDKEEPING**

A.  Representative Sampling

1.  Samples and measurements taken for the purpose of monitoring shall be representative of the monitored activity (40 CFR 122.41(j)(1)).  Representative sampling includes the collection of samples, where possible, during periods of adverse weather, changes in treatment plant performance and changes in treatment plant loading.  If possible, effluent samples must be collected where the effluent is well mixed near the center of the discharge conveyance and at the approximate mid-depth point, where the turbulence is at a maximum and the settlement of solids is minimized. (40 CFR 122.48, 25 Pa. Code § 92a.61)

2.  Records Retention (40 CFR 122.41(j)(2))

Except for records of monitoring information required by this permit related to the permittee's sludge use and disposal activities which shall be retained for a period of at least 5 years, all records of monitoring activities and results (including all original strip chart recordings for continuous monitoring instrumentation and calibration and maintenance records), copies of all reports required by this permit, and records of all data used to complete the application for this permit shall be retained by the permittee for 3 years from the date of the sample measurement, report or application, unless a longer retention period is required by the permit.  The 3-year period shall be extended as requested by DEP or the EPA Regional Administrator.

3.  Recording of Results (40 CFR 122.41(j)(3))

For each measurement or sample taken pursuant to the requirements of this permit, the permittee shall record the following information:

a.  The exact place, date and time of sampling or measurements.
b.  The person(s) who performed the sampling or measurements.
c.  The date(s) the analyses were performed.
d.  The person(s) who performed the analyses.
e.  The analytical techniques or methods used; and the associated detection level.
f.  The results of such analyses.

4.  Test Procedures

a.  Facilities that test or analyze environmental samples used to demonstrate compliance with this permit shall be in compliance with laboratory accreditation requirements of Act 90 of 2002 (27 Pa. C.S.  §§  4101-4113)  and  25  Pa.  Code  Chapter  252,  relating  to  environmental  laboratory accreditation.

b.  Test procedures (methods) for the analysis of pollutants or pollutant parameters shall be those approved under 40 CFR Part 136 or required under 40 CFR Chapter I, Subchapters N or O, unless the method is specified in this permit or has been otherwise approved in writing by DEP. (40 CFR 122.41(j)(4), 122.44(i)(1)(iv))

c.  Test procedures (methods) for the analysis of pollutants or pollutant parameters shall be sufficiently sensitive.  A method is sufficiently sensitive when 1) the method minimum level is at or below the level of the effluent limit established in the permit for the measured pollutant or pollutant parameter; or 2) the method has the lowest minimum level of the analytical methods approved under 40 CFR Part 136 or required under 40 CFR Chapter I, Subchapters N or O, for the measured pollutant or pollutant parameter; or 3) the method is specified in this permit or has been otherwise approved in writing by DEP for the measured pollutant or pollutant parameter. Permittees have the option of providing matrix or sample-specific minimum levels rather than the published levels. (40 CFR 122.44(i)(1)(iv))

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No.  PA0044741

Complaint Exhibit 1

5.   Quality/Assurance/Control

In an effort to assure accurate self-monitoring analyses results:

a.   The permittee, or its designated laboratory, shall participate in the periodic scheduled quality assurance inspections conducted by DEP and EPA. (40 CFR 122.41(e), 122.41(i)(3))

b.   The permittee, or its designated laboratory, shall develop and implement a program to assure the quality and accurateness of the analyses performed to satisfy the requirements of this permit, in accordance with 40 CFR Part 136. (40 CFR 122.41(j)(4))

B.   Reporting of Monitoring Results

1.   The permittee shall effectively monitor the operation and efficiency of all wastewater treatment and control facilities, and the quantity and quality of the discharge(s) as specified in this permit. (40 CFR 122.41(e), 122.44(i)(1))

2.   Discharge Monitoring Reports (DMRs) must be completed in accordance with DEP's published DMR Instructions (3800-FM-BPNPSM0463).  DMRs are based on calendar reporting periods unless Part C of this permit requires otherwise.  DMR(s) must be received by the agency(ies) specified in paragraph 3 below in accordance with the following schedule:

-   Monthly DMRs must be received within 28 days following the end of each calendar month.

-   Quarterly DMRs must be received within 28 days following the end of each calendar quarter, i.e., January 28, April 28, July 28, and October 28.

-   Semiannual DMRs must be received within 28 days following the end of each calendar semiannual period, i.e., January 28 and July 28.

-   Annual DMRs must be received by January 28, unless Part C of this permit requires otherwise.

3.   The permittee shall complete all Supplemental Reporting forms (Supplemental DMRs) provided by DEP in this permit (or an approved equivalent), and submit the signed, completed forms as an attachment to the DMR(s). If the permittee elects to use DEP's electronic DMR (eDMR) system, one electronic submission may be made for DMRs and Supplemental DMRs.  If paper forms are used, the completed forms shall be mailed to:

Department of Environmental Protection
Clean Water Program
909 Elmerton Avenue
Harrisburg, PA 17110-8200

4.   If the permittee elects to begin using DEP's eDMR system to submit DMRs required by the permit, the permittee shall, to assure continuity of business operations, continue using the eDMR system to submit all DMRs and Supplemental Reports required by the permit, unless the following steps are completed to discontinue use of eDMR:

a.   The permittee shall submit written notification to the regional office that issued the permit that it intends to discontinue use of eDMR. The notification shall be signed by a principal executive officer or authorized agent of the permittee.

b.   The permittee shall continue using eDMR until the permittee receives written notification from DEP's Central Office that the facility has been removed from the eDMR system, and electronic report submissions are no longer expected.

5.   The completed DMR Form shall be signed and certified by either of the following applicable persons, as defined in 25 Pa. Code § 92a.22:

Permit No.  PA0044741
Complaint Exhibit 1

- For a corporation - by a principal executive officer of at least the level of vice president, or an authorized representative, if the representative is responsible for the overall operation of the facility from which the discharge described in the NPDES form originates.
- For a partnership or sole proprietorship - by a general partner or the proprietor, respectively.
- For a municipality, state, federal or other public agency - by a principal executive officer or ranking elected official.

If signed by a person other than the above, written notification of delegation of DMR signatory authority must be submitted to DEP in advance of or along with the relevant DMR form.  (40 CFR 122.22(b))

6.  If the permittee monitors any pollutant at monitoring points as designated by this permit, using analytical methods described in Part A III.A.4. herein, more frequently than the permit requires, the results of this monitoring shall be incorporated, as appropriate, into the calculations used to report self-monitoring data on the DMR.  (40 CFR  122.41(l)(4)(ii))

C.  Reporting Requirements

1.  Planned Changes to Physical Facilities – The permittee shall give notice to DEP as soon as possible but no later than 30 days prior to planned physical alterations or additions to the permitted facility.  A permit under 25 Pa. Code Chapter 91 may be required for these situations prior to implementing the planned changes.  A permit application, or other written submission to DEP, can be used to satisfy the notification requirements of this section.

Notice is required when:

a.  The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in 40 CFR 122.29(b).  (40 CFR 122.41(l)(1)(i))

b.  The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged.  This notification applies to pollutants which are not subject to effluent limitations in this permit.  (40 CFR 122.41(l)(1)(ii))

c.  The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.  (40 CFR 122.41(l)(1)(iii))

d.  The planned change may result in noncompliance with permit requirements.  (40 CFR 122.41(l)(2))

2.  Planned Changes to Waste Stream – Under the authority of 25 Pa. Code § 92a.24(a), the permittee shall provide notice to DEP as soon as possible but no later than 45 days prior to any changes in the volume or pollutant concentration of its influent waste stream as a result of indirect discharges or hauled-in wastes, as specified in paragraphs 2.a. and 2.b., below.  Notice shall be provided on the "Planned Changes to Waste Stream" Supplemental Report (3800-FM-BPNPSM0482), available on DEP's website.  The permittee shall provide information on the quality and quantity of waste introduced into the facility, and any anticipated impact of the change on the quantity or quality of effluent to be discharged from the facility.  The Report shall be sent via Certified Mail or other means to confirm DEP's receipt of the notification.  DEP will determine if the submission of a new application and receipt of a new or amended permit is required.

a.  Introduction of New Pollutants (25 Pa. Code § 92a.24(a))

New pollutants are defined as parameters that meet all of the following criteria:

(i)  Were not detected in the facilities' influent waste stream as reported in the permit application; and

Complaint Exhibit 1

(ii)  Have not been approved to be included in the permittee's influent waste stream by DEP in writing.

The permittee shall provide notification of the introduction of new pollutants in accordance with paragraph 2 above.  The permittee may not authorize the introduction of new pollutants until the permittee receives DEP's written approval.

b.  Increased Loading of Approved Pollutants (25 Pa. Code § 92a.24(a))

Approved pollutants are defined as parameters that meet one or more of the following criteria:

(i)  Were detected in the facilities' influent waste stream as reported in the permittee's permit application; or

(ii)  Have been approved to be included in the permittee's influent waste stream by DEP in writing; or

(iii)  Have an effluent limitation or monitoring requirement in this permit.

The permittee shall provide notification of the introduction of increased influent loading (lbs/day) of approved pollutants in accordance with paragraph 2 above when (1) the cumulative increase in influent loading (lbs/day) exceeds 20% of the maximum loading reported in the permit application, or a loading previously approved by DEP, or (2) may cause an exceedance in the effluent of Effluent Limitation Guidelines (ELGs) or limitations in Part A of this permit, or (3) may cause interference or pass through at the facility, or (4) may cause exceedances of the applicable water quality standards in the receiving stream.  Unless specified otherwise in this permit, if DEP does not respond to the notification within 30 days of its receipt, the permittee may proceed with the increase in loading.  The acceptance of increased loading of approved pollutants may not result in an exceedance of ELGs or effluent limitations and may not cause exceedances of the applicable water quality standards in the receiving stream.

3.  Reporting Requirements for Hauled-In Wastes

a.  Receipt of Residual Waste

(i)  The permittee shall document the receipt of all hauled-in residual wastes (including but not limited to wastewater from oil and gas wells, food processing waste, and landfill leachate), as defined at 25 Pa. Code § 287.1, that are received for processing at the treatment facility.  The permittee shall report hauled-in residual wastes on a monthly basis to DEP on the "Hauled In Residual Wastes" Supplemental Report (3800-FM-BPNPSM0450) as an attachment to the DMR.  If no residual wastes were received during a month, submission of the Supplemental Report is not required.

The following information is required by the Supplemental Report.  The information used to develop the Report shall be retained by the permittee for five years from the date of receipt and must be made available to DEP or EPA upon request.

(1)  The dates that residual wastes were received.

(2)  The volume (gallons) of wastes received.

(3)  The license plate number of the vehicle transporting the waste to the treatment facility.

(4)  The permit number(s) of the well(s) where residual wastes were generated, if applicable.

(5)  The name and address of the generator of the residual wastes.

Permit No.  PA0044741

Complaint Exhibit 1

(6)  The type of wastewater.

The transporter of residual waste must maintain these and other records as part of the daily operational record (25 Pa. Code § 299.219).  If the transporter is unable to provide this information or the permittee has not otherwise received the information from the generator, the residual wastes shall not be accepted by the permittee until such time as the permittee receives such information from the transporter or generator.

(ii)  The following conditions apply to the characterization of residual wastes received by the permittee:

(1)  If the generator is required to complete a chemical analysis of residual wastes in accordance with 25 Pa. Code § 287.51, the permittee must receive and maintain on file a chemical analysis of the residual wastes it receives.  The chemical analysis must conform to the Bureau of Waste Management's Form 26R except as noted in paragraph (2), below. Each load of residual waste received must be covered by a chemical analysis if the generator is required to complete it.

(2)  For wastewater generated from hydraulic fracturing operations ("frac wastewater") within the first 30 production days of a well site, the chemical analysis may be a general frac wastewater characterization approved by DEP.  Thereafter, the chemical analysis must be waste-specific and be reported on the Form 26R.

b.  Receipt of Municipal Waste

(i)  The permittee shall document the receipt of all hauled-in municipal wastes (including but not limited to septage and liquid sewage sludge), as defined at 25 Pa. Code § 271.1, that are received for processing at the treatment facility.  The permittee shall report hauled-in municipal wastes on a monthly basis to DEP on the "Hauled In Municipal Wastes" Supplemental Report (3800-FM-BPNPSM0437) as an attachment to the DMR.  If no municipal wastes were received during a month, submission of the Supplemental Report is not required.

The following information is required by the Supplemental Report:

(1)  The dates that municipal wastes were received.

(2)  The volume (gallons) of wastes received.

(3)  The $BOD_5$ concentration (mg/l) and load (lbs) for the wastes received.

(4)  The location(s) where wastes were disposed of within the treatment facility.

(ii)  Sampling and analysis of hauled-in municipal wastes must be completed to characterize the organic strength of the wastes, unless composite sampling of influent wastewater is performed at a location downstream of the point of entry for the wastes.

4.  Unanticipated Noncompliance or Potential Pollution Reporting

a.  Immediate Reporting - The permittee shall immediately report any incident causing or threatening pollution in accordance with the requirements of 25 Pa. Code §§ 91.33 and 92a.41(b).

(i)  If, because of an accident, other activity or incident a toxic substance or another substance which would endanger users downstream from the discharge, or would otherwise result in pollution or create a danger of pollution or would damage property, the permittee shall immediately notify DEP by telephone of the location and nature of the danger.  Oral notification to the Department is required as soon as possible, but no later than 4 hours after the permittee becomes aware of the incident causing or threatening pollution.

Permit No.  PA0044741

Complaint Exhibit 1

(ii) If reasonably possible to do so, the permittee shall immediately notify downstream users of the waters of the Commonwealth to which the substance was discharged. Such notice shall include the location and nature of the danger.

(iii) The permittee shall immediately take or cause to be taken steps necessary to prevent injury to property and downstream users of the waters from pollution or a danger of pollution and, in addition, within 15 days from the incident, shall remove the residual substances contained thereon or therein from the ground and from the affected waters of this Commonwealth to the extent required by applicable law.

b. The permittee shall report any noncompliance which may endanger health or the environment in accordance with the requirements of 40 CFR 122.41(l)(6).  These requirements include the following obligations:

(i) 24 Hour Reporting - The permittee shall orally report any noncompliance with this permit which may endanger health or the environment within 24 hours from the time the permittee becomes aware of the circumstances.  The following shall be included as information which must be reported within 24 hours under this paragraph:

(1) Any unanticipated bypass which exceeds any effluent limitation in the permit;

(2) Any upset which exceeds any effluent limitation in the permit; and

(3) Violation of the maximum daily discharge limitation for any of the pollutants listed in the permit as being subject to the 24-hour reporting requirement.  (40 CFR 122.44(g))

(ii) Written Report - A written submission shall also be provided within 5 days of the time the permittee becomes aware of any noncompliance which may endanger health or the environment.  The written submission shall contain a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

(iii) Waiver of Written Report - DEP may waive the written report on a case-by-case basis if the associated oral report has been received within 24 hours from the time the permittee becomes aware of the circumstances which may endanger health or the environment.  Unless such a waiver is expressly granted by DEP, the permittee shall submit a written report in accordance with this paragraph. (40 CFR 122.41(l)(6)(iii))

5. Other Noncompliance

The permittee shall report all instances of noncompliance not reported under paragraph C.4 of this section or specific requirements of compliance schedules, at the time DMRs are submitted, on the Non-Compliance Reporting Form (3800-FM-BPNPSM0440). The reports shall contain the information listed in paragraph C.4.b.(ii) of this section. (40 CFR 122.41(l)(7))

D. Specific Toxic Pollutant Notification Levels (for Manufacturing, Commercial, Mining, and Silvicultural Direct Dischargers) - The permittee shall notify DEP as soon as it knows or has reason to believe the following: (40 CFR 122.42(a))

1. That any activity has occurred, or will occur, which would result in the discharge of any toxic pollutant which is not limited in this permit, if that discharge on a routine or frequent basis will exceed the highest of the following "notification levels":  (40 CFR 122.42(a)(1))

a. One hundred micrograms per liter.

b. Two hundred micrograms per liter for acrolein and acrylonitrile.

Permit No.  PA0044741

Complaint Exhibit 1

    c.  Five hundred micrograms per liter for 2,4-dinitrophenol and 2-methyl-4,6-dinitrophenol.

    d.  One milligram per liter for antimony.

    e.  Five times the maximum concentration value reported for that pollutant in this permit application.

    f.  Any other notification level established by DEP.

