Complaint Exhibit 1

# Exhibit 1, Part 3 of 3

Attachments M & O to Notice of Intent to Sue

Complaint Exhibit 1

# ATTACHMENT M

Complaint Exhibit 1

# PENN TOWNSHIP WATEWATER TREATMENT PLANT
# INDUSTRIAL WASTEWATER DISCHARGE PERMIT
# PERMIT NO. **2016-4**

## ISSUED TO: **HANOVER FOODS CORPORATION**

Pursuant to 40CFR Part 403.3 (t) (1) (ii) the above mentioned Industry is considered a Significant Industrial User.

Effluent limitations and monitoring requirements for discharge.

      A. During the Period beginning 01-01-2016 and lasting through 12-31-2020 the permittee is authorized to discharge industrial wastewater from the facility as identified in this permit.

The following limitations and monitoring requirements as outlined in this permit shall apply to said industrial wastewater discharge.

The quality of effluent shall be limited at all times as specified in this permit and shall conform to all wastewater discharge limitations as set forth in the Ordinances adopted by Penn Township pertaining to any use of the wastewater system.

Hanover Foods Corporation

MONITORING SCHEDULE          Complaint Exhibit 1

Laboratory analysis shall be performed on the following parameters and monitored as described below:

| PARAMETER | FREQUENCY | SAMPLE TYPE |
|---|---|---|
| BOD | 1/Week | 24/C |
| TSS | 1/Week | 24/C |
| Ammonia Nitrogen | 1/Week | 24/C |
| Phosphorus | 1/Week | 24/C |
| pH | 1/Week | Grab |
| Oil and Grease | 2/Annually | Grab |
| Copper | 2/Annually | 24/C |
| Lead | 2/Annually | 24/C |
| Mercury | 2/Annually | 24/C |
| Silver | 2/Annually | 24/C |
| Zinc | 2/Annually | 24/C |

All samples collection containers, preservation techniques, holding times and test procedures shall be in accordance with 40CFR Part 136.

Samples shall be collected at the sampling location as designated on the flow schematic and identified as sample location #001.  Samples shall be stored in a refrigerated automatic sampling device unless otherwise approved by the Township.  All sampling equipment shall be cleaned and maintained on a routine schedule by the Permittee to the reasonable satisfaction of the Township.  Path to sampler and sampler shall be kept clear at all times to insure safe access and efficient operation.  The sample device and location shall be approved by the Township.

Sampling shall be conducted by the Township in lieu of Industrial user self monitoring but shall be at the expense of the Industrial user.

For each measurement or sample taken pursuant to the requirements of this permit, the Permittee shall record the following information:

1)      The exact place, date, time of sampling and whom took the sample.

2)      The dates the analyses were performed.

3)      The person(s) who performed the analyses.

4)      The analytical techniques or methods used.

5)      The results of all analyses.

6)      Daily flow for period sampled.

Complaint Exhibit 1

Analysis shall be performed by an independent commercial laboratory. The results of **ANY** samples collected at the designated sampling location and analyzed in accordance with 40CFR part 136 shall be forwarded by the laboratory performing the analysis to the Township **WITHIN 3 WEEKS** of the sampling date.

Discharge Monitoring Reports must be sent to the Township at the following address:

> Penn Township
> 20 Wayne Avenue
> Hanover, PA  17331

If sampling performed by an Industrial user indicates a violation, the user shall notify the POTW within 24 hours of becoming aware of the violation, and repeat the sampling and analysis and submit the results within 30 days after becoming aware of the violation. [403.12(g)(2)]

All Industrial user reports must be signed by a proper industrial representative and contain the certification statement found in 40 CFR part 403.6(a)(2)(ii)[403.12(1)]

All Industrial Users shall as required by 40 CFR 403.12(j) notify the POTW in advance of any substantial change in the volume or character of pollutants in the discharge. "Substantial" refers to  +/- 20 percent. All Industrial Users shall notify the POTW as required in 40 CFR part 403.12(p) if it discharges into the POTW a substance which, if otherwise disposed of, would be a hazardous waste under 40 CFR part 261. All Industrial Users are also required per 40CFR 403.12(f) to notify the POTW immediately of all discharges that could cause problems to the POTW, including slug loading by the Industrial User.