2.  That any activity has occurred or will occur which would result in any discharge, on a nonroutine or infrequent basis, of a toxic pollutant which is not limited in this permit, if that discharge will exceed the highest of the following "notification levels": (40 CFR 122.42(a)(2))

    a.  Five hundred micrograms per liter.

    b.  One milligram per liter for antimony.

    c.  Ten times the maximum concentration value reported for that pollutant in the permit application.

    d.  Any other notification level established by DEP.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit                                                                                         Permit No. PA0044741

Complaint Exhibit 1

| PART B |
| --- |

## I.   MANAGEMENT REQUIREMENTS

A.   Compliance

1.   The permittee shall comply with all conditions of this permit.  If a compliance schedule has been established in this permit, the permittee shall achieve compliance with the terms and conditions of this permit within the time frames specified in this permit.  (40 CFR 122.41(a)(1))

2.   The permittee shall submit reports of compliance or noncompliance, or progress reports as applicable, for any interim and final requirements contained in this permit.  Such reports shall be submitted no later than 14 days following the applicable schedule date or compliance deadline. (25 Pa. Code § 92a.51(c), 40 CFR 122.47(a)(4))

B.   Permit Modification, Termination, or Revocation and Reissuance

1.   This permit may be modified, terminated, or revoked and reissued during its term in accordance with Title 25 Pa. Code § 92a.72 and 40 CFR 122.41(f).

2.   The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition. (40 CFR 122.41(f))

3.   In the absence of DEP action to modify or revoke and reissue this permit, the permittee shall comply with effluent standards or prohibitions established under Section 307(a) of the Clean Water Act for toxic pollutants within the time specified in the regulations that establish those standards or prohibitions. (40 CFR 122.41(a)(1))

C.   Duty to Provide Information

1.   The permittee shall furnish to DEP, within a reasonable time, any information which DEP may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this permit, or to determine compliance with this permit. (40 CFR 122.41(h))

2.   The permittee shall furnish to DEP, upon request, copies of records required to be kept by this permit. (40 CFR 122.41(h))

3.   Other Information - Where the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to DEP, it shall promptly submit the correct and complete facts or information. (40 CFR 122.41(l)(8))

D.   Proper Operation and Maintenance

The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit.  Proper operation and maintenance includes, but is not limited to, adequate laboratory controls including appropriate quality assurance procedures.  This provision also includes the operation of backup or auxiliary facilities or similar systems that are installed by the permittee, only when necessary to achieve compliance with the terms and conditions of this permit. (40 CFR 122.41(e))

E.   Duty to Mitigate

The permittee shall take all reasonable steps to minimize or prevent any discharge, sludge use or disposal in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment. (40 CFR 122.41(d))

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

F. Bypassing

1. Bypassing Not Exceeding Permit Limitations - The permittee may allow a bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation.  These bypasses are not subject to the provisions in paragraphs two, three and four of this section. (40 CFR 122.41(m)(2))

2. Other Bypassing - In all other situations, bypassing is prohibited and DEP may take enforcement action against the permittee for bypass unless:

   a. A bypass is unavoidable to prevent loss of life, personal injury or "severe property damage." (40 CFR 122.41(m)(4)(i)(A))

   b. There are no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime.  This condition is not satisfied if adequate backup equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance. (40 CFR 122.41(m)(4)(i)(B))

   c. The permittee submitted the necessary notice required in F.4.a. and b. below. (40 CFR 122.41(m)(4)(i)(C))

3. DEP may approve an anticipated bypass, after considering its adverse effects, if DEP determines that it will meet the conditions listed in F.2. above. (40 CFR 122.41(m)(4)(ii))

4. Notice

   a. Anticipated Bypass – If the permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible, at least 10 days before the bypass. (40 CFR 122.41(m)(3)(i))

   b. Unanticipated Bypass – The permittee shall submit oral notice of any other unanticipated bypass within 24 hours, regardless of whether the bypass may endanger health or the environment or whether the bypass exceeds effluent limitations. The notice shall be in accordance with Part A III.C.4.b.

## II.   PENALTIES AND LIABILITY

A. Violations of Permit Conditions

Any person violating Sections 301, 302, 306, 307, 308, 318 or 405 of the Clean Water Act or any permit condition or limitation implementing such sections in a permit issued under Section 402 of the Act is subject to civil, administrative and/or criminal penalties as set forth in 40 CFR 122.41(a)(2).

Any person or municipality, who violates any provision of this permit; any rule, regulation or order of DEP; or any condition or limitation of any permit issued pursuant to the Clean Streams Law, is subject to criminal and/or civil penalties as set forth in Sections 602, 603 and 605 of the Clean Streams Law.

B. Falsifying Information

Any person who does any of the following:

- Falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this permit, or

- Knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit (including monitoring reports or reports of compliance or noncompliance)

*Complaint Exhibit 1*

Shall, upon conviction, be punished by a fine and/or imprisonment as set forth in 18 Pa.C.S.A § 4904 and 40 CFR 122.41(j)(5) and (k)(2).

C.   Liability

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance pursuant to Section 309 of the Clean Water Act or Sections 602, 603 or 605 of the Clean Streams Law.

Nothing in this permit shall be construed to preclude the institution of any legal action or to relieve the permittee from any responsibilities, liabilities or penalties to which the permittee is or may be subject to under the Clean Water Act and the Clean Streams Law.

D.   Need to Halt or Reduce Activity Not a Defense

It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit. (40 CFR 122.41(c))

## III.   OTHER RESPONSIBILITIES

A.   Right of Entry

Pursuant to Sections 5(b) and 305 of Pennsylvania's Clean Streams Law, and Title 25 Pa. Code Chapter 92a and 40 CFR 122.41(i), the permittee shall allow authorized representatives of DEP and EPA, upon the presentation of credentials and other documents as may be required by law:

1.   To enter upon the permittee's premises where a regulated facility or activity is located or conducted, or where records must be kept under the conditions of this permit; (40 CFR 122.41(i)(1))

2.   To have access to and copy, at reasonable times, any records that must be kept under the conditions of this permit; (40 CFR 122.41(i)(2))

3.   To inspect at reasonable times any facilities, equipment (including monitoring and control equipment), practices or operations regulated or required under this permit; and (40 CFR 122.41(i)(3))

4.   To sample or monitor at reasonable times, for the purposes of assuring permit compliance or as otherwise authorized by the Clean Water Act or the Clean Streams Law, any substances or parameters at any location. (40 CFR 122.41(i)(4))

B.   Transfer of Permits

1.   Transfers by modification.  Except as provided in paragraph 2 of this section, a permit may be transferred by the permittee to a new owner or operator only if this permit has been modified or revoked and reissued, or a minor modification made to identify the new permittee and incorporate such other requirements as may be necessary under the Clean Water Act. (40 CFR 122.61(a))

2.   Automatic transfers.  As an alternative to transfers under paragraph 1 of this section, any NPDES permit may be automatically transferred to a new permittee if:

a.   The current permittee notifies DEP at least 30 days in advance of the proposed transfer date in paragraph 2.b. of this section; (40 CFR 122.61(b)(1))

b.   The notice includes the appropriate DEP transfer form signed by the existing and new permittees containing a specific date for transfer of permit responsibility, coverage and liability between them; (40 CFR 122.61(b)(2))

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

*Complaint Exhibit 1*

   c.  DEP does not notify the existing permittee and the proposed new permittee of its intent to modify or revoke and reissue this permit, the transfer is effective on the date specified in the agreement mentioned in paragraph 2.b. of this section; and (40 CFR 122.61(b)(3))

   d.  The new permittee is in compliance with existing DEP issued permits, regulations, orders and schedules of compliance, or has demonstrated that any noncompliance with the existing permits has been resolved by an appropriate compliance action or by the terms and conditions of the permit (including compliance schedules set forth in the permit), consistent with 25 Pa. Code § 92a.51 (relating to schedules of compliance) and other appropriate DEP regulations. (25 Pa. Code § 92a.71)

  3.  In the event DEP does not approve transfer of this permit, the new owner or operator must submit a new permit application.

C.  Property Rights

   The issuance of this permit does not convey any property rights of any sort, or any exclusive privilege. (40 CFR 122.41(g))

D.  Duty to Reapply

   If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must apply for a new permit. (40 CFR 122.41(b))

E.  Other Laws

   The issuance of this permit does not authorize any injury to persons or property or invasion of other private rights, or any infringement of state or local law or regulations.

## IV.  ANNUAL FEES

Permittees shall pay an annual fee in accordance with 25 Pa. Code § 92a.62. Annual fee amounts are specified in the following schedule and are due on each anniversary of the effective date of the most recent new or reissued permit. All flows identified in the schedule are annual average design flows. (25 Pa. Code 92a.62)

| | |
|---|---|
| Minor IW Facility without ELG (Effluent Limitation Guideline) | $500 |
| Minor IW Facility with ELG | $1,500 |
| Major IW Facility < 250 MGD (million gallons per day) | $5,000 |
| Major IW Facility ≥ 250 MGD | $25,000 |
| IW Stormwater Individual Permit | $1,000 |
| CAAP (Concentrated Aquatic Animal Production Facility) | $0 |

As of the effective date of this permit, the facility covered by the permit is classified in the following fee category: **Minor IW Facility with ELG**.

Invoices for annual fees will be mailed to permittees approximately three months prior to the due date. In the event that an invoice is not received, the permittee is nonetheless responsible for payment. Throughout a five year permit term, permittees will pay four annual fees followed by a permit renewal application fee in the last year of permit coverage. Permittees may contact the DEP at 717-787-6744 with questions related to annual fees. The fees identified above are subject to change in accordance with 25 Pa. Code § 92a.62(e).

Payment for annual fees shall be remitted to DEP at the address below by the anniversary date. Checks should be made payable to the Commonwealth of Pennsylvania.

PA Department of Environmental Protection

**3800-PM-BPNPSM0011   Rev. 10/2014**
**Permit**

**Permit No. PA0044741**
Complaint Exhibit 1

Bureau of Point and Non-Point Source Management
Re: Chapter 92a Annual Fee
P.O. Box 8466
Harrisburg, PA 17105-8466

3800-PM-BPNPSM0011   Rev. 10/2014
Permit                                                                  Permit No. PA0044741

Complaint Exhibit 1

**PART C**

**I.   CHESAPEAKE BAY SCHEDULE**

A . The permittee shall be in compliance with effluent limitations for Nitrogen and Phosphorus contained in Part A I.G.2, or terminate this discharge, in accordance with the following schedule:

| Activity | Due Date |
|---|---|
| 1. Submit Update to Act 537 Sewage Facilities Plan | Not Applicable |
| 2. Submit WQM Part II Permit Application | Not Applicable |
| 3. Award Contract for Construction or Begin Implementation | 10/1/2015 |
| 4. Construction or Implementation Progress Report(s) | Quarterly |
| 5. Issue Certification of Substantial Completion (Plant Fully Operational) | 10/1/2017 |
| 6. Compliance with effluent limitations | 9/30/2018 |

B.   No later than 14 calendar days following the date identified in the above schedule of compliance, the permittee shall submit to the Department a written notice of compliance or non-compliance with the specific schedule requirement(s) to:

> Department of Environmental Protection
> Southcentral Regional Office
> Water Management Program
> Attn: Compliance Specialist
> 909 Elmerton Avenue
> Harrisburg, PA  17110-8200

C.   Each notice of non-compliance, at a minimum, shall include the following information:

1.   A description of the noncompliance.

2.   A description of any actions taken or proposed by the permittee to comply with the elapsed schedule requirement.

3.   A description of any factors which tend to explain or mitigate the noncompliance.

4.   An estimate of the date that compliance with the elapsed schedule requirement will be achieved and an assessment of the probability that the next scheduled requirement will be met on time.

5.   A revised schedule of compliance for Department approval.

D.   The permittee should contact the compliance specialist indicated in the event of anticipated non-compliance with any of a compliance schedule activities listed, seven (7) days prior to the due date of the activity.

**II.   CHESAPEAKE BAY NUTRIENT REQUIREMENTS**

A.   The Annual Net Total Nitrogen (TN) and Annual Net Total Phosphorus (TP) Mass Load effluent limitations ("Cap Loads") in Part A of this permit are required in order to meet the downstream water quality standards of the State of Maryland, as required by 25 Pa. Code Chapter 92a, the federal Clean Water Act, and implementing regulations.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

B.  Definitions

Annual Net Mass Load (lbs): The sum of Monthly Total Mass Loads for one year beginning October 1st and ending September 30th, adjusted for credits sold and applied and offsets applied.  Annual Net Mass Loads are compared to Cap Loads to determine compliance.

Cap Load (lbs): The mass load of a pollutant authorized by an NPDES permit.  Cap Loads for TN and TP are implemented in NPDES permits by the establishment of Annual Net Mass Load limits.  The term "Net" is used to recognize that Credits and Offsets may be used to comply with the limits.  The Annual Net Mass Load must be less than or equal to the Cap Load to achieve compliance.

Certification: Written approval by DEP of a proposed pollutant reduction activity to generate credits before the credits are verified and registered to be used to comply with NPDES permit effluent limitations.

Compliance Year: The year-long period starting October 1st and ending September 30th.  The Compliance Year will be named for the year in which it ends.  For example, the period of October 1, 2014 through September 30, 2015 is compliance year 2015.

Credit: The tradable unit of compliance that corresponds with a unit of reduction of a pollutant as recognized by DEP which, when certified, verified and registered, may be used to comply with NPDES permit effluent limitations.

Delivery Ratio: A ratio that compensates for the natural attenuation of a pollutant as it travels in water before it reaches a defined compliance point.

Offset: The pollutant load reduction measured in pounds (lbs) that is created by an action, activity or technology which when approved by DEP may be used to comply with NPDES permit effluent limitations, conditions and stipulations under 25 Pa. Code Chapter 92a (relating to NPDES permitting, monitoring and compliance.)  The offset may only be used by the NPDES permittee that DEP determines is associated with the load reduction achieved by the action, activity or technology.

Registration: An accounting mechanism used by DEP to track certified and verified credits before they may be used to comply with NPDES permit effluent limitations.

Total Mass Load (lbs):

Monthly Total Mass Load = The sum of the actual daily discharge loads for TN and TP (lbs/day) divided by the number of samples per month, multiplied by the number of days in the month in which there was a discharge.  The daily discharge load for TN and TP (lbs/day) equals the average daily flow (MGD) on the day of sampling, multiplied by that day's sample concentration for TN and TP (mg/l), multiplied by 8.34.

Annual Total Mass Load = The sum of the Monthly Total Mass Loads for one year beginning October 1st and ending September 30th.

Total Nitrogen: For concentration and load, Total Nitrogen is the sum of Total Kjeldahl-N (TKN) plus Nitrite-Nitrate as N ($NO_2+NO_3$-N), where TKN and $NO_2+NO_3$-N are measured in the same sample.

Truing Period: The time provided following each Compliance Year for a permittee to comply with Cap Loads through the application of Credits and Offsets.  The Truing Period will start on October 1st and end on November 28th of the same calendar year, unless DEP extends this period.  During this period, compliance for the specified year may be achieved by using registered Credits that were generated during that Compliance Year.  For example, Credits that are used to achieve compliance in Compliance Year 2012 must have been generated during Compliance Year 2012.  Approved Offsets that have been generated may also be applied during the Truing Period.

3800-PM-BPNPSM0011   Rev. 10/2014
Permit

Permit No. PA0044741

Complaint Exhibit 1

Verification: Assurance that the verification plan contained in a certification, permit or other approval issued by DEP has been implemented.  Verification is required prior to registration of the credits for use in an NPDES permit to comply with NPDES permit effluent limitations.

C.  Nutrient Credits

1.  Credits may be used for compliance with the Cap Loads when authorized under 25 Pa. Code § 96.8 (Use of offsets and tradable credits from pollution reduction activities in the Chesapeake Bay Watershed), including amendments, updates and revisions thereto; in accordance with DEP's Phase 2 WIP Wastewater Supplement (see www.depweb.state.pa.us/npdes-bay); and in accordance with DEP's Phase 2 WIP Nutrient Trading Supplement (see www.depweb.state.pa.us/nutrient_trading).

2.  Where effluent limitations for TN and/or TP are established in Part A of the permit for reasons other than the Cap Load assigned for protection of the Chesapeake Bay ("local nutrient limits"), the permittee may purchase and apply credits for compliance with the Cap Load(s) only when the permittee has demonstrated that local nutrient limits have been achieved.

3.  Where local nutrient limits are established in Part A of the permit, the permittee may sell any credits generated only after the permittee has demonstrated that local nutrient limits have been achieved and those credits have been verified in accordance with the procedures established in the Phase 2 WIP Nutrient Trading Supplement.

4.  The facility discharge to oil Creek which is impaired for nutrients. TMDL is not finalized for Oil Creek therefore, purchase of credits outside of Oil Creek watershed to comply with Chesapeake Bay cap load is prohibited.

D.  Use of Offsets for Compliance

1.  Offsets can only be used by the permittee to comply with its Cap Loads. Offsets are not eligible for use as Credits.

2.  Offsets must be approved by DEP in writing before they may be applied for compliance with Cap Loads.

3.  Offsets that are approved under this permit are listed in Part A, Footnotes.  These Offsets may be applied each Compliance Year toward compliance with the Cap Loads.  The application of these Offsets must be reported on an annual basis.  Additional Offsets may be approved throughout the permit term.