All sampling data reported by the Industrial user must be representative of conditions occurring during the reporting period. [403.12(g)(3)]

The Township reserves the right to adjust the frequency of monitoring or to require additional testing of the industrial discharge, if unreported violations are suspected, or for the screening of suspect pollutants.

The Township can perform random sampling and analysis of the Industrial Users waste discharge to compare to the analysis submitted to the Township by the discharger.  The Township shall use the average of the analysis, if possible to calculate a surcharge, whereas if there is a difference of 15% plus or minus in the analysis, the highest result will be used in the calculation.

Permittee may be required to install and keep operational a metering device to measure the effluent flow on a twenty-four hour basis, the meter shall incorporate a chart recorder.  Such a device shall be placed in a location as to monitor the flow from the wastewater treatment facility.  The flow meter shall be calibrated on a 6 month basis with verification of accuracy provided by the calibrator with a copy sent to the Township.  Permittee shall insure that during all sampling the flow is recorded at the time of sampling and during the entire sampling period.

Permittee will make available to Penn Township the following items: (If not already provided)

> A.  An updated sketch of the location of all wastewater effluent lines that flow into the publicly owned sewer system.

3

B. A detailed description and appropriate sketches of pretreatment facilities, including operating data. The sketch, of which will become a permanent part of this permit, shall show the sampling point.

C. An access key to the sampler and area where the sampler is located unless area and sampler will be accessible on a twenty-four hour basis.

Permittee will submit to Penn Township, in the form of a Semi-Annual report the following information structured in a spreadsheet format.

A. The results of every sample taken and analyzed at the designated sampling location for all parameters during the report period. The minimum, maximum and average values of all parameters. Daily average flow and total flow (gallons) discharged to the Township WWTP

B. Number of production days if applicable.

C. Any intentional or unintentional discharge violations occurring during the calendar year.

D. A brief description of any planned operational changes that may affect the industrial discharge characteristics.

This report must be submitted to the Township no later than July 15th and January 15th of each year. The last report of the year ending must include a compilation of the previous (6) months of that year.

## EMERGENCY NOTIFICATION AND REPORTS

In the case of a spill or slug discharge, or any discharge that may cause potential problems for the POTW, it is the responsibility of the user to immediately telephone and notify the Pretreatment Coordinator of the incident. The notification shall include location of discharge, type of waste, concentration and volume, and corrective actions taken by the user.

Within five (5) days following such discharge, the user shall, unless waived by the Pretreatment Coordinator, submit a detailed written report describing the cause of the discharge and the measures to be taken by the user to mitigate and prevent any expense, loss, damage, or other liability which may be incurred as a result of damage to the POTW or aquatic life or any other damages to person or property. Such report shall not relieve the user of any fines, civil penalties, or other liability which may be imposed by this article or other applicable law. This written report shall be signed by an authorized representative of the user.

4

A notice shall be permanently posted on the user's bulletin board or other prominent place advising employees whom to call in the event of a dangerous discharge. Employers shall insure that all employees who may cause such a dangerous discharge to occur, are advised of the emergency notification procedures.

## SPILLS & SLUG LOADINGS CONTROL PLAN

At least once every two (2) years, all significant industrial users are required to evaluate the need to develop a Spill and Slug Discharge Control Plan and submit the evaluation in writing to the Township. The Pretreatment Coordinator will determine whether the IU will be required to develop a spill and slug loading control plan. In addition, any user may be required to develop a plan. A plan must address the facilities to be provided and maintained at the user's expense to prevent spills or slug discharges of prohibited materials. Detailed plans showing these facilities and operating procedures to provide this protection shall be submitted to the Pretreatment Coordinator for review and approval by the Township before construction may begin. A spill and slug loading control plan shall address, at a minimum, the following:

   A.  Description of discharge practices, including nonroutine batch discharges;

   B.  Description of stored chemicals;

   C.  Procedures for immediately notifying the Township of any spill or slug discharge, as required by Section 4.6.8 of the Townships Pretreatment ordinance.

   D.  Procedures to prevent adverse impact from any spill or slug discharge. Such procedures include, but are not limited to, inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site runoff, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants, and/or measures and equipment for emergency response.