4.  Offsets may be approved for the transfer of load between facilities owned by the same entity if (1) the facility receiving Offsets does not discharge to waters classified as impaired for nutrients and (2) the Delivery Ratios approved by DEP for TN or TP, as applicable, are the same.  Delivery ratios for the facility authorized to discharge under this permit are listed in DEP's Phase 2 Watershed Implementation Plan (WIP) Wastewater Supplement, available at the following website:

www.depweb.state.pa.us/npdes-bay

Such Offsets may only be applied in the Compliance Year in which the transfer occurred, and are not cumulative.

E.  Reporting Requirements

1.  The facility shall utilize DEP's electronic Discharge Monitoring Report (eDMR) system to submit DMR data and Supplemental DMR forms.  Unless the permittee is already using the eDMR system, within 30 days of permit issuance, the permittee shall submit the necessary Registration and Trading Partner Agreement forms to participate in eDMR, and begin using eDMR for submission of DMR data and Supplemental DMR forms when DEP notifies the permittee to begin doing so.  The eDMR website is

Complaint Exhibit 1

http://www.dep.state.pa.us/edmr.  Use of eDMR shall continue unless the requirements of Part A III.B.3 are met.

2. The Nutrient Monitoring supplemental form (3800-FM-BPNPSM0444) shall be used to report daily TN and TP sampling results for each monitoring period.  This completed form shall be attached to the monthly DMR.  The spreadsheet version of this form, available on DEP's website, must be used where the permittee seeks DEP's approval for the generation of credits in accordance with paragraph B, above.

3. The Nitrogen Budget and Phosphorus Budget supplemental forms (3800-FM-BPNPSM0445 and 3800-FM-BPNPSM0446, respectively) shall be used to document credits sold and applied and offsets applied in order to calculate Annual Net Mass Loads.  The permittee shall report Credits applied and sold during the Compliance Year, including registry number, contract effective date, and DEP certification approval date, and approved Offsets applied during the Compliance Year, including the source of Offsets and DEP approval date.  Where credits or offsets are utilized during the Compliance Year, the form(s) shall be attached to the Annual DMR.

4. The Annual DMR for the reporting of Annual Net Mass Loads for TN and TP is due on November 28th following each Compliance Year, unless DEP extends the Truing Period to a later date.

## III.   OTHER REQUIREMENTS

A. The approval herein given is specifically made contingent upon the permittee acquiring all necessary property rights by easement or otherwise, providing for the satisfactory construction, operation, maintenance or replacement of all structures associated with the herein approved discharge in, along, or across private property, with full rights of ingress, egress and regress.

B. Collected screenings, slurries, sludges, and other solids shall be handled, recycled and/or disposed of in compliance with the Solid Waste Management Act (35 P.S. §§ 6018.101 – 6018.1003), 25 Pa. Code Chapters 287, 288, 289, 291, 295, 297, and 299 (relating to requirements for landfilling, impoundments, land application, composting, processing, and storage of residual waste), Chapters 261a, 262a, 263a, and 270a (related to identification of hazardous waste, requirements for generators and transporters, and hazardous waste, requirements for generators and transporters, and hazardous waste permit programs), federal regulation 40 CFR Part 257, The Clean Streams Law, and the Federal Clean Water Act and its amendments.  Screenings collected at intake structures shall be collected and managed and not be returned to the receiving waters.

The permittee is responsible to obtain or assure that contracted agents have all necessary permits and approvals for the handling, storage, transport and disposal of solid waste materials generated as a result of wastewater treatment.

C. The terms and conditions of Water Quality Management (WQM) permits that may have been issued to the permittee relating to discharge requirements are superseded by this NPDES permit unless otherwise stated herein.

D. If the applicable standard or effluent guideline limitation relating to the application for Best Available Technology (BAT) Economically Achievable or to Best Conventional Technology (BCT) is developed by DEP or EPA for this type of industry, and if such standard or limitation is more stringent than the corresponding limitations of this permit (or if it controls pollutants not covered by this permit), DEP may modify or revoke and reissue the permit to conform with that standard or limitation.

E. The permittee shall optimize chlorine dosages used for disinfection or other purposes to minimize the concentration of Total Residual Chlorine (TRC) in the effluent, meet applicable effluent limitations, and reduce the possibility of adversely affecting the receiving waters.  Optimization efforts may include an evaluation of wastewater characteristics, mixing characteristics, and contact times, adjustments to process controls, and maintenance of the disinfection facilities.  If DEP determines that effluent TRC is causing adverse water quality impacts, DEP may reopen this permit to apply new or more stringent effluent

Permit No. PA0044741

Complaint Exhibit 1

limitations and/or require implementation of control measures or operational practices to eliminate such impacts.

Where the permittee does not use chlorine for primary or backup disinfection, but proposes the use of chlorine for cleaning or other purposes, the permittee shall notify DEP prior to initiating use of chlorine and monitor TRC concentrations in the effluent on each day in which chlorine is used.  The results shall be submitted as an attachment to the DMR.

F.   The permittee shall develop a treatment facility operations and maintenance (O&M) plan addressing key wastewater processes.  The plan shall be reviewed annually and updated when appropriate.  The plan shall be submitted to DEP for review upon request.  For the purpose of this paragraph, a key wastewater process includes any equipment or process that, if it fails, may cause the discharge of raw wastewater or wastewater that fails to meet NPDES permit discharge requirements, or a failure that may threaten human or environmental health.  The O&M plan shall include the following, at a minimum:

1.   A process control strategy that includes a schedule for process control sampling, monitoring, testing, and recordkeeping.

2.   A plan that identifies how key wastewater processes shall be monitored and adjusted while the facility is staffed.

3.   A plan that identifies how key wastewater processes will be monitored while the treatment facility is not staffed.

4.   For treatment plants that are impacted by wet weather flows, the permittee shall develop and implement a wet weather operations strategy that minimizes or eliminates the wash out of solids from the treatment system while maximizing the flow through the treatment plant.

5.   An emergency plan that identifies how the facility will be operated during times of emergency.  For example, the plan shall detail how key wastewater processes will be repaired or replaced in the event of a failure while minimizing loss of life and property damage to the facility.  This plan shall also include emergency contact numbers for local emergency response agencies, plant personnel, critical suppliers and vendors, and DEP contacts, at a minimum.

6.   A preventative maintenance plan that includes a schedule for preventative maintenance for all equipment within the treatment system.  A spare parts inventory shall be included as part of this plan.

7.   A solids management plan that identifies how solids produced by the facility will be wasted, treated, and ultimately disposed of.

G.   <u>Temperature</u>

This discharge shall not cause a change in the stream temperature of more than 2°F during any one hour.

H.   There shall be no net addition of pollutants to non-contact cooling water over intake values except for heat and water conditioning additives for which complete information was submitted in the application or is required to be submitted as a condition of this permit.

I.   The Department is currently evaluating the effect of phosphorus on the stream.  If it is determined that this discharge must control phosphorus further, the permit may be reopened before the expiration date and a more stringent limitation on phosphorus applied.

IV.   **SCHEDULE OF COMPLIANCE FOR TEMPERATURE**

A.   The permittee shall achieve compliance with final effluent limitations or terminate this discharge in accordance with the following schedule:

1.   Feasibility study completion          6 Months after permit effective date

Permit No. PA0044741

Complaint Exhibit 1

| | | |
|---|---|---|
| 2. | Final plan completion | 12 months after permit effective date |
| 3. | Start plan implementation | 12 months after permit effective date |
| 4. | Plan implementation progress report(s) | Quarterly |
| 5. | End of plan implementation | 36 months after permit effective date |
| 6. | Compliance with effluent limitations | 36 months after permit effective date |

B.  No later than 14 calendar days following a date identified in the above schedule of compliance, the permittee shall submit to DEP a written notice of compliance or non-compliance with the specific schedule requirement.  Each notice of non-compliance shall include the following information:

1.  A short description of the non-compliance.

2.  A description of any actions taken or proposed by the permittee to comply with the elapsed schedule requirement.

3.  A description of any factors which tend to explain or mitigate the non-compliance.

4.  An estimate of the date that compliance with the elapsed schedule requirement will be achieved and an assessment of the probability that the next scheduled requirement will be met on time.

## V.   REQUIREMENT TO USE EDMR SYSTEM

A.  Within 30 days of the Permit Issuance Date, the permittee shall submit the necessary forms to register for the Department's Electronic Discharge Monitoring Report (eDMR) system for the submission of DMRs and Supplemental DMRs.  The eDMR system, registration materials and instructions can be accessed at www.dep.state.pa.us/edmr.

B.  The registration materials shall be submitted to the DEP's Central Office for processing at the following address:

PA DEP
Bureau of Point and Non-Point Source Management
Rachel Carson State Office Building
P.O. Box 8466
Harrisburg, PA  17105-8466

C.  Upon notification from DEP that the permittee and its users are registered to use eDMR, the permittee shall begin using the eDMR system to submit its DMR(s) for the reporting period(s) identified in the DEP's notification. The permittee shall continue to use eDMR for all subsequent reporting periods unless DEP grants written approval to discontinue its use and issues an amendment to this permit.

## VI.   CHEMICAL ADDITIVES

A.  Approved Chemical Additives List

1.  The permittee is authorized to use chemical additives that are published on DEP's Approved Chemical Additives List (Approved List) (see www.depweb.state.pa.us/chemicaladditives) subject to paragraphs A.2 and A.3, below.

2.  The permittee may not discharge a chemical additive at a concentration that is greater than the water quality-based effluent limitation (WQBEL) for the chemical additive or, if applicable, a technology-based effluent limitation.  If effluent limitations are not specified in Part A of this permit for the chemical additive, the permittee is responsible for determining the WQBEL and ensuring the WQBEL is not

Permit No. PA0044741

Complaint Exhibit 1

exceeded by restricting usage to an amount that will not cause an excursion above in-stream water quality standards.

3. If the permittee decides to use a chemical additive that is on DEP's Approved List and the use would either (1) constitute an increase in the usage rate specified in the NPDES permit application or previous notification to DEP or (2) constitute a new use, not identified in the NPDES permit application or otherwise no previous notification occurred, the permittee shall complete and submit the "Chemical Additives Notification Form" (3800-FM-BPNPSM0487) to the DEP regional office that issued the permit. The permittee may proceed to use the chemical additive as reported on the Form upon receipt by the DEP regional office.

B. New Chemical Additives, Not on Approved Chemical Additives List

1. In the event the permittee wishes to use a chemical additive that is not listed on DEP's Approved List, the permittee shall submit the "New Chemical Additives Request Form" (3800-FM-BPNPSM0486) to DEP's Central Office, Bureau of Point and Non-Point Source Management (BPNPSM), Division of Planning and Permitting, Rachel Carson State Office Building, PO Box 8774, Harrisburg, PA 17105-8774, prior to use. A copy shall be submitted to the DEP regional office that issued the permit. The form must be completed in whole in order for BPNPSM to approve the chemical additive, and a Material Safety Data Sheet (MSDS) that meets the minimum requirements of 29 CFR 1910.1200(g) must be attached.

2. Following placement of the chemical additive on the Approved List, the permittee may submit the Chemical Additive Notification Form in accordance with paragraph A.3, above, to notify DEP of the intent to use the approved chemical additive. The permittee may proceed with usage when the new chemical has been identified on DEP's Approved List and following DEP's receipt of the Chemical Additives Notification Form.

3. The permittee shall restrict usage of chemical additives to the maximum usage rates determined and reported to DEP on Chemical Additives Notification Forms.

C. Chemical Additives Usage Reporting Requirements

The "Chemical Additives Usage Form" (3800-FM-BPNPSM0439) shall be used to report the usage of chemical additives and shall be submitted as an attachment to the Discharge Monitoring Report (DMR) at the time the DMR is submitted.

D. DEP may amend this permit to include WQBELs or otherwise control usage rates of chemical additives if there is evidence that usage is adversely affecting receiving waters, producing Whole Effluent Toxicity test failures, or is causing excursions of in-stream water quality standards.

## VII.  REQUIREMENTS APPLICABLE TO STORMWATER OUTFALLS

A. The permittee is authorized to discharge non-polluting stormwater from its site, alone or in combination with other wastewaters, through the following outfalls:

| Outfall No. | Area Drained (ft$^2$) | Latitude | Longitude | Description |
|---|---|---|---|---|
| 002 | | 39°48 '45.48 " | 76°56 '51.02 " | Facility site and roadway |
| 003 | | 39°48 '33.52 " | 76°57 '0.51 " | Waste storage area near freezing unit |
| 004 | | 39°48 '30.53 " | 76°57 '8.05 " | Spillway from stormwater detection pond |

Monitoring requirements and effluent limitations for these outfalls are specified in Part A of this permit, if applicable.

Permit No. PA0044741

Complaint Exhibit 1

B.  Preparedness, Prevention and Contingency (PPC) Plan

The permittee must develop and implement a PPC Plan in accordance with 25 Pa. Code § 91.34 following the guidance contained in DEP's "Guidelines for the Development and Implementation of Environmental Emergency Response Plans" (DEP ID 400-2200-001), its NPDES-specific addendum and the minimum requirements below.  For existing facilities, the PPC Plan must be developed prior to permit issuance.  For new facilities, the PPC Plan must be submitted to DEP no later than prior to startup of facility operation.

1.  The PPC Plan must identify all potential sources of pollutants that may reasonably be expected to affect the quality of stormwater discharges from the facility.

2.  The PPC Plan must describe preventative measures and best management practices (BMPs) that will be implemented to reduce or eliminate pollutants from coming into contact with stormwater resulting from routine site activities and spills.

3.  The PPC Plan must address actions that will be taken in response to on-site spills or other pollution incidents.

4.  The PPC Plan must identify areas which, due to topography or other factors, have a high potential for soil erosion, and identify measures to limit erosion.  Where necessary, erosion and sediment control measures must be developed and implemented in accordance with 25 Pa. Code Chapter 102 and DEP's "Erosion and Sediment Pollution Control Manual" (DEP ID  363-2134-008).

5.  The PPC Plan must address security measures to prevent accidental or intentional entry which could result in an unintentional discharge of pollutants.

6.  The PPC Plan must include a plan for training employees and contractors on pollution prevention, BMPs, and emergency response measures.

7.  If the facility is subject to SARA Title III, Section 313, the PPC Plan must identify releases of "Water Priority Chemicals" within the previous three years.  Water Priority Chemicals are those identified in EPA's "Guidance for the Determination of Appropriate Methods for the Detection of Section 313 Water Priority Chemicals" (EPA 833-B-94-001, April 1994).  The Plan must include an evaluation of all activities that may result in the stormwater discharge of Water Priority Chemicals.

8.  Spill Prevention Control and Countermeasure (SPCC) plans may be used to meet the requirements of this section if the minimum requirements are addressed.

9.  The PPC Plan shall be evaluated and if necessary updated on an annual basis, at a minimum, and when one or more of the following occur:

a.  The Plan fails in an emergency;

b.  There is a change in design, industrial process, operation, maintenance, or other circumstances, in a manner that materially increases the potential for fires, explosions or releases of toxic or hazardous constituents; or which changes the response necessary in an emergency;

c.  The list of emergency coordinators or equipment changes; or

d.  When notified in writing by DEP.

All updates must be kept on-site and be made available to DEP upon request.

C.  Minimum Required BMPs

In addition to BMPs identified in the PPC Plan, the permittee shall implement the following minimum BMPs relating to stormwater pollution prevention:

Permit No. PA0044741

Complaint Exhibit 1

1. If applicable, post-construction stormwater BMPs that are required under 25 Pa. Code Chapter 102 must be maintained.

2. For industrial facilities, the BMPs in the applicable Appendix to the NPDES PAG-03 General Permit for Discharges of Stormwater Associated with Industrial Activities that is currently in effect.

3. For POTWs, all of the following:

   a. Manage sludge in accordance with all applicable permit requirements.

   b. Store chemicals in secure and covered areas on impervious surfaces away from storm drains.

   c. For new facilities and upgrades, design wastewater treatment facilities to avoid, to the maximum extent practicable, stormwater commingling with sanitary wastewater, sewage sludge, and biosolids.

   d. Efficiently use herbicides for weed control. Where practicable, use the least toxic herbicide that will achieve pest management objectives. Do not apply during windy conditions.

   e. Do not wash parts or equipment over impervious surfaces that wash into storm drains.

   f. Implement infiltration techniques, including infiltration basins, trenches, dry wells, porous pavement, etc., wherever practicable.

D. Annual Inspection and Compliance Evaluation

1. The permittee shall conduct an annual inspection of each outfall identified in paragraph A and record the results on the "Annual Inspection Form for NPDES Permits for Discharges of Stormwater Associated with Industrial Activities" (3800-PM-WSFR0083v). The permittee shall submit a copy of the completed and signed Annual Inspection Form to DEP at the address provided in Part A III.B.3 of this permit by January 28 of each year.

2. Areas contributing to a stormwater discharge associated with industrial activity shall be visually inspected for evidence of, or the potential for, pollutants entering the drainage system. BMPs in the PPC Plan and required by this permit shall be evaluated to determine whether they are adequate and properly implemented in accordance with the terms of this permit or whether additional control measures are needed.