**Treatment Upsets**

For the purposes of this Section, "upset" means an exceptional incident in which there is unintentional and temporary noncompliance with Categorical Standards because of factors beyond the reasonable control of the user. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

An upset shall constitute an affirmative defense to an action brought for noncompliance with Categorical Standards if the requirements below are met. A user who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

   a.  An upset occurred and the user can identify the cause(s) of the upset;

5

b. The facility was at the time being operated in a prudent and professional manner and in compliance with applicable operation and maintenance procedures; Complaint Exhibit 1

c. The user has submitted the following information to the Pretreatment Coordinator within 24 hours of becoming aware of the upset (if this information is provided orally, a written submission must be provided within five (5) days.

   1. A description of the indirect discharge and cause of noncompliance;

   2. The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and

   3. Steps being taken and/or planned to reduce, eliminate and prevent recurrence of the noncompliance.

In any enforcement proceeding, the user seeking to establish the occurrence of an upset shall have the burden of proof. A user will have the opportunity for a judicial determination on any claim of upset only in an enforcement action brought for noncompliance with Categorical Standards.

The user shall control production of all discharges to the extent necessary to maintain compliance with Categorical Standards upon reduction, loss or failure of its treatment facility until the facility is restored or an alternative method of treatment is provided. This requirement applies in the situation where, among other things, the primary source of power of the treatment facility is reduced, lost or fails.

## 7.2 Treatment Bypasses

Bypass means the intentional diversion of wastestreams from any portion of an industrial user's treatment facility.

A user may allow a bypass to occur which does not cause pretreatment standards or requirements to be violated, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the conditions contained in this section.

If a user knows in advance of the need for a bypass, it shall submit prior notice to the pretreatment coordinator, if possible at least ten days before the date of the bypass.

A user shall submit oral notice of an unanticipated bypass that exceeds applicable pretreatment standards to the PC within 24 hours from the time the industrial user becomes aware of the bypass. A written submission shall also be provided within 5 days of the time the industrial user becomes aware of the bypass. The written submission shall contain a description of the bypass and its cause; the duration of the bypass, including exact dates and times, and, if the bypass has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass. The Township may waive the written report on a case-by-case basis if the oral report has been received within 24 hours.

Bypass is prohibited, and the Township may take enforcement action against a user, unless all of the following conditions are met:

6

a. The bypass is unavoidable to prevent loss of life, personal injury, or severe property damage, which is defined as substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production;

Complaint Exhibit 1

b. There is no feasible alternative to the bypass, including the use of auxiliary treatment or retention of the wastewater, or maintenance during normal periods of equipment downtime;

This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance; and

c. The user properly notifies the Pretreatment Coordinator as described in this section.

The Township may approve an anticipated bypass, after considering its adverse effects, if the Township determines that it will meet the three conditions listed above.


## MANAGEMENT REQUIREMENTS

A. <u>Change in Discharge</u>

All discharges authorized herein shall be consistent with terms and conditions of this permit. The discharge of any pollutant more frequently than, or at a level in excess of, that identified and authorized by this permit shall constitute a violation of the terms and conditions of this permit. Such a violation shall result in the imposition of penalties as provided for in the Township Ordinances and the Penn Township Code. Facility changes that increase the discharge must be reported to the Township 45 days prior to change, and this permit then will be modified or re-issued to reflect such changes. Any anticipated change in the facility discharge must be reported to the permitting authority.


B. <u>Permit Modification</u>

After notice and opportunity of a hearing, this permit may be modified, suspended, or revoked in whole or in part during its term for causes including, but not limited to, the following:

1) Violation of any terms or conditions of this permit.

2) Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts.

3) A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

4) Information newly-acquired by Penn Township.

5) A change in applicable water quality standards or treatment requirements.

6)  Any changes in State or Federal regulations or changes in the treatment process that require either a temporary or permanent reduction or elimination of the permitted discharge.

Complaint Exhibit 1

C.  Right of Entry

The Permittee shall allow the Township and/or its authorized representatives, upon the presentation of credentials:

1)  To enter upon the Permittee's premises where an effluent source is located or in which any records are required to be kept under the terms and conditions of this permit.