E. Stormwater Sampling Requirements

If stormwater sampling is required in Part A of this permit, the following requirements apply:

1. The permittee shall record stormwater sampling event information on the "Additional Information for the Reporting of Stormwater Discharge Monitoring" form (3800-PM-WSFR0083t) and submit the form as an attachment to the DMR.

2. All samples shall be collected from the discharge resulting from a storm event that is greater than 0.1 inch in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1 inch rainfall) storm event. The 72-hour storm interval is waived when the preceding storm did not yield a measurable discharge, or if the permittee is able to document that a less than 72-hour interval is representative for local storm events during the sample period.

3. Grab samples shall be taken during the first 30 minutes of the discharge. If the collection of a grab sample during the first 30 minutes is not possible, a grab sample can be taken during the first hour of the discharge, in which case the discharger shall provide an explanation of why a grab sample during the first 30 minutes was not possible.

Complaint Exhibit 1

# ATTACHMENT E



3800-FM-BPNPSM0168A  9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| NPDES Permit No. | Mo/Day/Yr | Entry Time | Exit Time | Inspection Type | eFACTS Inspection ID |
|---|---|---|---|---|---|
| PA0044741 | 4/18/2019 | 10:00 | | CEI | |

| | |
|---|---|
| Facility Name: Hanover Foods IWTP | Permittee Name: Hanover Foods Corporation |
| Physical Location/Directions: 1550 York Street, Hanover, PA 17331 | Permit Expiration Date: 09/30/2020 |
| Municipality: Penn Township | County: York | Permit Renewal Application Due: 03/31/2020 |

Facility Type:  ☐ Sewage  ☑ Industrial Waste  ☐ Industrial Stormwater  ☐ Other:
☐ Major  ☑ Minor

| | |
|---|---|
| Responsible Person: David Still | Certified Operator Required: ☐ Yes ☑ No |
| Title: Vice President - Operations | Certified Operator in Responsible Charge: Eric Eckersley |
| Permittee Address:  PO Box 334  1486 York Street  Hanover, PA 17331 | Client ID: Class-Subclass(es): Circuit Rider: ☐ Yes ☑ No |
| Business Phone: 717.632.6000 Fax: Email: dstill@hanoverfoods.com | Business Phone: 717.632.6000 xt 1214 Cell: Email: eeckersley@hanoverfoods.com |

24-Hour Emergency Contact Person / Phone:

| **VIOLATIONS:** (list below) | ☑ Yes  ☐ No  ☐ Pending Sample Results |
|---|---|

UV disinfection system offline for Outfall 001 is in violation of Part B.I.E of your NPDES Permit; Failure to properly operate and maintain all facilities which are installed or used to achieve compliance

| Person Interviewed: Eric Eckersley | Date: 04/18/2019 | Inspector: Austen Randecker | Date: 4/18/2019 |
|---|---|---|---|
| Signature: Report sent via mail | Phone No.: 717.632.6000 | Inspector Signature: | Phone No.: 717.503.7121 |
| Title: Operator | | Title: Water Quality Specialist | |
| Email: eeckersley@hanoverfoods.com | | Email: arandecker@pa.gov | |

This document is official notification that a representative of the Department of Environmental Protection inspected the above facility.  The findings of this inspection are shown above and on any attached pages.  Any violations which were noted during the inspection are indicated.  Violations may also be discovered upon examination of the results of laboratory analyses of the discharge and review of Department records.



3800-FM-BPNPSM0168B   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

pennsylvania
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

# NPDES COMPLIANCE INSPECTION REPORT

Complaint Exhibit 1

| Comments |
|---|
| A CEI inspection was conducted today by the Department's Clean Water Program. In attendance for the inspection was Austen Randecker (Water Quality Specialist), Erick Ammon (Compliance Specialist), and Summer Kunkel (Water Quality Specialist Supervisor). We were met on-site by David Still (VP – Operations) and by Eric Eckersley (Plant Operator) who accompanied us on the inspection. |
| Treatment plant receives industrial waste from canning operations as well as NCCW. Industrial waste is treated as a pre-treatment operation for Penn Township STP. NCCW is treated and discharged to Oil Creek at Outfall 001. Influent flow from industrial canning operations passes through screening, online during inspection, before entering the grit removal chamber. There were some food particles on the ground surface. Mr. Eckersley stated that the screening area is cleaned daily. Screenings are collected and stored in the residual storage pad for land application. During periods of high flows an EQ/Surge tank can be put online to store extra flow and can be fed back to the wet well by a flow metering device in the screening area. Influent samples are collected for weekly testing and for daily COD. |
| After screening and grit removal industrial waste is pumped to 1 of 2 bio-reactors via 3 influent wet well pumps. Bio-reactor #2 was online during the inspection. Bio-reactor #1 and clarifiers 1 and 2 were offline due to maintenance. Reactor #1 is currently operating at 90 degrees F or less and is designed to operate at ~95 degrees F. Mr. Eckersley states that heat exchanger may not be sufficient enough to maintain design temperature, there has been discussion of installing a heat exchanger on the IW/NCCW lines to help aide the temperature in the bio-reactor. The reactor has ability to flare gas, normal operations use the gas as fuel for the heat exchanger. |
| Flow from bio-reactor #2 is fed to a splitter box that diverts flow between primary clarifier 3 and 4, both online during the inspection. Clarifiers 3 and 4 are experiencing short-circuiting, gas release, and solids carry over in multiple areas along the weirs. There is algae accumulation in the effluent weir notches. RAS from the clarifiers is sent to a RAS pit. There is a valve in the RAS pit that is used to waste sludge. Wasted sludge is sent to the Slurry tank and ultimately is land applied. Effluent from clarifier 3 and 4 is gravity fed to aeration lagoon #1. |
| Lagoon #1 is currently experiencing spring "turn over". Lagoon #1 was a milky brown/grey color and there were no significant odors, scum, or floatables. The liner appears to be in good repair. Lagoon #1 is equipped with mixers and aerators. Due to spring "turn over" lagoon #1 is being aerated very little for increased settling to prevent solids carryover. Effluent from lagoon #1 is sampled and is then sent to Penn Township WWTP for final treatment. Flow to Penn Township during the inspection was 0.544 MGD. |
| NCCW is also treated on-site. NCCW flow enters aeration lagoon #2. Lagoon #2 appeared clear and had a green/brown tint. No rips/ tears noted with the liner and there were numerous snails present on the liner. Lagoon #1 has mixers and aerators, offline during the inspection. Flow from lagoon #1 is sent to a splitter box where flow is diverted to 2 polishing ponds. Aeration in the polishing ponds was off during inspection. The polishing ponds are experiencing heavy algae growth, which fouls the aerator motors. The fence around the polishing ponds is experiencing heavy erosion. |



3800-FM-BPNPSM0168B   9/2012

**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT Complaint Exhibit 1

## NPDES COMPLIANCE INSPECTION REPORT

| Comments |
|---|
| Effluent from the polishing ponds is sent to disinfection before being discharged to Oil Creek at Outfall 001. A UV system is in place for disinfection and the unit was "OFF" during the time of inspection and was turned to "AUTO" during the inspection. Mr. Eckersley stated that the UV system was turned to "OFF" to remove the algae accumulation on the UV bulbs from the polishing tanks ~2 weeks ago. The UV system has a PLC and SCADA that can be viewed and operated from the control building. Effluent composite samples are collected from the effluent line post UV disinfection. Flow from the UV unit is gravity fed to Outfall 001. The stream discharge pipe was submerged during the time of the inspection. The outfall appeared clear and no solids, foam, or scum was notable in Oil Creek. Oil Creek upstream and downstream of the outfall appeared clear. |
| |
| |
| Recommendations: |
| -Cleanup and housekeeping of residual waste storage pad and slurry tank |
| -Sampling NCCW influent 1/week for process control |
| -Adjusting wasting rates/transfer from clarifiers to slurry tank |
| -Repair of inoperable mixers and aerators in lagoons/polishing ponds |
| -Fixing the fencing and erosion gully around the polishing ponds |
| -Rake and dispose of algae from the ground surface around polishing ponds |
| -Notify the Department of any "pilot" studies relating chemical additions |
| -Notify the Department of conducting any temperature changes within the Bio-reactor |
| -Labeling and posting all outfalls |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |



3800-FM-BPNPSM0168C   9/2012

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Monitoring, Reporting and Recordkeeping |
|:---:|
| **(NPDES Permit Part A)** |

<u>On-site laboratory:</u> ■ Registered  ☐ Accredited  ☐ N/A  ☐ Not Registered/Accredited

On-site analyses: ■ pH  ■ DO  ■ TRC  ☐ All NPDES parameters  ☐ None
■ Other(s): Temperature

DEP Lab Registration/Accreditation #: 67-01061          Lab Supervisor:

Comments:

---

<u>Contract Laboratory Name:</u> ALS Environmental                    DEP Lab Accreditation #: 22-00293

Address & Phone: 301 Fulling Mill Road, Middletown

Parameters Analyzed: color, CBOD, TSS, O/G, fecal, NH3-N, Total Phos, Total Cadmium, Total nitrogen series

Comments:

---

<u>Sample Collection:</u> Influent sampling location: No NCCW influent sample collected

Effluent sampling location: Post UV system

Location(s) adequate for representative samples:                    ■ Yes  ☐ No

Parameters analyzed, sample frequencies and sample types meet permit requirements:  ■ Yes  ☐ No

Samples properly preserved during collection, storage and shipping:         ■ Yes  ☐ No

Sampler or sample temperature is recorded using NIST traceable thermometer:   ■ Yes  ☐ No

Comments:

---

<u>Composite samples:</u> Being collected: ■ Yes  ☐ No       Composites are: ☐ 8-hour  ■ 24-hour  ☐ Other

Samples are:  ■ Flow Proportional    ☐ Time Proportional

Sampler controlled by:   ☐ Influent flow meter    ■ Effluent flow meter

Minimum aliquot volume greater than 100 ml: ■ Yes      ☐ No

Composite sampler temperature during inspection: 4C

Comments:

---

<u>Sample records:</u> Available for inspection: ■ Yes  ☐ No       Retained for at least three years: ■ Yes  ☐ No

Includes:  Collector name: ■ Yes  ☐ No    Collection date/time: ■ Yes  ☐ No    Collection location: ■ Yes  ☐ No

Analyst name: ■ Yes  ☐ No    Analysis date/time: ■ Yes  ☐ No    Analysis Results: ■ Yes  ☐ No

Analytical methods & quantitation limits: ■ Yes  ☐ No    Chain-of-Custody forms: ☐ Yes  ☐ No

Comments:

---

<u>Bench sheets:</u> Data is consistent with data on the DMR: ■ Yes  ☐ No  ☐ N/A       Month(s)/year checked: September 2018

Comments:

---

<u>Field Testing:</u> Completed within required hold time: ■ Yes  ☐ No

Equipment is calibrated as required: pH: ■ Yes  ☐ No    DO: ■ Yes  ☐ No    TRC: ☐ Yes  ☐ No    ■ N/A

Other(s): ☐ Yes  ☐ No

Calibration records maintained: ■ Yes  ☐ No

Comments: Some buffer solutions were out of date, recommend verifying chlorine meter against secondary standards

---

<u>DMR Submittal:</u> DMRs are submitted as required: ■ Yes  ☐ No           eDMR User: ■ Yes  ☐ No

DMR Supplemental Reports are submitted as required: ■ Yes  ☐ No

DMRs include all sample results collected and analyzed using approved methods: ■ Yes  ☐ No

Comments:

---

3800-FM-BPNPSM0168D   9/2012


**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT

# NPDES COMPLIANCE INSPECTION REPORT

*Complaint Exhibit 1*

## Flow Measurement
### (NPDES Permit Part A)

<u>Primary flow meter and recorder:</u> Operable: ■ Yes ☐ No        Properly maintained: ■ Yes ☐ No

Measuring device type: ☐ Flume ☐ Weir ■ Full Pipe ☐ Open Channel ☐ Other:

Meter type: ☐ Ultrasonic ■ Magnetic Meter ☐ Bubbler ☐ Other:

Meter location: Post UV system

Recorder type: ■ Totalizer ☐ Daily Chart ☐ 7-Day Chart ■ SCADA/Electronic ☐ Other:

Capable of recording maximum flows: ☐ Yes ☐ No    Calibration Range: unknown

Inspection frequency: ■ Daily ☐ Weekly ☐ Other:

Calibration frequency: annual        Date of last calibration: 12-20-2018

Measuring device, meter and recorder included as part of flow meter calibration: ■ Yes ☐ No ☐ N/A

Influent flow is measured before all return lines: ■ Yes ☐ No   Influent flow is measured after hauled-in wastes: ☐ Yes ☐ No

Effluent flow is measured after all withdraws: ■ Yes ☐ No

Comments:

<u>Flumes:</u> Flow is uniform across the channel: ☐ Yes ☐ No ■ N/A     Flume is free of debris and deposits: ☐ Yes ☐ No ■ N/A
Comments:

<u>Weirs:</u> Clean with a visible air space below the nappe: ☐ Yes ☐ No ■ N/A
Comments:

## Treatment Plant
### (NPDES Permit Part B)

<u>Treatment plant bypass:</u> Since last inspection: ☐ Yes ■ No       Reported to DEP: ☐ Yes ☐ No
Location/cause:

<u>Major equipment repair/replacement:</u> Since last inspection: ☐ Yes ☐ No       Date of last inspection: CEI on 7/20/16
Repair List: New bioreactor, 2 new clarifiers, UV system

<u>Stand-by power:</u> ■ Emergency generator ☐ Dual power feed ☐ None ☐ Other:
System operable: ■ Yes ☐ No    Exercise frequency: weekly        Maintenance frequency: annual
Comments:

<u>Alarms:</u> Type: ☐ None ■ SCADA ☐ Auto Dialer ☐ PLC ■ Other: light alarm
System operable: ■ Yes ☐ No    Test frequency:
Alarm triggers: high/low levels

<u>Staffing schedule:</u> ☐ 24/7    Weekday hours: 0500 to 1300        Weekend/Holiday hours: Varies
Other:

<u>On site Logs:</u> Logs up-to-date: ■ Yes ☐ No ☐ N/A
Daily Log contains: ☐ Visual observations ■ Process adjustments ■ Problems and concerns
Repair log maintained: ■ Yes ☐ No   Routine maintenance log maintained: ■ Yes ☐ No
Comments: Repair and maintenance included in daily log

<u>Spare parts inventory:</u> maintained: ■ Yes ☐ No    ■ Standby units available
Comments:

3800-FM-BPNPSM0168E   9/2012

 pennsylvania
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT

## NPDES COMPLIANCE INSPECTION REPORT

Complaint Exhibit 1

| Treatment Process Units (NPDES Permit Part B) | | | | |
|---|---|---|---|---|
| Water Quality Management Permit No. | | | All treatment units are as noted in permit: ☐ Yes   ☐ No | |
| Treatment Units | Total | On-Line | Inoperable | Comments |
| Screening | 1 | 1 | | |
| Grit Removal | 1 | 1 | | |
| Surge Tank (EQ) | 1 | 1 | | |
| Bio-reactor | 2 | 1 | 0 | Reactor #1 offline for maintenance |
| Primary Clarifier | 4 | 2 | 0 | #1 and #2 offline for maintenance |
| Aeration Lagoons | 2 | 2 | | |
| Polishing ponds | 2 | 2 | | |
| UV System | 1 | 0 | 1 | UV system was in "off" mode during inspection |
| | | | | |
| | | | | |
| Residual Storage Pad | | | | Under roof cover |
| Slurry Tank | | | | Leaking slightly |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Chemical Additions: MgOH, sulfuric acid, ByoGon, polymer/coagulant, Urea | | | | |



3800-FM-BPNPSM0168F   9/2012

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

## Process Control
### (NPDES Permit Part B)

| Frequency of Testing | Current Testing Results |
|---|---|
| ☐ Settleability | |
| ☐ Dissolved Oxygen | |
| ■ Sludge Blanket | Clarifier 3 and 4: 7 Feet |
| ■ Mixed Liquor Suspended Solids   ☐ MLVSS | 9600 |
| ☐ Microscopic exam of MLSS | |
| ☐ Color   ☐ Odor | Comments/observations/results: |

■ Other: pH: 6.38 SU; Alkalinity: 540 mg/l

## Other Requirements
### (NPDES Permit Part C)

Special Conditions: Next submission/action:                                                            Due Date:
☐ WETT:
☐ TRE/TIE:
☐ EPA Pretreatment Program     ☐ Annual report submitted:
■ Stormwater requirements: sampling at 002 and 003
☐ Permit Schedule:
☐ TMDL:
■ Other: C-Bay nutrient monitoring
Comments:

Emergency Response/PPC Plan: on-site:   ■ Yes   ☐ No   ☐ N/A   Last updated:
Flood response plan available:   ☐ Yes   ☐ No   ■ N/A
Comments: Update the Department's South Central Regional #: 717-705-4700

## Compliance History

History of noncompliance: with discharge effluent limits: ■ Yes   ☐ No
Recent Compliance Actions:   ■ Yes   ☐ No
Comments:

Legal Agreement: Consent Order and Agreement, Consent Decree or Order:   ■ Yes   ☐ No   Date executed: 01/03/2017
In compliance with legal agreement:   ☐ Yes   ■ No
Obligations due next: Quarterly reports
Comments:



3800-FM-BPNPSM0168G   9/2012

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| Effluent/Receiving Water Evaluation | | | | | |
|---|---|---|---|---|---|
| **Outfall Number(s):** 001 | **Stream Name:** Oil Creek | | | | |
| DEP Collector #: 2660 | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: | Flow | | 0.00 | | MGD |
| Sample Location: Outfall 001 stream discharge pipe to Oil Creek | pH | | | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | | | mg/L |
| Effluent pipe was submerged | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | | | °F |
| Upstream Observations: Clear | | | | | |
| Outfall Observations: Clear; no erosion and free of debris | | | | | |
| Downstream Observations: Clear | | | | | |
| **Outfall Number(s):** | **Stream Name:** | | | | |
| DEP Collector #: | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: | Flow | | | | MGD |
| Sample Location: | pH | | | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | | | mg/L |
| | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | | | °F |
| Upstream Observations: | | | | | |
| Outfall Observations: | | | | | |
| Downstream Observations: | | | | | |
| **Outfall Number(s):** | **Stream Name:** | | | | |
| DEP Collector #: | **Field Measurements:** | **Upstream** | **Outfall** | **Downstream** | **Units** |
| Sample Date/Time: | Flow | | | | MGD |
| Sample Location: | pH | | | | S.U. |
| | Conductivity | | | | µmhos/cm |
| | Dissolved Oxygen | | | | mg/L |
| | Total/Free Chlorine Residual | | | | mg/L |
| | Temperature | | | | °F |
| Upstream Observations: | | | | | |
| Outfall Observations: | | | | | |
| Downstream Observations: | | | | | |

Complaint Exhibit 1

# ATTACHMENT F



Complaint Exhibit 1

October 9, 2020

**Via Email**

Erick M. Ammon
Environmental Protection Compliance Specialist
Clean Water Program
PADEP Southcentral Regional Office
909 Elmerton Ave.
Harrisburg, PA 17110
eammon@pa.gov

Re:   **Industrial Waste 3-A**
      **Hanover Foods Industrial Wastewater Treatment Plant**
      **NPDES Permit No. PA0044741**
      **Penn Township, York County**

Dear Mr. Ammon:

I am writing on behalf of Hanover Foods Corporation ("HFC") in response to a notice of violation from the Department dated August 26, 2020 ("NOV"), addressed to our Cannery Plant Manager, Dave Still (I was copied as HFC's Environmental Manager). The NOV requested HFC's response within 45 days describing the cause of the alleged violations and the steps being taken to prevent recurrence of the violations along with a correction schedule.

As background, HFC's industrial wastewater treatment plant ("IWTP") treats food processing wastewater, the majority of which is discharged to Penn Township's wastewater treatment plant ("WWTP") in accordance with the separate industrial pretreatment permit from the Township. HFC's IWTP has two lagoons that are downstream in the treatment process from its anerobic digester. Process wastewater is treated in the digester first before settling in the lagoons and further treated by polishing ponds, clarifiers, UV treatment, and, for Lagoon 1, Penn Township's WWTP. Process wastewater is typically discharged from the digester into Lagoon 1, and then flows to Penn Township's WWTP for additional treatment. Depending on operating conditions, process water may be directed or transferred to Lagoon 2, but typical operations maximize flows to Penn Township's WWTP for additional treatment.

Lagoon 2 is used for non-contact cooling water and any additional process water (beyond the Township flow limits). Lagoon 2 discharges to Oil Creek under NPDES Permit No. 0044741. At



Complaint Exhibit 1

the time of the Department's inspection, operations were affected by the dredging of sludge from Lagoon 1, which occurred later this year than usual because of the unique circumstances of 2020. The dredging is performed as annual preventative maintenance and, while this was happening in late June and early July, process water was diverted to Lagoon 2. Due to ongoing work related to controlling the flow to Penn Township's WWTP that lasted into July, HFC did not begin refilling Lagoon 1 with process water again until July 8. At the time of the Department's inspection on July 9, the process water was continuing to flow into Lagoon 1 below normal levels. Lagoon 1 was returned to normal operations on July 13.

With this background in mind, our responses to each of the issues identified in the NOV are outlined below:

1. **PADEP NOV Allegation:** IWTP bioreactor #2 was not operating as designed. The Department observed that the bioreactor was operating at 93.39 degrees Fahrenheit while designed to operate at temperatures above 95 degrees Fahrenheit. Similar issues were noted during the Department's previous inspection on April 16, 2019.

   **HFC Response:** IWTP bioreactor #2 was operating within the design range of 85 to 95 degrees Fahrenheit. While 95 degrees Fahrenheit is optimum temperature at design loading rates, HFC's design engineer has indicated that temperatures as low as 85 degrees Fahrenheit can be utilized at lower-than-design loading rates. On July 8, we were operating well below the design loading rate. In any event, we are in the process of converting the fuel source in the boiler from digester gas/#2 fuel oil to digester gas/natural gas to enhance and maintain higher temperature in the anaerobic digester. HFC previously began working with its air consultant, engaging him on June 8, 2020 to address the conversion of the fuel source in the boiler from #2 fuel oil to natural gas. HFC submitted a request for determination (RFD) to this effect to the Department on August 7, 2020. The Department approved the RFD for the conversion of the IWTP boiler to natural gas without needing a plan approval on August 10, 2020. Currently, we are in the process of completing that conversion. Expected completion date is on or before November 30, 2020.

2. **PADEP NOV Allegation:** IWTP clarifiers #3 and #4 were not operating as designed. The Department observed rising sludge in the clarifiers and solids carryover into the clarifier effluent weirs, an indication that the solids are not properly wasted to from the IWTP and that the clarifiers were short-circuiting. Similar issues were noted during the Department's previous inspection on April 18, 2019.

   **HFC Response:** We did not observe short-circuiting. While the sludge density index was within optimal range (0.5-1), the waste activated sludge ("WAS") pump was batch



Complaint Exhibit 1

discharging solids to the slurry tank. The blanket height was higher than normal resulting in rising sludge and solids carryover to the weirs. We did not observe excessive solids in the clarifier effluent, and TSS concentration was below 100 mg/L.

To the extent the Department is concerned with these issues or other issues at the IWTP, HFC has also taken the following actions:

- Since May 2020, we have been working with a new chemical supplier to conduct a quarterly review to determine optimal dosages for the coagulant/flocculant with the fluctuating organic loadings to the digester. We have re-configured polymer injection at the clarifiers to allow for better solids settling.
- On July 20, 2020, we began feeding nitrifying bacteria into Lagoon 1 to enhance with the nitrification process.
- Since August 2020, we have been utilizing the surge tank to blend the varying organic loadings in the wastewater for steady-state operation.

We believe the actions above should address the Department's concerns.  Thank you for your consideration.  You may contact me any time at knavile@hanoverfoods.com.

Sincerely,

K. Navile

Kumar Navile
Manager - Environmental Affairs / Sustainability
Hanover Foods Corporation

cc:    Stephanie Kleinfelter, Esq., HFC General Counsel
       Dave Still, VP Canning Operations

Complaint Exhibit 1

# ATTACHMENT G

# pennsylvania
DEPARTMENT OF ENVIRONMENTAL PROTECTION

Complaint Exhibit 1

July 9, 2019

## NOTICE OF VIOLATION

**CERTIFIED MAIL NO.  9171 9690 0935 0215 9096 83**

Mr. David Still
Hanover Foods Corporation
1486 York Street, PO Box 334
Hanover, PA 17331-0334

Re:  Hanover Foods
     NPDES Permit No. PA0044741
     Penn Township, York County

Dear Mr. Still:

On April 28, 2019, the Department of Environmental Protection (Department) conducted an inspection of the Hanover Foods Industrial Wastewater Treatment Facility. During the inspection the following violation was noted:

**The UV disinfection system was offline for Outfall 001.   Failure to properly operate and maintain all facilities which are installed to achieve compliance is a violation of Part B.I.D of your NPDES Permit.**

In addition, an administrative review of your DMR submissions determined the following:

**Hanover Foods failed to submit the Annual Stormwater DMRs and associated Annual Inspection Form for the years of 2016, 2017 and 2018 for Outfalls 002 and 003. Failure to submit monitoring reports or properly complete monitoring reports is a violation of Part A III.B of your NPDES permit.**

Please submit a written report to the Department within 10 days of receiving this letter explaining the cause and timeline of the UV system being offline and the measures taken to prevent future violations.

Also, please include in the report the reason why the Annual DMR and associated supplementals were not submitted.

Complaint Exhibit 1

Mr. David Still                              - 2 -                              07/09/2019

This Notice of Violation is neither an order nor any other final action of the Department.  It neither imposes nor waives any enforcement action available to the Department under any of its statutes.  If the Department determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at 717.503.7121 or arandecker@pa.gov.

Sincerely,

Austen Randecker
Clean Water Program

cc:     File

Complaint Exhibit 1

# ATTACHMENT H

**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

Complaint Exhibit 1

August 26, 2020

**CERTIFIED MAIL NO. 7015 1520 0001 1255 6348**

David Still
Plant Manager
Hanover Foods Corporation
1486 York Street
P.O. Box 334
Hanover, PA 17331

Re:  Industrial Waste 3-A
     Hanover Foods Industrial Wastewater Treatment Plant
     NPDES Permit No. PA0044741
     Penn Township, York County

Dear Mr. Still:

On July 9, 2020, the Department of Environmental Protection (Department) conducted an inspection of the Hanover Foods Industrial Wastewater Treatment Plant (IWTP). During the inspection the following violations were noted:

- IWTP bioreactor #2 was not operating as designed. The Department observed that the bioreactor was operating at 93.39 degrees Fahrenheit while designed to operate at temperatures above 95 degrees Fahrenheit. Similar issues were noted during the Department's previous inspection on April 18, 2019.

- IWTP clarifiers #3 and #4 were not operating as designed. The Department observed rising sludge in the clarifiers and solids carryover into the clarifier effluent weirs, an indication that the solids are not properly wasted to from the IWTP and that the clarifiers were short-circuiting. Similar issues were noted during the Department's previous inspection on April 18, 2019.

Part B.I.D of your NPDES Permit states "The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit.  Proper operation and maintenance includes, but is not limited to, adequate laboratory controls including appropriate quality assurance procedures.  This provision also includes the

Complaint Exhibit 1

operation of backup or auxiliary facilities or similar systems that are installed by the permittee, only when necessary to achieve compliance with the terms and conditions of this permit."

Additionally, during the July 9, 2020 inspection the Department collected grab sample of the IWTP effluent. The laboratory results of the samples collected, when compared with your NPDES Permit No. PA 0044741, revealed the following Instantaneous Maximum violations:

| Parameter | Permit Limits | Sample Results |
|-----------|---------------|----------------|
| Ammonia-Nitrogen | 2.5 mg/L | 16.75 mg/L |

We request that you submit a report to this office within forty-five (45) calendar days of the date of this letter, describing the cause of the violations and the steps being taken to prevent recurrence of the violations along with a correction schedule.

A copy of the inspection report and sample results are attached for your records.

This Notice of Violation is neither an order nor any other final action of the Department. It neither imposes nor waives any enforcement action available to the Department under any of its statutes. If the Department determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at 717.705.4775 or eammon@pa.gov .

Sincerely,

Erick M. Ammon
Environmental Protection Compliance Specialist
Clean Water Program

Cc: Mr. Kumar Navile, Hanover Foods (electronic cc, knavile@hanoverfoods.com)

Complaint Exhibit 1

Bcc:   Janna Williams, Assistant Counsel (electronic bcc)
        Victor Landis, Environmental Group Manager (electronic bcc)
        File
        T (via hard copy & electronic bcc)

DAVID STILL
1486 YORK STREET
P.O. BOX 334
HANOVER, PA 17331

Complaint Exhibit 1



**Date of Issue:**   08/11/2020 03:01:00

**DEP Bureau of Laboratories - Harrisburg**
**P.O. Box 1467**
**2575 Interstate Drive**
**Harrisburg, PA 17105-1467**

**Contact Phone Number:  (717) 346-7200**

**NELAP - accredited by**

**NJ DEP - Laboratory Number: PA059**
**PA DEP LAP - DEP Lab ID: 22-00223**

Analytical Report For
Water Quality Protection

Sample ID:  2660 072          Date Collected: 07/09/2020 11:28:00 AM          Lab Sample ID:  B2020002191          Status:  Completed

**Name of Sample Collector:** Austen Randecker
**Date Received:** 07/10/2020

**County:** NOT INDICATED                                    **State:**
**Municipality:** NOT INDICATED

**Location:** NOT INDICATED
**Reason:** Routine Sampling
**Project:** NOT INDICATED
**Standard Anlysis:** B002
**Matrix:** Water

**Stream Condition:**

**Sample Standard Comment:** Holding time exceeded

| Test Codes / CAS # - Description | Reported Results | Date And Time Analyzed | Approved by | Test Method |
|---|---|---|---|---|
| 31616   Fecal Coliform | 18 /100mL | 07/10/2020 09:55 AM | AMFUHRMAN | SM 9222D |

Complaint Exhibit 1

**Analytical Report For**
**Water Quality Protection**

| Sample ID: 2660 072 | Date Collected: 07/09/2020 11:28:00 AM | Lab Sample ID: B2020002191 | Status: Completed |
|---|---|---|---|

The results of the analyses provided in this laboratory report relate only to the sample(s) identified therein. Unless otherwise noted, the results presented on this laboratory report meet all requirements of the 2016 TNI standard. Sample was in acceptable condition when received by the Laboratory. Any exceptions are noted in the report.
* denotes tests that the laboratory is not accredited for

U - Indicates analysis was performed for the test but it was not detected. The sample quantitation limit is reported.

J - Indicates an estimated value, reported between Reporting Limit (RL) and Minimum Detection Limit (MDL).

June Black, Technical Director, Bureau of Laboratories

Complaint Exhibit 1



**Date of Issue:** 08/11/2020 03:01:06

**DEP Bureau of Laboratories - Harrisburg**
P.O. Box 1467
2575 Interstate Drive
Harrisburg, PA 17105-1467

**Contact Phone Number:** (717) 346-7200

**NELAP - accredited by**

NJ DEP - Laboratory Number: PA059
PA DEP LAP - DEP Lab ID: 22-00223

Analytical Report For
Water Quality Protection

Sample ID: 2660 072          Date Collected: 07/09/2020 11:28:00 AM          Lab Sample ID: I2020009471          Status: IN PROCESS

**Name of Sample Collector:** Austen Randecker
**Date Received:** 07/10/2020

**County:** NOT INDICATED                                    **State:**
**Municipality:** NOT INDICATED

**Location:** NOT INDICATED
**Reason:** Routine Sampling
**Project:** NOT INDICATED
**Standard Anlysis:** 077
**Matrix:** Water

**Stream Condition:**

| Test Codes / CAS # - Description | Reported Results | Date And Time Analyzed | Approved by | Test Method |
|---|---|---|---|---|
| 00410   ALKALINITY AS CaCO3 @ pH 4.5 | 399.4 mg/L | 07/10/2020 04:41 PM | MTUZINSKI | SM 2320B |
| 00610A   AMMONIA TOTAL AS NITROGEN | 16.75 mg/L | 07/24/2020 04:00 AM | MTUZINSKI | EPA 350.1 |
| 01027A   CADMIUM, TOTAL (WATER & WASTE) BY ICP | <10.0 ug/L  (U) | 07/13/2020 09:38 AM | ATAPSOBA | EPA 200.7 |
| 00314   CARBONACEOUS BIOCHEMICAL OXYGEN DEMAND 5 DAY | 15.60 mg/L | 07/10/2020 12:59 PM | JRONEMUS | SM 5210B |
| 00080   COLOR, PLATINUM-COBALT | 15 PT/C | 07/10/2020 09:18 AM | JANJOHN | SM 2120B |
| 00080P   pH at Time Color is Observed | 8.63 pH units | 07/10/2020 09:18 AM | JANJOHN | SM 2120B |
| 00625A   Total Kjeldahl Nitrogen | 20.68 mg/L | 07/16/2020 01:45 PM | MBOTTS | EPA 351.2 |
| 00620A   Total Nitrate Nitrogen-Colorimetric | 0.81 mg/L | 07/10/2020 11:04 AM | TBEAR | EPA 353.2 |

1 of 2

Complaint Exhibit 1

**Analytical Report For**
**Water Quality Protection**

Sample ID: 2660 072          Date Collected: 07/09/2020 11:28:00 AM          Lab Sample ID: I2020009471          Status: IN PROCESS

| Test Codes / CAS # - Description | Reported Results | Date And Time Analyzed | Approved by | Test Method |
|---|---|---|---|---|
| 00615A   Total Nitrite Nitrogen-Colorimetric | 2.99 mg/L | 07/10/2020 11:04 AM | TBEAR | EPA 353.2 |
| 00665A   Total Phosphorus as P | 0.757 mg/L | 07/13/2020 11:07 PM | LBENT | EPA 365.1 |
| 00530V   TOTAL SUSPENDED SOLIDS | 29 mg/L | 07/10/2020 11:17 PM | MARMANIOUS | USGS I-3765 |

The results of the analyses provided in this laboratory report relate only to the sample(s) identified therein. Unless otherwise noted, the results presented on this laboratory report meet all requirements of the 2016 TNI standard. Sample was in acceptable condition when received by the Laboratory. Any exceptions are noted in the report.
* denotes tests that the laboratory is not accredited for

U - Indicates analysis was performed for the test but it was not detected. The sample quantitation limit is reported.