2)  To have access to and copy at reasonable times any records required to be kept under the terms and conditions of this permit.

3)  To inspect at reasonable times any monitoring equipment or monitoring method required in this permit.

4)  To sample any discharge of pollutants.

D.  Property Rights

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property, invasion of personal rights, or any infringement of Federal, State, or local laws or regulations, nor does it authorize or approve the construction of any on-shore or off-shore physical structures or facilities or the undertaking of any work in any navigable waters.

E.  Availability of Reports

Except for data determined to be confidential, all required reports shall be available for public inspection at the Penn Township Wastewater Treatment Facility.

F.  Facility Operation and Quality Control

All waste collection, control, treatment and disposal facilities shall be operated in a manner consistent with the following:

1)  At all times, all facilities shall be operated as efficiently as possible in a manner which will minimize upsets and discharges of excessive pollutants.

2)  The Permittee shall provide an adequate operating staff which is fully qualified to carry out the operation, maintenance and testing functions required to insure compliance with the conditions of this permit.

3) Permittee shall notify Penn Township immediately of any planned or unplanned discharge of waste of a strength or character unusual for the Permittee or in violation of the permit.

Complaint Exhibit 1

G. <u>Civil and Criminal Liability</u>

Nothing in this permit shall be construed to relieve the Permittee from civil or criminal penalties for non-compliance.

**Administrative Fines**

Any Industrial User who is found to have violated, or continues to violate, any pretreatment standard or requirement, any provision, and the orders, rules, regulations, and permits issued hereunder, may be fined by the Pretreatment Coordinator an amount not to exceed Twenty-Five Thousand Dollars ($25,000.00) for each violation. Each day on which a violation shall occur or continue shall be deemed a separate and distinct offense. In the case of monthly or other long term average discharge limit violations, fines shall be assessed for each day during the period of violation.

**Civil Penalties**

Any Industrial User who has violated or continues to violate the orders, rules, regulations, and permits issued hereunder, shall be liable to the Township for a civil penalty of not more than Twenty-Five Thousand Dollars ($25,000.00) plus actual damages incurred by the Township per violation per day as the violation continues. In the case of a monthly or other long term average discharge limit, penalties shall accrue for each day during the period of the violation.

**Criminal Penalties**

In addition to any other remedies for non-compliance set forth by Township ordinance, or under any federal or state law or regulation, the Township shall have the right to institute criminal prosecution for violation of any provision of this permit. Procedures to be filed and penalties imposed as a result of such criminal proceedings shall be as permitted or required by law for the violation of Township ordinance generally, and penalties imposed as a result of conviction of violation of this permit shall be those penalties provided in the Code of Penn Township, providing for a fine of $1,000.00 or, upon default of payment of such fine, imprisonment for not more than thirty (30) days.

H. <u>Solids Disposal</u>

Collected screenings, slurries, sludges, and other solids shall be disposed of in accordance with local, State and Federal law.

I. <u>Permit Transfer</u>

Wastewater discharge permits are issued to a specific user for a specific operation. A wastewater discharge permit shall not be reassigned, transferred or sold to a new owner, new user, different premises, or a new or changed operation without written approval of the Pretreatment Coordinator.

The Permittee must give at least (30) days advance notice to the Pretreatment Coordinator. The notice to the Pretreatment Coordinator must include a written notarized certification by the new owner or operator which:

1) States that the new owner and/or operator has no immediate intent to change the facility's operations or processes;

2) Identifies the specific date on which the transfer is to occur; and acknowledges full responsibility for complying with the existing permit.

Failure to provide advance notice of a transfer renders the wastewater discharge permit void as of the date of the facility transfer.

J.  Severability

The provisions of the permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, and the remainder of this permit, shall not be affected thereby.

This permit does not relieve the Permittee of any limits or requirements of local, State or Federal Law. Where such law may impose more stringent requirements or additional requirements then these shall be part of the permit whether stated or not.

K.  Records Retention

All records and information resulting from the monitoring activities required by this permit, including all records and analyses performed and calibration and maintenance of instrumentation and recordings from continuous monitoring instrumentation, shall be retained on site for a minimum of three (3) years.