J - Indicates an estimated value, reported between Reporting Limit (RL) and Minimum Detection Limit (MDL).

June Black, Technical Director, Bureau of Laboratories

Complaint Exhibit 1

# ATTACHMENT I

Complaint Exhibit 1

December 29, 2020

**Via Electronic Mail**

David Still
Plant Manager
Hanover Foods Corporation
1486 York Street
P.O. Box 334
Hanover, PA 17331
dstill@hanoverfoods.com

Re:  Industrial Waste 3-A
     Hanover Foods Industrial Wastewater Treatment Plant
     NPDES Permit No. PA0044741
     Penn Township, York County

Dear Mr. Still:

Based upon a review of our records, including your electronic Discharge Monitoring Reports ("eDMRs") submitted for July through November 2020, a pattern of effluent violations is evident with respect to the limitations set forth in the Hanover Foods Corporation Industrial Wastewater Treatment Plant ("IWTP") NPDES Permit No. PA0044741. The monthly eDMR violations are included on pages 3 and 4 of this Notice of Violation ("NOV").

Additionally, a review of the Hanover Foods Corporation IWTP Chesapeake Bay nutrient monitoring data for the 2020 compliance year revealed the following violation of Part A.1.A of your NPDES Permit No. PA0044741:

| Parameter | | Reported Value | Permit Limit |
|---|---|---|---|
| Total Nitrogen | Total Annual Load | >32,539 lbs. | 26,385 lbs. |
| Total Phosphorous | Total Annual Load | >1,936 lbs. | 979 lbs. |

The Department requests that Hanover Foods Corporation submit, for Department review and comment, a report prepared by a Pennsylvania Professional Engineer summarizing the cause of these violations and the condition and operability of the Hanover Foods Corporation IWTP. The report shall include all corrective steps necessary for the IWTP to comply with all terms and conditions of NPDES Permit No. PA0044741 and a schedule that provides for implementation of

Complaint Exhibit 1

the necessary steps and actions. **Please submit the requested report within sixty (60) calendar days of the date of this correspondence.**

We remind you that a discharge of industrial waste contrary to conditions of your permit constitutes a violation of Sections 301 and 307 of The Clean Streams Law, 35 P.S. §§ 691.301 and 691.307. Sections 602 and 605 of The Clean Streams Law, 35 P.S. §§ 691.602 and 691.605, establish criminal and civil penalty provisions respectively, with civil penalties ranging up to $10,000 per violation.

You have an obligation to operate and maintain your treatment facilities in accordance with the requirements set forth in your permit. Recognizing your on-going permit obligations as well as the liability for any accrued penalties, you are advised to promptly initiate corrective measures.

This Notice of Violation is neither an order nor any other final action of the Department. It neither imposes nor waives any enforcement action available to the Department under any of its statutes. If the Department determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at 717.705.4775 or eammon@pa.gov .

Sincerely,

Erick M. Ammon
Environmental Protection Compliance Specialist
Clean Water Program

Cc: Mr. Kumar Navile, Hanover Foods (electronic cc, knavile@hanoverfoods.com)

Complaint Exhibit 1

Monthly eDMR violations submitted for July through November 2020.

| DMR Month | Parameter | | DMR Value | Permit Limit |
|-----------|-----------|---|-----------|--------------|
| July-20 | Ammonia-Nitrogen | Average Monthly | 3.6 mg/L | 1 mg/L |
| July-20 | Ammonia-Nitrogen | Daily Maximum | 10.2 mg/L | 2 mg/L |
| July-20 | Ammonia-Nitrogen | Average Monthly | 25 lbs/day | 7 lbs/day |
| July-20 | Ammonia-Nitrogen | Daily Maximum | 67 lbs/day | 14 |
| July-20 | CBOD5 | Average Monthly | 20.3 mg/L | 10 mg/L |
| July-20 | CBOD5 | Daily Maximum | 48.2 mg/L | 15 mg/L |
| July-20 | CBOD5 | Average Monthly | 170 lbs/day | 70 lbs/day |
| July-20 | CBOD5 | Daily Maximum | 461 lbs/day | 105 lbs/day |
| July-20 | TSS | Average Monthly | 37 mg/L | 30 mg/L |
| July-20 | TSS | Average Monthly | 310 lbs/day | 210 lbs/day |
| July-20 | TSS | Daily Maximum | 506 lbs/day | 420 lbs/day |
| August-20 | Ammonia-Nitrogen | Average Monthly | < 1.821 mg/L | 1 mg/L |
| August-20 | Ammonia-Nitrogen | Daily Maximum | 3.81 mg/L | 2 mg/L |
| August-20 | Ammonia-Nitrogen | Average Monthly | 15 lbs/day | 7 lbs/day |
| August-20 | Ammonia-Nitrogen | Daily Maximum | 35 lbs/day | 14 lbs/day |
| August-20 | CBOD5 | Daily Maximum | 49 mg/L | 15 mg/L |
| August-20 | CBOD5 | Average Monthly | 215 lbs/day | 70 lbs/day |
| August-20 | CBOD5 | Daily Maximum | 522 lbs/day | 105 lbs/day |
| August-20 | CBOD5 | Average Monthly | 24.3 mg/L | 10 mg/L |
| August-20 | TSS | Daily Maximum | 448 lbs/day | 420 lbs/day |
| September-20 | Ammonia-Nitrogen | Average Monthly | < 1.92 mg/L | 1 mg/L |
| September-20 | Ammonia-Nitrogen | Daily Maximum | 4.06 mg/L | 2 mg/L |
| September-20 | Ammonia-Nitrogen | Average Monthly | < 23.0 lbs/day | 7 lbs/day |
| September-20 | Ammonia-Nitrogen | Daily Maximum | 53 lbs/day | 14 lbs/day |
| September-20 | CBOD5 | Average Monthly | 74 lbs/day | 70 lbs/day |
| September-20 | CBOD5 | Daily Maximum | 135 lbs/day | 105 lbs/day |
| October-20 | CBOD5 | Average Monthly | 35.8 mg/L | 10 mg/L |
| October-20 | CBOD5 | Daily Maximum | 135 mg/L | 15 mg/L |
| October-20 | CBOD5 | Average Monthly | 405 lbs/day | 70 lbs/day |
| October-20 | CBOD5 | Daily Maximum | 1634 lbs/day | 105 lbs/day |
| October-20 | Fecal Coliform | IMAX | 26300 CFU/100 ml | 10000 CFU/100 ml |
| October-20 | Temperature | Daily Maximum | 85ºF | 76ºF |
| October-20 | TSS | Average Monthly | 78 mg/L | 30 mg/L |
| October-20 | TSS | Daily Maximum | 174 mg/L | 60 mg/L |
| October-20 | TSS | Average Monthly | 861 lbs/day | 210 lbs/day |
| October-20 | TSS | Daily Maximum | 2106 lbs/day | 420 lbs/day |
| November-20 | CBOD5 | Average Monthly | 18.5 mg/L | 18 mg/L |
| November-20 | CBOD5 | Daily Maximum | 52.6 mg/L | 27 mg/L |
| November-20 | CBOD5 | Average Monthly | 138 lbs/day | 126 lbs/day |
| November-20 | CBOD5 | Daily Maximum | 310 lbs/day | 189 lbs/day |
| November-20 | Dissolved Oxygen | Minimum | 4 mg/L | 5 mg/L |
| November-20 | Temperature | Daily Maximum | 84ºF | 69ºF |
| November-20 | Temperature | Daily Maximum | 86ºF | 59ºF |
| November-20 | TSS | Average Monthly | 46 mg/L | 30 mg/L |
| November-20 | TSS | Daily Maximum | 80 mg/L | 60 mg/L |
| November-20 | TSS | Average Monthly | 348 lbs/day | 210 lbs/day |
| November-20 | TSS | Daily Maximum | 759 lbs/day | 420 lbs/day |

Complaint Exhibit 1

# ATTACHMENT J

3800-FM-BPNPSM0168A  9/2012



**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

# NPDES COMPLIANCE INSPECTION REPORT

*Complaint Exhibit 1*

| NPDES Permit No. | Mo/Day/Yr | Entry Time | Exit Time | Inspection Type | eFACTS Inspection ID |
|---|---|---|---|---|---|
| PA0044741 | 1/28/2021 | | | CBAY | 3145393 |

| Facility Name: Hanover Foods Corporation | Permittee Name: Hanover Foods Corporation |
|---|---|

| Physical Location/Directions: PO Box 334, 1550 York St., Hanover, PA 17331-0334 | Permit Expiration Date: |
|---|---|

| Municipality: Penn Township | County: York | Permit Renewal Application Due: |
|---|---|---|

Facility Type: ☐ Sewage  ■ Industrial Waste  ■ Industrial Stormwater  ☐ Other:
☐ Major  ☐ Minor

| Responsible Person: Kumar Navile | Certified Operator Required: ☐ Yes ☐ No |
|---|---|
| | Certified Operator in Responsible Charge: |
| Title: Manager of Environmental Affairs and Sustainability | |
| Permittee Address: PO Box 334, 1486 York St., Hanover, PA 17331-0334 | Client ID:<br>Class-Subclass(es):<br>Circuit Rider: ☐ Yes ☐ No |
| Business Phone: 717-632-6000<br>Fax:<br>Email: knavile@hanoverfoods.com | Business Phone:<br>Cell:<br>Email: |

24-Hour Emergency Contact Person / Phone: Kumar Navile/717-632-6000

| **VIOLATIONS:** (list below) | ☐ Yes  ■ No  ☐ Pending Sample Results |
|---|---|

*Violations will remain in PADEP eDMR/GreenPort systems and EPA ICIS until HFC revises the 2020 CBAY annual report to indicate the Net annual loading (after credits/offsets are applied) rather than the Total (gross) annual loadings for TN & TP.

| Person Interviewed: Kumar Navile | Date: 1/28/2021 | Inspector: Brandon Bettinger | Date: 2/9/2021 |
|---|---|---|---|
| Signature: Sent electronically | Phone No.: 717-632-6000 | Inspector Signature: *Brandon Bettinger* | Phone No.: 717-503-7551 |
| Title: Manager of Environmental Affairs and Sustainability | | Title: Water Quality Specialist | |
| Email: knavile@hanoverfoods.com | | Email: bbettinger@pa.gov | |

This document is official notification that a representative of the Department of Environmental Protection inspected the above facility. The findings of this inspection are shown above and on any attached pages. Any violations which were noted during the inspection are indicated. Violations may also be discovered upon examination of the results of laboratory analyses of the discharge and review of Department records.

Page 1 of 2          Date: 1/28/2021          Permit No.: PA0044741

☐ White – Regional Office          ☐ Yellow – Responsible Person          ☐ Pink - Inspector

3800-FM-BPNPSM0168B   9/2012


**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**BUREAU OF POINT AND NON-POINT SOURCE MANAGEMENT**

Complaint Exhibit 1

## NPDES COMPLIANCE INSPECTION REPORT

| Comments |
|---|
| An Administrative Review of Hanover Foods Corporation Chesapeake Bay nutrient monitoring, for the compliance year 2019-2020, was conducted. |
| |
| The facility used the Chesapeake Bay Supplemental Report of Annual Nutrient Monitoring version 2.2 which was submitted on 11-20-2020. |
| |
| Permit No. PA0044741 requires sampling for Total Phosphorus (TP), Nitrite-Nitrate, (NO2+NO3), Ammonia-Nitrogen (NH3), and Total Kjeldahl Nitrogen (TKN) twice per week. A review of the Discharge Monitoring Reports (DMR) for water year 2019-2020 documents that the facility conducted sampling as required by the permit. |
| |
| The facility's TP annual total mass load of <1936 pounds exceeded their permit TP cap load limit of 979 pounds. The facility was brought into compliance by purchasing 959 pounds of Phosphorus with 418 nutrient credits using Registration ID No. 1269. DEP approval date was 11-20-2020. |
| |
| The facility's TN annual total mass load of <32539 pounds exceeded their permit TN cap load limit of 26385 pounds. The facility was brought into compliance by purchasing 6154 pounds of Nitrogen with 5914 nutrient credits using Registration ID No. 1269. DEP approval date was 11-20-2020. |
| |
| Hanover Foods Corporation tracked their nutrient credit purchases on the Annual Nutrient Budget form within the Annual Chesapeake Bay Nutrient Monitoring spreadsheet. The facility did not complete the required nutrient tracking supplemental forms or include the Net Loadings (after nutrient credits were applied) on their eDMR submissions. |
| |
| A review of three months of laboratory results from LABs, Inc. and eDMR documentation was completed with no discrepancies. However, the facility was missing flow data and daily grab sample results for the following dates: 7/3, 7/4, 7/26, 8/2, 8/9, 8/30, 9/7, 9/13, 9/20, 9/27. |
| |
| |
| Recommendations: |
| Recommend completing and submitting the required nutrient tracking supplemental forms within 30 calendar days upon receipt of this report. |
| |
| |
| |
| |
| |

Page 2 of 2                    Date: 1/28/2021                    Permit No.: PA0044741

☐ White – Regional Office          ☐ Yellow – Responsible Person          ☐ Pink - Inspector

Complaint Exhibit 1

# ATTACHMENT K

Complaint Exhibit 1

# NPDES COMPLIANCE INSPECTION REPORT

| NPDES Permit No. | Mo/Day/Yr | Entry Time | Exit Time | Inspection Type | eFACTS Inspection ID |
|---|---|---|---|---|---|
| PA0044741 | 02/04/2021 | 09:00 | 14:00 | RTNC | 3146038 |

| Facility Name: Hanover Foods Corporation | Permittee Name: Mr. Donald Herr |
|---|---|

| Physical Location/Directions: 1486 York Street. Hanover, PA 17331 | | Permit Expiration Date: September 30, 2020 |
|---|---|---|
| Municipality: Penn Township | County York | Permit Renewal Application Due: In renewal |

Facility Type:  ☐ Sewage  ☒ Industrial Waste  ☒ Industrial Stormwater  ☐ Other:
☐ Major  ☒ Minor

| Responsible Person: Mr. David Still | Certified Operator Required: ☐ Yes ☒ No |
|---|---|
| Title: Plant Manager / VP of Operations | Certified Operator in Responsible Charge: Eric Eckersly (IWTP Operator) |
| Permittee Address:  1486 York Street, P.O. Box 334, Hanover, PA 17331 | Client ID: Class-Subclass(es): Circuit Rider: ☐ Yes ☐ No |
| Business Phone: 717.632.6000 Fax: E mail: dstill@hanoverfoods.com | Business Phone: 717.632.6000 x 1214 Fax: Email: eeckersly@hanoverfoods.com |

24-Hour Emergency Contact Person / Phone: Kumar Navile, Manager - Envt'l Affairs & Sustainability, (O) 717.633.3957

| **VIOLATIONS:** (list below) | ☒ Yes  ☐ No  ☐ Pending Sample Results |
|---|---|

Discharge of turbid and inadequately treated IWTP effluent to Oil Creek resulting in growth/accumulation of sphaerotilus-type bacterial colonies on stream substrate at IWPT outfall DP001, and in areas downstream of outfall DP001, is a violation of Sections 301 and 307 of the Clean Streams Law, 35 P.S. §§ 691.301 and 691.307 and your NPDES Permit.

Short circuiting, rising sludge, and solids discharge from IWTP clarifiers #3 & #4 are a violation of Part B.I.D of your NPDES Permit No. PA0044741. Failure to properly operate and maintain all facilities which are installed or used by the permittee to achieve compliance

| Person Interviewed: Mr. Kumar Navile | Date: 2/4/2021 | Inspector: Erick M Ammon | Date: 2/4/2021 |
|---|---|---|---|
| Signature: | Phone No.: 717.633.3957 | Inspector Signature: | Phone No.: 717.705.4775 |
| Title: Manager-Environmental Affairs & Sustainability | | Title: Environmental Protection Compliance Specialist | |
| Email: knavile@hanoverfoods.com | | Email: eammon@pa.gov | |

This document is official notification that a representative of the Department of Environmental Protection inspected the above facility.  The findings of this inspection are shown above and on any attached pages.  Any violations which were noted during the inspection are indicated.  Violations may also be discovered upon examination of the results of laboratory analyses of the discharge and review of Department records.