## DEFINITIONS

1) <u>Average Monthly Flow</u> - The arithmetic mean of daily flow measurements taken during a calendar month.

2) <u>"Monthly Average"</u> - effluent concentration means the arithmetic average of all the daily determinations of concentration made during a calendar month.  When grab samples are used, the determination of the concentration shall be the arithmetic average of all the samples collected during that calendar month.

3) <u>"Weekly Average"</u> - effluent concentration means the arithmetic average of all the daily determinations of concentration made during a calendar week.  When grab samples are used, the weekly determination of concentration shall be the arithmetic average of all samples collected during that calendar week.

4) <u>"Instantaneous Maximum"</u> - concentration means the concentration not to be exceeded at any time in grab sample.

5) <u>"Grab Sample"</u> - An individual sample collected in less than 15 minutes.

6) <u>"Daily Maximum Limitations"</u>  - The maximum allowable discharge of pollutants during a 24 hour period.  Where daily maximum limitations are expressed in units of mass, the daily discharge is the total mass discharged over the course of the day.  Where daily maximum limitations are expressed in terms of a concentration, the daily discharge is the arithmetic average measurement of the pollutant concentration derived from all measurements taken that day.

Pollutants included in TTO'S                          Complaint Exhibit 1

acenaphthene                              1,2-trans-dichloroethylene
acrolein                                      2,4-dichlorophenol
acrylonitrile                                 1,2-dichloropropane
benzene                                       1,2-dichloropropylene
benzidine                                     (1.3-dichloropropene)
carbon tetrachloride                      2,4-dimethylphenol
chlorobenzene                             2,4-dinitrotoluene
1,2,4-trichlorobenzene                    2,6-dinitrotoluene
hexachlorobenzene                         1,2-diphenylhydrazine
1,2-dichloroethane                        ethylbenzene
1,1,1-trichloroethane                     fluoranthene
hexachloroethane                          4-chlorophenyl phenyl ether
1,1-dichloroethane                        4-bromophenyl phenyl ether
1,1,2-trichloroethane                     bis(2-chlorisopropyl) ether
1,1,2,2-tetrachloroethane                 bis (2-chloroethoxy) methane
chloroethane                              methlylen chloride
bis (2-chloroethyl) ether                 (dichloromethane) methl chlorid
2-chloroethyl vinyl ether (mixed)         (chloromethane)
2-chloronaphthalene                   methyl bromide (bromomethane)
2,4,6-trichlorophenol                 bromoform (tribromomethane)
parachlorometa cresol                 dichlorobromethane
chloroform (trichloromethane)             chlorodibromomethane
2-chlorophenol                            hexachlorobutadiene
1,2-dichlorobeneze                        hexachlorovyvlopentadiene
1,3-dichlorobenzene                   isphorne
1,4-dichlorobenzene                   naphthalene
3,3-dichlorobenzidine                 nitrobenzene
1,1-dichloroethylene                  nitrophenol
4-nitrophenol                         vinyl chloride (chloroethylene)
2,4-dinitrophenol                         aldrin
4,6-dinitro-o-cresol                      dieldrin
N-nitrosodimethylamine                    chlordane (technical mixture &
N-nitrosodiphenylamine                    metabolites)
N-nitrosodi-n-propylamine                 4,4'-DDT
pentachlorophenol                         4,4'-DDE (p,p'-DDX)
phenol                                4,4'-DDE (p,p'-TDE)

12

bis (2-ethylhexyl) phthalate
butyl benzyl phthalate
di-n-butyl phthalate
di-n-octyl phthalate
diethyl phthalate
dimethyl phthalate
benzo (a) anthracene
(1,2-benzanthracene)
benzo (a) pyrene
(3,4-benzopyrene) 3,4-benzofluoranthene
benzo (k) fluranthane
(11,12-benzofluranthene)
chrysene
acenaphthylene
anthracene
benzo (ghi) perylene
(1,12-benzoperylene)
fluorene
phenanthrene
dibenzo (a,h) anthracene
dibenzanthracene)
indeno (1,2,3-cd) pyrene
(2,3-o-phenylenepyrene)
pyrene
tetrachloroethylene
toluene
trichloroethylene