☐ White – Regional Office     ☐ Yellow – Responsible Person     ☐ Pink – Inspector

# NPDES COMPLIANCE INSPECTION REPORT

| Comments |
| --- |

Inspection of Hanover Foods Industrial Wastewater Treatment Plant (IWTP) today with EPA and JG Environmental (EPA contractor). Onsite with Mr. Jake Albright (JG Environmental), Ms. Amanda Pruzinsky and Shawn McAleer (US EPA Region 3, Water Branch, Enforcement and Compliance Division). Met onsite by Mr. Kumar Navile and Mr. David Still (Hanover Foods facility staff).

Opening conference and discussion of EPA's facility inspection targets and document review.

During the opening conference, Mr. Navile and Mr. Still provided a summary of the current operational challenges at the facility due to changes in product sales (more retail, less commercial) during the COVID-19 pandemic. During "normal operations" the facility is in production for 5 days per week and the increased retail sales has resulted in the facility in production 7 days a week to meet demand. As a result, the facility is currently producing more process wastewater and NCCW when compared to "normal" operation. This increase in the quantity of process wastewater and NCCW has created operational challenges at the IWTP that complies with the final effluent limits set in the NPDES Permit.

Toured IWTP with Mr. Navile and Mr. Eric Eckersly (IWTP Operator) and noted operation and maintenance concerns:

1) Non-Contact Cooling Water (NCCW) flow metering pit was flooded. I noted the accumulation of a fats/oils/grease rim within the manway lid for the pit and above the current level of the water in the pit. This is an indication that level of the water in the pit fluctuates and may overflow to the surface of the ground. No active overflow from the put but the snow in the area of the metering vault was melted.

2) The #1 Digester and #1 & #2 Clarifiers (old treatment units) were offline. Mr. Still noted that staff are determining the capital investment projects required to rehab/repair the #1 digester and bring it back into operation. The facility attempted to bring the #1 Digester online to provide treatment during the current period of higher production and increased wastewater flows, but the treatment unit was inefficient and resulted in elevated ammonia in the wastewater. The mechanical components of #1 Digester can be placed into service but the fixed-film biota has been underloaded since the all IWTP influent flow was routed to #2 Digester and #1 Digester was placed into an internal-recycle phase (2019?).

3) Facility staff noted that current operating parameters of the #2 Digester (Hydraulic retention time and operating temperatures) were sub-optimal and may be outside the design specifications of the treatment unit. Several small cracks were observed in the outer coating on Digester #2

4) Solids bulking and carryover in IWTP clarifiers 3 & 4 (new construction) to Lagoon #1. Facility staff noted current operational challenges and solids carryover is due to inability to equally load Clarifiers #3 & #4 from Digester #2 and/or waste solids. Supplemental wasting hoses have been used to remove more solids from #3 Clarifier.

5) Facultative Lagoon #1 (process wastewater) flows to Lagoon #2 are not currently monitored for quality or quantity. The flows from Lagoon #1 to #2 represent the balance of process wastewater flows that are not sent to Penn Township for treatment. The facility may determine that flows from Lagoon #1 to Lagoon #2 after calculation (IWTP influent flows minus Penn Twp. industrial pretreatment flows) but this is not reported in the monthly Discharge Monitoring Reports (DMRs).

6) UV disinfection treatment unit general alarm indicator light was active. Several indicator lights on the operational bank of bulbs (1 of 7) were active. Dose indicated at time of inspection appeared to be ~2 $\mu$w/cm2/s.

7) Facility was collecting 24-hour effluent composite sample at time of inspection. Brown colored suspended solids were observed in the sampler intake tubing and within the refrigerated sampler dewar/collection bottle.

8) Discharge from facultative Lagoon #2, polishing ponds, and IWTP outfall DP002 appeared turbid with brown tint and visible suspended solids. The discharge from IWTP outfall DP001 created a visible difference in water quality in Oil Creek to area approximately 20 meters downstream. A dusting of brown colored solids and accumulations of sphaerotilus-type bacterial colonies were observed on the stream substrate at IWTP outfall DP001 and were visible in stream to approximately 10-20 meters downstream. Stream substrate upstream from IWTP outfall DP001 appeared clean and free of solids or sphaerotilus-type bacterial colonies.

During the closing conference PADEP discussed its concerns regarding the IWTP effluent quality and solids/bacterial accumulations in Oil Creek with Mr. Still and Mr. Navile.

Page 2 of 5                    Date: 2/4/2021                    Permit No.: PA0044741

☐ White – Regional Office          ☐ Yellow – Responsible Person          ☐ Pink – Inspector

Complaint Exhibit 1

| Photos |
| --- |



Photo by Erick M Ammon. Photograph (1/6) of turbid, brown colored, effluent discharge from Hanover Foods Corporation IWTP outfall DP001 to Oil Creek.



Photo by Erick M Ammon. Photograph (2/6) of turbid flow in Oil Creek at Hanover Foods Corporation IWTP outfall DP001. IWTP outfall DP001 at left-center of photo. Note sphaerotilus-type bacterial colonies at bottom of photo.

Complaint Exhibit 1

| Photos |
| --- |



Photo by Erick M Ammon. Photograph (3/6) of sphaerotilus-type bacterial colonies and accumulation of brown-colored solids on stream substrate in Oil Creek. Picture taken approximately 3 meters downstream from IWTP outfall



Photo by Erick M Ammon. Photograph (4/6) looking downstream from photograph 3/6. Turbid stream flow and solids accumulation on stream substrate observed.

Complaint Exhibit 1

| Photos |
| --- |



Photo by Erick M Ammon. Photograph (5/6) shows turbid flow in Oil Creek downstream from Hanover Foods Corporation IWTP outfall 001 discharge. Photo collected approximately 10 meters downstream from outfall location.



Photo by Erick M Ammon. Photograph (6/6) looking upstream from Hanover Foods Corporation IWTP outfall 001 to Oil Creek. Flow in Oil Creek upstream of IWTP outfall 001 appeared clear with no observed solids accumulations.

Complaint Exhibit 1

# ATTACHMENT L

Complaint Exhibit 1

# PENN TOWNSHIP WASTEWATER TREATMENT PLANT
# INDUSTRIAL WASTEWATER DISCHARGE PERMIT
# PERMIT NO. **2021-4**

## ISSUED TO: **HANOVER FOODS CORPORATION**

Pursuant to 40CFR Part 403.3 (t) (1) (ii) the above mentioned Industry is considered a Significant Industrial User.

Effluent limitations and monitoring requirements for discharge.

    A.  During the Period beginning 01-01-2021 and lasting through 12-31-2025 the permittee is authorized to discharge industrial wastewater from the facility as identified in this permit.

The following limitations and monitoring requirements as outlined in this permit shall apply to said industrial wastewater discharge.

The quality of effluent shall be limited at all times as specified in this permit and shall conform to all wastewater discharge limitations as set forth in the Ordinances adopted by Penn Township pertaining to any use of the wastewater system.

Hanover Foods Corporation

MONITORING SCHEDULE          Complaint Exhibit 1

Laboratory analysis shall be performed on the following parameters and monitored as described below:

| PARAMETER | FREQUENCY | SAMPLE TYPE |
|---|---|---|
| BOD | 1/Week | 24/C |
| TSS | 1/Week | 24/C |
| Ammonia Nitrogen | 1/Week | 24/C |
| Phosphorus | 1/Week | 24/C |
| pH | 1/Week | Grab |
| Oil and Grease | 2/Annually | Grab |
| Copper | 2/Annually | 24/C |
| Lead | 2/Annually | 24/C |
| Mercury | 2/Annually | 24/C |
| Silver | 2/Annually | 24/C |
| Zinc | 2/Annually | 24/C |

All samples collection containers, preservation techniques, holding times and test procedures shall be in accordance with 40CFR Part 136.

Samples shall be collected at the sampling location as designated on the flow schematic and identified as sample location #001. Samples shall be stored in a refrigerated automatic sampling device unless otherwise approved by the Township. All sampling equipment shall be cleaned and maintained on a routine schedule by the Permittee to the reasonable satisfaction of the Township. Path to sampler and sampler shall be kept clear at all times to insure safe access and efficient operation. The sample device and location shall be approved by the Township.

Sampling shall be conducted by the Township in lieu of Industrial User self monitoring but shall be at the expense of the Industrial User.

For each measurement or sample taken pursuant to the requirements of this permit, the Permittee shall record the following information:

1)      The exact place, date, time of sampling and whom took the sample.

2)      The dates the analyses were performed.

3)      The person(s) who performed the analyses.

4)      The analytical techniques or methods used.

5)      The results of all analyses.

6)      Daily flow for period sampled.

Complaint Exhibit 1

Analysis shall be performed by an independent commercial laboratory.  The results of **ANY** samples collected at the designated sampling location and analyzed in accordance with 40CFR part 136 shall be forwarded by the laboratory performing the analysis to the Township **WITHIN 3 WEEKS** of the sampling date.

Discharge Monitoring Reports must be sent to the Township at the following address:

> Penn Township
> 20 Wayne Avenue
> Hanover, PA  17331

If sampling performed by an Industrial User indicates a violation, the user shall notify the POTW within 24 hours of becoming aware of the violation, and repeat the sampling and analysis and submit the results within 30 days after becoming aware of the violation. [403.12(g)(2)]

All Industrial user reports must be signed by a proper industrial representative and contain the certification statement found in 40 CFR part 403.6(a)(2)(ii)[403.12(1)]

All Industrial Users shall as required by 40 CFR 403.12(j) notify the POTW in advance of any substantial change in the volume or character of pollutants in the discharge. "Substantial" refers to  +/- 20 percent. All Industrial Users shall notify the POTW as required in 40 CFR part 403.12(p) if it discharges into the POTW a substance which, if otherwise disposed of, would be a hazardous waste under 40 CFR part 261. All Industrial Users are also required per 40CFR 403.12(f) to notify the POTW immediately of all discharges that could cause problems to the POTW, including slug loading by the Industrial User.

All sampling data reported by the Industrial User must be representative of conditions occurring during the reporting period. [403.12(g)(3)]

The Township reserves the right to adjust the frequency of monitoring or to require additional testing of the industrial discharge, if unreported violations are suspected, or for the screening of suspect pollutants.

The Township can perform random sampling and analysis of the Industrial Users waste discharge to compare to the analysis submitted to the Township by the discharger.  The Township shall use the average of the analysis, if possible to calculate a surcharge, whereas if there is a difference of 15% plus or minus in the analysis, the highest result will be used in the calculation.

Permittee may be required to install and keep operational a metering device to measure the effluent flow on a twenty-four hour basis, the meter shall incorporate a chart recorder.  Such a device shall be placed in a location as to monitor the flow from the wastewater treatment facility.  The flow meter shall be calibrated on a 6 month basis with verification of accuracy provided by the calibrator with a copy sent to the Township.  Permittee shall insure that during all sampling the flow is recorded at the time of sampling and during the entire sampling period.

Permittee will make available to Penn Township the following items: (If not already provided)

A. An updated sketch of the location of all wastewater effluent lines that flow into the publicly owned sewer system.

Complaint Exhibit 1

B. A detailed description and appropriate sketches of pretreatment facilities, including operating data.  The sketch, of which will become a permanent part of this permit, shall show the sampling point.

C. An access key to the sampler and area where the sampler is located unless area and sampler will be accessible on a twenty-four hour basis.

Permittee will submit to Penn Township, in the form of a Semi-Annual report the following information structured in a spreadsheet format.

A. The results of every sample taken and analyzed at the designated sampling location for all parameters during the report period.  The minimum, maximum and average values of all parameters. Daily average flow and total flow (gallons) discharged to the Township WWTP

B. Number of production days if applicable.

C. Any intentional or unintentional discharge violations occurring during the calendar year.

D. A brief description of any planned operational changes that may affect the industrial discharge characteristics.

This report must be submitted to the Township no later than July 15th and January 15th of each year.  The last report of the year ending must include a compilation of the previous (6) months of that year.

## EMERGENCY NOTIFICATION AND REPORTS

In the case of a spill or slug discharge, or any discharge that may cause potential problems for the POTW, it is the responsibility of the user to immediately telephone and notify the Pretreatment Coordinator of the incident.  The notification shall include location of discharge, type of waste, concentration and volume, and corrective actions taken by the user.

Within five (5) days following such discharge, the user shall, unless waived by the Pretreatment Coordinator, submit a detailed written report describing the cause of the discharge and the measures to be taken by the user to mitigate and prevent any expense, loss, damage, or other liability which may be incurred as a result of damage to the POTW or aquatic life or any other damages to person or property.  Such report shall not relieve the user of any fines, civil penalties, or other liability which may be

4

imposed by this article or other applicable law.  This written report shall be signed by an authorized representative of the user.                    Complaint Exhibit 1

A notice shall be permanently posted on the user's bulletin board or other prominent place advising employees whom to call in the event of a dangerous discharge.  Employers shall insure that all employees who may cause such a dangerous discharge to occur, are advised of the emergency notification procedures.

## SPILLS & SLUG LOADINGS CONTROL PLAN

At least once every two (2) years, all significant industrial users are required to evaluate the need to develop a Spill and Slug Discharge Control Plan and submit the evaluation in writing to the Township. The Pretreatment Coordinator will determine whether the IU will be required to develop a spill and slug loading control plan.  In addition, any user may be required to develop a plan.  A plan must address the facilities to be provided and maintained at the user's expense to prevent spills or slug discharges of prohibited materials.  Detailed plans showing these facilities and operating procedures to provide this protection shall be submitted to the Pretreatment Coordinator for review and approval by the Township before construction may begin.  A spill and slug loading control plan shall address, at a minimum, the following:

    A.  Description of discharge practices, including nonroutine batch discharges;

    B.  Description of stored chemicals;

    C.  Procedures for immediately notifying the Township of any spill or slug discharge, as required by Section 4.6.8 of the Townships Pretreatment ordinance.

    D.  Procedures to prevent adverse impact from any spill or slug discharge.  Such procedures include, but are not limited to, inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site runoff, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants, and/or measures and equipment for emergency response.

**Treatment Upsets**

For the purposes of this Section, "upset" means an exceptional incident in which there is unintentional and temporary noncompliance with Categorical Standards because of factors beyond the reasonable control of the user. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

An upset shall constitute an affirmative defense to an action brought for noncompliance with Categorical Standards if the requirements below are met. A user who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

a. An upset occurred and the user can identify the cause(s) of the upset; Complaint Exhibit 1

b. The facility was at the time being operated in a prudent and professional manner and in compliance with applicable operation and maintenance procedures;

c. The user has submitted the following information to the Pretreatment Coordinator within 24 hours of becoming aware of the upset (if this information is provided orally, a written submission must be provided within five (5) days.

   1. A description of the indirect discharge and cause of noncompliance;

   2. The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and

   3. Steps being taken and/or planned to reduce, eliminate and prevent recurrence of the noncompliance.

In any enforcement proceeding, the user seeking to establish the occurrence of an upset shall have the burden of proof. A user will have the opportunity for a judicial determination on any claim of upset only in an enforcement action brought for noncompliance with Categorical Standards.

The user shall control production of all discharges to the extent necessary to maintain compliance with Categorical Standards upon reduction, loss or failure of its treatment facility until the facility is restored or an alternative method of treatment is provided. This requirement applies in the situation where, among other things, the primary source of power of the treatment facility is reduced, lost or fails.

## 7.2    Treatment Bypasses

Bypass means the intentional diversion of waste streams from any portion of an industrial user's treatment facility.

A user may allow a bypass to occur which does not cause pretreatment standards or requirements to be violated, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the conditions contained in this section.

If a user knows in advance of the need for a bypass, it shall submit prior notice to the pretreatment coordinator, if possible at least ten days before the date of the bypass.

A user shall submit oral notice of an unanticipated bypass that exceeds applicable pretreatment standards to the PC within 24 hours from the time the industrial user becomes aware of the bypass. A written submission shall also be provided within 5 days of the time the industrial user becomes aware of the bypass. The written submission shall contain a description of the bypass and its cause; the duration of the bypass, including exact dates and times, and, if the bypass has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass. The Township may waive the written report on a case-by-case basis if the oral report has been received within 24 hours.

Bypass is prohibited, and the Township may take enforcement action against a user, unless all of the following conditions are met:

6

a. The bypass is unavoidable to prevent loss of life, personal injury, or severe property damage, which is defined as substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production;

b. There is no feasible alternative to the bypass, including the use of auxiliary treatment or retention of the wastewater, or maintenance during normal periods of equipment downtime;

This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance; and

c. The user properly notifies the Pretreatment Coordinator as described in this section.

The Township may approve an anticipated bypass, after considering its adverse effects, if the Township determines that it will meet the three conditions listed above.

## MANAGEMENT REQUIREMENTS

A. Change in Discharge

All discharges authorized herein shall be consistent with terms and conditions of this permit. The discharge of any pollutant more frequently than, or at a level in excess of, that identified and authorized by this permit shall constitute a violation of the terms and conditions of this permit. Such a violation shall result in the imposition of penalties as provided for in the Township Ordinances and the Penn Township Code. Facility changes that increase the discharge must be reported to the Township 45 days prior to change, and this permit then will be modified or re-issued to reflect such changes. Any anticipated change in the facility discharge must be reported to the permitting authority.