Alpha-endosulfan
Beta-endosulfan
        endosulfan sulfate
        endrin
        endrin aldehyde
        heptachlor
heptachlor epoxide
Alpha-BHC
        Beta-BHC
Gamma-BHC (lindane)
Delta-BHC
        PCB-1242 (Arochlor 1242)
        PCB-1254 (Arochlor 1254)
        PCB-1221 (Arochlor 1221)
        PCB-1232 (Arochlor 1232)
PCB-1248 (Arochlor 1248)
PCB-1260 (Arochlor 1260)
        PCB-1016 (Arochlor 1016)
toxaphene
        2,3,7,8-tetrachlorodibenzo-p-dioxin (1,2,5,6-
(TCDD)

Complaint Exhibit 1

GENERAL DISCHARGE PROHIBITIONS

No user may contribute or cause to be contributed the following substances into the POTW:   Complaint Exhibit 1

A. Any liquids, solids, or gases which by reason of their nature or quantity are, or may be sufficient either alone or by interaction with other substances to cause fire or explosion, or be injurious in any other way to the POTW or to the operation of the POTW, including, but not limited to, waste streams with a closed cup flashpoint of less than 140 degrees F (60 degrees C) using the test methods specified in 40 CFR 261.21. At no time shall two (2) successive readings on an explosion hazard meter at the point of discharge into the system (or at any point in the system) be more than five percent (5%), nor any single reading over ten percent (10%) of the Lower Explosive Limit (LEL) of the meter.

Prohibited materials include, but are not limited to: gasoline, kerosene, naphtha, benzene, toluene, xylene, ethers, alcohols, ketones, aldehydes, peroxides, chlorates, perchlorates, bromates, carbides, hydrides and sulfides, and any other substances which is a fire or a hazard to the system.

B. Pollutants which may cause corrosive structural damage to the POTW. The wastewater pH shall not be less than 5.0 nor more than 11.0 in the user's discharge to the POTW.

C. Solids greater than one-half inch (1/2") in any dimension, or any solid or viscous substance which may cause obstruction to the flow in the POTW resulting in interference.

Prohibited materials include, but are limited to: garbage, offal, manure, ashes, cinders, spent lime, stone or marble dust, metal, glass, straw, shavings, grass clippings, rags, spent grains and hops, waste paper, wood, plastics, gas, tar, asphalt residues, residues from refining or processing of fuel or lubricating oil, mud glass grinding or polishing wastes.

D. Any pollutants, including oxygen demanding pollutants (BOD5, etc.) released at a flow rate and/or pollutant concentration which cause interference to the POTW. In no case shall a wasteload have a flow rate or contain concentrations or qualities of pollutants that exceed for any time period longer than 15 minutes, more than five (5) times the average 24-hour concentration, quantities, or flow during normal operation, unless otherwise authorized in writing by the Pretreatment Coordinator.

E. Any wastewater having a temperature which will inhibit biological activity in the Township's treatment plant resulting in interference, but in no case wastewater which causes the temperature at the introduction into the POTW to exceed 104 degrees F (40 degrees C).

F. Petroleum oil, nonbiodegradable cutting oil, or products of mineral origin in amounts that will cause interference or pass through.

G. Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quality that may cause acute worker health and safety problems.

H. Hauled or trucked waste unless authorized by the Pretreatment Coordinator and only at designated discharge points.

14

Complaint Exhibit 1

I.  Any noxious or malodorous liquid, gases, or solids, which either singly or by interaction with other wastes are sufficient to create a public nuisance or hazard to life, or are sufficient to prevent entry into the sewers for maintenance or repair.

J.  Any wastewater which imparts color which cannot be removed by the treatment process such as, but not limited to, dye wastes and vegetable tanning solutions, which consequently impart color to the treatment plant's effluent, thereby violating the Township's NPDES Permit, color (in combination with turbidity) shall not cause the treatment plant effluent to reduce the depth of the compensation point for photosynthetic activity by more than ten percent (10%) from the seasonably established norm for aquatic life.

K.  Any wastewater containing any radioactive wastes or isotopes of such half-life or concentration except in compliance with applicable State or Federal regulations.