B. Permit Modification

After notice and opportunity of a hearing, this permit may be modified, suspended, or revoked in whole or in part during its term for causes including, but not limited to, the following:

1) Violation of any terms or conditions of this permit.

2) Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts.

3) A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

4) Information newly-acquired by Penn Township.

5) A change in applicable water quality standards or treatment requirements.

Complaint Exhibit 1

6) Any changes in State or Federal regulations or changes in the treatment process that require either a temporary or permanent reduction or elimination of the permitted discharge.

C.  Right of Entry

The Permittee shall allow the Township and/or its authorized representatives, upon the presentation of credentials:

1) To enter upon the Permittee's premises where an effluent source is located or in which any records are required to be kept under the terms and conditions of this permit.

2) To have access to and copy at reasonable times any records required to be kept under the terms and conditions of this permit.

3) To inspect at reasonable times any monitoring equipment or monitoring method required in this permit.

4) To sample any discharge of pollutants.

D.  Property Rights

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property, invasion of personal rights, or any infringement of Federal, State, or local laws or regulations, nor does it authorize or approve the construction of any on-shore or off-shore physical structures or facilities or the undertaking of any work in any navigable waters.

E.  Availability of Reports

Except for data determined to be confidential, all required reports shall be available for public inspection at the Penn Township Wastewater Treatment Facility.

F.  Facility Operation and Quality Control

All waste collection, control, treatment and disposal facilities shall be operated in a manner consistent with the following:

1) At all times, all facilities shall be operated as efficiently as possible in a manner which will minimize upsets and discharges of excessive pollutants.

2) The Permittee shall provide an adequate operating staff which is fully qualified to carry out the operation, maintenance and testing functions required to insure compliance with the conditions of this permit.

3) Permittee shall notify Penn Township immediately of any planned or unplanned discharge of waste of a strength or character unusual for the Permittee or in violation of the permit.

G. Civil and Criminal Liability

   Nothing in this permit shall be construed to relieve the Permittee from civil or criminal penalties for non-compliance.

**Administrative Fines**

Any Industrial User who is found to have violated, or continues to violate, any pretreatment standard or requirement, any provision, and the orders, rules, regulations, and permits issued hereunder, may be fined by the Pretreatment Coordinator an amount not to exceed Twenty-Five Thousand Dollars ($25,000.00) for each violation. Each day on which a violation shall occur or continue shall be deemed a separate and distinct offense. In the case of monthly or other long term average discharge limit violations, fines shall be assessed for each day during the period of violation.

**Civil Penalties**

Any Industrial User who has violated or continues to violate the orders, rules, regulations, and permits issued hereunder, shall be liable to the Township for a civil penalty of not more than Twenty-Five Thousand Dollars ($25,000.00) plus actual damages incurred by the Township per violation per day as the violation continues. In the case of a monthly or other long term average discharge limit, penalties shall accrue for each day during the period of the violation.

**Criminal Penalties**

In addition to any other remedies for non-compliance set forth by Township ordinance, or under any federal or state law or regulation, the Township shall have the right to institute criminal prosecution for violation of any provision of this permit. Procedures to be filed and penalties imposed as a result of such criminal proceedings shall be as permitted or required by law for the violation of Township ordinance generally, and penalties imposed as a result of conviction of violation of this permit shall be those penalties provided in the Code of Penn Township, providing for a fine of $1,000.00 or, upon default of payment of such fine, imprisonment for not more than thirty (30) days.

H. Solids Disposal

   Collected screenings, slurries, sludges, and other solids shall be disposed of in accordance with local, State and Federal law.

I. Permit Transfer

   Wastewater discharge permits are issued to a specific user for a specific operation. A wastewater discharge permit shall not be reassigned, transferred or sold to a new owner, new user, different premises, or a new or changed operation without written approval of the Pretreatment Coordinator.

The Permittee must give at least (30) days advance notice to the Pretreatment Coordinator. The notice to the Pretreatment Coordinator must include a written notarized certification by the new owner or operator which:

1) States that the new owner and/or operator has no immediate intent to change the facility's operations or processes;

2) Identifies the specific date on which the transfer is to occur; and acknowledges full responsibility for complying with the existing permit.

Failure to provide advance notice of a transfer renders the wastewater discharge permit void as of the date of the facility transfer.

J.  Severability

The provisions of the permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, and the remainder of this permit, shall not be affected thereby.

This permit does not relieve the Permittee of any limits or requirements of local, State or Federal Law.  Where such law may impose more stringent requirements or additional requirements then these shall be part of the permit whether stated or not.

K.  Records Retention

All records and information resulting from the monitoring activities required by this permit, including all records and analyses performed and calibration and maintenance of instrumentation and recordings from continuous monitoring instrumentation, shall be retained on site for a minimum of three (3) years.

<u>DEFINITIONS</u>                    Complaint Exhibit 1

1) <u>Average Monthly Flow</u> - The arithmetic mean of daily flow measurements taken during a calendar month.

2) <u>"Monthly Average"</u>  - effluent concentration means the arithmetic average of all the daily determinations of concentration made during a calendar month.  When grab samples are used, the determination of the concentration shall be the arithmetic average of all the samples collected during that calendar month.

3) <u>"Weekly Average"</u> - effluent concentration means the arithmetic average of all the daily determinations of concentration made during a calendar week.  When grab samples are used, the weekly determination of concentration shall be the arithmetic average of all samples collected during that calendar week.

4) <u>"Instantaneous Maximum"</u> - concentration means the concentration not to be exceeded at any time in grab sample.

5) <u>"Grab Sample"</u> - An individual sample collected in less than 15 minutes.

6) <u>"Daily Maximum Limitations"</u>  - The maximum allowable discharge of pollutants during a 24 hour period.  Where daily maximum limitations are expressed in units of mass, the daily discharge is the total mass discharged over the course of the day.  Where daily maximum limitations are expressed in terms of a concentration, the daily discharge is the arithmetic average measurement of the pollutant concentration derived from all measurements taken that day.

Complaint Exhibit 1

Pollutants included in TTO'S

acenaphthene
acrolein
acrylonitrile
benzene
benzidine
carbon tetrachloride
chlorobenzene
1,2,4-trichlorobenzene
hexachlorobenzene
1,2-dichloroethane
1,1,1-trichloroethane
hexachloroethane
1,1-dichloroethane
1,1,2-trichloroethane
1,1,2,2-tetrachloroethane
chloroethane
bis (2-chloroethyl) ether
2-chloroethyl vinyl ether (mixed)
2-chloronaphthalene
2,4,6-trichlorophenol
parachlorometa cresol
chloroform (trichloromethane)
2-chlorophenol
1,2-dichlorobeneze
1,3-dichlorobenzene
1,4-dichlorobenzene
3,3-dichlorobenzidine
1,1-dichloroethylene
4-nitrophenol
2,4-dinitrophenol
4,6-dinitro-o-cresol
N-nitrosodimethylamine
N-nitrosodiphenylamine
N-nitrosodi-n-propylamine
pentachlorophenol
phenol

1,2-trans-dichloroethylene
2,4-dichlorophenol
1,2-dichloropropane
1,2-dichloropropylene
(1.3-dichloropropene)
2,4-dimethylphenol
2,4-dinitrotoluene
2,6-dinitrotoluene
1,2-diphenylhydrazine
ethylbenzene
fluoranthene
4-chlorophenyl phenyl ether
4-bromophenyl phenyl ether
bis(2-chlorisopropyl) ether
bis (2-chloroethoxy) methane
methylen chloride
(dichloromethane) methl chlorid
(chloromethane)
methyl bromide (bromomethane)
bromoform (tribromomethane)
dichlorobromomethane
chlorodibromomethane
hexachlorobutadiene
hexachlorovyvlopentadiene
isphorne
naphthalene
nitrobenzene
nitrophenol
vinyl chloride (chloroethylene)
aldrin
dieldrin
chlordane (technical mixture &
metabolites)
4,4'-DDT
4,4'-DDE (p,p'-DDX)
4,4'-DDE (p,p'-TDE)

Complaint Exhibit 1

bis (2-ethylhexyl) phthalate
butyl benzyl phthalate
di-n-butyl phthalate
di-n-octyl phthalate
diethyl phthalate
dimethyl phthalate
benzo (a) anthracene
(1,2-benzanthracene)
benzo (a) pyrene
(3,4-benzopyrene) 3,4-benzofluoranthene
benzo (k) fluranthane
(11,12-benzofluranthene)
chrysene
acenaphthylene
anthracene
benzo (ghi) perylene
(1,12-benzoperylene)
fluorene
phenanthrene
dibenzo (a,h) anthracene
dibenzanthracene)
indeno (1,2,3-cd) pyrene
(2,3-o-phenylenepyrene)
pyrene
tetrachloroethylene
toluene
trichloroethylene

Alpha-endosufan
Beta-endosulfan
    endosulfan sulfate
    endrin
    endrin aldehyde
    heptachlor
heptachlor epoxide
Alpha-BHC
    Beta-BHC
Gamma-BHC (lindane)
Delta-BHC
    PCB-1242 (Arochlor 1242)
    PCB-1254 (Arochlor 1254)
    PCB-1221 (Arochlor 1221)
    PCB-1232 (Arochlor 1232)
PCB-1248 (Arochlor 1248)
PCB-1260 (Arochlor 1260)
    PCB-1016 (Arochlor 1016)
toxaphene
    2,3,7,8-tetrachlorodibenzo-p-dioxin (1,2,5,6-
(TCDD)

GENERAL DISCHARGE PROHIBITIONS  Complaint Exhibit 1

No user may contribute or cause to be contributed the following substances into the POTW:

A.  Any liquids, solids, or gases which by reason of their nature or quantity are, or may be sufficient
    either alone or by interaction with other substances to cause fire or explosion, or be injurious in
    any other way to the POTW or to the operation of the POTW, including, but not limited to, waste
    streams with a closed cup flashpoint of less than 140 degrees F (60 degrees C) using the test
    methods specified in 40 CFR 261.21.  At no time shall two (2) successive readings on an
    explosion hazard meter at the point of discharge into the system (or at any point in the system) be
    more than five percent (5%), nor any single reading over ten percent (10%) of the Lower
    Explosive Limit (LEL) of the meter.

Prohibited materials include, but are not limited to: gasoline, kerosene, naphtha, benzene, toluene,
xylene, ethers, alcohols, ketones, aldehydes, peroxides, chlorates, perchlorates, bromates, carbides,
hydrides and sulfides, and any other substances which is a fire or a hazard to the system.

B.  Pollutants which may cause corrosive structural damage to the POTW.  The wastewater pH shall
    not be less than 5.0 nor more than 11.0 in the user's discharge to the POTW.

C.  Solids greater than one-half inch (1/2") in any dimension, or any solid or viscous substance
    which may cause obstruction to the flow in the POTW resulting in interference.

Prohibited materials include, but are limited to: garbage, offal, manure, ashes, cinders, spent lime, stone
or marble dust, metal, glass, straw, shavings, grass clippings, rags, spent grains and hops, waste paper,
wood, plastics, gas, tar, asphalt residues, residues from refining or processing of fuel or lubricating oil,
mud glass grinding or polishing wastes.

D.  Any pollutants, including oxygen demanding pollutants (BOD5, etc.) released at a flow rate
    and/or pollutant concentration which cause interference to the POTW.  In no case shall a
    wasteload have a flow rate or contain concentrations or qualities of pollutants that exceed for any
    time period longer than 15 minutes, more than five (5) times the average 24-hour concentration,
    quantities, or flow during normal operation, unless otherwise authorized in writing by the
    Pretreatment Coordinator.

E.  Any wastewater having a temperature which will inhibit biological activity in the Township's
    treatment plant resulting in interference, but in no case wastewater which causes the temperature
    at the introduction into the POTW to exceed 104 degrees F (40 degrees C).

F.  Petroleum oil, nonbiodegradable cutting oil, or products of mineral origin in amounts that will
    cause interference or pass through.

G.  Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a
    quality that may cause acute worker health and safety problems.

14

H. Hauled or trucked waste unless authorized by the Pretreatment Coordinator and only at designated discharge points.

Complaint Exhibit 1

I. Any noxious or malodorous liquid, gases, or solids, which either singly of by interaction with other wastes are sufficient to create a public nuisance or hazard to life, or are sufficient to prevent entry into the sewers for maintenance or repair.

J. Any wastewater which imparts color which cannot be removed by the treatment process such as, but not limited to, dye wastes and vegetable tanning solutions, which consequently impart color to the treatment plant's effluent, thereby violating the Township's NPDES Permit, color (in combination with turbidity) shall not cause the treatment plant effluent to reduce the depth of the compensation point for photosynthetic activity by more than ten percent (10%) from the seasonably established norm for aquatic life.

K. Any wastewater containing any radioactive wastes or isotopes of such half-life or concentration except in compliance with applicable State or Federal regulations.

L. Storm water, surface, ground water, artesian well water, roof runoff, subsurface drainage, swimming pool drainage, noncontact cooling water, condensate, unpolluted industrial or nonresidential process water, unless specifically authorized in writing by the Pretreatment Coordinator.

The discharge of cooling water from air conditioning units with cooling towers or recirculating systems or from air conditioning units using flow-through or unrecirculating systems is prohibited.  The sanitary sewers are not designed to handle the cooling water volumes produced by air conditioning units. Cooling water, free from bacteria and harmful chemicals should be drained into storm sewers in accordance with State and federal requirements.

M. Any residue, including biosolids, chemical sludges or screenings from the pretreatment of industrial wastes.

N. Medical wastes, except as specifically authorized by the Pretreatment Coordinator in a wastewater discharge permit.

O. Any wastewater containing pollutants in sufficient quality which, either singly or by interaction with other pollutants may create a toxic effect in the receiving waters of the POTW, cause the plant effluent to fail a toxicity test, or exceeds the limitations set forth in a National Categorical Pretreatment Standard.  A toxic pollutant shall include, but not limited to, any pollutant identified pursuant to Section 307 (a) of the Clean Water Act.

P. Detergents, surface-active agents, or other substances in sufficient quantities which causes excessive foaming in the POTW.

Q. Any substance which may cause the POTW's effluent or any other product of the POTW, such as residues, sludges, or scums, to be unsuitable for reclamation or reuse, or interfere with the reclamation process.  In no case shall a substance discharged to the POTW cause the POTW to be in noncompliance with sludge use or disposal criteria, guidelines or regulations developed under Section 405 of the Act; or any criteria, guidelines, or regulations affecting sludge use or disposal developed pursuant to the Solid Waste Disposal Act, the Clean Air Act, the Toxic Substance Control Act, or State criteria applicable to the sludge management method being used.

Complaint Exhibit 1

# HANOVER FOODS CORPORATION

## SPECIFIC

## DISCHARGE LIMITS

Complaint Exhibit 1

*O/D limits*

| Parameter | Daily Maximum Load in Pounds Per Day | |
|---|---|---|
| BOD | | 1500 |
| TSS | | 4000 |
| Ammonia Nitrogen | | 225 |
| Phosphorus | | 115 |
| Oil & Grease | | 400 |
| Copper | 1.0 | |
| Lead | | .09 |
| Mercury | | .001 |
| Silver | | .75 |
| Zinc | | 2.0 |
| pH | 5.0 – 11.0 S.U. | |

## SURCHARGE LIMITS

The following parameters shall be used to calculate a surcharge to your sewer bill if the limit exceeds those listed below.

| Parameter | Monthly Average |
|---|---|
| Biochemical Oxygen Demand (BOD) | 300 mg/L |
| Total Suspended Solids (TSS) | 300 mg/L |
| Ammonia Nitrogen (NH3) | 40 mg/L |
| Phosphorus | 13 mg/L |

The discharge of wastewater from the facility shall not exceed an average monthly flow of 450,000 gallons per day or a peak maximum daily flow of 700,000 gallons per day.

Complaint Exhibit 1 
New limits

# HANOVER FOODS CORPORATION

## SPECIFIC

## DISCHARGE LIMITS

| **Parameter** | **Daily Maximum Load in Pounds Per Day** |
|---|---|
| BOD | 2,300 |
| TSS | 4000 |
| Ammonia Nitrogen | 225 |
| Phosphorus | 115 |
| Oil & Grease | 400 |
| Copper | 1.0 |
| Lead | .09 |
| Mercury | .001 |
| Silver | .75 |
| Zinc | 2.0 |
| pH | 5.0 – 11.0 S.U. |

## SURCHARGE LIMITS

The following parameters shall be used to calculate a surcharge to your sewer bill if the limit exceeds those listed below.

| **Parameter** | **Monthly Average** |
|---|---|
| Biochemical Oxygen Demand (BOD) | 300 mg/L |
| Total Suspended Solids (TSS) | 300 mg/L |
| Ammonia Nitrogen (NH3) | 40 mg/L |
| Phosphorus | 13 mg/L |

The discharge of wastewater from the facility shall not exceed an average monthly flow of 450,000 gallons per day or a peak maximum daily flow of 700,000 gallons per day.