L.  Storm water, surface, ground water, artesian well water, roof runoff, subsurface drainage, swimming pool drainage, noncontact cooling water, condensate, unpolluted industrial or nonresidential process water, unless specifically authorized in writing by the Pretreatment Coordinator.

The discharge of cooling water from air conditioning units with cooling towers or recirculating systems or from air conditioning units using flow-through or unrecirculating systems is prohibited.  The sanitary sewers are not designed to handle the cooling water volumes produced by air conditioning units. Cooling water, free from bacteria and harmful chemicals should be drained into storm sewers in accordance with State and federal requirements.

M.  Any residue, including biosolids, chemical sludges or screenings from the pretreatment of industrial wastes.

N.  Medical wastes, except as specifically authorized by the Pretreatment Coordinator in a wastewater discharge permit.

O.  Any wastewater containing pollutants in sufficient quality which, either singly or by interaction with other pollutants may create a toxic effect in the receiving waters of the POTW, cause the plant effluent to fail a toxicity test, or exceeds the limitations set forth in a National Categorical Pretreatment Standard.  A toxic pollutant shall include, but not limited to, any pollutant identified pursuant to Section 307 (a) of the Clean Water Act.

P.  Detergents, surface-active agents, or other substances in sufficient quantities which causes excessive foaming in the POTW.

Q.  Any substance which may cause the POTW's effluent or any other product of the POTW, such as residues, sludges, or scums, to be unsuitable for reclamation or reuse, or interfere with the reclamation process.  In no case shall a substance discharged to the POTW cause the POTW to

15

Complaint Exhibit 1

be in noncompliance with sludge use or disposal criteria, guidelines or regulations developed under Section 405 of the Act; or any criteria, guidelines, or regulations affecting sludge use or disposal developed pursuant to the Solid Waste Disposal Act, the Clean Air Act, the Toxic Substance Control Act, or State criteria applicable to the sludge management method being used.

# HANOVER FOODS CORPORATION

## SPECIFIC

Complaint Exhibit 1

## DISCHARGE LIMITS

| Parameter | Daily Maximum Load in Pounds Per Day |
|---|---|
| BOD | 1500 |
| TSS | 4000 |
| Ammonia Nitrogen | 225 |
| Phosphorus | 115 |
| Oil & Grease | 400 |
| Copper | 1.0 |
| Lead | .09 |
| Mercury | .001 |
| Silver | .75 |
| Zinc | 2.0 |
| pH | 5.0 – 11.0 S.U. |

## SURCHARGE LIMITS

The following parameters shall be used to calculate a surcharge to your sewer bill if the limit exceeds those listed below.

| Parameter | Monthly Average |
|---|---|
| Biochemical Oxygen Demand (BOD) | 300 mg/L |
| Total Suspended Solids (TSS) | 300 mg/L |
| Ammonia Nitrogen (NH3) | 40 mg/L |
| Phosphorus | 13 mg/L |

The discharge of wastewater from the facility shall not exceed an average monthly flow of 450,000 gallons per day or a peak maximum daily flow of 700,000 gallons per day.

Complaint Exhibit 1

# ATTACHMENT O



Complaint Exhibit 1

July 23, 2019

RECEIVED

JUL 26 2019

Mr. Austen Randecker
Clean Water Program
DEP - SCRO
909 Elmerton Avenue, Harrisburg, PA 17110

DEP SOUTHCENTRAL OFFICE
CLEAN WATER PROGRAM

Dear Mr. Randecker,

As a follow-up to the letter received by the Department on July 9, 2019, attached are the responses:

UV system offline – maintenance had work done to remove algae clog in the influent line to the UV system and had shut off the UV train two weeks prior to the inspection. There was no flow on the day of the inspection. We have initiated a checklist to make sure facilities are online.

Annual storm water DMRs and inspection forms for 2016, 2017 and 2018 – We were under the impression that all DMRs are reported online and did not find means to report in Greenport. We collected samples from Outfalls 002 and 003 in 2016 but failed to report due to this reason. Samples were not collected in 2017 and 2018. We have initiated a procedure to collect storm water samples per the NPDES permit requirements and report by January 28 of each year.

Sincerely,

David K. Still
VP – Canning Operations
Hanover Foods Corporation